No. 23-5669

# In the United States Court of Appeals for the Sixth Circuit

KAYLA GORE, JAIME COMBS, L.G., and K.N.,

*Plaintiffs-Appellants*,

v.

WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Middle District of Tennessee (Nashville Division)
No. 3:19-cv-00328
Honorable Eli Richardson

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

John T. Winemiller
MERCHANT & GOULD P.C.
800 S. Gay Street, Ste. 2150
Knoxville, TN 37929
(865) 380-5960
jwinemiller@merchantgould.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiffs-Appellants*
(Additional counsel listed on signature block.)

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5669                    Case Name: Kayla Gore, et al. v. William Lee, et al.

Name of counsel:  Omar Gonzalez-Pagan

Pursuant to 6th Cir. R. 26.1, Kayla Gore
                                               *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ October 19, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Omar Gonzalez-Pagan

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5669 _____     Case Name: Kayla Gore, et al. v. William Lee, et al. ___

Name of counsel:  Omar Gonzalez-Pagan _____

Pursuant to 6th Cir. R. 26.1, Jaime Combs _____
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ October 19, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Omar Gonzalez-Pagan _____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5669          Case Name: Kayla Gore, et al. v. William Lee, et al.

Name of counsel: Omar Gonzalez-Pagan

Pursuant to 6th Cir. R. 26.1, L.G.
_Name of Party_
makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

    No

---

CERTIFICATE OF SERVICE

I certify that on _____ October 19, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Omar Gonzalez-Pagan

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5669     Case Name: Kayla Gore, et al. v. William Lee, et al.

Name of counsel: Omar Gonzalez-Pagan

Pursuant to 6th Cir. R. 26.1, K.N.
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ October 19, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Omar Gonzalez-Pagan

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

## TABLE OF CONTENTS

Table of Authorities .................................................................................... iii

Statement in Support of Oral Argument ................................................... xi

Statement of jurisdiction ................................................................................1

Statement of Issues...........................................................................................2

Introduction ........................................................................................................3

Statement of the Case.......................................................................................5

        A.    Sex and Gender Identity.............................................................5

        B.    The Importance of Accurate Birth Certificates.........................6

        C.    Plaintiffs' Experiences ................................................................9

        D.    Tennessee's Birth Certificate Policy.......................................10

        E.    District Court Proceedings........................................................13

Standard of Review..........................................................................................17

Summary of the Argument..............................................................................18

Argument............................................................................................................19

    I.    The District Court Failed to Construe the Pleadings in the Light Most Favorable to Plaintiffs................................................................19

        A.    The district court injected its own notions of sex contrary to those pleaded in Plaintiffs' Complaint. ...............................22

        B.    The district court erred by engaging in extraneous research and by exceeding its authority to take judicial notice of adjudicative facts. .......................................................27

    II.    The District Court Erred in Finding No Disparate Treatment Sufficient to State a Plausible Equal Protection Claim......................28

        A.    Plaintiffs pleaded sufficient facts to state a plausible claim that the Policy facially and intentionally discriminates against transgender persons.................................29

        B.    The Policy is subject to heightened scrutiny. ............................32

            1.    The Policy discriminates based on sex. .........................32

            2.    The Policy discriminates based on transgender status. ..........................................................................37

i

C.    Plaintiffs plausibly alleged that the Policy does not serve any important or compelling government interest...................41

III.    The District Court Erred in Finding No Right to Informational Privacy Sufficient to State a Plausible Substantive Due Process Claim ................................................................................45

A.    The district court misapplied *Kallstrom* in rejecting Plaintiffs' informational privacy claim....................................45

B.    The district court misapplied *Bloch* to dismiss Plaintiffs' liberty interest in the privacy of their transgender status.........51

Conclusion ................................................................................57

Certificate of Compliance ........................................................59

Certificate of Service ...............................................................60

Addendum ............................................................................ A-1

Designation of Court Documents ................................ A-2

Statutory Provisions and Regulations...................... A-10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty*,
    57 F.4th 791 (11th Cir. 2022) (en banc) ............................................................33

*Arroyo González v. Rosselló Nevares*,
    305 F.Supp.3d 327 (D.P.R. 2018) ...................................................18, 42, 48, 54

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................19, 20, 21, 22

*Barber v. Overton*,
    496 F.3d 449 (6th Cir. 2007) ......................................................................47, 48

*Barnes v. City of Cincinnati*,
    401 F.3d 729 (6th Cir. 2005) ..............................................................................35

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
    208 F.Supp.3d 850 (S.D. Ohio 2016) .................................................................39

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................17, 19, 20, 21, 22

*Bloch v. Ribar*,
    156 F.3d 673 (6th Cir. 1998) .................................................................*passim*

*Bovee v. Coopers & Lybrand C.P.A.*,
    272 F.3d 356 (6th Cir. 2001) ......................................................................18, 21

*Bowen v. Gilliard*,
    483 U.S. 587 (1987)........................................................................................38, 40

*Bowman v. United States*,
    564 F.3d 765 (6th Cir. 2008) ..............................................................................42

*Brandt v. Rutledge*,
    47 F.4th 661 (8th Cir. 2022) ...............................................................................39

*Carter v. Stanton*,
    405 U.S. 669 (1972) (per curiam)................................................................24, 28

iii

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ...................................................................38

*Clinton v. Sec. Benefit Life Ins. Co.*,
  63 F.4th 1264 (10th Cir. 2023) ...........................................18

*Cooper Butt ex rel Q.T.R. v. Barr*,
  954 F.3d 901 (6th Cir. 2020) ...............................................17

*Corbitt v. Taylor*,
  513 F.Supp.3d 1309 (M.D. Ala. 2021) ........................42, 44

*Darnell v. Lloyd*,
  395 F.Supp. 1210 (D. Conn. 1975) ......................................54

*Déjà vu of Nashville v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*,
  274 F.3d 377 (6th Cir. 2001) ...............................................48

*Dekker v. Weida*,
  2023 WL 4102243 (N.D. Fla. June 21, 2023) ....................39

*Doe v. Blue Cross & Blue Shield of Rhode Island*,
  794 F.Supp. 72 (D.R.I. 1992) ...............................................53

*Eastwood v. Dep't of Corr. of State of Okl.*,
  846 F.2d 627 (10th Cir. 1988) .............................................51

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972) ...............................................................43

*El-Hallani v. Huntington Nat'l Bank*,
  623 F. App'x 730 (6th Cir. 2015) (unpub.) ......................22

*Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
  884 F.3d 560 (6th Cir. 2018),
  *aff'd sub nom. Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020) ........33, 36

*Evancho v. Pine-Richland Sch. Dist.*,
  237 F.Supp.3d 267 (W.D. Pa. 2017) ...................................39

*F.V. v. Barron*,
  286 F.Supp.3d 1131 (D. Idaho 2018) .......................18, 30, 39, 40, 42

*Fabian v. Hosp. of Cent. Conn.*,
  172 F.Supp.3d 509 (D. Conn. 2016)....................................................35

*Fain v. Crouch*,
  618 F.Supp.3d 313 (S.D.W. Va. 2022)..............................................37

*Fisher v. Univ. of Tex. at Austin*,
  570 U.S. 297 (2013)...........................................................................42

*Flack v. Wis. Dep't of Health Servs.*,
  328 F.Supp.3d 931 (W.D. Wis. 2018)................................................37

*Foster v. Andersen*,
  2019 WL 329548 (D. Kan. Jan. 25, 2019) ........................................48

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) .............................................33, 39, 41

*Hecox v. Little*,
  79 F.4th 1009 (9th Cir. 2023) ...........................................................34

*In Re Childers-Gray*,
  487 P.3d 96 (Utah 2021).....................................................................44

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019) .............................................................27

*Jones v. City of Cincinnati*,
  521 F.3d 555 (6th Cir. 2008) .............................................................17

*K.L. v. State Dept. of Admin., Div. of Motor Vehicles*,
  3 AN-11-05431-CI, 2012 WL 2685183
  (Alaska Super. Mar. 12, 2012)..............................................42, 44, 53

*Kallstrom v. City of Columbus*,
  136 F.3d 1055 (6th Cir. 1998) ..............................................16, 46, 48

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ...........................................................39

*Keys v. Humana, Inc.*,
  684 F.3d 605 (6th Cir. 2012) .............................................................22

*L.W. by & through Williams v. Skrmetti*,
    --- F.4th ---, 2023 WL 6321688 (6th Cir. Sept. 28, 2023)..........................*passim*

*LA All. for Hum. Rts. v. Cnty. of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021) ...............................................................28

*Lambert v. Hartman*,
    517 F.3d 433 (6th Cir. 2008) .......................................................52, 57

*Lautermilch v. Findlay City Schs.*,
    314 F.3d 271 (6th Cir. 2003) ...........................................................34

*Lawrence v. Texas*,
    539 U.S. 558 (2003).........................................................................36

*Lee v. City of Columbus*,
    636 F.3d 245 (6th Cir. 2011) ...........................................................53

*Love v. Johnson*,
    146 F.Supp.3d 848 (E.D. Mich. 2015) ...............................42, 44, 53

*Majestic Bldg. Maint., Inc. v. Huntington Bancshares, Inc.*,
    864 F.3d 455 (6th Cir. 2017) ...........................................................17

*Mangels v. Pena*,
    789 F.2d 836 (10th Cir. 1986) .........................................................51

*Marvaso v. Sanchez*,
    971 F.3d 599 (6th Cir. 2020) ...........................................................17

*Mathews v. Lucas*,
    427 U.S. 495 (1976).........................................................................40

*Mills v. Habluetzel*,
    456 U.S. 91 (1982)...........................................................................40

*Mississippi Univ. for Women v. Hogan*,
    458 U.S. 718 (1982).........................................................................42

*Morgan v. Church's Fried Chicken*,
    829 F.2d 10 (6th Cir. 1987) .............................................................27

vi

*Neitzke v. Williams*,
  490 U.S. 319 (1989) ........................................................................................21

*Nyquist v. Mauclet*,
  432 U.S. 1 (1977) ............................................................................................40

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) ........................................................................................33

*Plyler v. Doe*,
  457 U.S. 202 (1982) ........................................................................................38

*Powell v. Schriver*,
  175 F.3d 107 (2d Cir. 1999) ...............................................................48, 53, 54

*Ray v. Himes*,
  2019 WL 11791719 (S.D. Ohio Sept. 12, 2019) ...............................................18

*Ray v. McCloud*,
  507 F.Supp.3d 925 (S.D. Ohio 2020) ......................................................*passim*

*Rhodes v. R&L Carriers, Inc.*
  491 F. App'x 579 (6th Cir. 2012) ....................................................................22

*Scarbrough v. Morgan Cnty. Bd. of Educ.*,
  470 F.3d 250 (6th Cir. 2006) ....................................................................28, 29

*Schroer v. Billington*,
  424 F.Supp.2d 203 (D.D.C. 2006) ...................................................................36

*Schroer v. Billington*,
  577 F.Supp.2d 293 (D.D.C. 2008) ...................................................................36

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017) ..........................................................................................41

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2004) ...........................................................................35

*Soho Ocean Resort TRS, LLC v. Rutois*,
  2023 WL 242350 (11th Cir. Jan. 18, 2023) .....................................................18

*Sterling v. Borough of Minersville*,
   232 F.3d 190 (3d Cir. 2000) ...............................................................54

*Summe v. Kenton Cnty. Clerk's Office*,
   604 F.3d 257 (6th Cir. 2010) ...............................................................53

*Thompson v. Hebdon*,
   7 F.4th 811 (9th Cir. 2021) ..................................................................34

*Thorne v. City of El Segundo*,
   726 F.2d 459 (9th Cir. 1983) ...............................................................51

*Toomey v. Arizona*,
   2019 WL 7172144 (D. Ariz. Dec. 23, 2019) ......................................37

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ..........................................................................33

*United States v. Virginia*,
   518 U.S. 515 (1996) .................................................................32, 41, 42

*United States v. Westinghouse Elec. Corp.*,
   638 F.2d 570 (3d Cir. 1980) .................................................................52

*United States v. Windsor*,
   133 S. Ct. 2675 (2013) ..........................................................................32

*Webster v. Reprod. Health Servs.*,
   492 U.S. 490 (1989) ...............................................................................33

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) .............................................................39

*Windsor v. United States*,
   699 F.3d 169 (2d Cir. 2012) .....................................................38, 39, 40

*Zzyym v. Pompeo*,
   958 F.3d 1014 (10th Cir. 2020) ...........................................................36

**STATUTES AND REGULATIONS**

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1331 .......................................................................................1

28 U.S.C. § 1343 ...........................................................................................1

42 U.S.C. § 1983 ...........................................................................................1

Tenn. Code Ann. § 4-58-103(c)(2) ..............................................................7

Tenn. Code Ann. § 50-1-703(a)(1)(B) .........................................................7

Tenn. Code Ann. § 68-3-203 ......................................................................11

Tenn. Code Ann. § 68-3-203(d)......................................................12, 28, 37

Tenn. Code Ann. §§ 68-3-101 et seq. ...........................................................3

Tenn. Code Ann. § 68-3-311(b)(2) .............................................................10

Tenn. Comp. R. & Regs. 0450-01-.05 ..........................................................7

Tenn. Comp. R. & Regs. 0770-01-05-.13(2)(a) ...........................................7

Tenn. Comp. R. & Regs. 1200-07-01-.04....................................................43

Tenn. Comp. R. & Regs. 1200-07-01-.10.....................................11, 12, 43, 44

## RULES

Fed. R. App. P. 32(a)(5) ..............................................................................59

Fed. R. App. P. 32(a)(6) ..............................................................................59

Fed. R. App. P. 32(a)(7)(B) .........................................................................59

Fed. R. App. P. 32(f)....................................................................................59

Fed. R. Civ. P. 8(a)(2) .................................................................................17

Fed. R. Civ. P. 12(b)(6).........................................................................*passim*

## OTHER AUTHORITIES

ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*,
   https://www.aclu.org/legislative-attacks-on-lgbtq-rights (Oct. 14, 2023) .........40

Aya Gruber, *Sex Exceptionalism in Criminal Law*,
   75 Stan. L. Rev. 755 (2023)...............................................................56

Fed. Bureau of Investigation, Crime Data Explorer,
https://cde.ucr.cjis.gov/LATEST/webapp/# .......................................49

Howard M. Erichson, *What is the Difference Between a Conclusion and a Fact?*,
41 Cardozo L. Rev. 899 (2020) ........................................................25

Jasper Jackson, *Wikipedia Bans Daily Mail as 'Unreliable' Source*,
The Guardian (Feb. 8, 2017), https://tinyurl.com/wjttyutw ..............................27

Movement Advancement Project, *Under Fire: Banning Medical Care and Legal Recognition for Transgender People* (Sept. 2023),
https://www.mapresearch.org/file/MAP-2023-Under-Fire-Report-5.pdf ..........41

Press Release, Human Rights Campaign, FBI's Annual Crime Report —
Amid State of Emergency, Anti-LGBTQ+ Hate Crimes Hit Staggering
Record Highs (Oct. 16, 2023), https://tinyurl.com/3673e8nr;............................49

Scott Skinner-Thompson, *Outing Privacy*,
110 Nw. U. L. Rev. 159 (2015) ........................................................54

Tenn. Op. Att'y Gen. No. 14-70, 2014 WL 3700672 (July 16, 2014) ....................37

Tenn. Op. Att'y Gen. No. 88-43, 1988 WL 410159 (Feb. 29, 1988)......................37

Vital Records, *How Do I Get My Certificate Corrected?*, Tenn. Dep't of Health,
https://www.tn.gov/health/health-program-areas/vital-records/corrected-
certificate.html#Sex (accessed Oct. 14, 2023) ...................................................11

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs-Appellants respectfully request that this Court grant oral argument pursuant to Sixth Circuit Rule 34(a) and Federal Rule of Appellate Procedure 34(a)(1). The district court committed significant legal errors and reached several factual conclusions while applying an incorrect legal standard. Oral argument will assist the panel in wading through the important and complex issues presented in this case.

