23-5669

In the United States Court of Appeals
for the Sixth Circuit

───────────────────────────────

KAYLA GORE, ET AL.,
*PLAINTIFFS-APPELLANTS*

v.

WILLIAM BYRON LEE, ET AL.,
*DEFENDANTS-APPELLEES*

───────────────────────────────

On Appeal from the United States District Court,
Middle District of Tennessee (Nashville Division)
Case No. 3:19-cv-00328, Judge Eli Richardson

## Brief of Amicus Curiae Equality Ohio Education Fund in Support of Appellants in Seeking Reversal

**Tucker Ellis LLP**
Chad M. Eggspuehler, SBN 0094094
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Telephone: 216.592.5000
Facsimile: 216.592.5009
Chad.Eggspuehler@tuckerellis.com

*Attorneys for Amicus Curiae Equality Ohio Education Fund*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 6th Cir. R. 26.1, Amicus Curiae makes the following disclosure:

1. Amicus Curiae Equality Ohio Education Fund is <u>NOT</u> a subsidiary or affiliate of publicly owned corporations.

2. Amicus Curiae Equality Ohio Education Fund is <u>NOT AWARE</u> of any publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

<u>/s/ Chad M. Eggspuehler</u>
Chad M. Eggspuehler

*Attorney for Amicus Curiae Equality Ohio Education Fund*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ..................................................................... ii

STATEMENT OF INTEREST ...................................................................1

INTRODUCTION .....................................................................................2

ARGUMENT .............................................................................................4

    I.    The *Ray II* Court Correctly Struck Down Ohio's Restrictive Birth-Certificate Correction Policy, on the Evidence, and the State Agency Did Not Appeal. ..................4

    II.    *Ray II*'s Fact-Based Approach Is Consistent with the Consensus of Federal Court Decisions. ................................8

CONCLUSION........................................................................................11

CERTIFICATE OF COMPLIANCE ......................................................... i

CERTIFICATE OF SERVICE ................................................................. ii

# TABLE OF AUTHORITIES

**Cases**

*Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327 (D.P.R. 2018).............9

*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998)......................................... 7, 11, 12

*F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018) (Mag.).........................9

*F.V. v. Jeppesen*, 466 F. Supp. 3d 1110 (D. Idaho) (Mag.)...............................9

*F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020)..................................9

*Gore v. Lee*, No. 3:19-cv-0328, 2023 WL 4141665
   (M.D. Tenn. June 22, 2023) .....................................................................8

*In re: Application for Correction of Birth Record of Hailey Emmeline Adelaide*,
   No. 2022-Ohio-0934 (Ohio)....................................................................5

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) ................. 7, 11, 12

*Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015).............................. 10

*Powell v. Schriver*, 175 F.3d 107 (2d Cir.1999) ............................................... 11

*Ray v. Himes*, No. 2:18-CV-272, 2019 WL 11791719
   (S.D. Ohio Sept. 12, 2019)............................................................... 3, 11

*Ray v. McCloud*, 507 F. Supp. 3d 925 (S.D. Ohio 2020)......................... passim

**Statutes**

Ohio Rev. Code § 3705.15............................................................................4

## STATEMENT OF INTEREST

***Identity.*** Amicus Curiae Equality Ohio Education Fund ("Equality Ohio") is an Ohio non-profit corporation founded in 2005. Equality Ohio's mission is to identify and transform systems and institutions so LGBTQ+ Ohioans can fully access legal and lived equality. Equality Ohio's stated values include:

- belief in the intrinsic worth and dignity of all people;
- trust that LGBTQ+ people know what they need;
- individual self-determination, free of societal barriers erected by bias, ignorance, fear, and oppression; and
- promoting equity and equality in our institutions.

***Interest.*** Equality Ohio's interest in this case is seeing that transgender individuals have the ability to correct core, state-issued identification documents, such as birth certificates, in states within the Sixth Circuit. *See Ray v. McCloud*, 507 F. Supp. 3d 925 (S.D. Ohio 2020).

***Source of Authority to File.*** Counsel for all parties have consented to the filing of this brief, and therefore the authority to file is based on Rule 29(a)(2) of the Federal Rules of Appellate Procedure.

***Rule 29(a)(4)(E) Statement.*** Equality Ohio's counsel authored this brief in its entirety. Neither Equality Ohio, nor Equality Ohio's counsel, nor any other

1

person contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

The District Court's decision is an outlier in form and in substance that should be corrected on *de novo* review. Not only did it become the first court in recent years to reject federal equal protection and due process challenges to one of the very few remaining state policies that prohibits transgender citizens from correcting their birth certificates, but it did so with hardly a mention of the well-reasoned cases that came before and reached the opposite conclusion. Most critical for present purposes, it resolved this matter on the pleadings *three years* into the case when the plaintiffs stood ready to offer credible proof in support of the harms that Tennessee's restrictive policy posed.

