No. 23-5669

## United States Court of Appeals
## For the Sixth Circuit

KAYLA GORE, JAIME COMBS, L.G., and K.N.,

*Plaintiffs-Appellants*,

v.

WILLIAMS BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Middle District of Tennessee (Nashville Division)
No. 3:19-cv-00328
Honorable Eli Richardson

## BRIEF OF GLBTQ LEGAL ADVOCATES & DEFENDERS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS SEEKING REVERSAL

Kimberly A. Havlin
Ariell D. Branson
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
kim.havlin@whitecase.com

Patience Crozier
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
pcrozier@glad.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, the counsel for *Amicus Curiae* represent that the *Amicus Curiae* does not have a parent corporation, is not owned in whole or in part by any publicly held corporation, or is itself a publicly held company.

Respectfully submitted this October 26, 2023.

*/s/ Patience Crozier*
Patience Crozier
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................C-1

TABLE OF CONTENTS........................................................................... i

TABLE OF AUTHORITIES ..................................................................... ii

IDENTITY AND INTEREST OF AMICUS CURIAE............................................1

SUMMARY OF ARGUMENT ..................................................................2

ARGUMENT .....................................................................................3

I.    TENNESSEE'S PROHIBITION IS CONTRARY TO SCIENTIFIC AND MEDICAL CONSENSUS. ..................................................................3

II.   TENNESSEE'S BAN HARMS TRANSGENDER PEOPLE IN "AN ALMOST LIMITLESS NUMBER OF TRANSACTIONS AND ENDEAVORS THAT CONSTITUTE ORDINARY CIVIL LIFE IN A FREE SOCIETY."....................................................................7

III.  THE VAST MAJORITY OF STATES, AS WELL AS THE FEDERAL GOVERNMENT, PERMIT TRANSGENDER INDIVIDUALS TO AMEND THEIR BIRTH CERTIFICATES ..................................................13

CONCLUSION....................................................................................15

CERTIFICATE OF COMPLIANCE.......................................................13

CERTIFICATE OF SERVICE ..............................................................13

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Romer v. Evans*,
  517 U.S. 620 (1996)..........................................................................................7

## STATUTES AND RULES

8 FAM 403.3 ...............................................................................................................14

20 C.F.R. § 422.103 ...................................................................................................7

22 C.F.R. § 51.42 .......................................................................................................7

42 C.F.R. § 435.407 ...................................................................................................7

10 U.S.C. § 504(b) .....................................................................................................7

410 Ill. Comp. Stat. Ann. 535/17 .........................................................................13

Ala. Code § 22-9A-19(d) ........................................................................................13

Alas. Stat. § 18.50.220(c) .......................................................................................13

Ariz. Rev. Stat. § 36-337(A)(3) .............................................................................13

Ark. Code Ann. § 20-18-307(d) .............................................................................13

Cal. Health & Saf. Code § 103425 ........................................................................13

Colo. Rev. Stat. § 1006-1 .......................................................................................13

Conn. Gen. Stat. § 7-51 ..........................................................................................13

D.C. Law 20-37 .........................................................................................................13

Del. Code Title 16 § 3131 .......................................................................................13

Fla. Stat. Ann. § 382.016 ........................................................................................13

Ga. Code Ann. § 31-10-23(e) .................................................................................13

Haw. Rev. Stat. Ann. § 338-17.7(a)(4)(B)....................................................13

Idaho Code § 39-245A(3) ...............................................................................13

Ind. Code Ann. § 16-37-2-10 .........................................................................13

Iowa Code § 144.23 ........................................................................................13

KS SB180.........................................................................................................12

Ky. Rev. Stat. § 213.121(5) ...........................................................................13

La. Rev. Stat. Ann. § 40:62 ............................................................................13

Mass. Ann. Laws Chapter 46, § 13(e) ...........................................................13

Md. Code Ann., Health-Gen. § 4-211 ...........................................................13

Me. Rev. Stat. Title 22, § 2765 ......................................................................13

Mich. Comp. Laws Serv. § 333.2831(c) .........................................................13

Minn. Stat. Ann. § 144.218 ............................................................................13