## <u>STATEMENT OF JURISDICTION</u>

The district court had subject-matter jurisdiction over the claims arising under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343.

This Court possesses jurisdiction under 28 U.S.C. § 1291.  On June 22, 2023, the district court granted Defendants' motion to dismiss Plaintiffs' amended complaint ("MTD") and entered judgment dismissing Plaintiffs' action.  Order, R.111, PageID#2667; Judgment, R.112, PageID#2668.  Plaintiffs timely appealed on July 20, 2023.  Notice of Appeal, R.113, PageID#2669-71.

## <u>STATEMENT OF ISSUES</u>

1.      Whether the district court erred by failing to construe the pleadings in a light most favorable to Plaintiffs and by assuming extraneous or incorrect facts not supported by the pleadings.

2.      Whether the district court erred in dismissing Plaintiffs' equal protection claim alleging that Tennessee's birth certificate policy discriminates against transgender people.

3.      Whether the district court erred in dismissing Plaintiffs' privacy claim where the birth certificate policy causes the disclosure of one's transgender status.

## **INTRODUCTION**

Birth certificates are critical and foundational identity documents. They are not mere records of historical facts or observations. They are used to prove identity in many circumstances, such as enrolling in school, seeking employment, or accessing government services. Pls.' Amended Complaint ("Complaint"), R.59, PageID#376. Indeed, Tennessee frequently requires the provision of birth certificates to prove *identity*. Pls.' Opposition to MTD ("MTD Opp'n"), R.71, PageID#918.

Notwithstanding their ubiquitous use as identity documents, Tennessee, through its Vital Records Act, Tenn. Code Ann. §§ 68-3-101 et seq., and state regulations promulgated thereunder, specifically prohibits transgender individuals from correcting the sex on their birth certificates to accurately reflect their sex and therefore their identity (the "Policy"). Complaint, R.59, PageID#389. It does so even though it permits corrections and updates to birth certificate records in many other circumstances, including correcting the recordation of a person's sex. *Id*.

Plaintiffs are four transgender women—Kayla Gore, Jaime Combs, L.G., and K.N.—born in Tennessee who wish to correct their birth certificates to accurately reflect their sex as female, consistent with their gender identity. *Id.*, Page ID#375-76. Because Tennessee's Policy prohibits them from doing so, they sued, alleging the Policy violates their rights under the Fourteenth Amendment.

More than three years after the completion of briefing on the motion to dismiss, the district court dismissed Plaintiffs' Complaint with prejudice because – in its view – birth certificates are not *current identity documents*, but are merely records of past historical observations.  Opinion, R.110, PageID#2624.  It reached this conclusion despite the plausibly alleged violations of Plaintiffs' constitutional rights to equal protection and privacy that other courts have recognized in identical contexts.  In so doing, the district court improperly applied the legal standard applicable to motions to dismiss, drew material inferences against Plaintiffs, relied on facts outside the pleadings, and imposed its own views contrary to the factual allegations in the Complaint.

The district court gravely erred.  Tennessee's Policy discriminates against transgender people because it deprives them of birth certificates that accurately reflect their sex and identity, which others are afforded.  The Policy also infringes upon their right to privacy because one's transgender status is highly personal and intimate information.

Because Plaintiffs plausibly alleged violations of their rights under the Fourteenth Amendment, this Court should reverse and remand.

## STATEMENT OF THE CASE

### A.    Sex and Gender Identity

A person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, *and gender identity*.  Complaint, R.59, PageID#381.  These characteristics may not always be in alignment.  *Id.*

The phrase "sex assigned at birth" refers to the sex recorded on a birth certificate at the time of birth.  *Id.*  Typically, a person is assigned a sex on their birth certificate solely based on the appearance of external genitalia at the time of birth.  *Id.*  Other sex-related characteristics (like chromosomal makeup or gender identity) are typically not assessed or considered at the time of birth.  *Id.*

Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex.  *Id.*  Every person has a gender identity.  *Id.*  There is medical consensus that gender identity is innate, has biological underpinnings, and is fixed at an early age.  *Id.*

For most people, their gender identity matches their sex assigned at birth.  *Id.*  Hence, utilizing external genitalia *as a proxy* to determine a person's sex is accurate in most, *but not all*, circumstances.  For transgender people, their gender identity diverges from their assigned sex at birth.  *Id.*  A transgender woman's sex is female

even though she was assigned the sex of male at birth. *Id.* For cisgender people, their gender identity aligns with their assigned sex at birth. *Id.*, PageID#382.

External reproductive organs are not determinative of a person's sex. *Id.* Rather, gender identity is the critical determinant of a person's sex. *Id.* This is true for transgender people, whose assigned sex and gender identity are not in typical alignment. *Id.* Gender identity and transgender status are thus inextricably linked to one's sex and are sex-related characteristics. *Id.*

Gender dysphoria is the clinically significant distress resulting from the incongruence between one's assigned sex and gender identity. *Id.* Without appropriate treatment, gender dysphoria can result in distress, anxiety, depression, self-harm, and suicidal ideation. *Id.* Social transition (i.e., living in a manner consistent with one's gender identity, rather than their sex assigned at birth) is a key aspect of treatment. *Id.*, PageID#383-84. The ability to access identity documents consistent with one's gender identity is important to social transition and necessary for a person's optimal health. *Id.* Depriving transgender people of birth certificates that match their gender identity harms their health and wellbeing. *Id.*, PageID#384-85.

**B.    The Importance of Accurate Birth Certificates**

Identity documents, and especially birth certificates, play a critical and ubiquitous role in modern life. They answer a fundamental question: who are you?

People rely on identity documents to prove to others that they are who they say they are.

A birth certificate is an essential government-issued document that serves as proof of one's identity. It is commonly used for many purposes, including proof of identity, age, and citizenship, and by many entities, including employers, government agencies, and financial, educational, and health care institutions. Complaint, R.59, PageID#385. It also serves as the foundation for other important identity documents like passports, driver's licenses, social security cards, and voter registration cards. *Id.*

Recognizing birth certificates are *current identity documents*, Tennessee *requires* their use as *proof of identity* in numerous contexts. MTD Opp'n, R.71, PageID#918. Tennesseans must produce birth certificates as a form of identification to obtain certain governmental benefits. *See, e.g.*, Tenn. Code Ann. § 4-58-103(c)(2) (food stamps); Tenn. Comp. R. & Regs. 0770-01-05-.13(2)(a) (housing assistance). Likewise, Tennessee employers must keep some proof of citizenship on file for their employees, which for most people is their birth certificate. *See* Tenn. Code Ann. § 50-1-703(a)(1)(B). And Tennesseans seeking licensure in several professional fields are required to provide a copy of their birth certificate. *See, e.g.*, Tenn. Comp. R. & Regs. 0450-01-.05.

Accordingly, transgender people—like all people—require access to identity documents, including birth certificates, that accurately reflect who they are. Complaint, R.59, PageID#385.  Yet the sex designation originally placed on a transgender person's birth certificate is inaccurate because it is based on visual assumptions about that person's sex made at the time of their birth, without taking into consideration relevant factors that determine a person's sex, including most importantly, gender identity.  *Id.*, PageID#386.  Tennessee's Policy deprives transgender people—*and only transgender people*—of the ability to have birth certificates that accurately reflect their sex, consistent with their gender identity.  *Id.*

Denying transgender people identity documents consistent with their gender identity causes significant harm.  Depriving transgender persons of birth certificates that accurately reflect their sex, consistent with their gender identity, forcibly discloses private and sensitive information about them in contexts where it would otherwise remain undisclosed.  *Id.*  As a result of being forced to use identification documents that are inconsistent with who they are, transgender persons experience high rates of discrimination, harassment, and violence.  *Id.*, PageID#386-87.  Inconsistent identity documents also undermine the goal of identity verification by causing others to question whether a transgender person is, in fact, the same person supposedly described on their birth certificate.  *Id.*, PageID#387.

### C.     Plaintiffs' Experiences

Plaintiffs are four transgender women born in Tennessee who seek to obtain birth certificates that accurately reflect their sex as female, consistent with their gender identity.  Complaint, R.59, PageID#391, 395, 399, 403.  Under the Policy, they are unable to do so.  The sex designation on their birth certificates incorrectly identifies them as male, which is inconsistent with their female gender identity and other identification documents.  *Id.*, PageID#393, 396-97, 400, 404.

Below are pictures of Plaintiffs Kayla Gore (left) and Jaime Combs (right):

 

*Id.*, PageID#391, 395.

Each Plaintiff has experienced first-hand the discrimination and hostility many transgender people experience when presenting identification that conflicts with their gender identity.  *Id.*, PageID#394, 397, 401, 404.

For example, Ms. Gore has had to present her birth certificate in the context of securing employment, which has directly led to her being "outed" as transgender

and being subjected to awkward, deeply personal, and invasive questions by prospective employers about her transgender status and transition. *Id.*, PageID#394.

Similarly, Ms. Combs has had to submit her birth certificate alongside her driver's license, forcing her to explain the discrepancy between the two forms of identification, subject herself to a physical examination, and disclose private medical information. *Id.*, PageID#397.

Likewise, presenting identification inconsistent with her gender identity has caused L.G.'s transgender status to be involuntarily disclosed, resulting in harassment and inappropriate, deeply invasive, and uncomfortable questions. *Id.*, PageID#401.

And questions about the incongruity between the sex listed on K.N.'s birth certificate and her gender identity have made K.N. uncomfortable and anxious. *Id.*, PageID#404-05.

### D.    Tennessee's Birth Certificate Policy

Tennessee's Vital Records Act provides that all birth certificates must include, inter alia, a newborn's date of birth, place of birth, sex, given name and surnames, and parents' names. *See, e.g.*, Tenn. Code Ann. § 68-3-311(b)(2); Complaint, R.59, PageID#388. It is the practice of Tennessee, for purposes of determining the sex designation on birth certificates, to rely solely on third-parties' observations of the

external genitalia of newborns.  *Id.*; Mem. MTD, R.66, PageID#814-15 & n.6; *see also* Defs.' Resp. to RFA, R.62-2, PageID#560.

Recognizing that information on birth certificates may sometimes be inaccurate or need updating, the Act, and the regulations promulgated and enforced by Defendants, permit the correction of errors and updates to birth certificate records.  *See* Tenn. Code Ann. § 68-3-203; Tenn. Comp. R. & Regs. 1200-07-01-.10.  According to Regulation 1200-07-01-.10 and the Office of Vital Records' public website, for example, the sex listed on a person's birth certificate may be corrected if the change is substantiated by a signed and notarized affidavit showing the full name, date of birth, the sex as it is shown on the certificate and the sex as it should be correctly listed, as well as documentary evidence showing the correct sex of the individual.  *See* Complaint, R.59, PageID#389.[1]

The corrections to the sex designation on a birth certificate permitted by Tennessee are not limited to clerical errors.[2]  Tennessee permits persons born with

---

[1] *See also* Vital Records, *How Do I Get My Certificate Corrected?*, Tenn. Dep't of Health, https://www.tn.gov/health/health-program-areas/vital-records/corrected-certificate.html#Sex (accessed Oct. 14, 2023) (also available at R.62-3, PageID#566).

[2] Going outside the pleadings, the district court drew an inference *against* Plaintiffs "that the original sex designation on a birth certificate can be changed if (but only if) documentary evidence establishes that the original sex designation for some reason (perhaps a clerical error) does not actually reflect the person's external genitalia at the time of birth."  Opinion, R.110, PageID#2596 n.6.  The court did so notwithstanding the extensive record below to the contrary.  *See* Lefler Tr., R.93-16,

ambiguous genitalia whose sex was recorded at birth as "unknown" to correct their sex designation later in life based on other sex characteristics, including gender identity. *See* Complaint, R.59, PageID#389 ("Defendants have promulgated rules and regulations permitting persons born in Tennessee the ability to correct the sex listed on a person's birth certificate in order to accurately identify the sex of such person"); *see also* Opinion, R.110, PageID#2630 n.42; Pls' Mot. Summ. J. ("MSJ") Reply, R.93, PageID#1392.

But "[t]he sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." Tenn. Code Ann. § 68-3-203(d). Defendants thus enforce a policy, custom, or practice that categorically prohibits Tennessee-born transgender persons from correcting the sex listed on their birth certificates to match their sex, consistent with their gender identity, regardless of what steps they have taken to live in a manner consistent with their gender identity. Complaint, R.59, PageID#389. This is the Policy challenged here.

Further, under Regulation 1200-07-01-.10(11)(a)(2), Tennessee typically requires drawing a single line through an item to be amended on a birth certificate, which Plaintiffs challenge as violative of the Fourteenth Amendment. Complaint, R.59, PageID#411.

---

PageID#2383:19-2386:21; Bishop Tr., R.93-10, PageID#2046:16-2050:21; Trabue Tr., R.93-8, PageID#1945:14-1948:8, 1951:2-15.

### E.    District Court Proceedings

Plaintiffs filed their original complaint on April 23, 2019, against the Governor and the Commissioner of the Tennessee Department of Health, in their official capacities, seeking declaratory and injunctive relief against Tennessee's Policy categorically prohibiting them, as transgender persons, from obtaining birth certificates that accurately reflect their sex, consistent with their gender identity. Original Complaint, R.1, PageID#1-43. Unopposed, Plaintiffs filed an amended complaint on March 3, 2020, adding a plaintiff (Jaime Combs) and removing a plaintiff previously dismissed by the Court. Complaint, R.59, PageID#375-417. In their Complaint, Plaintiffs allege that Tennessee's Policy violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the Free Speech Clause of the First Amendment. *Id.*, PageID#407-14.