The other federal district courts addressing this and closely related issues in recent years have permitted evidence before ruling or rejected pleadings-based motions. Though a modest sample size, these decisions reflect the fact that, as of 2020, fewer than five states in the country still prohibited this type of birth-certificate correction. *Ray v. McCloud*, 507 F. Supp. 3d 925, 928 (S.D. Ohio 2020) (citing Movement Advancement Project data and map).[1] These courts have

---

[1] The exact number of states with restrictive policies has varied from the two cited in the *Ray II* decision in December 2020 to the four states currently pressing

uniformly found constitutional violations on the evidence where a state selectively prohibits corrections to sex markers on state-issued identification forms. In short, these courts have found that such policies discriminate against transgender citizens.

The final *Ray* decision out of the Southern District of Ohio is one such case. It is commonly referred to as "*Ray II*" because it followed the initial ruling on the pleadings.[2] It made detailed findings of fact demonstrating exactly how Ohio's restrictive policy violated due process and equal protection and could not survive any level of scrutiny, in light of evidence of animus. The relevant state agencies, including the Ohio Department of Health (ODH), did not appeal *Ray II*, but accepted a permanent injunction and final judgment, and ODH has since adopted a policy of allowing sex-marker changes to birth certificates.

The District Court's premature ruling here cut off the fact-finding process, upsetting the district court consensus and clear path of progress in this area.

---

restrictive policies today (Kansas, North Dakota, Oklahoma, Tennessee). Montana's status has shifted multiple times, with the most recent development being a state court decision striking down a new restrictive policy in 2023. *See* https://www.lgbtmap.org/equality-maps/identity_document_laws (accessed October 26, 2023) ("Birth Certificate" tab, links to respective state laws provided in the "Citations & More Information" tab).

[2] *See generally Ray v. Himes*, No. 2:18-CV-272, 2019 WL 11791719 (S.D. Ohio Sept. 12, 2019) (hereafter "*Ray I*") (denying state's motion to dismiss).

Equality Ohio has a vested interest in defending Ohio's inclusive policy post-*Ray II* and thus supports this appeal.

## ARGUMENT

**I. The *Ray II* Court Correctly Struck Down Ohio's Restrictive Birth-Certificate Correction Policy, on the Evidence, and the State Agency Did Not Appeal.**

Unlike Tennessee's provisions, the relevant provisions in Ohio law addressing birth-certificate corrections do not expressly mention "sex." Before 2016, Ohio allowed sex-marker corrections to birth certificates, but a transgender citizen's application prompted ODH to reassess its policy under Ohio Rev. Code § 3705.15 at some point in 2015. *Ray II*, 507 F. Supp. 3d at 929–30. As of 2020, the policy change left Ohio as one of only two states that prohibited sex-marker changes for transgender citizens' birth certificates. *Id.* at 928.

The *Ray II* court concluded that the state's shifting exclusionary policy was unconstitutional on both federal equal protection and due process privacy grounds, issuing a permanent injunction. *Id.* at 940. The state agencies named as defendants, ODH and the Ohio Office of Vital Statistics, declined to appeal, accepted a final judgment, and ODH changed its policy to comply with *Ray II* by once again allowing these corrections—a policy that remains in effect today. ODH, Changing or Correcting a Birth Record, https://odh.ohio.gov/know-

our-programs/vital-statistics/changing-correcting-birth-record (select "Court-Ordered Correction of Birth Record" tab) (accessed October 26, 2023).[3]

The *Ray II* court's constitutional analysis followed well-established due process and equal protection precedents of the U.S. Supreme Court and this Court available as of December 2020, as well as persuasive authority from other federal courts. The District Court below did not address much of this authority, especially the *Ray II* court's privacy-related due process analysis and supporting authority. Amicus fully supports Appellants' arguments on the merits. But Amicus wishes to direct this Court's attention to *Ray II*'s fact-based approach.