Miss. Admin. Code 15-5-85:3.21.2 .................................................................13

Mo. Ann. Stat. § 193.215(9) ...........................................................................13

N.C. Gen. Stat. §§ 130A-118(b)(4),(e) ...........................................................13

N.J. Stat. Ann. § 26:8-40.12 ...........................................................................13

N.M. SB 20 ......................................................................................................13

Neb. Rev. Stat. § 71-604.01 ............................................................................13

Nev. Admin. Code. Chapter 440, § 130.........................................................13

NYCCRR tit. 10 § 35.2....................................................................................13

Okla. Exec. Or. 2021-24 .................................................................................12

Or. HB 2673....................................................................................................14

R.I. Gen. Laws § 23-3-21................................................................................14

REAL ID Act, H.R. 1268, 109th Cong. § 202(b) (2005) ..........................................7

RSA 5-C:87 N.H. ..................................................................................................13

S.C. Code. Ann. Regs. 44-63-100 ........................................................................13

S.D. Admin. R. 44:09:05:02 .................................................................................14

T.C.A. § 36-1-116 ..................................................................................................8

T.C.A. § 49-6-3008(b) ............................................................................................8

T.X. Health & Safety Code § 192.011...................................................................14

Tenn. Code Ann, § 68-3-203(a)(d) .......................................................................12

Tenn. Code Ann. § 50-1-703(a)(1)(B) ...................................................................8

U.S. Const. Article 1, § 3, cl. 3 .............................................................................7

U.T. SB93..............................................................................................................14

V.T. H.628 (Act 88) ..............................................................................................14

V.A. SB 657 ..........................................................................................................14

W.Y. Rules and Regulations HLTH VR Ch. 10 s 4(e)(iii)....................................14

Wis. Stat. Ann. § 69.15 .........................................................................................14

## MISCELLANEOUS

Am. Bar Ass'n, *Birth Certificates* (Nov. 20, 2018), https://perma.cc/K7BV-W5QN ......................................................................................................................7

Am. Med. Ass'n, *Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967* (2019), https://perma.cc/2NKY-VALP............5

Am. Med. Ass'n, GLMA 127-18-101: Transgender Healthcare (2018)...................4

Am. Med. Ass'n House of Delegates Resolution 223 (A-23), Protecting Access to Gender Affirming Care (2023) .......................................................................4, 5

Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PYSCH. 834 (2015) ...............................3

iv

Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PYSCH. 823 (2015) ...........................4

Arjee Restar et al., *Legal Gender Marker and Name Change is Associated with Lower Negative Emotional Response to Gender-Based Mistreatment and Improve Mental Health Outcomes Among Trans Populations*, 11 SSM-POPULATION HEALTH 6-7 (2020) .........................................................................5

Ayden I. Scheim et al., *Gender-Concordant Identity Documents and Mental Health Among Transgender Adults in the USA: A Cross-Sectional Study*, 5 LANCET PUB. HEALTH 196 (2020) .............................................................................................................4

Brandon J. Hill et al., *Exploring Transgender Legal Name Change as a Potential Structural Intervention for Mitigating Social Determinants of Health Among Transgender Women of Color*, 15 SEXUALITY RSCH. & SOC. POL'Y 9 (2019) ...11

*Changing or Correcting a Birth Record*, https://perma.cc/6VLK-MR6V (last visited Oct. 5, 2023).............................................................................................13

Greta R. Bauer et al., *Intervenable Factors Associated with Suicide Risk in Transgender Persons: A Respondent Driven Sampling Study in Ontario, Canada*, 15 BMC PUB. HEALTH 6 (2015) .............................................................6

Ilan H. Meyer et al., *Demographic Characteristics and Health Status of Transgender Adults in Select US Regions: Behavioral Risk Factor Surveillance System, 2014*, 107 AM. J. PUB. HEALTH 582 (2017) ..........................................11

Jack Drescher & Ellen Haller, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals*, Am. Psych. Ass'n. (July 2018) ..5

Jaclyn M. White Hughto et al., *Social and Medical Gender Affirmation Experience Are Inversely Associated with Mental Health Problems in a U.S. Non-Probability Sample of Transgender Adults*, 49 ARCHIVES SEXUAL BEHAV. 2635-47 (2020) .............................................................................................................6