Plaintiffs moved for summary judgment. MSJ & Mem., R.60-61, PageID#418-57. And Defendants moved to dismiss. MTD & Mem., R.65-66, PageID#800-25.

On June 22, 2023, more than three years after the dispositive motions were fully briefed, the district court issued its decision on the motion to dismiss. Opinion, R.110, PageID#2596-666. Pursuant to its opinion, the court dismissed Plaintiffs' claims with prejudice (without any opportunity to amend) and entered a final judgment. Order, R.111, PageID#2667; Judgment, R.112, PageID#2668.

The court "relie[d] on facts not set forth in the Amended Complaint" and "observations of the Court that are not quite of the 'factual' type potentially subject to judicial notice" but that in its view "are valid as of a matter of common sense." Opinion, R.110, PageID#2594 n.2. Going outside the Complaint, the court reframed the Policy by "observ[ing]" that Tennessee birth certificates classify not based on sex per se but rather "based on—and only on—external genitalia at the time of birth," which the district court calls "sex (based on birth appearance)." *Id.*, PageID#2601, 2608. Contrary to the allegations in the Complaint and the extensive record with which it was familiar, the court found that a "birth certificate does not purport to say in any way what a person's 'sex' is at any point after birth, and that its purported statement about 'sex' at the time of birth is in reality a statement only about external genitalia." *Id.*, PageID#2634. "[N]othing more, nothing less." *Id.*, PageID#2630 n.42.

Having made such *factual determinations* outside the pleadings, the court addressed Plaintiffs' claims.

With respect to equal protection, the court determined that for Plaintiffs' claim to succeed, "the Court must find plausible Plaintiffs' contention that the birth certificate's sex designation for a transgender person is 'incorrect.'" *Id.*, PageID#2614. Based on its observations noted above, the court repeatedly rejected "Plaintiffs' . . . view that the sex designation on a transgender person's birth

certificate is 'incorrect' if it reflects that person's sex at the time of birth rather than his or her current gender identity." *Id.*, PageID#2617 (alternation in original) (citation omitted).

The court ultimately dismissed Plaintiffs' equal protection claim based on its determination that Plaintiffs had purportedly failed to allege disparate treatment because, in its view, a Tennessee birth certificate does not communicate a person's sex in terms of identity but rather "a Tennessee birth certificate is intended to reflect only circumstances (as it happens, the person's external genitalia) *at the time of birth*." *Id.*, PageID#2633. In so doing, the court equated "[a] Tennessee birth certificate ha[ving] a blank space to fill in for the category denominated 'Sex,'" as is the case, with a birth certificate having a "space . . . for a category denominated 'External genitalia,' and was to be completed with either a 'P' (instead of 'male') or a 'V' (instead of 'female') based . . . on external genitalia." *Id.*, PageID#2636.

With respect to due process, Plaintiffs alleged that the Policy violates their right to privacy in two ways. First, Plaintiffs claimed that the Policy violated their "right to privacy by causing disclosure of their transgender status and by depriving them of significant control over the circumstances around such disclosure." Complaint, R.59, PageID#411. Second, Plaintiffs alleged that the Policy unduly interferes with their right to decisional privacy/personal autonomy because it interferes with the "deeply personal . . . decision[] by transgender persons to live

consistent with their gender identity—which is rooted in their constitutionally-protected rights to liberty and autonomy—and to disclose their transgender status to others."  MTD Opp'n, R.71, PageID#922; Complaint, R.59, PageID#412-13.

Citing this Court's decision in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), the court determined that Plaintiffs did not allege a recognizable right to informational privacy because "*Kallstrom* requires more than the existence of *some risk or possibility* of bodily harm resulting from disclosure."  Opinion, R.110, PageID#2641-42.  The court further rejected the possibility of a liberty interest under *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), reasoning that transgender identity, although it may be personal, is neither sexual nor humiliating. Opinion, R.110, PageID#2645.

Further addressing Plaintiffs' informational privacy argument, the court determined that Plaintiffs failed to identify "a particular *personal choice* that is supposedly infringed by the Birth Certificate Policy or Tennessee birth certificates more generally."  *Id.*, PageID#2647.  The court determined that because Tennessee birth certificates disclose only an individual's sex at birth, rather than their gender identity, the Policy does not disclose transgender status.  *Id.*, PageID#2649.

The court also dismissed Plaintiffs' decisional privacy and First Amendment claims.  *Id.*, PageID#2648, 2664.

16

On July 20, 2023, Plaintiffs timely filed their Notice of Appeal, seeking review of the district court's decision and order. Notice of Appeal, R.113, PageID#2669-71.

## STANDARD OF REVIEW

"This Court reviews de novo a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6)." *Cooper Butt ex rel Q.T.R. v. Barr*, 954 F.3d 901, 904 (6th Cir. 2020) (citing *Majestic Bldg. Maint., Inc. v. Huntington Bancshares, Inc.*, 864 F.3d 455, 458 (6th Cir. 2017)). A motion to dismiss is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

"[W]hen evaluating a complaint's sufficiency," courts must "accept its factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and only then determine whether those facts and inferences plausibly give rise to an entitlement to relief." *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). Hence, courts must "construe the complaint in the light most favorable to the plaintiff." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) (quotation omitted). To survive a motion to dismiss, therefore, a plaintiff need only "allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face." *Cooper Butt*, 954 F.3d at 904 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007)); *see also* Fed. R. Civ. P. 8(a)(2).

17

"There is a low bar for surviving a motion to dismiss, and a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (cleaned up); *see also Soho Ocean Resort TRS, LLC v. Rutois*, 2023 WL 242350, at *2 (11th Cir. Jan. 18, 2023) (same). "A court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001).

## SUMMARY OF THE ARGUMENT

Plaintiffs plausibly alleged that Tennessee's Policy barring them from obtaining accurate birth certificates reflecting their sex, consistent with their gender identity, violates their rights to equality and privacy guaranteed by the Fourteenth Amendment.  Reflecting the plausibility of Plaintiffs' claims, numerous courts have denied motions to dismiss or favorably decided similar or identical claims in other cases. *See*, *e.g.*, *Ray v. Himes*, 2019 WL 11791719 (S.D. Ohio Sept. 12, 2019); *see also Arroyo González v. Rosselló Nevares*, 305 F.Supp.3d 327, 329 (D.P.R. 2018); *F.V. v. Barron*, 286 F.Supp.3d 1131 (D. Idaho 2018).

The district court here, however, failed to accept Plaintiffs' factual allegations as true—as it was required to do—and drew inferences to Plaintiffs' detriment as opposed to in their favor, again as required.  In fact, the court looked outside the

Complaint and relied on questionable sources of online information after engaging in its own extraneous research.  By failing to apply the appropriate standard at the motion to dismiss stage, the district court gravely erred. This Court should reverse and remand for further proceedings.

And because the district court failed to apply the appropriate standard, this Court need not delve into the merits of Plaintiffs' claims.  It need only reverse the dismissal and instruct the district court to apply the proper standard.   Indeed, Plaintiffs' equal protection and informational privacy claims are plausibly alleged.

## **ARGUMENT**

## I.    **The District Court Failed to Construe the Pleadings in the Light Most Favorable to Plaintiffs.**

The Complaint alleges plausible and well-pleaded facts to support each of the claims asserted.  Rather than accepting these facts as true and construing them in the light most favorable to Plaintiffs, the district court either ignored or rejected the facts as pleaded and instead inserted its own allegations and evidence, which Plaintiffs had no opportunity to challenge.  It then weighed these allegations and "evidence" under the guise of a plausibility analysis and dismissed the suit.

Rule 12(b)(6) requires that the facts supporting a plaintiff's claims to relief be not just possible but plausible.  *See Twombly*, 550 U.S. at 557.  A claim is plausible when the plaintiff alleges facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement.'" *Id.* Rather, "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* While a court may look to its own judicial experience and common sense to determine whether a claim is plausible, *id.* at 679, it must still accept factual allegations as true and draw all inferences in a plaintiff's favor.

The *Twombly* and *Iqbal* courts used their experience and common sense not to supplant the facts that were pleaded but to determine that those facts did not necessarily lead to the conclusions asserted by Plaintiffs. In *Twombly*, the fact that there was parallel activity, *taken as true*, did not necessarily mean the defendants colluded. 550 U.S. at 545-46. In *Iqbal*, the fact that many members of the same ethnic and religious group were subjected to the same treatment, *taken as true*, did not necessarily mean the defendant had discriminatory intent. 556 U.S. at 663.

That is not how the district court here used its "common sense." Rather, it introduced and relied on new "facts" it admitted were "not quite of the 'factual' type potentially subject to judicial notice," but justified this by saying it "believes that they are valid as a matter of common sense." Opinion, R.110, PageID#2594 n.2. It also added the requirement that, to be taken as true, a fact could not begin with "Plaintiffs allege," *id.*, mischaracterized facts as legal conclusions to avoid having to accept them, see, e.g., *id.* PageID#2616 n.30, and relied on sources such as *Yahoo News* and *The Daily Mail*, *id.*, PageID#2621-22.

That a court disagrees with alleged facts does not justify dismissal: "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, *on the assumption that all the allegations in the complaint are true (even if doubtful in fact).*" (emphasis added) (citations omitted); *Bovee*, 272 F.3d at 360. Once facts have been offered to support the allegations and arguments presented in a trial or summary judgment hearing, the court can decide whether it agrees with a plaintiff's position.

By inserting its own facts and dismissing the suit, the court was able to avoid confronting all of the evidence supporting Plaintiffs' claims and which directly contradicted its preconceived notions. And rather than deciding whether intermediate or strict scrutiny should apply, the court simply avoided applying any level of scrutiny beyond its "common sense." Plaintiffs were thus denied the opportunity to challenge the evidence used against them or to respond to the court's legal positions. Rule 12(b)(6) should not be used to bypass all required process.

To be sure, *Twombly* and *Iqbal* raised the bar for pleading a claim, but they do not require that the complaint, on its own, carry the entire burden of proof and persuasion. *See Twombly*, 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible

on its face.").  In fact, this Court has repeatedly cautioned against interpreting

*Twombly* and *Iqbal* as the "death of notice pleading."  *Keys v. Humana, Inc.*, 684

F.3d 605, 609 (6th Cir. 2012); *see also Rhodes v. R&L Carriers, Inc.* 491 F. App'x

579, 583 (6th Cir. 2012); *El-Hallani v. Huntington Nat'l Bank*, 623 F. App'x 730,

739 (6th Cir. 2015) (unpub.) (citation omitted) ("Although *Twombly* and *Iqbal* have

raised the bar for pleading, it is still low.").

## A.    The district court injected its own notions of sex contrary to those pleaded in Plaintiffs' Complaint.

The Complaint repeatedly asserts that a person's sex is more than their

external genitalia at birth.  For example:

> 21. A person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity.  These characteristics may not always be in alignment. . . .
>
> 23.  Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex. . . .
>
> 28.  External reproductive organs are not determinative of a person's sex.
>
> 29.  Gender identity is the critical determinant of a person's sex, including for transgender people whose sex-related characteristics are not in typical alignment. . . .
>
> 43. The various components associated with transition—social transition and gender confirming medical care—do not change a person's sex, but instead bring a person's physical appearance and lived experience into better alignment with their true sex, as determined by their gender identity. . . .

>    53. The gender marker originally placed on a transgender
>    person's birth certificate is inaccurate because it is based on visual
>    assumptions about the person's sex made at the time of their birth,
>    without taking into consideration relevant factors that determine
>    a person's sex, including most importantly, gender identity

Complaint, R.59, PageID#381-82, 384, 386. Each of these facts supports the proposition that "sex," which has multiple components, is determined by gender identity. The court was obligated to accept these facts as true. If it had, the case would have survived the dismissal stage, and Plaintiffs would have had the opportunity to prove these facts were true. In fact, *Plaintiffs did prove these facts to be true. See, e.g.*, Material Facts Reply, R.94, PageID#2452 (Fact 6: "External genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex."); *id.*, PageID#2453 (Fact 7: "When there is a divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation.").[3]

The district court acknowledged that one fact alleged in the Complaint is that "sex" is determined by gender identity. Opinion, R.110, PageID#2606. It nonetheless decided that this assertion is not plausible, and that "sex" for purposes of Tennessee birth certificates—the entire subject of this suit—means only "external genitalia at the time of birth." *Id.*, PageID#2608. This conclusion is based on:

---

[3] Plaintiffs do not cite the record evidence intending that it be considered on a motion to dismiss, but rather to show that, had the district court accepted the Complaint's factual allegations as true, they would have been able to prove said facts.

23

(1) semantic arguments about some of the phrasing in the Complaint, to the exclusion of the Complaint as a whole, *id.*, PageID#2604-08; (2) arguments in Defendants' motion to dismiss, *id.*, PageID#2606; (3) other parties' concession in an unrelated case for the sake of argument in that case, *id.*, PageID#2607; and (4) the fact stated in the Complaint that Tennessee's *typical practice* is to use the external genitalia of babies to determine "sex" on a birth certificate, *id.*, PageID#2608. But Defendants' arguments are not relevant to the determination of whether the Complaint states a claim upon which relief can be granted. Rule 12(b)(6) judges the Complaint on its face. *See Carter v. Stanton,* 405 U.S. 669, 671 (1972) (per curiam). Another party's concession in another case is also not relevant. And Plaintiffs' acknowledgement that external genitalia at birth is all Tennessee *typically* uses to determine sex at the time of birth cannot be construed as either approval of that practice or a concession that external genitalia alone determine a person's sex, particularly considering the Complaint in its entirety.

Although the district court expressly acknowledged Plaintiffs' factual allegation that "*a person's gender identity is their sex*," Opinion, R.110, PageID#2617, it declined to accept this "proposition as true" and deemed it "irrelevant" because, in the court's view (ignoring the Complaint), "Plaintiffs are using the word 'sex' to refer to something very different from the 'sex' here at issue, *i.e.*, sex (based on birth appearance)." *Id.* That sex is determined by gender identity

24

is not a legal conclusion; it is a fact.  *See generally* Howard M. Erichson, *What is the Difference Between a Conclusion and a Fact?*, 41 Cardozo L. Rev. 899 (2020).[4]  The district court was obliged to accept Plaintiffs' factual allegations as true or, at minimum, to consider the Complaint in the light most favorable to Plaintiffs.  On a motion to dismiss, the court was not free to reach its own conclusion about the meaning and relevance of the sex designation on a person's birth certificate, without regard to any evidence.