Judge Watson's decision in *Ray II* rested on a number of careful findings on the evidence presented, including evidence concerning the four named plaintiffs' experiences with harassment after the forced disclosure of their status as transgender persons in a variety of contexts, ranging from the employment/HR context to social security records. *Id.* at 932–33. The plaintiffs presented evidence of name-calling, exclusion at work, threats of physical violence, inappropriate inquiries about genitals from co-workers, and the

---

[3] The affiliated legal clinic for Amicus Curiae and counsel have appeared on behalf of an applicant for birth-certificate correction under Ohio Rev. Code § 3705.15 in an unopposed matter now pending before the Ohio Supreme Court, seeking guidance on the procedural vehicle for such applications. *See In re: Application for Correction of Birth Record of Hailey Emmeline Adelaide*, No. 2022-Ohio-0934.

indiscriminate and offensive disclosure of status to the other members of the public at the Social Security Administration office. *Id.* The court also considered testimony from multiple experts as to (i) the heightened risk of physical harm in the workplace to transgender employees, and (ii) the fear of forced disclosure that "leads some transgender individuals to not pursue jobs, services, or opportunities because they are fearful of pushback and humiliation." *Id.* at 933. The expert testimony included anecdotes of death threats, cut brake lines, and two employees whose desk was covered with excrement. *Id.*

After weighing this case-specific evidence, the *Ray II* court noted similar findings of discrimination, harassment, and threats against transgender citizens from other federal court decisions,[4] as well as data from a 2015 survey showing that "36% of transgender people in Ohio who showed identification that did not match their sex presentation were harassed, denied benefits or services, asked to leave a place, or assaulted." *Id.* at 933 (citing National Center for Transgender Equality, 2015 U.S. Transgender Survey: Ohio State Report 3 (2017)).

Collectively, this evidence guided the *Ray II* court's analysis of this Court's due process / informational privacy precedents, *Bloch v. Ribar*, 156 F.3d 673

---

[4] *See id.* at 933 (citing *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 720 (D. Md. 2018)).

(6th Cir. 1998), and *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998). The court reasonably concluded that "*Kallstrom* does not require courts to wait until plaintiffs are actually assaulted, or worse, to recognize 'a very real threat to [transgender individuals'] personal security and bodily integrity' upon disclosure of their status." *Ray II*, 507 F. Supp. 3d at 934 (citations omitted). The *Ray II* court's findings are sensible, measured, and paint a detailed portrait of the very real and constitutionally cognizable harms that restrictive birth-certificate-correction policies pose to transgender citizens. Further, they refute the suggestion that birth certificates are merely historical records, demonstrating how birth certificates are routinely used as core government-issued identification documents in, *inter alia*, employment situations and social services, and that those forced disclosures result in harassment, threats of violence, exclusion, and other discriminatory behavior.

Instead of engaging with the evidence, as the *Ray II* court did before carefully reaching its factual findings and legal conclusions, the District Court inappropriately dismissed the Plaintiffs' claims. It adopted a narrow view of the pleadings, and it brushed aside the *Ray II* court's proper focus on the state's differential treatment of birth-certificate information subject to change. No. 3:19-cv-0328, 2023 WL 4141665, at *22 (M.D. Tenn. June 22, 2023) ("declin[ing] to place any material weight on th[e] fact" that a state permits

7

numerous other birth-certificate changes, but singly prohibits sex-marker changes for transgender citizens). Having bypassed an evidence-based approach, the District Court's dismissal of Plaintiffs' alleged harms as *conclusory* rings hollow. Indeed, even the District Court "recognize[d] that disclosure to an individual that a person is transgender *can* jeopardize the person's safety, *can* risk bodily harm to the person, and *can* subject transgender persons to violence from that individual (if the individual is violent and hateful)," conceding that "the disgrace of anti-transgender hate crimes do occur in this country." *Id.*

Although this matter was already three years old when it ruled, the District Court omitted the evidence-based analysis, opting instead to resolve factual issues on an extremely narrow reading of the pleadings. The resulting decision is an outlier, both on the merits and on the procedure, and it improperly minimizes the very real harms of forced disclosure occasioned by restrictive birth certificate policies.

## II. *Ray II*'s Fact-Based Approach Is Consistent with the Consensus of Federal Court Decisions.

*Ray II* has good company. Federal courts in Idaho and Puerto Rico have issued similar decisions in the past decade after conducting an evidence-based assessment of the constitutional claims challenging restrictive birth-certificate policies, and another court in Michigan denied a motion to dismiss similar

constitutional challenges to that state's restrictive state-identification card policy, recognizing that plausible claims may exist on the evidence.

For instance, in *F.V. v. Barron*, the court granted summary judgment to the plaintiffs and permanently enjoined Idaho's exclusionary birth-certificate policy on federal equal protection grounds under both heightened scrutiny and rational basis analysis. 286 F. Supp. 3d 1131, 1142–46 (D. Idaho 2018) (Mag.).[5] Key findings included 2015/2016 survey data on harassment and violence, in multiple contexts (*e.g.*, employment, education), from the National Center for Transgender Equality; contemporaneous hate crimes statistics recorded by the FBI; and the plaintiffs' accounts of both the intrinsic harms and resulting harassment of having inconsistent identification documents. *Id.* at 1137–39.