Jaclyn M. White Hughto, Sari L. Reisner & John E. Pachankis, *Transgender Stigma and Health: A Critical Review of Stigma Determinants, Mechanisms, and Interventions*, 147 SOC. SCI. & MED. 222-31 (2015) ....................................6

Jamie Langowski et al., *Transcending Prejudice: Gender Identity and Expression-Based Discrimination in the Metro Boston Rental Housing Market*, 29 YALE J.L. & FEMINISM 322 (2018) .............................................................................12

Movement Amendment Project, *Identity Document Laws and Policies: Birth Certificates*, https://perma.cc/A4U7-MSBX (last visited Oct. 5, 2023) ............14

Nat'l Acads., Sci., Eng'g, & Med., *Understanding the Well-Being of LGBTQI+ Populations* (2020) .......................................................................................7, 12

*Request to Change Sex Designation on a Birth Certificate for an Adult*, https://perma.cc/RH6U-DZ4H (last visited Oct. 5, 2023)...................................14

Richard A. Crosby, Laura F. Salazar, & Brandon J. Hill, *Gender Affirmation and Resiliency Among Black Transgender Women With and Without HIV Infection*, 1 TRANSGENDER HEALTH 87 (2016)......................................................................6

Sandy E. James et al., Nat'l Ctr. Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 10 (2016) .............................................................10, 11, 12

Shanna K. Kattari et al., *Correlations Between Healthcare Provider Interactions and Mental Health Among Transgender and Nonbinary Adults*, 10 SSM-POPULATION HEALTH 4 (2020)............................................................................10

Shelby County Tennessee, *Marriage Licenses*, https://www.shelbycountytn.gov/574/Marriage-Licenses (last visited Oct. 25, 2023) .......................................................................................................................8

Telephonic Interview with S. (Oct. 23, 2023) (Notes on file with counsel for Amicus Curiae White & Case LLP) ....................................................................9

Tennessee Dep't Human Services, *Child Care Payment Assistance*, https://www.tn.gov/humanservices/for-families/child-care-services/child-care-payment-assistance.html (last visited Oct. 25, 2023) ..........................................8

Tennessee Dep't of Safety & Homeland Security, *Identification License*, https://www.tn.gov/safety/driver-services/idonly.html (last accessed Oct. 25, 2023) .......................................................................................................................8

Tennessee Dep't of Safety & Homeland Security, *REAL ID Requirements*, https://www.tn.gov/tnrealid/requirements.html (last accessed Oct. 25, 2023) ....7

Tiffany R. Glynn et al., *The Role of Gender Affirmation in Psychological Well-Being Among Transgender Women*, 3 PSYCH. SEXUAL ORIENTATION & GENDER DIVERSITY 3 (2016)...............................................................................................6

*To Change Sex/Gender on a Pennsylvania Certification of Birth*, https://perma.cc/FS73-CVDY; ...........................................................................13

U.S. Dep't of State, *Birth of U.S. Citizens and Non-Citizen Nationals Abroad*, https://perma.cc/4RF6-XZSP (last visited Oct. 5, 2023)...................................14

World Pro. Ass'n Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People* (8th ed., 2022)....................................3

Wylie C. Hembree et al., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (2017) ...................4

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* GLBTQ Legal Advocates & Defenders ("GLAD") is a legal advocacy organization dedicated to securing legal equality for transgender people, LGBQ people, and people living with HIV on the bedrock promise that we all come before our government as equals.

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. Only Amicus contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

*Amicus curiae* respectfully submits this brief in support of Appellants to present the following to the Court:

(i)     The unequivocal consensus among the medical and scientific community of the profound health harms inflicted on transgender people when they are forced to bear identification that does not match their gender identity, as well as the profound benefits to transgender people—a highly at-risk community already—of conforming birth certificates in the manner requested here;

(ii)    The myriad ways in which birth certificates are utilized in Tennessee, and thus the ways that the State's refusal to amend birth certificates of transgender people undermines their economic stability and well-being by impeding their ability to engage in a wide range of basic acts of life; and

(iii)   That the overwhelming majority of states, as well as the federal government, enable transgender people to amend their birth certificates.