The court's error was not harmless.  The entire opinion turns on the court's assumption that "sex" for the purposes of Tennessee birth certificates means only external genitalia at birth.  *See, e.g.*, Opinion, R.110, PageID#2612-13 (stating that "Plaintiffs' entire equal protection claim . . . fails" because, "[i]n the Court's view," the proposition "that [Plaintiffs'] sex assigned at birth is not correct, based on a broad scientific and medical consensus that gender identity is determinative of one's sex," is "not plausible" and "not relevant"); *id.*, PageID#2614 ("Plaintiffs' entire theory of disparate treatment, and resulting equal protection claim, depends on the validity of the notion that the sex designation on a transgender person's birth certificate is

---

[4]  An example of a legal conclusion would be that Tennessee unlawfully discriminates against transgender people.  At most, the statement above is a factual conclusion, which a court is also not obligated to accept as true—except that here, the facts that support that conclusion were also asserted in the Complaint.  *See* Erichson at 906 ("The distinction [between conclusions and factual assertions] concerns factual assertions to be believed only if supported by other factual assertions."); *see also* Complaint, R.59, PageID#382, 384, 386.

*incorrect*."); *id.*, PageID#2595 n.4.  This dispositive issue was decided in direct contradiction to the facts as pleaded.  The district court was not free to disregard those facts because it did not believe or otherwise disagreed with them.

For example, the district court "disregard[ed] any role of chromosomes in placing persons in one or the other category of biological sex, because Plaintiffs allege that persons are categorized on (and for purposes of) Tennessee birth certificates based solely on external genitalia."  *Id.*, PageID#2602 n.12.  But this ignores Plaintiffs' factual allegations and draws inferences *against* them, instead of in their favor.  They alleged, "*[t]ypically*, a person is assigned a sex on their birth certificate solely based on the appearance of external genitalia at the time of birth."  Complaint, R.59, PageID#381 (emphasis added).  "Typically" does not mean "always" like the district court presumed while ignoring Plaintiffs' further allegation that "the State of Tennessee permits cisgender persons born in Tennessee to correct the sex listed on their birth certificates, but specifically prohibits transgender persons born in Tennessee from doing the same."  *Id.*, PageID#377.[5]

---

[5] The record supports Plaintiffs' allegations: "[T]he record evidence demonstrates Defendants permit other individuals, such as those born with ambiguous genitalia, to correct the sex designation of 'unknown' on their birth certificates *after the time of recordation*, based on sex-related characteristics *other than* external genitalia." MSJ Reply, R.93, PageID#1393.

**B.      The district court erred by engaging in extraneous research and by
exceeding its authority to take judicial notice of adjudicative facts.**

The district court erred by going outside the pleadings to take judicial notice

of, and consider, extraneous materials that purportedly undermined Plaintiffs'

allegations.

For example, in concluding that "[p]ersons certainly can have sex-change

surgery for reasons unrelated to being transgender," the court cited to sensationalistic

articles published by online tabloids and conservative outlets, namely, *Yahoo News*,

*New York Post*, and *The Daily Mail*.[6]  Opinion, R.110, PageID#2621-22.  Likewise,

it cited hate crimes statistics outside the Complaint.  *Id.*, PageID#2643.

The district court should not have considered or relied upon such material

outside the pleadings.  "[T]he district court was not free to conduct its own extra-

record research and then draw inferences from that research."  *In re U.S. Off. of Pers.*

*Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019).

It is also not proper material for judicial notice.  *See Morgan v. Church's Fried*

*Chicken*, 829 F.2d 10, 12 n.2 (6th Cir. 1987) ("We must deny plaintiff's request to

supplement the record to include a newspaper article and police report that were not

filed in the district court and strike plaintiff's references to these materials because

---

[6] The *Daily Mail* is such an unreliable source that even Wikipedia has banned it due
to its "reputation for poor fact checking, sensationalism and flat-out fabrication."
*See* Jasper Jackson, *Wikipedia Bans Daily Mail as 'Unreliable' Source*, The
Guardian (Feb. 8, 2017), https://tinyurl.com/wjttyutw.

a Rule 12(b)(6) motion is addressed to the face of the pleading." (citing *Carter v. Stanton*, 405 U.S. 669, 671 (1972) (per curiam))).

This was not harmless error. *See LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 957 (9th Cir. 2021) (in preliminary injunction context, district court "abused its discretion" when it "relied on its own independent research and cited material not subject to judicial notice").  Here, the district court relied on its extra-record research to find that "Tenn. Code Ann. § 68-3-203(d) does not apply only to transgender persons," Opinion, R.110, PageID#2621-22, and it relied on the hate crimes statistics to find that "the Amended Complaint does not allege the kind of case-specific, concrete risk of bodily harm that *Kallstrom* seems to require."  *Id.*, PageID#2642-43.

The district court should not have considered facts outside the Complaint based on its own research, nor should it have taken judicial notice of such facts.[7]

## II.    __The District Court Erred in Finding No Disparate Treatment Sufficient to State a Plausible Equal Protection Claim.__

The Equal Protection Clause "protects against invidious discrimination among similarly situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).  "The threshold element of an equal protection claim is disparate treatment; once disparate

---

[7] The court's research was also cursory, not even-handed, and failed to consider applicable peer-reviewed research.

treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Id.*

Plaintiffs pleaded sufficient facts to state a plausible equal protection claim.

## A.    Plaintiffs pleaded sufficient facts to state a plausible claim that the Policy facially and intentionally discriminates against transgender persons.

Plaintiffs alleged their sex assigned at birth is not correct, based on broad scientific and medical consensus that gender identity is determinative of one's sex, and that the assignment of sex at birth based solely on external genitalia is not accurate for transgender people. Complaint, R.59, PageID#381-82, 386. Indeed, transgender people are defined by the fact their sex assigned at birth was inaccurate. *Id.*, PageID#376. For transgender people, the sex designation on their birth certificates is inaccurate at the time of recordation. *Id.*, PageID#381-82.

The Policy treats transgender persons born in Tennessee differently from similarly situated cisgender persons because it prohibits *only* transgender persons, including Plaintiffs, from having birth certificates that accurately reflect their sex, consistent with their gender identity. *Id.*, PageID#389, 408. The Policy prohibits transgender persons—and only transgender persons—from correcting the incorrect sex marker on their birth certificates while allowing cisgender people to correct inaccurate sex markers on their birth certificates. Thus, the State recognizes the need

29

to correct inaccurate sex markers on birth certificates but chooses to single out transgender people for denial of that right.

While similar statutory regimes have been found to violate the Equal Protection Clause, *see*, *e.g.*, *Ray v. McCloud*, 507 F.Supp.3d 925, 935 (S.D. Ohio 2020); *F.V.*, 286 F.Supp.3d at 1141, the district court here found that Plaintiffs failed to allege disparate treatment.

The court determined that "Plaintiffs' entire equal protection claim (of transgender-status-based disparate treatment) fails because" it "depends fully on the plausibility and relevance of the proposition" that Plaintiffs' "sex assigned at birth is not correct, based on a broad scientific and medical consensus that gender identity is determinative of one's sex, and that the assignment of sex at birth based solely on external genitalia is not accurate for transgender people."  Opinion, R.110, PageID#2612-13 (citation omitted).  The court improperly rejected this proposition because it disagreed with it.  *See supra* Part I.

There can be no serious dispute that birth certificates classify based on sex, and Plaintiffs adequately alleged that the Policy causes disparate treatment.  First, the Policy "depriv[es] transgender people—and only transgender people—born in Tennessee of birth certificates that accurately reflect their sex and that are consistent with their gender identity."  Complaint, R.59, PageID#409.  Second, "the State of Tennessee permits cisgender persons born in Tennessee to correct the sex listed on

their birth certificates, but specifically prohibits transgender persons born in Tennessee from doing the same." *Id.*, PageID#377.

The district court dismissed the first argument based on its belief birth certificates do not reflect a person's sex, in terms of identity or otherwise, but rather are just "historical information … reflecting the person's sex (based on birth appearance)." Opinion, R.110, PageID#2616. This proposition is not only a contention outside the Complaint, but also demonstrably false. *See supra* note 6. It is inaccurate to say that a birth certificate is simply a dusty historical document. Indeed, consistent with the second disparate treatment argument, the record ultimately showed that individuals, such as those born with ambiguous genitalia, are permitted "to correct the sex designation of 'unknown' on their birth certificates *after the time of recordation*, based on sex-related characteristics *other than* external genitalia." MSJ Reply, R.93, PageID#1393. Thus, the district court improperly *disregarded* the allegation of disparate treatment in the Complaint and wrongly *assumed* no disparate treatment based on its own views of what sex means or how the Policy works.

In sum, the Policy deliberately creates a permanent underclass of people who are singled out and denied an accurate government-issued birth certificate based simply on their constitutionally protected personal characteristics. This second-class status cannot be squared with the basic dictates of the equal protection guarantee,

31

which "withdraws from [the] Government the power to degrade or demean" any person in the way the Policy does. *See United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013).

Because the district court's finding that Plaintiffs failed to sufficiently allege disparate treatment relied on an erroneous rejection of Plaintiffs' well-pleaded factual allegations, the dismissal of Plaintiffs' equal protection claim must be reversed, and the case should be remanded for evaluation in the first instance whether the Policy survives scrutiny in light of the evidence.

> **B.     The Policy is subject to heightened scrutiny.**

This Court need not delve into questions of the appropriate level of scrutiny applicable to Plaintiffs' equal protection claim or whether the Policy survives scrutiny in light of the evidence without giving the district court an opportunity to do so in the first instance. That said, for the sake of completeness, Plaintiffs set forth how the Policy is subject to heightened scrutiny because it discriminates based on sex and transgender status.

> *1.     The Policy discriminates based on sex.*

The Policy is subject to heightened scrutiny because it is a sex-based classification on its face. "[A]ll gender-based classifications … warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (quotations omitted). This is not an instance where sex merely "factors into a government decision," *L.W.*

*by & through Williams v. Skrmetti*, --- F.4th ---, 2023 WL 6321688, at \*16 (6th Cir.

Sept. 28, 2023), rather it is *the decision*.    "[T]he policy necessarily rests on a sex

classification."    *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir.

2020).    By its very terms, it classifies persons as "male" or "female."    It is in that

respect no different than the bathroom policies at issue in *Adams by & through

Kasper v. School Board of St. Johns County*, 57 F.4th 791, 803 (11th Cir. 2022) (en

banc), and *Grimm*.[8]

Additionally, "discrimination on the basis of transgender and transitioning

status is necessarily discrimination based on sex."    *Equal Emp. Opportunity Comm'n

v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018), *aff'd

sub nom. Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020).    True, this Court

recently stated that *Bostock*'s "text-driven reasoning applies only to Title VII."    *L.W.*,

---

[8] While Plaintiffs disagree with the Court's contention in *L.W.* that "[m]ere appearance of the words sex or gender in a law does not by itself require skeptical review under the Constitution," such contention is beside the point in a circumstance such as this one that literally classifies based on sex.    2023 WL 6321688, at \*16. Moreover, that the Supreme Court did not invalidate bans on marriage by same-sex couples as sex discrimination in *Obergefell v. Hodges*, 576 U.S. 644 (2015), says nothing on this point.    In reversing this Court, the Supreme Court held that "same-sex couples may exercise the fundamental right to marry in all States."    *Id.* at 681. Having reached such a conclusion, the Supreme Court did not need to reach the sex discrimination argument because "federal courts do not issue advisory opinions," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021), and typically "refrain[] from deciding constitutional questions where there is no need to do so," *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 495 (1989).

2023 WL 6321688, at *16.[9]  But the question here is not whether to import Title VII's standard to the equal protection clause,[10] but instead whether the specific policy at issue discriminates against Plaintiffs because they are transgender.  The answer is yes.  As other courts have found in the equal protection context, "discrimination on the basis of transgender status is a form of sex-based discrimination."  *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023).

The Policy discriminates based on sex in several ways.  First, the Policy, regardless of how sex is defined, prevents Plaintiffs from obtaining a birth certificate matching their female gender identity because they were assigned male at birth.  Had Ms. Gore, Ms. Combs, L.G., and K.N. been assigned female at birth, they would be able to have certificates matching their identity, which they could use to participate in society like everyone else without experiencing the harms detailed in the Complaint.  The district court's contention that "sex" excludes gender identity—in defiance of the Complaint's clear allegations and all scientific and medical understanding to the contrary, *see* Complaint, R.59, PageID#381-85—is not only

---

[9] Still, lower courts are "bound by more than just the express holding of a case," their decisions "must comport with the 'reasoning or theory,' not just the holding, of Supreme Court decisions."  *Thompson v. Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021).

[10] *But see Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003) ("[T]o prove a violation of the equal protection clause under § 1983, a plaintiff must prove the same elements as are required to establish a disparate treatment claim under Title VII." (cleaned up)).

34

wrong as a matter of fact and impermissible at the pleading stage, but futile.  In adopting the view that "sex" on a birth certificate merely refers to external genitalia, the district court lost sight that such observation does not relieve the government of justifying the harm that its sex-based classification causes to transgender people.

The Policy also rests on stereotypical notions about what it means to be male or female.  It is blackletter law that discrimination based on "sex" encompasses discrimination based on the failure to conform to sex stereotypes—not merely "biological sex."  This Court recognized this in *Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005), and *Smith v. City of Salem*, 378 F.3d 566, 573-75 (6th Cir. 2004).  Here, by forcing Plaintiffs to have identity documents inconsistent with their gender identity, the State enforces notions about how men or women should identify based on the appearance of their external genitalia.

Moreover, such discrimination "is not only discrimination because of maleness and discrimination because of femaleness," it also includes "discrimination because of the properties or characteristics by which individuals may be classified as male or female."  *Fabian v. Hosp. of Cent. Conn.*, 172 F.Supp.3d 509, 526 (D. Conn. 2016).  True, this case challenges preconceived notions that many may have about what sex means, but that is why Plaintiffs' claims should be permitted to proceed, so that they may be tested considering the *evidence*.