In *Arroyo Gonzalez v. Rossello Nevares*, the court concluded on summary judgment that Puerto Rico's exclusionary birth-certificate policy violated the informational-privacy component of federal due process applicable to sensitive, personal information. 305 F. Supp. 3d 327, 333 (D.P.R. 2018). The court's decision rested on 36 findings of fact, including increased rates of harassment and stigmatization and the chilling effect that inconsistent identification

---

[5] *See also F.V. v. Jeppesen*, 466 F. Supp. 3d 1110, 1120 (D. Idaho) (Mag.) (granting clarification in part concerning scope of remedy); *F.V. v. Jeppesen*, 477 F. Supp. 3d 1144, 1151 (D. Idaho 2020) (Mag.) (granting clarification concerning scope of remedy).

documents have on the activities of transgender citizens (including one plaintiff's fear of attempting to vote). *Id.* at 329–33. The court also stressed that, factually, an "individual's birth certificate is a primary identification document" because Puerto Rico requires birth certificates as a prerequisite "to obtain a driver's license, a marriage license, a U.S. passport, a Social Security card, a voting card," while also crediting birth certificates as a preferred "proof of identification to conduct banking transactions and other business." *Id.* at 329 (finding ¶ 13).

And in *Love v. Johnson*, from within this Circuit, the court denied a motion to dismiss, finding plausible privacy-based due process claims against Michigan's restrictive state-ID card policy. 146 F. Supp. 3d 848, 857 (E.D. Mich. 2015). Michigan's policy had required a corrected birth certificate before sex markers on other identification documents could be updated. The court credited the plaintiffs for citing a "plethora of evidence" and allegations "which, accepted as true, suggests that the [restrictive] Policy poses a real threat to their 'personal security and bodily integrity.'" *Id.* at 855. In addition to hate-crime statistics showing a high incidence of violence from the forced disclosure of transgender status, the plaintiffs alleged firsthand instances of harassment in public accommodations as varied as voting precincts, bars, and retail stores when their state-issued identification cards outed them as transgender. *Id.*

Like *Ray I & II*, the *Love* decision persuasively linked this Circuit's *Bloch* and *Kallstrom* precedents to the Second Circuit's decision in *Powell* that extended those privacy principles to transgender status. *Id.* at 853–56; *see also Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir.1999) (concluding that disclosure of prisoner's transgender status implicated the due process right to informational privacy because transgender status was the sort of distinctive "condition that is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others").

The District Court's narrow analysis did not account for *any* of this persuasive authority, and its pleadings-based analysis precluded any meaningful comparison. Its ruling should therefore be remanded for a more fulsome review of the record and prevailing authority.

## CONCLUSION

*Ray II* and the other cases cited in Part II clearly demonstrate the importance of evidence to this type of claim. The District Court put the cart ahead of the horse, procedurally, and steered off-course on the merits without meaningful consideration of the evidence or contrary authority. Equality Ohio thus supports these Plaintiffs in asking this Court to REVERSE the District Court's judgment.

Yet, even if this Court harbors doubts about the reasoning of other federal courts and the proper application of *Bloch* and *Kallstrom*, discretion is the better part of valor. Such a judgment would be better informed by consideration of the evidence in this case, and a discussion of why the District Court seemingly believes the other cases are misguided. The parties, in turn, would benefit from the further development of these issues, as they consider their appellate options. Accordingly, Equality Ohio requests, at a minimum, that the District Court's judgment be REMANDED for further consideration of the record and related authorities at the summary judgment stage.

Dated: October 26, 2023

Respectfully submitted,

TUCKER ELLIS LLP

/s/  Chad M. Eggspuehler
Chad M. Eggspuehler, SBN 0094094
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Telephone: 216.592.5000
Facsimile: 216.592.5009
Chad.Eggspuehler@tuckerellis.com

*Attorneys for Amicus Curiae Equality Ohio Education Fund*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because this brief contains 2,540 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Calisto MT 14-point type.

/s/ Chad M. Eggspuehler
Chad M. Eggspuehler

*Attorney for Amicus Curiae Equality Ohio Education Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. Notice of this filing will be sent to all parties of record by operation of the Court's CM/ECF system.

/s/ Chad M. Eggspuehler
Chad M. Eggspuehler

*Attorney for Amicus Curiae Equality Ohio Education Fund*