All of the foregoing substantiates and underscores that Tennessee's prohibition on transgender people amending the gender marker on their birth certificates inflicts deep and lasting harm, in violation of their constitutional rights to equal protection (under any standard of review) and to privacy.

## ARGUMENT

## I.   TENNESSEE'S PROHIBITION IS CONTRARY TO SCIENTIFIC AND MEDICAL CONSENSUS.

Gender identity is a well-established concept in medicine that refers to a person's internal sense of self as a particular gender. *See* Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Pysch. 834 (2015). For transgender people, their gender identity does not align with the sex they were assigned at birth.

For those prevented from living consistently with their gender identity, the incongruence can result in gender dysphoria, a serious medical condition characterized by a clinically significant and persistent discomfort or distress with a person's assigned sex at birth.[2] Without proper treatment, people with gender dysphoria experience a range of debilitating symptoms, including anxiety, depression, and suicidality.

Gender dysphoria, however, is highly treatable, and with treatment transgender people can and do lead thriving, productive lives. The consensus standards of care for that medical treatment are set forth in the internationally recognized World Professional Association for Transgender Health ("WPATH") Standards of Care which have been endorsed by (among others) the American

---

[2] World Pro. Ass'n Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People* (8th ed., 2022).

Medical Association, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the Endocrine Society, and the American College of Obstetrics and Gynecology.[3]  In accordance with the WPATH Standards of Care, many transgender individuals with gender dysphoria undergo an individualized, medically indicated and supervised gender transition to address the symptoms of gender dysphoria and to live life consistently with their gender identity.  A key component of that medical treatment includes steps to enable an individual to live, function in society, and be seen by others as the gender matching their gender identity.

What some call "legal transition" ensures that a person's identity documents, such as their birth certificate, reflect their accurate name and gender marker.  *See* WPATH Standards of Care, *supra*, at 11; *see also* Ayden I. Scheim et al., *Gender-Concordant Identity Documents and Mental Health Among Transgender Adults in the USA: A Cross-Sectional Study*, 5 LANCET PUB. HEALTH 196, 197 (2020)

---

[3] *See, e.g.*, Am. Med. Ass'n House of Delegates Resolution 223 (A-23), Protecting Access to Gender Affirming Care (2023) ("AMA I"); Am. Med. Ass'n, GLMA 127-18-101: Transgender Healthcare (2018) ("AMA II"); Wylie C. Hembree et al., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (2017); Am. Psych. Ass'n, Guidelines for Psychological Practice with Transgender and Gender Nonconforming People, 70 AM. PYSCH. 823 (2015).

("Changing one's name and gender marker on IDs such as birth certificates, passports, and driver's licenses can be a crucial step in legal and social gender affirmation"). Having legal identification consistent with gender identity provides enormous positive benefits to transgender people that have been extensively recognized and documented by medical experts.[4] Thus the American Medical Association, the nation's largest association of physicians, maintains that transgender people should be able to amend birth certificates. *See* Am. Med. Ass'n, *Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967* (2019), https://perma.cc/2NKY-VALP.

Individuals who can update their gender marker and name on IDs report lower rates of "depression, anxiety, somatization, psychiatric distress, and emotionally upsetting response due to gender-based mistreatment." Arjee Restar et al., *Legal Gender Marker and Name Change is Associated with Lower Negative Emotional Response to Gender-Based Mistreatment and Improve Mental Health Outcomes Among Trans Populations*, 11 SSM-POPULATION HEALTH 6-7 (2020). Studies have found that aligning identification with gender identity was associated with a 32% reduction in psychological distress and a 22-25% reduction in suicidal ideation. *See,*

---

[4] *See, e.g.*, Am. Med. Ass'n House of Delegates Resolution 223 (A-23), *Protecting Access to Gender Affirming Care* (2023), *supra*; Jack Drescher & Ellen Haller, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals*, Am. Psych. Ass'n. (July 2018).