No one person can presume to know definitively that what they generally understand *now* is true and will forever be true. People thought the earth was flat, and yet it is round. People thought planet Earth was the center of the universe, and yet it orbits the Sun. That is because "times can blind us to certain truths." *Lawrence v. Texas*, 539 U.S. 558, 579 (2003). However, "later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Id.*

Here, the district court was of the view that one's sex can only mean what is observed of someone's genitalia at birth. That happens to be true for most people, because all their sex characteristics are in alignment. But we now know that is not the case for everyone. *See* Complaint, R.59, PageID#381; *see also Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020) (recognizing that while most people are male or female, "some people are neither," as in the case of an intersex person). Sex "is not a cut-and-dried matter of chromosomes" or external genitalia. *Schroer v. Billington*, 424 F.Supp.2d 203, 211 (D.D.C. 2006); Complaint, R.59, PageID#381. As this Court has recognized, "stereotypical notions of how sexual organs and gender identity ought to align" are inherent in discrimination against transgender people. *Harris Funeral Homes*, 884 F.3d at 576. This is also why discrimination based on gender transition, for instance, is based on sex, even if males and females are treated equally. *See Schroer v. Billington*, 577 F.Supp.2d 293, 306 (D.D.C. 2008).

36

2.    *The Policy discriminates based on transgender status.*

The Policy is also subject to heighted scrutiny because it discriminates against transgender persons, a quasi-suspect class.

The statute that undergirds the Policy states, "The sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." Tenn. Code Ann. § 68-3-203(d).  But only transgender people obtain such a surgery (known as gender-affirming surgery).  *See Fain v. Crouch*, 618 F.Supp.3d 313, 327 (S.D.W. Va. 2022); *Toomey v. Arizona*, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019); *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 950 (W.D. Wis. 2018).  Moreover, the Policy clearly prohibits all transgender people, including those who have not received gender confirming surgery, from obtaining accurate birth certificates because there is no alternative method for transgender people who have not had "sex change surgery" to correct a birth certificate.[11]    Because this classification is enshrined in statute, it is not accidental or inadvertent, but targeted and deliberate.

---

[11] The State interprets and applies § 68-3-203(d) to apply to all transgender people regardless of what steps they have taken to live in accordance with their gender identity.  *See, e.g.*, Tenn. Op. Att'y Gen. No. 14-70, 2014 WL 3700672 (July 16, 2014) (requiring sex designation on police booking sheets, warrants, and other court records to match birth certificate in accordance with § 68-3-203(d), regardless of gender-confirming surgery); Tenn. Op. Att'y Gen. No. 88-43, 1988 WL 410159 (Feb. 29, 1988) (person's sex is determined at birth, pursuant to § 68-3-203(d), for purposes of obtaining Tennessee marriage license).

Furthermore, all indicia counseling in favor of the application of heightened scrutiny are present here. Heightened scrutiny is required where the government targets a class that (1) has been historically "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985); (3) has "obvious, immutable, ***or distinguishing characteristics*** that define them as a discrete group," *Gilliard*, 483 U.S. at 602 (emphasis added); and (4) is "a minority or politically powerless," *id.*; *see also Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (cleaned up). Not all considerations need point toward heightened scrutiny, and the first two alone may be dispositive. *See Plyler v. Doe*, 457 U.S. 202, 216 & n.14 (1982).

Although this Court in *L.W.*, in a preliminary injunction context, applied rational basis to such classifications, it did so because "neither the Supreme Court nor this Court has recognized transgender status as a suspect class." 2023 WL 6321688, at *18. "But the lack of binding precedent does not require this Court to only apply rational basis review, nor does it prevent this Court from relying on well-reasoned opinions of non-binding courts to inform its opinion here." *Ray*, 507 F.Supp.3d at 938.

Transgender people meet all the hallmarks of a quasi-suspect classification. Indeed, most courts that have considered the question, including the Fourth and

Ninth Circuits, have found transgender persons constitute a quasi-suspect class for purposes of the Equal Protection Clause. *See, e.g.*, *Grimm*, 972 F.3d at 608; *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019); *Dekker v. Weida*, 2023 WL 4102243, at *12-13 (N.D. Fla. June 21, 2023); *Ray*, 507 F.Supp.3d at 937; *F.V.*, 286 F.Supp.3d at 1145 *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp.3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F.Supp.3d 850, 873 (S.D. Ohio 2016); *cf. Brandt v. Rutledge*, 47 F.4th 661, 670 n.4 (8th Cir. 2022).

"There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *see also Grimm*, 972 F.3d at 612. This longstanding discrimination is unrelated to transgender people's value to society. *See Grimm*, 972 F.3d at 612. Because "[i]mmutability and lack of political power are not strictly necessary factors to identify a suspect class," *Windsor*, 699 F.3d at 181, these first two factors alone can be dispositive. The last two factors also favor Plaintiffs.

While the Court in *L.W.* observed that being transgender "is not necessarily immutable," 2023 WL 6321688, at *18,[12] such observation misses the mark. "No

---

[12] *But see* Complaint, R.59, PageID#381 ("[G]ender identity is innate, has biological underpinnings … , and is fixed at an early age. As such, efforts to change a person's gender identity are unethical and harmful ….").

'obvious badge' is necessary." *Windsor*, 699 F.3d at 183 (quoting *Mathews v. Lucas*, 427 U.S. 495, 506 (1976)). This third factor is not limited to immutability. "[T]he test is broader," *id.*, as it also includes whether individuals exhibit "distinguishing characteristics that define them as a discrete group." *Gilliard*, 483 U.S. at 602.[13] Such is the case here, where transgender people are easily a distinguishable and discrete group in the legal context.

Finally, "transgender people are unarguably a politically vulnerable minority." *F.V.*, 286 F.Supp.3d at 1145. Yes, the Court in *L.W.* observed (in dicta) that transgender people are not a politically powerless group largely because some states and large law firms appeared as *amici* in their favor in that case. 2023 WL 6321688, at *19.[14] But the notion that "it is difficult to maintain that the democratic process remains broken on this issue today," *id.*, is as untenable as it is fanciful. Just this year alone, over 500 anti-LGBTQ laws have been proposed in state legislatures, and over 84 of them have become law.[15] These laws, among other things, prohibit the mention of transgender people in schools, ban or restrict the provision or

---

[13]   Illegitimacy and alienage are quasi-suspect or suspect classifications notwithstanding that they are not immutable. *See Mills v. Habluetzel*, 456 U.S. 91, 98-99 (1982); *Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977).

[14]  As the Court should be aware, that "Title VII [] protects transgender individuals in the employment setting," *L.W.*, 2023 WL 6321688, at *19, was achieved through court intervention, not the political process.

[15]  ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*, https://www.aclu.org/legislative-attacks-on-lgbtq-rights (Oct. 14, 2023).

coverage of gender-affirming medical care, prohibit transgender people from accessing sex-designated facilities in a manner consistent with their gender identity, and, as here, prohibit transgender people from obtaining identity documents consistent with their gender identity. *Id.*; *see also Grimm*, 972 F.3d at 612. "[T]hese attacks are part of a much larger, coordinated effort to erase transgender people entirely."[16] It cannot therefore be stated, with any seriousness, that transgender people are not a politically powerless group, *particularly today*.

Accordingly, discrimination based on an individual's transgender status triggers heightened scrutiny.

### C.    Plaintiffs plausibly alleged that the Policy does not serve any important or compelling government interest.

Because the Policy impermissibly discriminates against Plaintiffs based on sex and transgender status, the Policy is subject to heightened or at least intermediate scrutiny. To survive intermediate scrutiny, Defendants must show that the Policy serves "important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (cleaned up); *see also Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017) (same). To survive strict scrutiny, Defendants must show that the Policy is

---

[16] Movement Advancement Project, *Under Fire: Banning Medical Care and Legal Recognition for Transgender People* (Sept. 2023), https://www.mapresearch.org/file/MAP-2023-Under-Fire-Report-5.pdf.

"narrowly tailored to advance a compelling governmental interest." *Bowman v. United States*, 564 F.3d 765, 772 (6th Cir. 2008). The burden of justification under both intermediate and strict scrutiny "is demanding and . . . rests entirely on the State." *Virginia*, 518 U.S. at 533 (1996); *see also Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982); *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 309 (2013) (strict scrutiny).

Plaintiffs plausibly alleged the Policy does not serve any legitimate, important, or compelling interest sufficient to survive any level of scrutiny. Complaint, R.59, PageID#389-91, 410. Moreover, Defendants' justifications below in defense of the Policy fail to demonstrate that the Policy serves a legitimate, important, or compelling interest, or that the discriminatory means employed by the Policy are substantially related to the achievement of an important government objective or are narrowly tailored.

Several courts have held policies barring transgender people from obtaining identity documents that match their gender identity lack any adequate governmental justification. *See, e.g.*, *Corbitt v. Taylor*, 513 F.Supp.3d 1309, 1323 (M.D. Ala. 2021); *Arroyo Gonzalez*, 305 F.Supp.3d at 333; *F.V.*, 286 F.Supp.3d at 1142; *Love v. Johnson*, 146 F.Supp.3d 848, 856 (E.D. Mich. 2015); *K.L. v. State Dept. of Admin., Div. of Motor Vehicles*, 3 AN-11-05431-CI, 2012 WL 2685183, at *7 (Alaska Super. Mar. 12, 2012). A court recently concluded that Ohio's similar birth certificate

policy failed under either strict or intermediate scrutiny where the defendants asserted that (1) "the accuracy of Ohio's birth certificate records is a substantial interest of the State," and (2) Ohio had an interest in preventing fraud. *Ray*, 507 F.Supp.3d at 939.

Like defendants in *Ray*, Defendants here (1) asserted an interest in the accuracy of birth certificates and preparing related vital statistic reports, and (2) contended that birth certificates are merely records of past events, not current identification documents. Both arguments fail.

First, Defendants fail to explain how the interest in the accuracy of birth certificates and preparing related vital statistic reports[17] is furthered by refusing to allow transgender people to correct the sex listed on their birth certificate when Tennessee allows other amendments to birth certificates, including but not limited to name changes, Tenn. Comp. R. & Regs. 1200-07-01-.10, changes to the parents listed on a birth certificate after an adoption, Tenn. Comp. R. & Regs. 1200-07-01-.04, and the sex listed on the birth certificates of people with ambiguous genitalia. Tellingly, the fact these amendments are allowed to correct for information that has changed or has been discovered after the "moment in time" of birth demonstrates there is no rational basis for the Policy with respect to sex. *See Eisenstadt v. Baird*,

---

[17] Even assuming Defendants require information about a person's sex assigned at birth for reports, such information may be kept under seal without requiring transgender people to possess and use inaccurate birth certificates.

405 U.S. 438, 449 (1972) (no rational basis where law was "riddled with exceptions"); *see also Ray*, 507 F.Supp.3d at 938.

Moreover, the Policy as applied to transgender persons undermines the goal of accurate birth certificates because it forces transgender people to have inaccurate documents.  As alleged, "denying transgender persons accurate birth certificates, consistent with their gender identity, undermines rather than serves the purpose of verifying that a transgender person is, in fact, the same person reflected on that person's birth certificate."  Complaint, R.59, PageID#387.  Multiple courts have concluded as much.  *See Corbitt*, 513 F.Supp.3d at 1323; *Love*, 146 F.Supp.3d at 856-57 (government's refusal to correct gender markers on driver's licenses "undermines Defendant's interest in accurately identifying Plaintiffs"); *In Re Childers-Gray*, 487 P.3d 96, 108 n.19 (Utah 2021) (depriving transgender people of identity documents matching their gender identity creates confusion and "obviate[s] the very purpose of legal identification"); *K.L.*, 2012 WL 2685183, at *7.

Second, Defendants (and the district court) attempt to cast birth certificates as mere relics of past events, and not current identification documents.  But that is belied by Tennessee's regulation allowing cisgender people to correct errors on their birth certificates (including sex), or to update the name or the parentage of a person.  *See* Tenn. Comp. R. & Regs. 1200-07-01-.10.  Moreover, this argument ignores Plaintiffs' well-pleaded allegations.  *See supra* Part I.

44

In sum, Plaintiffs sufficiently pleaded that the Policy does not rationally serve any interest, and the justifications raised below by Defendants fail.

Plaintiffs adequately pleaded an equal protection claim.

## III.  The District Court Erred in Finding No Right to Informational Privacy Sufficient to State a Plausible Substantive Due Process Claim

The District Court's analysis of Plaintiffs' informational privacy claims—both with respect to the possibility of bodily harm under *Kallstrom* and disclosure of sexual, personal, or humiliating information under *Bloch*—suffers several errors.

### A.    The district court misapplied *Kallstrom* in rejecting Plaintiffs' informational privacy claim.

The district court dismissed Plaintiffs' informational privacy claim based on a threat of violence or physical harm because it found that: (1) the threat to Plaintiffs was not sufficiently particularized, and (2) transgender people need to suffer *more* hate crimes before they are entitled to constitutional protection.  In making these findings, the court failed to construe the Complaint in a light most favorable to Plaintiffs and misinterpreted *Kallstrom* to "require[] more than the existence of *some risk or possibility* of bodily harm resulting from disclosure" of Plaintiffs' transgender status. Opinion, R.110, PageID#2642.

The Complaint generally alleges that "[a] person's transgender status (and medical diagnosis of gender dysphoria) constitutes deeply personal and sensitive information over which a transgender person has a reasonable expectation of

privacy, and the disclosure of which can jeopardize a person's safety and risk bodily harm." Complaint, R.59, Page ID#386. Each Plaintiff further alleged they personally and individually fear violence and physical harm as a result of having to present a birth certificate that conflicts with their gender identity. *Id.*, PageID#393, 397, 401, 404.

These fears are informed by Plaintiffs' personal and individual "aware[ness] of the high incidence of violence and harassment directed at transgender persons." *Id.*, PageID#394, 398, 402, 405. Plaintiffs also referred to a 2015 national survey (the "U.S. Trans Survey") that found "nearly one third of respondents who had shown an identification document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted." *Id.*, PageID#387. These well-pleaded factual allegations, which the district court was required to accept as true, *see supra* Part I, sufficiently state a violation of the same constitutional privacy right this Court recognized in *Kallstrom*.

In *Kallstrom*, this Court found that undercover police officers had an informational privacy right precluding the disclosure of their identities to attorneys for gang members against whom the officers had testified, based on the "substantial risk" that disclosure of such information may trigger retaliation against the officers. 136 F.3d at 1063-64. Here, the district court seemed to accept Defendants' argument

46

that *Kallstrom*'s right to informational privacy is "limited to circumstances where the information disclosed was particularly sensitive and the persons to whom it was disclosed were particularly dangerous *vis-à-vis the plaintiffs*." Mem. Mot. to Dismiss, R.66, PageID#817 (quoting *Barber v. Overton*, 496 F.3d 449, 456 (6th Cir. 2007)); Opinion, R.110, PageID#2642-44.   But *Barber* does not support such a cramped reading of *Kallstrom*.