*e.g.*, Scheim, *supra*; Greta R. Bauer et al., *Intervenable Factors Associated with Suicide Risk in Transgender Persons: A Respondent Driven Sampling Study in Ontario, Canada*, 15 BMC PUB. HEALTH 6 (2015) ("[H]aving one or more identity documents concordant with lived gender . . . [had] the potential to prevent 90 cases of ideation per 1,000 trans persons . . . and 230 [suicide] attempts per 1,000 with ideation."). Identification that reflects a person's gender identity yields life-saving improvements in health and well-being, which in turn allows transgender people to be stable, productive, and participating members of society.[5]

---

[5] *See generally*, Richard A. Crosby, Laura F. Salazar, & Brandon J. Hill, *Gender Affirmation and Resiliency Among Black Transgender Women With and Without HIV Infection*, 1 TRANSGENDER HEALTH 87 (2016) ("concordant identification documents are a critical step in gaining social inclusion and legal legitimacy, which may have downstream effects on transgender health—particularly among those for whom access to medical transition might be limited due to resources (e.g., low-income transwomen)"); Tiffany R. Glynn et al., *The Role of Gender Affirmation in Psychological Well-Being Among Transgender Women*, 3 PSYCH. SEXUAL ORIENTATION & GENDER DIVERSITY 3 (2016) ("Access to gender affirmative types of support (i.e., medical, legal, and social gender affirmation) has been shown to offset the negative psychological effects of social oppression"); Jaclyn M. White Hughto et al., *Social and Medical Gender Affirmation Experience Are Inversely Associated with Mental Health Problems in a U.S. Non-Probability Sample of Transgender Adults*, 49 ARCHIVES SEXUAL BEHAV. 2635-47 (2020) (participants reported significantly lower suicidal thoughts and behaviors following gender affirmation process); Jaclyn M. White Hughto, Sari L. Reisner & John E. Pachankis, *Transgender Stigma and Health: A Critical Review of Stigma Determinants, Mechanisms, and Interventions*, 147 SOC. SCI. & MED. 222-31 (2015) (finding that policies reducing stigma present the potential to improve the health of transgender individuals).

Tennessee's prohibition on updating gender markers for transgender people on birth certificates is directly contrary to these widely endorsed medical principles about how to best care for, and treat, these members of the community.

## II. TENNESSEE'S BAN HARMS TRANSGENDER PEOPLE IN "AN ALMOST LIMITLESS NUMBER OF TRANSACTIONS AND ENDEAVORS THAT CONSTITUTE ORDINARY CIVIL LIFE IN A FREE SOCIETY."[6]

People rely on birth certificates in a myriad of life-sustaining ways to function in society. *See* Nat'l Acads., Sci., Eng'g, & Med., *Understanding the Well-Being of LGBTQI+ Populations* 5-11 (2020). A birth certificate is the first legal document an individual acquires and is foundational for accessing a wide range of federal rights and benefits throughout a person's life. *See* Am. Bar Ass'n, *Birth Certificates* (Nov. 20, 2018), https://perma.cc/K7BV-W5QN. A birth certificate secures citizenship, which is necessary to vote and run for certain elected office. *See, e.g.*, U.S. Const. art. 1, § 3, cl. 3. A birth certificate is necessary to obtain a passport and a social security number. 22 C.F.R. § 51.42; 20 C.F.R. § 422.103. It is also needed to apply for key government health benefits such as Medicaid and Medicare, 42 C.F.R. § 435.407, and is used to obtain a REAL ID and to enlist in the military.[7]

---

[6] *Romer v. Evans*, 517 U.S. 620, 631 (1996).

[7] REAL ID Act, H.R. 1268, 109th Cong. § 202(b) (2005); Tennessee Dep't of Safety & Homeland Security, *REAL ID Requirements*, https://www.tn.gov/tnrealid/requirements.html (last accessed Oct. 25, 2023); 10 U.S.C. § 504(b) (detailing the citizenship or residency requirement to enlist in the armed forces).