In *Barber*, this Court declined to extend privacy protections to corrections officers when their names, social security numbers, and dates of birth were disclosed to prisoners who thereafter used the information to harass and threaten the officers and their families.   496 F.3d at 456-57.   The Court based its decision on: (1) the ability of prisoners to achieve the same harassment and threats of violence using publicly available information; (2) a lack of "clear animosity" such as that "apparent in *Kallstrom* where the plaintiffs had gone undercover, infiltrated a violent gang, and testified against them at trial"; and (3) a general deference to "the states or the legislative process" for privacy interests that do not rise to a "constitutional dimension, so as to require balancing government action against individual privacy." *Id*. (quotations omitted).[18]

_____

[18] In fact, *Barber* does not establish Defendants' contention, which the district court adopted, that *Kallstrom* requires "more than the existence of *some risk or possibility* of bodily harm resulting from disclosure."   Opinion, R.110, PageID#2642.   The panel that heard *Barber* was fractured, each member authoring an opinion.   The

47

These same factors are not present here. But for Tennessee's Policy, Plaintiffs control the circumstances surrounding the disclosure of their transgender status, which unlike the information at issue in *Barber*, would generally be unascertainable through other publicly available information. *See* Complaint, R.59, PageID#386. As numerous courts have held, a person's transgender status is particularly private, intimate personal information. *See*, *e.g.*, *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999); *Foster v. Andersen*, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019); *Arroyo Gonzalez*, 305 F.Supp.3d at 333.

Plaintiffs also sufficiently alleged a "clear animosity" against transgender people, *see* Complaint, R.59, PageID#387-405, that creates "a very real threat to [Plaintiffs'] personal security and bodily integrity, and possibly their lives." *Kallstrom*, 136 F.3d at 1063. That those hostile to transgender persons do not belong to a readily identifiable organization, like a gang, does not diminish Plaintiffs' informational privacy rights. *See*, *e.g.*, *Déjà vu of Nashville v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 274 F.3d 377, 394-95 (6th Cir. 2001)

---

majority opinion held that in that case "the threat of retaliation [was not] apparent enough to warrant constitutional protection." *Barber*, 496 F.3d at 456. In her concurrence, Judge Cook noted the question in *Kallstrom* was the role played by the government "in increasing the risk of violence/harm." *Id.* at 460 (Cook, J., concurring). In his partial dissent, Judge Cole opined that "it is difficult to see how this case does not involve a violation of the same constitutional right that we described in *Kallstrom*," noting that Judge Cook implicitly suggested the same. *Id.*, at 461 (Cole, J., concurring in part and dissenting in part).

(applying *Kallstrom*'s reasoning to find that, due to risks of harassment and physical violence, sexually oriented business license and permit applicants' names and residential addresses constitute protected private information exempted from Tennessee's Open Records Act).

Separate and apart from its misapplication of *Kallstrom*, the district court also declared that, while "[h]ate crimes certainly do occur in this country," *more* hate crimes must be visited upon transgender people to give them a privacy interest in their transgender status.  Opinion, R. 110, PageID#2643-44.  This remarkable conclusion has no basis in law.  *See supra* Part I.  It is also based on faulty math. *See infra* note 18.

The district court ignored the 2015 U.S. Trans Survey, reasoning that the study "adds very little, in the view of the Court" because (1) it "conveys no information at all about how many assaults were suffered by transgender persons, or when any such assaults occurred" and (2) "it is indisputable that the frequency of attacks against transgender persons in or before 2015 . . . is by no means necessarily indicative of the frequency of such attacks today, given changing societal attitudes about transgender persons."  Opinion, R.110, PageID#2642-43.[19]  The district court

---

[19] If anything, the rates of violence, harassment, and hate crimes against transgender people are **higher today**.  Reported hate crimes based on gender identity increased by 32.9% in the last year (and from the FBI statistics considered by the district court). *See* Press Release, Human Rights Campaign, FBI's Annual Crime Report — Amid

49

offered no evidence to support these "beliefs" and, regardless, violated the basic requirement that courts construe pleadings in the light most favorable to Plaintiffs—not ignore them entirely based on unsubstantiated, extraneous "beliefs."

Based on its unsubstantiated belief that the likelihood of harm to transgender people is not "obvious," the court further erred by going outside the Complaint to rely on 2021 Federal Bureau of Investigations crime data statistics to calculate its own "likelihood of anti-transgender bias."[20]  It then went on to conclude that the "data does not reflect that in any one year . . . the heinous act of anti-transgender crime is statistically at all likely to be visited upon any particular Plaintiff."  Opinion, R.110, PageID#2643-44.  In doing so, the district court not only strayed from the *Iqbal/Twombly* standard, but also exceeded its authority to take judicial notice of adjudicative facts.  *See supra* Part I.

---

State of Emergency, Anti-LGBTQ+ Hate Crimes Hit Staggering Record Highs (Oct. 16, 2023), https://tinyurl.com/3673e8nr; *see also* Fed. Bureau of Investigation, Crime Data Explorer, https://cde.ucr.cjis.gov/LATEST/webapp/# (accessed Oct. 17, 2023).

[20] The district court's math is wrong.  It compared the number of anti-transgender hate crimes against the *entire* U.S. population.  But assuming such calculation were proper, the correct comparison would be to the population of transgender people. There are only approximately 1.4 million transgender adults in the United States. Williams Inst. Report, R.62-10, PageID#631.  Because the district court used a population 216 times larger than the transgender population, the "likelihood of anti-transgender bias" is much higher than the court's estimate.

**B.    The district court misapplied *Bloch* to dismiss Plaintiffs' liberty interest in the privacy of their transgender status.**

The right to not have one's transgender status "outed" would meet this Court's threshold of legitimate informational privacy, yet the district court's one-paragraph analysis applied a standard that departs from this Court's precedents. "Our sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood." *Bloch*, 156 F.3d at 685. Because public disclosure of such information "exposes an aspect of our lives that we regard as highly personal and private[,] … information regarding private sexual matters warrants constitutional protection against public dissemination." *Id.*

Abiding by these principles, this Court in *Bloch* found a fundamental right to informational privacy in preventing government officials from disseminating intimate details of a rape. In doing so, the court referred to various sister-circuit decisions that emphasized the highly personal, intimate nature of "sexual matters." *See id.* at 685-86.

Importantly, those decisions discuss "sexual matters" beyond sexual preferences or activities. *See id.* at 685 (collecting cases); *Eastwood v. Dep't of Corr. of State of Okl.*, 846 F.2d 627, 631 (10th Cir. 1988) ("personal sexual matters" concerning sexual history); *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986) ("aspect of personal identity which, under prevailing precedent, is entitled to constitutional protection"); *Thorne v. City of El Segundo*, 726 F.2d 459, 462, 468-

51

69 (9th Cir. 1983) ("personal sexual matters," including pregnancy/miscarriage history and sexual history); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) ("Information about one's body and state of health"). Hence, the rationale that animated *Bloch* assessed whether the information at issue would constitute "sexual matters" of "intimate nature which define significant portions of our personhood" that would be considered "highly personal and private." *See Bloch*, 156 F.3d at 685.

This Court's decision in *Lambert v. Hartman*, 517 F.3d 433 (6th Cir. 2008), reaffirmed the "clear principles" outlined in *Bloch*. True, *Lambert* paraphrased *Bloch*'s reasoning as one that found a right to informational privacy "where the information released was of a sexual, personal, and humiliating nature." *Id.* at 440. But far from articulating a more restrictive construction of *Bloch*, the Court in *Lambert* merely rejected the plaintiff's proposition that disclosure of her traffic citation rose to the level of governmental intrusion that *Bloch* found unconstitutional.

Indeed, after quoting from *Bloch* that "sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood," *Lambert*, 517 F.3d at 441 (quoting *Bloch*, 156 F.3d at 685), the Court identified a "clear principle emerging from *Bloch*": The "right to be free from governmental intrusion into matters touching on sexuality and family life" rises to the level of constitutional protection so that an intrusion of such right "would be to

52

strip away the very essence of [the plaintiff's] personhood." *Id.* (citing *Bloch*, 156 F.3d at 685).

The principles established in *Bloch* remain the governing law in this Circuit. *Summe v. Kenton County Clerk's Office* found the operative principle in *Bloch* to be "where the government intruded into matters touching on the plaintiff's sexuality and family life." 604 F.3d 257, 270-71 (6th Cir. 2010). Similarly, *Lee v. City of Columbus* found that the informational privacy concern must implicate "the interest in shielding sexuality and choices about sex, protected in *Bloch*." 636 F.3d 245, 261 (6th Cir. 2011). While post-*Bloch* decisions in this Circuit may have declined to find informational privacy in a variety of non-"sexual matter[s]," they have been unanimous in echoing that information concerning "sexuality" satisfies the threshold established by *Bloch*.

A person's transgender status plainly falls into the category of protected information under *Bloch*. Transgender status self-evidently implicates "sexuality," much less the broader term "sexual matters." Indeed, most courts considering the question have agreed that information about a person's transgender status and gender identity could hardly be more intimate. *See Powell*, 175 F.3d at 111 ("The excrutiatingly [sic] private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate."); *Ray*, 507 F.Supp.3d at 932; *Love*, 146 F.Supp.3d at 855; *K.L.*, 2012 WL 2685183, at *6; *Doe*

53

*v. Blue Cross & Blue Shield of Rhode Island*, 794 F.Supp. 72, 74 (D.R.I. 1992); *Darnell v. Lloyd*, 395 F.Supp. 1210, 1214 (D. Conn. 1975); *see also* Complaint, R.59, PageID#411 ("The fact that a person is transgender constitutes highly personal and intimate information."). "[T]here are few areas which more closely intimate facts of a personal nature than one's transgender status." *Arroyo Gonzalez*, 305 F.Supp.3d at 333.

It is thus no wonder that sister-circuits, to the extent they have addressed similar issues, have been relatively unidirectional in finding a protected constitutional interest. *See, e.g.*, *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) ("It is difficult to imagine a more private matter than one's sexuality and a less likely probability that the government would have a legitimate interest in disclosure of sexual identity."); *Powell*, 175 F.3d at 111 ("[T]he Constitution does indeed protect the right to maintain the confidentiality of one's transsexualism."); *see also generally* Scott Skinner-Thompson, *Outing Privacy*, 110 Nw. U. L. Rev. 159, 206-08 (2015).

The district court erred by misapplying the legal standard set forth in *Bloch* and its progeny. In its one-paragraph discussion of *Bloch*, the court ignored the principles animating that case. Instead, it latched onto shorthand language suggesting *Bloch* applies only when the information at issue is "sexual, personal, *and* humiliating." Opinion, R.110, PageID#2644-45. But neither *Bloch* nor *Lambert*

54

suggests such a strained interpretation.  Indeed, there is no authority for the position that *Bloch* adopted such a mechanistic three-factor test where all three factors must be met.  After all, this Court has never rejected an informational privacy claim because the information was not humiliating enough.  To the contrary, each decision of this Court rejecting an informational privacy right did so on the basis that the information at issue was too far removed from being of "sexual" or "intimate" nature.[21]

In fact, the district court's insistence that the information itself be "humiliating" (as opposed to the disclosure causing "humiliation") would turn *Bloch*'s logic on its head.  "And while Plaintiffs are not ashamed of their transgender status, it *is* humiliating to have their status forcibly disclosed by the State of Tennessee."    MSJ Reply, R.93, PageID#1396; *see also* Complaint, R.59, PageID#394 (having an inaccurate birth certificate forced Ms. Gore to endure awkward, deeply personal, and invasive questions); *id.*, PageID#397-98 (Ms. Combs was not open about her transgender status and was worried how it would affect her if forcibly disclosed); *id.*, PageID#401 (being forced to discuss her transgender due to inaccurate identification caused L.G. to feel humiliated and uncomfortable); *id.*,

---

[21] And as discussed herein, *Bloch*'s references to cases that discussed issues beyond sexual preferences refute the district court's characterization that *Bloch* was limited to "sexual preferences, orientation, attitudes, and activities."  *See* Opinion, R.110, PageID#2645.

PageID#404-05 (presenting an inaccurate birth certificate made K.D. feel very uncomfortable and anxious); *id.*, PageID#377, 386-87.

The district court appropriately acknowledged "there is no basis . . . to find anything humiliating about being transgender."  Opinion, R.110, PageID#2645.  But by collapsing the two disjointed inquiries into one—by treating information and the *disclosure* of information as the same—the court's opinion replicates the same ill *Bloch* was trying to prevent.

To illustrate, the fact that one was raped is not something to be ashamed of; the survivor has no control over the event.  But disclosure of such fact could subject the survivor to humiliation.  The district court sees no difference between the two and implicitly considers information regarding rape as "humiliating."  In doing so, the district court reinforced the "historic social stigma [that] has attached to victims of sexual violence," in lieu of "protecting the victims of sexual violence from humiliation."  *Bloch*, 156 F.3d at 685.  The district court's standard is not only patronizing,[22] but also conflicts with *Bloch*'s reasoning.

Even if this Court were to decide that the new governing standard for informational privacy requires proving that the information is "sexual, personal, and humiliating," the district court still erred because it injected its own factual judgment

---

[22] *See generally* Aya Gruber, *Sex Exceptionalism in Criminal Law*, 75 Stan. L. Rev. 755, 774-78 (2023) (discussing origins of elevated status of rape over other crimes and such treatment's problematic consequences).

in place of what Plaintiffs pleaded, in violation of the motion to dismiss standard. Specifically, the court said Plaintiffs failed to allege that "being transgender is sexual or humiliating," Opinion, R.110, PageID#2645, notwithstanding several allegations in the Complaint that the disclosure of one's transgender status can lead to humiliation. *See*, *e.g.*, Complaint, R.59, PageID#382-83, 394, 397-98, 400-01, 404-05.

In sum, the district court erred by failing to apply the "clear principle" articulated in *Bloch* (and restated in *Lambert*) that information concerning one's "sexuality" is of such "intimate nature" that it warrants constitutional protection because it constructs a core part of one's "personhood." *Lambert*, 517 F.3d at 441 (quoting *Bloch*, 156 F.3d at 685). But even if this Court has a different view of *Bloch*'s governing principle, the district court still erred because it impermissibly weighed on a factual dispute—such as whether the disclosure of one's transgender status was "humiliating"—in deciding the motion to dismiss. Either way, reversal is required.

## CONCLUSION

The district court erred by going outside the Complaint to consider facts not alleged in the Complaint, including its own notions about sex and transgender status, and by failing to examine the Complaint in the light most favorable to Plaintiffs.

Accordingly, this Court should reverse the dismissal of Plaintiffs' equal protection and informational privacy claims and remand the case for further proceedings.

Dated this 19th day of October 2023.