Tennessee law affirms that vital records "furnish and preserve evidence affecting personal and property rights of the individual citizen." Tenn. Code Ann. §68-3-201. Under Tennessee law, birth certificates are vital for obtaining identification and accessing numerous opportunities, benefits, and services. Birth certificates serve as proof of citizenship to obtain a state identification license.[8] They are used to verify identity for employment for private employers, Tenn. Code Ann. §50-1-703(a)(1)(B), and to open a bank account.[9] In some counties, birth certificates are necessary to obtain a marriage license.[10] Birth records serve to verify citizenship for child care payment assistance and are required for first-time enrollment in TennCare, the state's Medicaid program.[11] Birth records are required to enroll in school and to be adopted.[12] Birth certificates can also be necessary at key life transitions governed by state law, such as an individual or family member's death, or the birth or adoption of a child, or divorce.

---

[8] Tennessee Dep't of Safety & Homeland Security, *Identification License*, https://www.tn.gov/safety/driver-services/idonly.html (last accessed Oct. 25, 2023).
[9] Consumer Financial Protection Bureau, *Checklist for opening a bank or credit union account*, https://files.consumerfinance.gov/f/documents/cfpb_adult-fin-ed_checklist-for-opening-an-account.pdf.
[10] *See, e.g.*, Shelby County Tennessee, *Marriage Licenses*, https://www.shelbycountytn.gov/574/Marriage-Licenses (last visited Oct. 25, 2023).
[11] Tennessee Dep't Human Services, *Child Care Payment Assistance*, https://www.tn.gov/humanservices/for-families/child-care-services/child-care-payment-assistance.html (last visited Oct. 25, 2023).
[12] T.C.A. § 49-6-3008(b); T.C.A. § 36-1-116.

This is shown in the painful experience of Jaime Combs, a transgender woman and one of the Plaintiffs, who was harmed by Tennessee's policy when her marriage ended. [13]  As her marriage to a man was ending after seven years, Ms. Combs was told that Tennessee would not consider her marriage legal because Tennessee did not, at the time, recognize marriage between same-sex couples, and her birth certificate reported her sex as male.[14]  Ms. Combs was concerned that if she contested the divorce proceedings, her transgender status would become publicly known, and she would face bias and discrimination.[15]  At the time, Ms. Combs was not open about being transgender and was worried that this would negatively impact her salon business.  The result was that Ms. Combs felt she had to agree to an uncontested divorce, allowing her former husband to retain all of their joint assets to her financial detriment.[16]

The same is true of S., a transgender woman born in Tennessee.  Her birth certificate is the only mismatching document she still has.[17]  One of her main worries is what happens on her death as a result of her birth certificate and whether her wife

---

[13] Am. Compl., R. 59, Page ID # 397-98.

[14] *Id.* at 23.

[15] *Id.* at 23-24.

[16] *Id.* at 24.

[17] Telephonic Interview with S. (Oct. 23, 2023) (Notes on file with counsel for Amicus Curiae White & Case LLP).

will have difficulty getting a death certificate for S. No one should have to worry about facing bias and disrespect in death.

The stories of Ms. Combs and of S. are not outliers. Holding a birth certificate that does not match one's gender identity results in repeated forced disclosure of transgender status—in violation of basic privacy rights (*See* App. Br. 45-48, 51-57)—as well as "mismatched" identification that can lead to questioning, suspicion, and ultimately denial of service and other barriers in many spheres of life:

**Health Care.** It is well-documented that transgender people encounter significant discrimination in health care settings, and that the experience and fear of denial and discrimination dissuades transgender people from seeking basic healthcare, and further undermining health and well-being. *See*, *e.g.*, Sandy E. James et al., Nat'l Ctr. Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 10 (2016) ("NCTE Survey"); Shanna K. Kattari et al., *Correlations Between Healthcare Provider Interactions and Mental Health Among Transgender and Nonbinary Adults*, 10 SSM–POPULATION HEALTH 4 (2020).