Respectfully submitted,

John T. Winemiller
MERCHANT & GOULD P.C.
800 S. Gay Street, Ste. 2150
Knoxville, TN 37929
(865) 380-5960
jwinemiller@merchantgould.com

River Lord
MERCHANT & GOULD P.C.
150 South Fifth Street, Ste. 2200
Minneapolis, MN 55402
(612) 332-5300
rlord@MerchantGould.com

Gavin R. Villareal
Maddy R. Dwertman
BAKER BOTTS L.L.P.
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(512) 322-2500
gavin.villareal@bakerbotts.com
maddy.dwertman@bakerbotts.com

Brandt Thomas Roessler
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2500
brandt.roessler@bakerbotts.com

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Sasha Buchert*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC 20006
(202) 804-6245
sbuchert@lambdalegal.org

Joshua Lee*
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
(202) 639-7700
joshua.lee@bakerbotts.com

*\* Application for admission and/or
appearance forthcoming.*

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 12,998 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P.  32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

<em>/s/ Omar Gonzalez-Pagan</em><br>Omar Gonzalez-Pagan

## <u>CERTIFICATE OF SERVICE</u>

On October 19, 2023, a true and correct copy of the foregoing was filed with

the electronic case filing (ECF) system of the U.S. Court of Appeals for the Sixth

Circuit, which currently provides electronic service on all counsel of record.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

## ADDENDUM

Designation of Court Documents..........................................................................A-2

Statutory Provisions and Regulations ................................................................A-10

## DESIGNATION OF COURT DOCUMENTS

*Gore, et al. v. Lee,*
No. 3:19-cv-00328 (M.D. Tenn.)

| Docket # | Description | Page ID # |
|---|---|---|
| 1 | Complaint for Declaratory and Injunctive Relief | 1-43 |
| 59 | Amended Complaint for Declaratory and Injunctive Relief | 375-417 |
| 60 | Plaintiffs' Motion for Summary Judgment | 418-421 |
| 61 | Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment | 422-457 |
| 61-1 | Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment Exhibit 1, Expert Declaration of Dr. Randi C. Ettner, Ph.D | 458-473 |
| 61-2 | Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment Exhibit 2, Expert Declaration of Dr. Shayne Sebold Taylor, M.D. | 474-491 |
| 61-3 | Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment Exhibit 3, Declaration of Kayla Gore | 492-497 |
| 61-4 | Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment Exhibit 4, Declaration of Jaime Combs | 498-503 |
| 61-5 | Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment Exhibit 5, Declaration of L.G. | 504-509 |
| 61-6 | Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment Exhibit 6, Declaration of K.N. | 510-514 |
| 62 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment | 515-518 |

| Docket # | Description | Page ID # |
|---|---|---|
| 62-1 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit A, Opinion and Order, Ray v. Himes, No. 2:18-cv-00272-MHW-CMV (S.D. Ohio Sept. 12, 2019), ECF 47 | 519-552 |
| 62-2 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit B, Defendants' Responses to Plaintiffs' Requests for Admission | 553-562 |
| 62-3 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit C, Vital Records, How Do I Get My Certificate Corrected?, Tenn. Dep't of Health (2020) | 563-568 |
| 62-4 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit D, Nat'l Ctr. for Transgender Equal., 2015 U.S. Transgender Survey: Tennessee State Report (2017) | 569-573 |
| 62-5 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit E, Consent Judgment, Foster v. Andersen, No. 2:18-cv-02552-DDC-KGG (D. Kan. June 21, 2019), ECF 33 | 574-578 |
| 62-6 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit F, Sandy E. James et al., Nat'l Ctr. for Transgender Equal., Report of the 2015 U.S. Transgender Survey: Executive Summary (2016) | 579-595 |
| 62-7 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit G, Logan S. Casey et al., Health Servs. Research, Discrimination in the United States: Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Americans (2019) | 596-609 |

A-3

| Docket # | Description | Page ID # |
|---|---|---|
| 62-8 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit H, Rebecca L. Stotzer, Violence Against Transgender People: A Review of United States Data, in Aggression and Violent Behavior (Elsevier 2009) | 610-620 |
| 62-9 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit I, Human Rights Campaign Found., Corporate Equality Index 2017: Rating Workplaces on Lesbian, Gay, Bisexual and Transgender Equality (2016) | 621-627 |
| 62-10 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit J, Andrew R. Flores et al., Williams Inst., How Many Adults Identify as Transgender in the United States? (2016) | 628-641 |
| 62-11 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit K, Ashley DeJean, Transgender Rights Are Under Attach in These 11 States, Mother Jones: Politics (Jan. 27, 2017) | 642-646 |
| 62-12 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit L, Certified Copy of H.B. 425 (Tenn. 1977) | 647-671 |
| 62-13 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit M, Certified Copy of S.B. 162 (Tenn. 1977) | 672-702 |
| 62-14 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit N, Transcript of Audio Recording of Tennessee Legislative Session (H-79), Apr. 4, 1977 | 703-713 |

| Docket # | Description | Page ID # |
|---|---|---|
| 62-15 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit O, Transcript of Audio Recording of Tennessee Legislative Session (S-98), Apr. 20, 1977 | 714-721 |
| 62-16 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit P, Certified Copy of Legislative Session Log Sheets | 722-730 |
| 62-17 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit Q, Nat'l Ctr. for Health Statistics, U.S. Dep't of Health & Human Servs., Model State Vital Statistics Act and Regulations (rev. 1992) | 731-771 |
| 62-18 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit R, W. Grimsley, Transexual Wins Premier, The Tennessean (Aug. 22, 1976) | 772-773 |
| 62-19 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit S, Peter P. Spudich, Transsexual to Play Here Next Week: Richards Joins WTT Nets, The Tennessean (June 3, 1977) | 774-775 |
| 62-20 | Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Summary Judgment Exhibit T, Associated Press, Doctor Cites 3,000 U.S. Sex Changes, The Tennessean (Aug. 26, 1976) | 776-777 |
| 63 | Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment | 778-798 |
| 65 | Defendants' Motion to Dismiss Amended Complaint | 800-803 |
| 66 | Memorandum of Law in Support of Defendants' Motion to Dismiss | 804-825 |

| Docket # | Description | Page ID # |
|:---:|:---|:---:|
| 69 | Plaintiffs' Notice of Filing | 834-836 |
| 69-1 | Plaintiffs' Notice of Filing Exhibit 1, Expert Declaration of Dr. Randi C. Ettner, Ph.D. | 837-868 |
| 69-2 | Plaintiffs' Notice of Filing Exhibit 2, Expert Declaration of Dr. Shayne Sebould Taylor, M.D. | 869-896 |
| 71 | Plaintiffs' Opposition to Defendants' Motion to Dismiss Amended Complaint | 905-933 |
| 74 | Defendants' Reply in Support of Their Motion to Dismiss | 937-943 |
| 82 | Plaintiffs' Notice of Filing | 959-961 |
| 82-1 | Plaintiffs' Notice of Filing Exhibit 1, Declaration of Kayla Gore | 962-967 |
| 85 | Defendants' Response to Plaintiffs' Motion for Summary Judgment | 974-995 |
| 86 | Defendants' Response to Plaintiffs' Statement of Material Facts | 996-1022 |
| 87 | Defendants' Statement of Additional Facts | 1023-1029 |
| 88 | Defendants' Notice of Filing Materials in Support of Their Response to Plaintiffs' Motion for Summary Judgment | 1030-1032 |
| 88-1 | Defendants' Notice of Filing Materials in Support of Their Response to Plaintiffs' Motion for Summary Judgment Exhibit 1, Deposition of L.G. | 1033-1036 |
| 88-2 | Defendants' Notice of Filing Materials in Support of Their Response to Plaintiffs' Motion for Summary Judgment Exhibit 2, Deposition of Jaime Combs | 1037-1042 |

| Docket # | Description | Page ID # |
|---|---|---|
| 88-3 | Defendants' Notice of Filing Materials in Support of Their Response to Plaintiffs' Motion for Summary Judgment Exhibit 3, Deposition of Randi C. Ettner, Ph.D. | 1043-1330 |
| 88-4 | Defendants' Notice of Filing Materials in Support of Their Response to Plaintiffs' Motion for Summary Judgment Exhibit 4, Declaration of Anthony E. D. Trabue M.D. | 1331-1336 |
| 88-5 | Defendants' Notice of Filing Materials in Support of Their Response to Plaintiffs' Motion for Summary Judgment Exhibit 5, Declaration of Vanessa Lefler | 1337-1339 |
| 88-6 | Defendants' Notice of Filing Materials in Support of Their Response to Plaintiffs' Motion for Summary Judgment Exhibit 6, Declaration of Edward Gray Bishop | 1340-1341 |
| 88-7 | Defendants' Notice of Filing Materials in Support of Their Response to Plaintiffs' Motion for Summary Judgment Exhibit 7, Deposition of Kayla Gore | 1342-1357 |
| 88-8 | Defendants' Notice of Filing Materials in Support of Their Response to Plaintiffs' Motion for Summary Judgment Exhibit 8, Deposition of Shayne Sebold Taylor, M.D. | 1358-1366 |
| 93 | Plaintiffs' Reply in Support of Their Motion for Summary Judgment | 1389-1401 |
| 93-1 | Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit 1, Declaration of Brandt Thomas Roessler | 1402-1406 |
| 93-2 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit A, Deposition of Randi C. Ettner, Ph.D. | 1407-1487 |

| Docket # | Description | Page ID # |
|---|---|---|
| 93-3 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit B, Deposition of Dr. Shayne Sebold Taylor, M.D. | 1488-1552 |
| 93-4 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit C, Deposition of Kayla Gore | 1553-1658 |
| 93-5 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit D, Deposition of Jaime Combs | 1659-1719 |
| 93-6 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit E, Deposition of L.G. | 1720-1791 |
| 93-7 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit F, Deposition of K.N. | 1792- |
| 93-8 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit G, Deposition of Anthony Trabue, M.D. | 1857-1992 |
| 93-9 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit H, Exhibit 6 to Deposition of Anthony Trabue, M.D. | 1993-1999 |
| 93-10 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit I, Deposition of Edward Gray Bishop, III | 2000-2110 |

| Docket # | Description | Page ID # |
|---|---|---|
| 93-11 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit J, Tenn. Dep't of Health, Handbook on Birth Registration and Fetal Death (Stillbirth) Reporting (2007) (Exhibit 4 to Deposition of Edward Gray Bishop, III) | 2111-2323 |
| 93-12 | Omitted from addendum (document filed under seal) | 2324 |
| 93-13 | Omitted from addendum (document filed under seal) | 2325 |
| 93-14 | Omitted from addendum (document filed under seal) | 2326 |
| 93-15 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit N, Vital Records, How Do I Get My Certificate Corrected?, Tenn. Dep't of Health (2020) (Exhibit 13 to Deposition of Edward Gray Bishop, III) | 2327-2333 |
| 93-16 | Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment Exhibit O, Deposition of Vanessa Lefler, Ph.D. | 2334-2447 |
| 94 | Plaintiffs' Reply in Support of Their Statement of Material Facts | 2448-2507 |
| 95 | Plaintiffs' Responses to Defendants' Statement of Additional Facts | 2508-2523 |
| 110 | Memorandum Opinion | 2593-2666 |
| 111 | Order granting Defendants' Motion to Dismiss Amended Complaint | 2667 |
| 112 | Entry of Judgment | 2668 |
| 113 | Plaintiffs' Notice of Appeal | 2669-2671 |

## STATUTORY PROVISIONS AND REGULATIONS

**Tenn. Code Ann. § 4-58-103. Public benefit; verification of status as citizen or qualified alien.**

(a)(1) Except where prohibited by federal law, every state governmental entity and local health department shall verify that each applicant eighteen (18) years of age or older, who applies for a federal, state or local public benefit from the entity or local health department, is a United States citizen or lawfully present in the United States in the manner provided in this chapter.

\*\*\*

(c) For an applicant who claims United States citizenship, the entity or local health department shall make every reasonable effort to ascertain verification of the applicant's citizenship, which may include requesting the applicant to present any one (1) of the following:

\*\*\*

(2) An official birth certificate issued by a state, jurisdiction or territory of the United States, including Puerto Rico, United States Virgin Islands, Northern Mariana Islands, American Samoa, Swains Island, Guam; provided, that Puerto Rican birth certificates issued before July 1, 2010, shall not be recognized under this subdivision (c)(2);

\*\*\*

**Tenn. Code Ann. § 50-1-703. Employer request and maintenance of documents; offices of employment verification assistance; application; violation; penalties.**

(a)(1) Employers shall:

(A) For nonemployees, request and maintain a copy, pursuant to subdivision (a)(4), of any one (1) of the following documents prior to the nonemployee providing labor or services:

\*\*\*

(iii) An official birth certificate issued by a United States state, jurisdiction or territory;

(iv) A United States government-issued certified birth certificate;

\*\*\*

(B) For employees, either:

(i) Request and maintain a copy, pursuant to subdivision (a)(4), of any one (1) of the documents described in (a)(1)(A)(i)-(xi) prior to the employee providing labor or services; or

(ii)    *(a)* Enroll in the E-Verify program prior to hiring an employee;

*(b)* Verify the work authorization status of the employee hired by using the E-Verify program; and

*(c)* Maintain an E-Verify case result for each employee that shows that the employee is authorized to work, whether on the E-Verify Quick Audit Report, the E-Verify User Audit Report, or the individual employee E-Verify case verification result. The E-Verify case result must be visible showing the work authorization status.

\*\*\*

## Tenn. Code Ann. § 68-3-203. Amendments.

(a) In order to protect the integrity and accuracy of vital records, a certificate or record registered under this chapter may be amended only in accordance with this chapter and regulations adopted by the department.

(b) Except as otherwise provided by subsection (f), a certificate or record that is amended under this section shall be marked "amended." The date of amendment and a summary description of the evidence submitted in support of the amendment shall be endorsed on or made a part of the record. The department shall prescribe, by regulation, the conditions under which additions or minor corrections may be made to certificates or records within one (1) year after the date of the event, without the certificate or record being considered "amended." "Minor corrections" means amendment of obvious errors, transposition of letters in words of common knowledge, or omissions.

(c) Upon receipt of a certified copy of a court order changing the name of a person born in the state, and upon request of such person or such person's parents, guardian or legal representative, the state registrar shall amend the certificate of birth to show the new name.

(d) The sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery.

(e) When an applicant does not submit the minimum documentation required in the regulations for amending a vital record, or when the state registrar has reasonable cause to question the validity or adequacy of the applicant's sworn statements or the documentary evidence, and if the deficiencies are not corrected, the state registrar shall not amend the vital record and shall advise the applicant of the reason for this action.