Plaintiff L.G. experienced this first-hand. She has tried multiple times to update her gender marker on her birth certificate, but was always denied, and she was previously unable to update the sex designation on her drivers' license as well.[18] L.G. describes the invasive questions and harassment she encountered following the

---

[18] Am. Compl. R. 59, Page ID # 400.

forced disclosure of her transgender status at her doctor's office, even during her physical examination.[19]

**Employment and Economic Security.**    Identification—often multiple forms—is vital to accessing employment and, in turn, promoting economic stability for transgender individuals and their families.    Transgender people have higher unemployment and poverty rates than the U.S. population as a whole, NCTE Survey, *supra*, at 141-42, 145, and face extensive discrimination in the workplace.    *See* Ilan H. Meyer et al., *Demographic Characteristics and Health Status of Transgender Adults in Select US Regions: Behavioral Risk Factor Surveillance System, 2014*, 107 AM. J. PUB. HEALTH 582 (2017).    Plaintiff Ms. Gore has experienced this multiple times, as prospective employers have required her to produce her birth certificate, leading to her involuntary "outing"—and invasive and inappropriate questioning having nothing to do with her qualifications—just for trying to secure a job.[20]

Meanwhile, one study showed that transgender women with conforming identification were more likely to be employed and to hold stable housing, and reported higher monthly incomes.    Brandon J. Hill et al., *Exploring Transgender Legal Name Change as a Potential Structural Intervention for Mitigating Social*

---

[19] *Id.* at 26-27.
[20] *Id.* at 93.

*Determinants of Health Among Transgender Women of Color*, 15 SEXUALITY RSCH. & SOC. POL'Y 9, 9-8 (2019).

**Housing**.  Housing is another arena that routinely requires multiple forms of identification, and one in which discrimination (and indeed, homelessness) is an acute problem for the transgender community.  *See* Nat'l Acads., Sci., Eng'g, & Med., *supra*, at 10-15.  In one study, 61% of transgender people experienced discriminatory treatment when searching for housing.  Jamie Langowski et al., *Transcending Prejudice: Gender Identity and Expression-Based Discrimination in the Metro Boston Rental Housing Market*, 29 YALE J.L. & FEMINISM 322 (2018). Another study found that 23% of respondents had experienced a form of housing discrimination in the past year.  NCTE Survey, *supra*, at 176.

**Daily life and services**.  Daily life requires many interactions verifying identity.  Denying transgender people amended identification to use in these daily interactions is not merely an inconvenience: it subjects them to discrimination, harassment, and worse, allegations of criminal activity such as fraud.  "As a result of showing an ID with a name or gender that did not match their gender presentation, 25% of people were verbally harassed, 16% were denied services or benefits, 9% were asked to leave a location or establishment, and 2% were assaulted or attacked." *See* NCTE Survey, *supra*, at 82. These disruptions cause considerable stress and undermine well-being for transgender community members.

### III. THE VAST MAJORITY OF STATES, AS WELL AS THE FEDERAL GOVERNMENT, PERMIT TRANSGENDER INDIVIDUALS TO AMEND THEIR BIRTH CERTIFICATES

There are only three states in the U.S. that categorically ban transgender people from amending their birth certificates. *See* TN 68-3-203(a)(d); KS SB180; Okla. Exec. Or. 2021-24. The overwhelming majority of states—as well as the District of Columbia and U.S. territories such as Puerto Rico, Guam, and Northern Mariana Island—permit individuals to amend gender on a birth certificate. *See* Alas. Stat. § 18.50.220(c); Ala. Code § 22-9A-19(d); Ariz. Rev. Stat. § 36-337(A)(3); Ark. Code Ann. § 20-18-307(d); Cal. Health & Saf. Code § 103425; Colo. Rev. Stat. § 1006-1; Conn. Gen. Stat. § 7-51; Del. Code tit. 16 § 3131; D.C. Law 20-37; Fla. Stat. Ann. § 382.016; Ga. Code Ann. § 31-10-23(e); Haw. Rev. Stat. Ann. § 338-17.7(a)(4)(B); Idaho Code § 39-245A(3); 410 Ill. Comp. Stat. Ann. 535/17; Ind. Code Ann. § 16-37-2-10; Iowa Code § 144.23; Ky. Rev. Stat. § 213.121(5); La. Rev. Stat. Ann. § 40:62; Mich. Comp. Laws Serv. § 333.2831(c); Me. Rev. Stat. tit. 22, § 2765; Md. Code Ann., Health–Gen. § 4-211; Mass. Ann. Laws ch. 46, § 13(e); Minn. Stat. Ann. § 144.218; Miss. Admin. Code 15-5-85:3.21.2; Mo. Ann. Stat. § 193.215(9); Neb. Rev. Stat. § 71-604.01; Nev. Admin. Code. Ch. 440, § 130; N.H. RSA 5-C:87; N.J. Stat. Ann. § 26:8-40.12; N.M. SB 20; NYCCRR tit. 10 § 35.2; N.C. Gen. Stat. §§ 130A-118(b)(4),(e); *Changing or Correcting a Birth Record*, https://perma.cc/6VLK-MR6V (last visited Oct. 5, 2023); *To Change Sex/Gender*