(f) In addition to other methods of amending certificates that may be provided by statute or by duly authorized department rule, the state registrar, if presented by an applicant with evidence that a reasonable person would conclude proves beyond a reasonable doubt that an original entry on a certificate was factually inaccurate at the time of recordation, shall block out the misinformation and make the necessary correction. When such an amendment is made, no record of the amendment shall appear upon the face of the certificate; provided, that a record of all evidence submitted relative to the amendment, along with the registrar's analysis of the evidence, shall be maintained by the office of vital records.

(g) If a form approved, as provided in § 68-3-305(b), acknowledging the paternity of a child is signed by both parents of the child and is submitted to the office of vital records at any time after the original certificate is filed and prior to the child's nineteenth birthday, the legal surname of the father may be entered on the certificate as that of the child, and the father's name and other personal information may be shown on the certificate of birth in the manner prescribed by regulation; provided, that paternity is not already shown on the certificate of birth. The state registrar may mark the record as amended, but not on the portion to be disclosed pursuant to § 68-3-205. Further, a legitimation by subsequent marriage of the individuals shown on the certificate as the father and mother shall not require a new certificate of birth and §§ 68-3-310(3), 68-3-311 and 68-3-313 shall not apply.

(h) In the event a voluntary acknowledgment of paternity is rescinded and a new father is not named, the name and personal information of the originally named father shall be removed by blocking, and the child's surname shall be blocked and the legal surname of the mother at the time of the birth shall be entered as the

surname of the child. In the event a voluntary acknowledgment of paternity is rescinded and a new father is named, the changes in the birth certificate shall be made in accordance with subsection (g).

**Tenn. Code Ann. § 68-3-311. New certificates; forms; contents.**

(a)(1) New certificates of birth shall be prepared on adoptions, legitimations and orders of paternity only.

(2) All orders of adoption, legitimation and paternity shall be final, and all required legal papers placed on file in the office of vital records.

(3) The certificate of birth in the original name shall be removed from the volume and a record inserted that shall show the original certificate number, date removed and code citation.

(4) The birth shall have occurred in Tennessee and a certificate of birth in the original name shall be on file in the department.

(b)(1) The new certificate shall be prepared on a standard form in current use in the department and shall be signed by the state registrar in the space provided for the signature of the attendant at birth.

(2) The new certificate shall show the date of birth, place of birth, sex, and date of filing as shown on the certificate of birth in the original name.

\*\*\*

**Tenn. Comp. R. & Regs. 0450-01-.05. Procedures for Licensure.**

To become licensed as a professional counselor in Tennessee a person must comply with the following procedures and requirements.

(1) Professional Counselor by Examination

\*\*\*

 (f) An applicant shall submit with his application, a certified copy of his birth certificate.

\*\*\*

(3) Licensed Professional Counselor (LPC) by Reciprocity

A-13

\*\*\*

     (f) An applicant shall submit a certified photocopy of his or her birth certificate.

\*\*\*

(4) Licensed Professional Counselor with Mental Health Service Provider designation (LPC/MHSP).

\*\*\*

     (f) An applicant shall submit with his application, a certified copy of his birth certificate.

\*\*\*

(5) Licensed Professional Counselor with Mental Health Service Provider designation (LPC/MHSP) by reciprocity.

\*\*\*

     (f) An applicant shall submit a certified photocopy of his birth certificate.

\*\*\*

**Tenn. Comp. R. & Regs. 0770-01-05-.13. Citizenship.**

Section 214 of the Housing and Community Development Act of 1980, as amended, prohibits the making of financial assistance available to persons who are other than United States citizens, nationals, or certain categories of eligible noncitizens.

\*\*\*

(2) Verification.

     (a) A household must provide verification that identifies each household member as a U.S. citizen, a U.S. national, an eligible noncitizen, or an ineligible noncitizen and submit the documents discussed below for each member. Once eligibility to receive assistance has been verified for an individual, it need not be collected or verified again during continuously-assisted occupancy (24 C.F.R. 5.508(g)(5)).

\*\*\*

     (c) Other Documentation Required.

1. Citizens and Nationals.

(i) Citizen Declaration signed, no further verification of citizenship is needed.

(I) HUD requires a declaration for each member who claims to be a U.S. citizen or national, which must be signed personally by any household member eighteen (18) years of age or older or by a guardian for minors.

(II) The THDA also requests verification of legal identity by requiring presentation of a birth certificate, United States passport, or other appropriate documentation. See § 0770-01-05-.11(5)(a).

(ii) Household members who claim U.S. citizenship or national status will not be required to provide additional documentation unless the THDA receives information indicating that an individual's declaration may not be accurate.

***

**Tenn. Comp. R. & Regs. 1200-07-01-.04. New certificates of birth following adoption, legitimation, paternity determination and paternity acknowledgement.**

(1) Adoption. A new certificate of birth shall be prepared by the State Registrar for a child born in Tennessee, if a certificate in the name at birth is on file and upon receipt of

(a) A certified Certificate of Adoption or

(b) A certified copy of an adoption decree and a completed application for a New Certificate of Birth by Adoption on a form prescribed or approved by the State Registrar.

***

(10) New Certificate. The new certificate of birth shall be on a form prescribed by the State Registrar and shall include the following items necessary to complete the certificate:

(a) The full name of the child;

(b) The date and place of birth, sex, and date of filing as shown on the original or delayed certificate in the name at birth;

(c) The names and personal information of the parent(s); and

(d) The signature of the State Registrar in the space provided for the signature of the certifier of the birth.

\*\*\*

(12) Sealing of documents. After preparation of a new certificate of birth or report of foreign birth, the certificate in the name at birth and/or the legal documents upon which the new certificate or report was prepared are to be placed in an envelope and sealed. Such sealed file may be opened by the State Registrar for the issuance of a copy of the certificate in the name at birth only upon order of a court of competent jurisdiction or upon receipt of a directive from the Tennessee Department of Children's Services.

**Tenn. Comp. R. & Regs. 1200-07-01-.10. Amendment of vital records.**

(1) Amendment of Minor Errors on Certificates During the First Year.

(a) Amendment of obvious errors, transposition of letters in words of common knowledge, or the addition of omitted information may be made by the State Registrar within the first year after the date of the event either upon his own observation or query or upon request of the person defined in 1200-07-01-.10(3). When such additions or minor amendments are made by the State Registrar, a notation as to the source of the information together with the date the change was made shall be maintained in such a way as not to become a part of any certification issued. The certificate is not to be marked "Amended".

(b) The State Registrar may at his discretion accept an affidavit only to correct inaccurate information recorded on a certificate within the first year after the date of the event. The affidavit must be signed and sworn to by the individual, institutional representative, clerk or funeral director who originally provided the information for the certificate or prepared the certificate. The State Registrar may require supporting documentation to amend the certificate. The certificate will be marked "Amended".

(2) All Other Amendments.

(a) Unless otherwise provided in these rules or by statute, all other amendments to vital records shall be supported by:

1. An affidavit signed by one of the persons defined in 1200-07-01-.10(3) setting forth the information to identify the certificate, the incorrect data as it is listed on the certificate, and the correct data as it should appear; and

2. One or more items of documentary evidence which support the alleged facts and which were created at least five years prior to the date of the application for amendment or within seven years of the date of the event, i.e., birth, death, marriage or divorce related to the record.

3. The date of birth on a birth certificate cannot be changed to a date which is after the date of filing. The date of birth can be corrected by an affidavit required in (2)(a)(1) and either of the following:

(i) One item of documentary evidence which was created before the registrant's tenth birthday which supports the correct date of birth, or

(ii) A transcript of the Federal Census which next followed the registrant's birth to establish the year of birth and a document which was made prior to the registrant's twenty-first birthday which supports the correct date of birth, or

(iii) To amend only a day of birth (with month and year to remain as originally recorded) documentary evidence established before the registrant's twenty-first birthday that supports the correct date of birth.

4. To amend the records for births that occurred more than seventy years prior to the application, the State Registrar may at his discretion require documentary evidence only. The documents must be at least five years old at the time of amendment.

5. No item on a certificate may be amended by an order of a court of competent jurisdiction except in accordance with the Vital Records Act of 1977 and regulations adopted by the department. A certified copy of the order must be submitted to the State Registrar.

6. An item that was established by court order on a certificate can only be amended by an order of a court of competent jurisdiction, preferably the court which granted the original decree. A certified copy of the order signed by the clerk of the court must be submitted to the State Registrar.

7. A legal change of name order from a court of competent jurisdiction is required to change the name as shown on the certificate, unless the registrant presents documentary evidence that the name was incorrectly recorded at the time of registration of birth. In order to prove incorrect recording, the documentary evidence should be the oldest document available, preferably a hospital birth worksheet or other record created very soon after birth, that proves the correct name.

(b) The State Registrar shall evaluate the evidence submitted in support of any amendment and, when he finds reason to doubt its validity or adequacy, he may reject the amendment and in writing shall advise the applicant of the reasons for this action.

(3) Who May Apply.

(a) To amend a birth certificate, application may be made by one of the parents named on the birth certificate, the guardian, the registrant (if 18 years of age or older), or the individual or institution responsible for filing the certificate.

(b) To amend a death certificate, application may be made by the next of kin, the informant listed on the death certificate, or the funeral director or person acting as such who submitted the death certificate. Applications to amend the date of death or the medical certification of cause of death shall be made by the physician who signed the medical certification or the medical examiner.

(c) Applications for amendment of a certificate of marriage shall be made jointly by both parties to the marriage or by the survivor. In the event the marriage to which the application relates was terminated by divorce or annulment on or before the date of application for amendment, the applicant may request amendment only of those items on the certificate of marriage which relate to the applicant.

(d) Applicants for amendment of matters contained in a certificate of divorce or annulment which are not part of the decree may be made by either party to the marriage so terminated. Applications for amendment of matters contained in a certificate of divorce or annulment which are part of the decree may only be made by the court which ordered the divorce or annulment upon which the report was made.

(4) Amendment of Registrant's Given Name on Birth Certificates Within the First Year.

(a) Until the registrant's first birthday, given names may be amended upon receipt of an affidavit signed by the parent(s) named on the certificate or the guardian, person, or agency having legal custody of the registrant.

(b) After one year from the date of birth, the provisions of Rule 1200-07-01-.10(2) must be followed to amend a given name, if the name was entered incorrectly on the birth certificate. A legal change of name order must be submitted from a court of competent jurisdiction to change a given name after one year and the order must be certified.

(5) Addition of Given Name.

(a) Given names, for a child whose birth was recorded without a given name, may be added to the certificate upon affidavit of the parent(s) named on the certificate or the guardian, person, or agency having legal custody of the registrant.

(b) If a birth was recorded without a given name and the registrant is age 18 years or older, he may sign the affidavit to add given names only when supported by documentary evidence at least five years old which establishes the name.

(6) Addition of Father's Name to Birth Certificate.

(a) A birth certificate may be amended to show the father's name and personal information in a case in which the parents were married at the time of their child's birth, if the father's name was omitted from the birth certificate or another man was shown as the father on the birth certificate.

1. If another man is listed on the birth certificate as the father, a certified copy of a court order specifically refuting the man listed as father must be submitted to the State Registrar before the certificate can be amended to show the correct information. The original entries concerning the father will be blocked. If the child's surname is to be changed, the original entry will be blocked.

2. The father's name and personal information may be added, if those items on the original certificate are blank, upon submission of the following to the State Registrar:

(i) An affidavit of both natural parents attesting to the fact that the man is the natural father and stating the surname to be given to the child, and

(ii) A certified copy of the marriage certificate of the father and mother showing that the marriage occurred before the child's birth, or information for locating the marriage certificate if the certificate is filed in the Division of Vital Records.

(iii) The State Registrar shall evaluate the evidence and affidavits submitted in support of this amendment, and, when he finds reason to doubt its validity or adequacy, he may reject the amendment and shall advise the applicant in writing of the reasons for this action.

(iv) In all cases the fact of amendment will be noted on the certificate and on all certified copies issued.

(b) In cases in which the mother was not married at the time of the child's birth and no information about the father is shown on the child's birth certificate, the father's name and personal information may be entered on the birth certificate, if prior to the child's nineteenth birthday both natural parents submit a voluntary acknowledgment of paternity form attesting to the fact that the man is the natural father and stating the surname to be given to the child.

1. If the parents elect to change the child's surname, the original surname will be blocked.

2. The record will be marked as amended, but certified copies will not bear the amendment notation.

(7) Removal of Father's Name and Personal Information. The originally shown father's name and personal data may be removed from a birth certificate only upon receipt of either

(a) A properly completed Rescission of Voluntary Acknowledgment of Paternity received by the State Registrar within 60 days of the date on which the Voluntary Acknowledgment of Paternity was completed, or

(b) A certified copy of an order from a court of competent jurisdiction which determines that the named man is not the father.

(8) If a Rescission of Voluntary Acknowledgment of Paternity is accepted to make the amendment, the child's surname will be changed to the mother's legal surname

at the time of birth. If a court order to remove the father is received, the child's name will be changed only if so authorized by the court.

(9) Medical Items. All items in the medical certification or of a medical nature may be amended only upon receipt of an affidavit from those persons responsible for the completion of such items or the medical examiner. The State Registrar may require documentary evidence to substantiate the requested amendment.

(10) Amendment of the Same Item More than Once. Once an amendment of an item is made on a vital record, that item shall not be amended again, except upon receipt of an order from a court of competent jurisdiction, and the order must be certified.

(11) Methods of Amending Certificates.

(a) Certificates of birth, death, marriage, and divorce or annulment may be amended by the State Registrar in the following manner upon receipt of the required documentation:

1. Completing the item in any case where the item was left blank on the existing certificate or

2. Drawing a single line through the item to be amended and inserting the correct data immediately above or to the side thereof. The line drawn through the original entry must not obliterate such entry. The original entry will be blocked out only if the court so orders or blocking is required by statute.

(b) In all cases, there shall be inserted on or filed with the certificate a statement identifying the affidavit and documentary evidence used as proof of the correct facts and the date the amendment was made. As required by statute or rule, the certificate shall be marked "Amended".

(12) Old Records That Will Not Be Amended. When one hundred years have elapsed after the date of birth or fifty years have elapsed after the date of death, marriage or divorce, the record of the event will not be amended.

### 28 U.S.C. § 1291. Final decisions of district courts.

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the

Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

### 28 U.S.C. § 1331. Federal question.

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

### 28 U.S.C. § 1343. Civil rights and elective franchise.

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

> (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

> (2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

> (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

> (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

\*\*\*

### 42 U.S.C. § 1983. Civil action for deprivation of rights.

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in

equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.