13

*on a Pennsylvania Certification of Birth*, https://perma.cc/FS73-CVDY; Or. HB

2673; R.I. Gen. Laws § 23-3-21; S.C. Code. Ann. Regs. 44-63-100; S.D. Admin. R.

44:09:05:02; T.X. Health & Safety Code § 192.011; U.T. SB93; V.T. H.628 (Act

88); V.A. SB 657; *Request to Change Sex Designation on a Birth Certificate for an*

*Adult*, https://perma.cc/RH6U-DZ4H (last visited Oct. 5, 2023); Wis. Stat. Ann. §

69.15; W.Y. Rules and Regulations HLTH VR Ch. 10 s 4(e)(iii).[21]

The U.S. government is in accord—for U.S. citizens born abroad, the federal

government issues a "Consular Report of Birth of a U.S. Citizen Abroad," for which

there is a clear and accessible process for updating gender.[22] *See* 8 FAM 403.3-1.

It bears noting, as Appellants have done (App. Br. at 43), that Tennessee itself

already permits amendment—not merely correction—of birth certificates in several

ways.  A person who has changed their name from the name they were given at birth

can update that part of their birth certificate.  §68-3-203(c).  So can someone who

wishes to reflect parents who are different from those listed on the day they were

born, by adding or removing a parent.  §68-3-203(g), (h).  This negates the district

court's repeated and heavy reliance on the notion that birth certificates are intended

to record things as they existed at the moment of birth, never to be changed.  *See,*

---

[21] *See* Movement Amendment Project, *Identity Document Laws and Policies: Birth Certificates*, https://perma.cc/A4U7-MSBX (last visited Oct. 5, 2023).
[22] U.S. Dep't of State, *Birth of U.S. Citizens and Non-Citizen Nationals Abroad*, https://perma.cc/4RF6-XZSP (last visited Oct. 5, 2023).

*e.g.*, Opinion, R. 110, Page ID ## 2624; 2627; 2630-31.  It also negates any asserted governmental interest (*see* R. 110, Page ID # 2622-23) in having birth certificates be fixed, unchangeable documents—that is already not what they are—let alone a governmental interest that could justify the very real harms Tennessee inflicts on its transgender citizens by refusing to make the amendments sought here.

## CONCLUSION

Medical and scientific consensus, lived experience, and state and federal governmental policies across the United States all show that the ability to amend their birth certificates is essential for transgender people to live safe, stable, and productive lives.  Tennessee's ban subjects transgender Tennesseans to a litany of harms and violates their constitutional rights. The judgment of the district court should be reversed.

Date:  October 26, 2023

Respectfully submitted,

*/s/ Patience Crozier*

Kimberly A. Havlin
Ariell D. Branson
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY  10020
(212) 819-8200
kim.havlin@whitecase.com

Patience Crozier
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA  02108
(617) 426-1350
pcrozier@glad.org

*Counsel for Amicus Curiae*

15

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(5) and 32(g)(1), I certify as follows:

1.      This Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 3,246 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated:  October 26, 2023                    By: */s/ Patience Crozier*
                                                                *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I, Patience Crozier, certify that on this 26th day of October 2023, I caused to be electronically filed the foregoing document with the United States Court of Appeals for the Sixth Circuit using the Court's CM/ECF system.  I further certify that this document was served this day on all counsel of record electronically via CM/ECF.


Dated: October 26, 2023                    By: */s/ Patience Crozier*
                                           *Counsel for Amicus Curiae*