No. 23-5669

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT
_____

KAYLA GORE ET AL.,

*Plaintiff-Appellants*,

v.

WILLIAM LEE ET AL.,

*Defendant-Appellees*.
_____

On Appeal from the Judgment of the United States
District Court for the Middle District of Tennessee
(No. 3:19-cv-00328)

## APPELLEES' RESPONSE BRIEF

Jonathan Skrmetti
 *Attorney General & Reporter*
 *of the State of Tennessee*

Andrée Sophia Blumstein
 *Solicitor General*

Dianna Baker Shew
 *Senior Executive Counsel*
 *for Trial Advocacy*

Sara E. Sedgwick
 *Senior Assistant Attorney General*

J. Matthew Rice
 *Associate Solicitor General*
 *Counsel of Record*

Steven J. Griffin
 *Senior Counsel for Strategic Litiga-*
 *tion and Assistant Solicitor General*

Trenton M. Meriwether
 *Assistant Attorney General*

Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee
(615) 532-6026
matt.rice@ag.tn.gov

## Table of Contents

INTRODUCTION ...................................................................................... 1

BACKGROUND ........................................................................................ 3

A.     Tennessee Birth Certificates ................................................................ 3

B.     The Sex Designation Policies ............................................................. 5

C.     Factual and Procedural Background .................................................... 6

SUMMARY OF THE ARGUMENT ........................................................ 9

STANDARD OF REVIEW ...................................................................... 11

ARGUMENT ........................................................................................... 12

I.     The Complaint Fails to State an Equal Protection Claim. ............... 12

    A. The Amendment Policy does not treat transgender persons
       differently. ...................................................................................... 12

       1. The Amendment Policy applies equally. .............................. 13

       2. The Complaint alleges no disparate impact motivated by a
          discriminatory purpose. ...................................................... 17

    B. The Amendment Policy passes constitutional review. ........................... 20

       1. Rational-basis review applies. .............................................. 20

       2. The Amendment Policy easily satisfies rational-basis review. ........... 31

II.     The Complaint Fails to State a Due Process Claim. ..................................... 34

    A. Plaintiffs have no unenumerated constitutional right to amend the sex
       designation on their birth certificates. ..................................................... 34

       1. The Due Process Clause provides no constitutional right to amend a
          birth certificate to reflect gender identity. ........................................... 36

       2. Plaintiffs' informational-privacy argument fails as a matter
          of law. ............................................................................................. 40

          a. The Court should not create a new informational-privacy right. .... 41

          b. Plaintiffs' challenge falls outside of recognized
             informational-privacy rights. ......................................................... 42

    B. Plaintiffs allege no forced disclosure of their transgender status. ............ 49

C. The Amendment Policy does not violate any informational-privacy right....................................................................................52

III. The Court Should Reject Plaintiffs' Remand Request...................................54

CONCLUSION .......................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*37712, Inc. v. Ohio Dep't of Liquor Control*,
113 F.3d 614 (6th Cir. 1997) .................................................................31

*Adams v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) ....................................................... 27, 33

*Am. Fed'n of Gov't Emps. v. HUD*,
118 F.3d 786 (D.C. Cir. 1997) ............................................................41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................11

*Barber v. Overton*,
496 F.3d 449 (6th Cir. 2007) ....................................................... 43, 44

*Barnes v. City of Cincinnati*,
401 F.3d 729 (6th Cir. 2005) ..............................................................30

*Bd. of Trustees v. Garrett*,
531 U.S. 356 (2001) ...............................................................................2

*Beaty v. United States*,
937 F.2d 288 (6th Cir. 1991) ..............................................................55

*Bloch v. Ribar*,
156 F.3d 673 (6th Cir. 1998) ..................................................... *passim*

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) ................................................................. 28, 29

*Bowen v. Gilliard*,
483 U.S. 587 (1987) ............................................................................22

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) ............................................................................19

*Brown v. Cooke*,
362 Fed. App'x 897 (10th Cir. 2010) ..................................................37

*California v. Rooney*,
   483 U.S. 307 (1987) .................................................................55

*Canterino v. Wilson*,
   869 F.2d 948 (6th Cir. 1989) ...............................................14

*Chambers v. Sanders*,
   63 F.4th 1092 (6th Cir. 2023) ..............................................36

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) .................................................................21

*Clark v. Jackson*,
   2023 WL 2787325 (6th Cir. 2023) ............................... 35, 36

*Collins v. City of Harker Heights*,
   503 U.S. 115 (1992) .................................................................35

*Collins v. Yellen*,
   141 S. Ct. 1761 (2021) ...........................................................51

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) .................................................. *passim*

*Doe v. City of Mansfield*,
   2023 WL 1822208 (6th Cir. 2023) ....................... 44, 48, 53

*Doe v. Mich. State Univ.*,
   989 F.3d 418 (6th Cir. 2021) ...............................................55

*Dog Pound v. City of Monroe*,
   558 Fed. App'x 589 (6th Cir. 2014) ..................................12

*Doyle v. Okla. Bar Ass'n*,
   998 F.2d 1559 (10th Cir. 1993) ..........................................37

*Elkins v. Richardson-Merrell*,
   8 F.3d 1068 (6th Cir. 1993) .................................................16

*EMW Women's Surgical Ctr. v. Beshear*,
   920 F.3d 421 (6th Cir. 2019) ...............................................51

*FCC v. Beach Commc'ns*,
 508 U.S. 307 (1993) ........................................................................ 31, 33

*Ferguson v. Neighborhood Hous. Servs.*,
 780 F.2d 549 (6th Cir. 1986) ...............................................................15

*Flaskamp v. Dearborn Pub. Sch.*,
 385 F.3d 935 (6th Cir. 2004) ......................................................... 53, 54

*Fowler v. Stitt*,
 2023 WL 4010694 (N.D. Okla. June 8, 2023) ........................... *passim*

*Geduldig v. Aiello*,
 417 U.S. 484 (1974) ....................................................................... 14, 17

*Glicker v. Mich. Liquor Control Comm'n*,
 160 F.2d 96 (6th Cir. 1947) ..................................................................12

*Grindstaff v. Green*,
 133 F.3d 416 (6th Cir. 1998) ...............................................................18

*Heller v. Doe*,
 509 U.S. 312 (1993) ..............................................................................31

*Hoohuli v. Ariyoshi*,
 631 F. Supp. 1153 (D. Haw. 1986) .......................................................27

*Horner v. KHSAA*,
 43 F.3d 265 (6th Cir. 1994) .................................................................17

*Hughes v. Sanders*,
 469 F.3d 475 (6th Cir. 2006) ...............................................................11

*In re Zuniga*,
 714 F.2d 632 (6th Cir. 1983) ...............................................................54

*Jana-Rock Constr. v. N.Y. Dep't of Econ. Dev.*,
 438 F.3d 195 (2d Cir. 2006) .................................................................26

*Kallstrom v. Columbus*,
 136 F.3d 1055 (6th Cir. 1998) ....................................... 37, 42, 43, 52

*Kenny v. Bartman*,
   2017 WL 3613601 (6th Cir. 2017) ........................................................ 48

*L.W. v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ........................................................ *passim*

*Lambert v. Hartman*,
   517 F.3d 433 (6th Cir. 2008) ........................................................ *passim*

*Lawrence v. Pelton*,
   2021 WL 1511664 (6th Cir. 2021) ........................................................ 37

*Lee v. City of Columbus*,
   636 F.3d 245 (6th Cir. 2011) ........................................................ 48

*Leiser v. Moore*,
   903 F.3d 1137 (10th Cir. 2018) ........................................................ 41

*Lyng v. Castillo*,
   477 U.S. 635 (1986) ........................................................ 22

*Marie v. Am. Red Cross*,
   771 F.3d 344 (6th Cir. 2014) ........................................................ 13

*Mass. Bd. of Ret. v. Murgia*,
   427 U.S. 307 (1976) ........................................................ 20

*Mattox v. City of Forest Park*,
   183 F.3d 515 (6th Cir. 1999) ........................................................ 48

*McDonald v. Chicago*,
   561 U.S. 742 (2010) ........................................................ 39

*MH v. First Jud. Dist. Ct.*,
   465 P.3d 405 (Wyo. 2020) ........................................................ 32

*Michael H. v. Gerald D.*,
   491 U.S. 110 (1989) ........................................................ 35

*Michael M. v. Superior Ct.*,
   450 U.S. 464 (1981) ........................................................ 30

*Miller v. DEA,*
    566 Fed. App'x 395 (6th Cir. 2014) ............................................................ 15, 18

*NASA v. Nelson,*
    562 U.S. 134 (2011) .............................................................................. 41, 52, 53

*Nguyen v. INS,*
    533 U.S. 53 (2001) ..................................................................................... 30, 31

*Ondo v. City of Cleveland,*
    795 F.3d 597 (6th Cir. 2015) ..................................................................... 21, 24

*Orion Ins. Grp. v. Wash. Off. of Minority & Women's Bus. Enters.,*
    2017 WL 3387344 (W.D. Wash. Aug. 7, 2017) ................................................ 26

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ........................................................................................ 18

*Piatt v. Gray,*
    321 F.2d 79 (6th Cir. 1963) .............................................................................. 55

*Pineda v. Hamilton Cnty.,*
    977 F.3d 482 (6th Cir. 2020) ........................................................................... 52

*Reform Am. v. City of Detroit,*
    37 F.4th 1138 (6th Cir. 2022) .......................................................................... 12

*Scarbrough v. Morgan Cnty. Bd. of Educ.,*
    470 F.3d 250 (6th Cir. 2006) ........................................................................... 20

*Smith v. City of Salem,*
    378 F.3d 566 (6th Cir. 2004) ........................................................................... 30

*Smith v. Troyan,*
    520 F.2d 492 (6th Cir. 1975) ..................................................................... 14, 17

*Summe v. Kenton Cnty. Clerk's Off.,*
    604 F.3d 257 (6th Cir. 2010) ........................................................................... 48

*Tennessee v. Dep't of Educ.,*
    615 F. Supp. 3d 807 (E.D. Tenn. 2022) ........................................................... 23

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ........................................................................34

*United States v. Des Moines Nav. & Ry. Co.*,
    142 U.S. 510 (1892) ...........................................................................18

*United States v. Johnson*,
    440 F.3d 832 (6th Cir. 2006) .................................................. 40, 47, 51

*United States v. McKinnie*,
    24 F.4th 583 (6th Cir. 2022) ..............................................................28

*United States v. Virginia*,
    518 U.S. 515 (1996) ...........................................................................29

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...........................................................................18

*Warren v. City of Athens*,
    411 F.3d 697 (6th Cir. 2005) .............................................................32

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ...................................................................*passim*

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
    979 F.3d 426 (6th Cir. 2020) ....................................................... 16, 19

*Weberg v. Franks*,
    229 F.3d 514 (6th Cir. 2000) .............................................................17

*Whitney v. State Tax Comm'n*,
    309 U.S. 530 (1940) ...........................................................................12

*Wiles v. Ascom Transp. Sys.*,
    478 Fed. App'x 283 (6th Cir. 2012) ...................................................48

*Wilson v. Collins*,
    517 F.3d 421 (6th Cir. 2008) .............................................................41

*Wurzelbacher v. Jones-Kelley*,
    675 F.3d 580 (6th Cir. 2012) .............................................................48

**Constitutional and Statutory Provisions**

U.S. Const. amend. XIV, § 1 ............................................................. 12, 34

Ala. Code § 22-9A-19 .........................................................................39

Ark. Code Ann. § 20-18-307(d) ..........................................................39

Haw. Rev. Stat. Ann. § 338-17.7 ........................................................39

410 Ill. Comp. Stat. Ann. 535/17 ........................................................39

Ky. Rev. Stat. Ann. § 213.121(5) ........................................................39

La. Stat. Ann. § 40:62 .........................................................................39

Minn. Stat. § 260.925 ..........................................................................23

Mo. Ann. Stat. § 193.215(9) ...............................................................39

N.J. Stat. Ann. § 26:8-40.12 ...............................................................39

Tenn. Code Ann. § 2-2-141(e) ............................................................54

Tenn. Code Ann. § 4-58-103(c) ..........................................................51

Tenn. Code Ann. § 49-2-801 ..............................................................33

Tenn. Code Ann. § 49-6-310(a) ..........................................................33

Tenn. Code Ann. § 68-3-201 ..............................................................32

Tenn. Code Ann. § 68-3-203 ..............................................................19

Tenn. Code Ann. § 68-3-203(a) ....................................................... 4, 32

Tenn. Code Ann. § 68-3-203(d) ...................................................... 18, 19

Tenn. Code Ann. § 68-3-203(e) ............................................................5

Tenn. Code Ann. § 68-3-203(f) .............................................................7

Tenn. Code Ann. § 68-3-301(a) ........................................................3, 4

Tenn. Code Ann. § 68-3-302(a) ........................................................3, 4

Va. Code Ann. § 38.2-3449.1 ...................................................................23

Vt. Stat. Ann. tit. 18, § 5112 .................................................................39

Wash. Rev. Code Ann. § 28A.642.080....................................................23

Wis. Stat. Ann. § 69.15(4)(b)................................................................39

## Rules and Regulations

Cal. Educ. Code § 221.5(f) ....................................................................23

Fed. R. App. P. 43(c)(2)...........................................................................6

Fed. R. Civil P. 12(b)(6) ........................................................................11

Tenn. Comp. R. & Regs. 1200-07-01-.01(1) ...........................................4

Tenn. Comp. R. & Regs. 1200-07-01-.10(1) .................................. 4, 5, 7

Wash. Admin. Code 246-490-075 ..........................................................39

## Other Authorities

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021)...................23

## ORAL ARGUMENT REQUEST

Appellees William Lee and Ralph Alvarado, in their official capacities (collectively, "the State"), respectfully request oral argument. This appeal raises important constitutional questions under the Equal Protection Clause and Due Process Clause. Oral argument will aid the Court's consideration of those questions.

## ISSUE STATEMENT

The Complaint asserts that the Fourteenth Amendment provides Plaintiffs a constitutional right to compel Tennessee to amend its own records—birth certificates—to reflect Plaintiffs' gender identity.  The questions presented are:

1.   Whether the district court correctly held that Plaintiffs failed to state a claim under the Equal Protection Clause.

2.   Whether the district court correctly held that Plaintiffs failed to state a claim under the Due Process Clause.

## INTRODUCTION

Tennessee birth certificates record one set of information (biological sex based on genitalia at birth), while Plaintiffs would prefer that they record different information (gender identity).  Rather than seek to change that through the political process, Plaintiffs ask the federal judiciary to constitutionalize the contents of state birth certificates.  But nothing in the Fourteenth Amendment provides a constitutional right to force States to record gender identity in their own records.

The Equal Protection Clause provides Plaintiffs no such right because Tennessee's policies do not treat transgender persons differently than anyone else.  All Tennessee birth certificates record sex based on the appearance of external genitalia at birth, and no one can change the initial "male" or "female" designation unless it was incorrect when recorded.  No aspect of that neutral amendment policy turns on whether a person is transgender.

What Plaintiffs fundamentally seek is *unequal* treatment.  They want the "sex" designation on Tennessee birth certificates to reflect biological sex based on genitalia at birth for one group of people and gender identity for another.  But the Constitution demands equality, not equivocation.

And, even if Tennessee *did* treat transgender persons differently, the challenged policy still would satisfy constitutional review.  This Court has already held that transgender persons are not a protected class and, therefore, transgender

discrimination claims face mere rational-basis review. *L.W. v. Skrmetti*, 83 F.4th 460, 486-87 (6th Cir. 2023). Tennessee's policy easily satisfies that deferential standard, providing an independent basis for dismissal. Put simply, "[i]f special accommodations for [transgender people] are to be required" on birth certificates, "they have to come from positive law and not through the Equal Protection Clause." *Bd. of Trustees v. Garrett*, 531 U.S. 356, 368 (2001).

The original, fixed meaning of the Due Process Clause likewise includes no constitutional right to dictate the contents of state records. Courts "exercise the utmost care when[] . . . asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences" of the judiciary. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quotations omitted). And the right sought here—a right to force States to amend birth certificates to include gender identity—is neither fundamental to our Nation's concept of liberty nor deeply rooted in history. The concept of gender identity and statewide birth-certificate regimes did not even exist at the time of the Fourteenth Amendment's adoption.

That lack of historical pedigree sinks Plaintiffs' effort to raise a so-called "informational privacy" right. This Court has taken an exceedingly narrow approach to informational privacy, limiting the doctrine to circumstances implicating

2

fundamental rights.  And the forced disclosure of one's transgender status does not involve any fundamental right.  Without a protected right, Plaintiffs have no claim.

Even with a right, Plaintiffs have no claim.  Under Plaintiffs' own allegations, a Tennessee birth certificate does not disclose a person's transgender status, as it cannot reveal a person's "*internal* sense of their own gender."  Compl., R.59, at 381 (emphasis added).[1]  Moreover, the limited disclosures alleged—to certain government officials, medical professionals, and employers—hardly constitute the widespread dissemination needed to show infringement.

The bottom line:  The Complaint fails to allege a constitutional violation.  The Court should affirm.

## BACKGROUND

### A.    Tennessee Birth Certificates

Tennessee, like all States, issues a "certificate of birth" for each live birth within its borders.  Tenn. Code Ann. § 68-3-301(a).  That certificate includes, among other things, the child's name, date of birth, parents' names, and sex based on external genitalia.  Compl., R.59, at 388.

Typically, a representative at the institution where the birth occurs gathers the information needed for the birth certificate.  Tenn. Code Ann. § 68-3-302(a).  The "physician in attendance . . . provide[s] the medical information required by the

---

[1] All record pincites refer to the "Page ID" numbers in the ECF file stamps.

certificate"—like the biological sex of the child based on external genitalia. *Id.* § 68-3-302(b). And a "parent of the child" or "other knowledgeable informant" provides the remaining information, "attest[ing] to the accuracy of the personal data provided." *Id.* § 68-3-301(b). The individual preparing the certificate then "certif[ies] that the child was born alive at the place and time and on the date stated . . . and fil[es] the certificate with the office of vital records or as otherwise directed by the state registrar." *Id.* § 68-3-302(a).

Tennessee's Office of Vital Records bears responsibility for the "preservation" of birth certificates and all other "official records." *Id.* § 68-3-103(1). The Office "give[s] instructions and prescribe[s] forms for collecting, transcribing, compiling and preserving vital records." *Id.* § 68-3-103(2). And, by law, official records—like birth certificates—"remain the property of the office." *Id.* § 68-3-104(6); Tenn. Comp. R. & Regs. 1200-07-01-.01(1).

"[T]o protect the integrity and accuracy of [these] vital records," state law restricts their amendment. Tenn. Code Ann. § 68-3-203(a). Within one year of the birth, the State Registrar may correct minor errors—like the "transposition of letters in words"—and may "accept an affidavit . . . to correct inaccurate information recorded on a certificate." Tenn. Comp. R. & Regs. 1200-07-01-.10(1). After a year, though, amendments generally must be supported by an affidavit identifying "the incorrect data as it is listed on the certificate," as well as "documentary evidence

4

which support[s] the alleged facts." *Id.* 1200-07-01-.10(2). The Registrar reviews this documentation and determines whether to amend the certificate. Tenn. Code Ann. § 68-3-203(e). In all instances, the Registrar shall "make the necessary correction" "if presented by an applicant with evidence that a reasonable person would conclude proves beyond a reasonable doubt that an original entry on a certificate was factually inaccurate at the time of recordation." *Id.* § 68-3-203(f).

While certain information that was accurate when recorded cannot be amended (e.g., a person's date of birth and sex), Tennessee law permits some voluntary amendments (e.g., a name change upon court order). For these amendments, unless a statute or rule provides otherwise, the Registrar "[d]raw[s] a single line through the item to be amended and insert[s] the correct data immediately above or to the side thereof." Tenn. Comp. R. & Regs. 1200-07-01-.10(11)(a)(2). The certificate is also marked "Amended." *Id.* 1200-07-01-.10(11)(b).

## B.    The Sex Designation Policies

In Tennessee, "a person is assigned a sex on their birth certificate solely based on the appearance of external genitalia at the time of birth." Compl., R.59, at 381, 388. If the child has penile genitalia, the certificate states "male." Op., R. 110, at 2602 n.12. If the child has vulvic genitalia, the certificate states "female." *Id.* Other "characteristics"—such as a person's "gender identity"—are "not assessed or considered at the time of birth." Compl., R.59, at 381. The sex designation conveys

5

only the "sex assigned at birth" based on external genitalia—sometimes referred to as "biological sex."  *Id.* at 381, 388.  And the "male" or "female" designation cannot be changed unless it was inaccurately recorded at the time of the child's birth.  *Id.*

### C.    Factual and Procedural Background

Plaintiffs Kayla Gore, Jamie Combs, L.G., and K.N. sued Governor Lee and Commissioner Piercy[2] to challenge the constitutionality of the State's amendment policy for the sex designation on Tennessee birth certificates (the "Amendment Policy" or "Policy").  Each Plaintiff is transgender, meaning their "gender identity diverges from the sex they were assigned at birth."  Compl., R. 59, at 375, 379, 381.  And each wishes to amend the sex designation on their birth certificate from their "sex assigned at birth" to their "gender identity"—i.e., their "internal sense of their own gender."  *Id.* at 375-77, 381, 389.  The Complaint claims that the U.S. Constitution requires the State to make such an amendment.

Count I contends that the Amendment Policy violates the Fourteenth Amendment's Equal Protection Clause.  Plaintiffs do not challenge "the State's practice of assigning a newborn a 'sex' of 'male' or 'female' at the time of birth."  Op., R.110, at 2609, 2612.  Rather, they object to the State's refusal to amend the sex designation on a birth certificate to match a person's gender identity.  Compl., R.59, at 376.

---

[2] Under Federal Rule of Appellate Procedure 43(c)(2), Commissioner Alvarado was automatically substituted for Commissioner Piercy.

According to Plaintiffs, the Amendment Policy violates the Equal Protection Clause "by depriving all transgender people—and only transgender people—born in Tennessee of access to an *accurate* birth certificate." *Id.* at 409 (emphasis added); *see id.* at 378, 387.

Count II rests on the Fourteenth Amendment's Due Process Clause. Plaintiffs claim that the Policy results in the "[f]orced disclosure of a person's transgender status." *Id.* at 411. This forced disclosure, the Complaint alleges, violates a host of supposed substantive due process rights, including the right to informational privacy. *Id.* at 411-13.[3]

Among other relief, the Complaint seeks an order requiring the State to "immediately issue corrected birth certificates to Plaintiffs . . . consistent with their gender identity, without adhering to the practice delineated in . . . Tenn. Comp. R. & Regs. 1200-07-01-.10 of using a strikeout line to change one's name, and with no record of the correction appearing upon the face of the certificate as provided by Tenn. Code Ann. § 68-3-203(f)." *Id.* at 415-16.

The district court dismissed Plaintiffs' Complaint for failure to state a claim. Op., R.110. For the equal protection claim, the court held that Plaintiffs could not show "[t]he threshold element": disparate treatment. *Id.* at 2613. Plaintiffs' theory

---

[3] On appeal, Plaintiffs abandoned their First Amendment claim and all substantive due process theories except informational privacy.

of disparate treatment, the court concluded, "depends on the validity of the notion that the sex designation on a transgender person's birth certificate is *incorrect*." *Id.* at 2614. The court rebuffed that notion because, as the Complaint recognizes, the State "use[s] the term 'sex' on a birth certificate to refer [only] to external genitalia at the time of birth." *Id.* at 2615; *see* Compl., R. 59, at 388. Given the narrow usage of the term, the court concluded that "it is not plausible to suggest that the 'sex' listed on a Tennessee birth certificate for a transgender person becomes 'incorrect' or 'inaccurate' when it is eventually understood to diverge from the transgender person's gender identity." Op., R.110, at 2615.

For the substantive due process claim, the district court held that the Complaint alleged no viable legal theory. It found no alleged facts that, if proven, would implicate the limited right to informational privacy recognized in the Sixth Circuit. *Id.* at 2639-45. The court noted that, contrary to other circuits, the Sixth Circuit has taken a restrictive approach to recognizing informational-privacy rights, only protecting "privacy interest[s that] implicate a fundamental right." *Id.* at 2639 (quotations omitted). And it rejected Plaintiffs' "exceedingly broad" reading of the two "very limited circumstances" in which this Court has found an informational-privacy right. *Id.* at 2640, 2645.

Even assuming the existence of such a right, the court found no forced disclosure. The court recognized that Plaintiffs' asserted right "depends entirely on the

notion that the . . . Policy forces transgender persons to disclose their transgender status." *Id.* at 2648. But, according to the Complaint, determining someone's transgender status requires knowing "not only a . . . person's sex (based on birth appearance), but also the transgender person's *gender identity.*" *Id.* at 2649. The court rejected "the notion that gender identity, defined by Plaintiffs as something *internal*, somehow is conveyed based on external appearance." *Id.* at 2651 (emphasis added). Rather, "a person's gender identity can be revealed only by the person himself or herself disclosing his or her internal feelings." *Id.* at 2652. Thus, the court concluded that "the State is not responsible for the disclosure of a person's transgender status through the person's birth certificate." *Id.* at 2653.

With no cognizable claim alleged, the district court dismissed Plaintiffs' Complaint.

## SUMMARY OF THE ARGUMENT

**I.** The Complaint states no equal protection claim.

**A.** Plaintiffs fail to allege disparate treatment. Under Plaintiffs' own allegations, the State's birth-certificate policies apply equally to transgender and cisgender persons. At most, Plaintiffs suggest there may be a disparate impact on transgender persons, but the Complaint fails to allege that a discriminatory purpose motivated the Amendment Policy.

9

**B.** Even if the Policy treated transgender persons differently, it would raise no constitutional problem.  Transgender persons are not a protected class, and transgender discrimination cannot be conflated with sex discrimination.  Rational-basis review thus applies.  The Amendment Policy easily satisfies that deferential standard.

**II.** The Complaint states no substantive due process claim.

**A.** The Due Process Clause does not provide a constitutional right to compel a State to amend its birth certificates to reflect gender identity.  That request is neither fundamental to ordered liberty nor deeply rooted in this Nation's history and tradition.  And Plaintiffs cannot fit their claim within the two narrow circumstances in which this Court has recognized an informational-privacy right.

**B.** Even assuming an informational-privacy right exists, Plaintiffs allege no forced disclosure of their transgender status.  A Tennessee birth certificate does not reveal a person's transgender status, because it conveys only sex assigned at birth, not internal feelings.  Moreover, Plaintiffs do not tie any forced disclosure to the Policy or the defendants in this case.

**C.** In any event, the Complaint fails to allege facts sufficient to establish infringement.  The governmental interests furthered by the Policy outweigh any minor privacy intrusion associated with the limited disclosure alleged.

10

**III.** The Court should not remand.  When reviewing a dismissal de novo, this Court determines whether a plaintiff has stated a viable claim with fresh eyes.  It does not pick out stray statements from the lower court's opinion, without ever analyzing how they affect the outcome, and tell the court to try again.  And, regardless, the district court made no error.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Meeting this standard requires "more than the bare assertion of legal conclusions"; it requires "either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Hughes v. Sanders*, 469 F.3d 475, 477 (6th Cir. 2006) (quotations omitted). To determine whether a complaint satisfies that requirement, the Court must "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## ARGUMENT

### I.    The Complaint Fails to State an Equal Protection Claim.

Plaintiffs' factual allegations do not state a viable claim under the Equal Protection Clause.  That provision prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This language "was not designed to compel uniformity in the face of difference," *Whitney v. State Tax Comm'n*, 309 U.S. 530, 542 (1940); rather, it bars only "intentional and arbitrary discrimination," *Glicker v. Mich. Liquor Control Comm'n*, 160 F.2d 96, 99 (6th Cir. 1947) (quotations omitted).

Plaintiffs allege nothing of the sort.  The Complaint does not plausibly plead disparate treatment.  Even if it did, the Policy would face only rational-basis review, and it survives that deferential standard.  For either reason, Plaintiffs' equal protection claim fails.

### A.    The Amendment Policy does not treat transgender persons differently.

To state an equal protection claim, a complaint must first allege that the government has intentionally "treated the plaintiff disparately as compared to similarly situated persons."  *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1152 (6th Cir. 2022) (quotations omitted).  "In other words, unless the plaintiff shows that a law (as written or as enforced) treats people who are in the same position differently, a successful equal-protection claim cannot be made."  *Dog Pound v. City of Monroe*, 558 Fed.

App'x 589, 592 (6th Cir. 2014). Plaintiffs cannot satisfy this "threshold" require-

ment. *Marie v. Am. Red Cross*, 771 F.3d 344, 361 (6th Cir. 2014).

### 1.   The Amendment Policy applies equally.

Plaintiffs cannot show disparate treatment "against transgender persons,"

Pltfs. Br. 29-32, because Tennessee's Amendment Policy does not treat persons dif-

ferently based on their transgender status. As Plaintiffs acknowledge, "it is the prac-

tice of the State of Tennessee, for purposes of determining the sex designation on

birth certificates, to rely solely on observations about the external genitalia of new-

borns." Compl., R.59, at 388; *see id.* at 381. And no one—*whether transgender or*

*cisgender*—can amend a "male" or "female" designation unless it was factually in-

accurate at the time of birth. *Id.* at 389. Thus, as the district court recognized, "the

general ban against changing a birth certificate's sex designation applies to

transgender and cisgender persons alike." Op., R.110, at 2619 n.33.

Put differently, the Policy does not differentiate based on transgender status.

Rather, it creates two groups: (1) persons with birth certificates that reflect their gen-

italia at birth, who cannot amend, and (2) persons with birth certificates that do not

reflect their genitalia at birth, who can amend. These groups bear no relation to

whether one is transgender. Indeed, cisgender and transgender persons can fall

within both groups, illustrating that no transgender classification is at issue. *See*

*Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974); *Canterino v. Wilson*, 869 F.2d 948, 954 (6th Cir. 1989); *Smith v. Troyan*, 520 F.2d 492, 495 (6th Cir. 1975).

The disparate-treatment issue is thus quite simple. Tennessee has an across-the-board rule for designating sex on birth certificates—record biological sex based on the appearance of external genitalia at birth. And it has an across-the-board policy for the amendment of that designation—no amendments unless the designation was factually inaccurate when recorded. By definition, a policy that applies equally cannot possibly treat transgender persons differently.

Plaintiffs nonetheless contend that "[t]he Policy prohibits transgender persons—and only transgender persons—from correcting the incorrect sex marker on their birth certificates while allowing cisgender people to correct inaccurate sex markers." Pltfs. Br. 29. But Plaintiffs' own allegations recognize that the sex designation on a Tennessee birth certificate reflects only a person's biological sex at birth based on external genitalia. Compl., R.59, at 381, 388. So a transgender person's sex designation remains accurate even when a person's gender identity later diverges from their sex assigned at birth. Op., R.110, at 2614-15.

Plaintiffs argue that treating Tennessee birth certificates as conveying sex based only on external genitalia at the time of birth discards their allegations as to the proper meaning of "sex" and impermissibly incorporates subjective "views of what sex means." Pltfs. Br. 31; *see id.* at 22-26. But the question here is not the

14

"proper" understanding of "sex" or what "sex" means in the abstract. The question is: What does "sex" *on Tennessee birth certificates* reflect?

Plaintiffs' allegations provide the answer. The Complaint recognizes that "it is the practice of the State of Tennessee, for purposes of determining the sex designation on birth certificates, to rely solely on observations about the external genitalia of newborns." Compl., R.59, at 388; *see also id.* at 381. And it confirms that a person's "gender identity" is not "considered at the time of birth" when recording the sex designation. *Id.* Plaintiffs' Opening Brief reiterates that "[i]t is the practice of Tennessee, for purposes of determining the sex designation on birth certificates, to rely solely on third-parties' observations of the external genitalia of newborns." Pltfs. Br. 10-11. This undisputed usage of the term "sex" on Tennessee birth certificates—referring to biological sex based on external genitalia at birth—is far from novel.

The district court, thus, did not "reach its own conclusion about the meaning and relevance of the sex designation on a person's birth certificate." Pltfs. Br. 25. It simply adhered to the Complaint's allegations that Tennessee's sex designation merely reflects sex based on the appearance of external genitalia at birth, not gender identity—admissions that bind Plaintiffs. *Miller v. DEA*, 566 Fed. App'x 395, 397 (6th Cir. 2014); *Ferguson v. Neighborhood Hous. Servs.*, 780 F.2d 549, 551 (6th Cir. 1986). "So even if (as Plaintiffs claim) 'sex' in whatever sense they mean it is

15

determined by . . . gender identity, 'sex' in *the very limited sense* that the birth certificate means it (*i.e.*, sex (based on birth appearance)) undisputedly is distinct from gender identity." Op., R.110, at 2634.

Viewing the "sex" designation on a birth certificate for what it is—a record of external genitalia at birth—Plaintiffs cannot plausibly claim that they have inaccurate birth certificates.

Plaintiffs also attempt to muddy the waters by arguing that "Tennessee permits persons born with ambiguous genitalia whose sex was recorded at birth as 'unknown' to correct their sex designation later in life based on other sex characteristics." Pltfs. Br. at 11-12. But Plaintiffs did not allege as much in their Complaint, and they cannot supplement their allegations through their briefing. *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020). Moreover, Plaintiffs did not make this argument to the district court "in connection with th[e] Motion [to Dismiss]," Op., R.110, at 2603 n.13, and "except in exceptional cases," this Court "does not normally address issues raised for the first time on appeal," *Elkins v. Richardson-Merrell*, 8 F.3d 1068, 1072 (6th Cir. 1993).

Regardless, the belatedly asserted ambiguous-genitalia argument does not help Plaintiffs. Contrary to Plaintiffs' suggestion, allowing persons born with ambiguous genitalia to amend their sex designation does not show that *transgender persons* are treated differently from *cisgender persons*. Pltfs. Br. 26, 31. It shows

16

that persons with ambiguous genitalia are treated differently from persons without ambiguous genitalia.  That is, even considering Plaintiffs' (unpleaded) factual allegation, it merely shows that the Policy creates two groups: (1) persons with ambiguous genitalia at birth, who can amend their sex designation, and (2) persons without ambiguous genitalia at birth, who generally cannot amend their sex designation.  These groups, again, do not turn on one's transgender status, meaning a "lack of identity" exists between the policy and transgender status.  *Geduldig*, 417 U.S. at 496 n.20; *Troyan*, 520 F.2d at 495.  And persons born *without* ambiguous genitalia—like Plaintiffs—are not a quasi-suspect class warranting heightened review, making Plaintiffs' adoption of this argument all the more quizzical.

The punchline: Plaintiffs cannot show that they are treated differently based on their transgender status.

### 2. The Complaint alleges no disparate impact motivated by a discriminatory purpose.

To the extent Plaintiffs mean to argue that the Amendment Policy has a disparate impact on transgender persons, that theory also fails.  "[M]ere disparate impact is not sufficient to state an equal protection claim."  *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000).  Instead, "[w]hen a facially neutral rule is challenged on equal protection grounds, the plaintiff must show that the rule was promulgated . . . *because of,* not merely in spite of, its adverse impact on" a particular group.  *Horner v. KHSAA*, 43 F.3d 265, 276 (6th Cir. 1994).  This requires affirmative, factual

allegations—and eventually evidence to prove—that a "discriminatory intent or purpose" gave rise to the facially neutral policy. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *see Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose' . . . implies more than . . . intent as awareness of consequences."). And it requires a showing sufficient to overcome the well-established presumption that "a legislature acts . . . in good faith." *United States v. Des Moines Nav. & Ry. Co.*, 142 U.S. 510, 544 (1892).

Plaintiffs' Complaint contains no such allegations. The Complaint's bare contention that the "Policy . . . intentionally discriminates based on transgender status" cannot establish discriminatory purpose. Compl., R.59, at 408; *see id.* at 409. "[T]he Court need not accept as true legal conclusions," *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998), and no facts support Plaintiffs' conclusory assertion. In fact, neither the Complaint nor Plaintiffs' Opening Brief contains *any* allegations related to the adoption of the Amendment Policy whatsoever. The absence of such allegations is dispositive. Plaintiffs have not set out a claim based on discriminatory intent or purpose.

Plaintiffs cannot remedy this pleading deficiency with a passing reference to Tenn. Code Ann. § 68-3-203(d)—which, consistent with the Policy, does not allow persons who have had a sex-change operation to amend the sex designation on their birth certificates. *See* Op., R.110, at 2618-23. *First*, Plaintiffs challenge the

18

application of the Amendment Policy, not any application of § 68-3-203(d). Compl., R.59, at 389, 407-10. *Second*, the Complaint alleges no facts indicating that anti-transgender animus underlies § 68-3-203(d), and Plaintiffs' briefing cannot supplement their allegations. *Waskul*, 979 F.3d at 440. *Third*, § 68-3-203 does not even target transgender persons: "It applies to any person who has a sex-change surgery," Op., R.110, at 2621,[4] and it does *not* "apply to transgender persons who . . . have not had sex-change surgery," *id.* at 2619-20. *Fourth*, Plaintiffs cannot tie § 68-3-203(d) to the "result of some [supposed] movement to discriminate against transgender persons . . . associated with the current powers that be in the Tennessee state government." *Id.* at 2620-21. Section 68-3-203(d) became law in 1977, when "[t]he majority of both of the houses of the Tennessee legislature" and "the Tennessee governor" were "all of the same party—and it was *not* the party that has controlled the Tennessee legislature and the Tennessee governor's office for the past dozen years or so." *Id.* at 2620. *Fifth*, the "inquiry" into whether "animus toward transgender individuals as a class drives this law" is "whether the law at issue is inexplicable by anything but animus." *L.W.*, 83 F.4th at 487 (quotations omitted). And § 68-3-

---

[4] Plaintiffs claim that "only transgender people obtain [sex-change] surgery." Pltfs. Br. 37. That factual assertion is not alleged in Plaintiffs' Complaint so it cannot be considered. *Waskul*, 979 F.3d at 440. It defies reality. Op., R.110, at 2621-22. And it does not even show intentional discrimination against transgender persons. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993) (holding that restrictions on abortion do not "*ipso facto* . . . discriminate invidiously against women as a class" even though "only women can become pregnant").

203(d) is explainable by reasons having nothing to do with anti-transgender animus. *See, e.g.*, *infra* 31-33.

In short, Plaintiffs cannot establish the disparate treatment of transgender persons. The district court thus properly dismissed the equal protection claim. Op., R.110, at 2611-38.

**B.     The Amendment Policy passes constitutional review.**

Even if Plaintiffs could establish that the Policy "single[s] out transgender people," Pltfs. Br. 30, their equal protection claim would still fail. "[O]nce disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). The classification Plaintiffs press here—disparate treatment based on transgender status—calls for mere rational-basis review, and the Policy easily satisfies that "relaxed standard." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976).

**1.     Rational-basis review applies.**

Plaintiffs allege disparate treatment *based on their transgender status*. Pltfs. Br. 29-32. But transgender persons are not a suspect class warranting heightened review. And, as this Court recently recognized, transgender-based claims cannot be conflated with sex-based challenges in the Equal Protection context.

***Transgender-status challenges face rational-basis review.*** As a general rule, legislation is presumed valid and will be sustained "if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). This rule gives way to heightened review only when laws "burden[] a fundamental right" or "involve a suspect or quasi-suspect class." *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015). To date, though, the Supreme Court has recognized only three suspect classifications (race, alienage, and national origin) and two quasi-suspect classes (sex and illegitimacy). *Id.* "[N]either the Supreme Court nor this Court has recognized transgender status as a suspect [or quasi-suspect] class." *L.W.*, 83 F.4th at 486.

This Court should not expand the (short) list of protected classifications to include transgender status. The Supreme Court "has not recognized any new constitutionally protected classes in over four decades." *Ondo*, 795 F.3d at 609. And just months ago, this Court declined to recognize transgender status as a protected class. *L.W.*, 83 F.4th at 486-87.

In *L.W.*, Chief Judge Sutton's majority opinion held that "areas of regulation that affect transgender individuals" should not be subject to heightened review. *Id.* at 486-87. The Constitution, the court explained, "does not offer a principled way to judge" the "line-drawing dilemmas" that accompany these issues. *Id.* If courts apply heightened scrutiny, it will only remove "trying policy choices" from the

"arena of public debate and legislative action" and vest them in "one [unelected] Supreme Court." *Id.* "That is not how a constitutional democracy is supposed to work—or at least works best—when confronting evolving social norms." *Id.* at 487.

That well-reasoned conclusion fits with the "[o]ther considerations that the [Supreme] Court has highlighted" when deciding whether to create "a new suspect class." *Id.* at 487. Those considerations generally look to whether the government's classification scheme disfavors a "discrete group" with "immutable" characteristics that is "politically powerless" and has "been subjected to discrimination" "[a]s a historical matter." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). Transgender persons do not fit that bill.

For one, transgender persons do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *L.W.*, 83 F.4th at 487 (quoting *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987)). Quite the contrary, as this Court recognized, transgender status "is not definitively ascertainable at the moment of birth," "is not necessarily immutable," and is not the creator of a "discrete group" because "a huge variety of gender identities and expressions" exist. *Id.* (citations and quotations omitted).

For two, "[w]hatever may have been true in the past about our society's treatment of individuals with gender dysphoria," transgender persons are "[n]ot a politically powerless group" today. *L.W.*, 83 F.4th at 487. From his first day in office,

President Biden has prioritized "Preventing and Combating Discrimination on the Basis of Gender Identity." Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021). He has "appointed a record number of openly LGBTQI+ leaders." White House, A Proclamation on Transgender Day of Visibility (Mar. 30, 2023), perma.cc/VZN6-4ATC. And his agencies have attempted to impose new gender identity obligations on the States. *See, e.g.*, *Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 838-39 (E.D. Tenn. 2022). Similarly, in many States, transgender and gender-dysphoric individuals have flexed their political muscle and persuaded legislatures to provide them unprecedented statutory rights. *See, e.g.*, Cal. Educ. Code § 221.5(f); Minn. Stat. § 260.925; Va. Code Ann. § 38.2-3449.1; Wash. Rev. Code Ann. § 28A.642.080. That transgender persons have not won every political battle in every State does not make them politically powerless. There is no "skewed or unfair political process [for transgender persons]—and [Plaintiffs] offer no explanation for inviting a greater political dysfunction problem: the difficulty of amending the Constitution if the federal courts err in choosing to occupy the field." *L.W.*, 83 F.4th at 487.

Plaintiffs resist this conclusion, characterizing *L.W.*'s reasoning as "untenable" and "fanciful." Pltfs. Br. 39-40. But this Court cannot discard Chief Judge Sutton's thoughtful opinion simply because Plaintiffs think it "misse[d] the mark" and desire to be governed by out-of-circuit precedent. *Id.*

In any event, Plaintiffs' case for heightened review lacks merit. Plaintiffs suggest that historical discrimination and their ability to contribute to society alone justify protection under heightened review. Pltfs. Br. 39. But the Supreme Court "has *never* defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth." *Ondo*, 795 F.3d at 609 (emphasis added). Adopting Plaintiffs' lax approach would confer protected status on practically any group that has suffered discrimination.

Ultimately, "[t]he bar for recognizing a new suspect class is a high one." *L.W.*, 83 F.4th at 486. "Constitutionalizing new areas of American life is not something federal courts should do lightly, particularly when the 'States are currently engaged in serious, thoughtful' debates about the issue." *Id.* at 471 (quoting *Glucksberg*, 521 U.S. at 719). And this Court has rightfully decided not to break new ground in cases alleging discrimination against transgender persons. Rational-basis review applies.

***Plaintiffs cannot invoke sex-based intermediate scrutiny.*** With no viable argument that heightened review governs transgender-status classifications, Plaintiffs resort to blurring the line between transgender-discrimination claims (subject to rational basis review) and sex-discrimination claims (subject to intermediate scrutiny). Pltfs. Br. 32-36. This effort takes two forms: (1) Plaintiffs characterize their claim as a sex-based challenge, and (2) Plaintiffs contend that discrimination based on

transgender status necessarily involves discrimination based on sex. *Id.*  Neither argument holds up.

*First*, Plaintiffs cannot recast their claim as a sex-discrimination challenge. The Opening Brief claims that heightened scrutiny applies because Tennessee's birth certificates involve a "sex-based classification on its face"—i.e., the "classifi[cation of] persons as 'male' or 'female.'"  Pltfs. Br. 32-33.  But Plaintiffs *do not challenge that classification*.  As the district court recognized, at no point in this litigation have Plaintiffs "challenge[d] the State's practice of assigning a newborn a 'sex' of 'male' or 'female.'"  Op., R.110, at 2609.  Instead, Plaintiffs challenge the State's "*refusal to change* the birth certificate's sex categorization for a transgender person based on the person's gender identity."  *Id.*  Indeed, Plaintiffs' entire theory of disparate treatment is that "[t]he Policy treats transgender persons born in Tennessee differently from similarly situated cisgender persons."  Pltfs. Br. 29.  Plaintiffs cannot focus on one characteristic—transgender status—to allege disparate treatment and then flip to a separate characteristic—sex—to request heightened review.

It is not enough, as Plaintiffs suggest, that a challenge based on transgender status is tangential to a sex classification.  *L.W.* limited sex-discrimination claims to those where the government has used "sex classifications to bestow unequal treatment on men and women."  83 F.4th at 483.  Plaintiffs have raised no such argument.

Plaintiffs nowhere allege that the Policy "appl[ies] one rule for males and another for females" or "prefer[s] one sex over the other." *Id.* at 480. Nor could they.

If raising a challenge tangential to a sex classification sufficed, then *L.W.* would not have stated that "areas of regulation that affect transgender individuals"— like "bathrooms," "locker rooms," "[s]ports teams and sports competitions"— should not be removed from the "arena of public debate and legislative action" through heightened review applied by "one [unelected] Supreme Court." 83 F.4th at 486-87 (quotations omitted). Every one of those examples involves a restriction on transgender persons tangential to a sex classification (separation based on sex), yet *L.W.* said they should *not* face heightened review. *Id.*

Nor can Plaintiffs invoke heightened scrutiny by purporting to challenge the "contours" of a class—as opposed to the classification itself. *Jana-Rock Constr. v. N.Y. Dep't of Econ. Dev.*, 438 F.3d 195, 210 (2d Cir. 2006). "The purpose" of applying heightened scrutiny "is to ensure that the government's choice to use [protected] classifications is justified." *Id.* But "[o]nce it has been established that the government is justified in resorting to" a protected "classification[]" like sex, heightened scrutiny "has little utility in supervising the government's definition" of male or female. *Id.* This is so even where the line drawn "appear[s] arbitrary or unfair to persons classified as being" outside a particular "category." *Id.* (applying rational-basis review to definition of "Hispanic"); *cf. Orion Ins. Grp. v. Wash. Off. of*

*Minority & Women's Bus. Enters.*, 2017 WL 3387344, at *13 (W.D. Wash. Aug. 7, 2017) (applying rational-basis review to a claim challenging the definition of "Black"). Courts cannot delve into an analysis of the "parameters of the . . . class" without transforming the judiciary into "a superlegislature [that] judge[s] the wisdom or desirability of legislative policy determinations." *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153, 1159 (D. Haw. 1986) (quotations omitted).

Put simply, Plaintiffs had two options: a whole-hog challenge to a sex classification with the possibility of heightened review or a transgender-discrimination claim with rational-basis review. Some transgender plaintiffs have chosen the former. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc) (noting that the case is about the "legality of separating bathrooms by biological sex"). But Plaintiffs chose the latter, avoiding the staggering implications of a challenge to all sex classifications. The Court must analyze the actual challenge raised: a discrimination claim based on transgender status, not sex.

*Second*, contrary to Plaintiffs' contentions, discrimination based on transgender status does not merge with discrimination based on sex for purposes of an Equal Protection analysis. Pltfs. Br. 33-35. *L.W.* considered—and rejected—the very arguments that Plaintiffs press here.

Plaintiffs first claim that "discrimination on the basis of transgender and transitioning status is necessarily discrimination based on sex," citing a Title VII

decision affirmed by *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).  Pltfs. Br. 33.  But the plaintiffs in *L.W.*—and the dissenting opinion in *L.W.*—made that exact same argument.  *See* Appellees' Br. in *Doe 1 v. Thornbury* (consolidated with *L.W.*), No. 23-5609, ECF No. 68, at 49; *L.W.*, 83 F.4th at 499 (White, J., dissenting).  And the *L.W.* majority flat out rejected a *Bostock*-style conflation of transgender discrimination and sex discrimination in the Equal Protection context.  83 F.4th at 484-86.

Plaintiffs acknowledge that this Court "recently stated that *Bostock*'s text-driven reasoning applies only to Title VII," but then ask this Court to discard *L.W.* as wrongly decided, preferring the approach taken in the Ninth Circuit.  Pltfs. Br. 33-34 (quotations omitted).  That is not how horizontal stare decisis works.  This Court follows the holdings of prior Sixth Circuit panels absent en banc review or intervening Supreme Court precedent.  *United States v. McKinnie*, 24 F.4th 583, 589 (6th Cir. 2022) (explaining law-of-the-circuit doctrine).

And, regardless, *L.W.* did not err in differentiating between the discrimination principles of Title VII and the Equal Protection Clause.  Title VII "focuses on but-for discrimination," whereas the Equal Protection Clause "focuses on the denial of equal protection."  *L.W.*, 83 F.4th at 484-85.  Whatever the merit of *Bostock*'s logic in Title VII's but-for analysis, it does not carry over to the Equal Protection analysis.  "[T]his explains why Title VII covers disparate impact claims, and the Fourteenth Amendment does not."  *Id.* at 485 (citations omitted).  The "differently worded

28

provisions" do not "mean the same thing." *Id.* at 484. Put otherwise, *Bostock*'s layered if-he-had-been-born-a-boy reasoning, 140 S. Ct. at 1741-42, does not map on to the Equal Protection Clause's aim of equal treatment of certain protected characteristics, *L.W.*, 83 F.4th at 484-85.

Unswayed, Plaintiffs claim that "[h]ad [they] been assigned female at birth," they could have a birth certificate with a sex designation that matches their gender identity. Pltfs. Br. 34. But that argument mirrors *Bostock*'s but-for inquiry into whether "changing the employee's sex would have yielded a different choice by the employer." 140 S. Ct. at 1741. This Court should reject the invitation to openly defy *L.W.* by adopting *Bostock*'s but-for reasoning in all but name. And, even accepting the but-for test, Plaintiffs do not allege that any intentional discriminatory choice (e.g., firing someone because they are transgender, *Bostock*, 140 S. Ct. at 1740-41) caused the claimed injury. *See supra* 12-20.

Plaintiffs' sex-stereotyping argument fares no better. Pltfs. Br. 35. In *L.W.*, this Court declared that "[r]ecognizing and respecting biological sex differences does not amount to stereotyping." *L.W.*, 83 F.4th at 486. And that is all the sex designation on a birth certificate does: recognize biological differences. The maintenance of that information does not "create or perpetuate . . . legal, social, [or] economic" hierarchies; it acknowledges the "[p]hysical differences between men and women." *United States v. Virginia*, 518 U.S. 515, 533-34 (1996). The Supreme

Court has "consistently upheld statutes where the gender classification . . . realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Ct.*, 450 U.S. 464, 469 (1981) (plurality opinion) (citing examples). By "fail[ing] to acknowledge even [the] most basic biological differences" separating the sexes, this suit "risks making the guarantee of equal protection superficial." *Nguyen v. INS*, 533 U.S. 53, 73 (2001).

Plaintiffs cannot cure their flawed stereotyping argument by invoking *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) and *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005). *L.W.* held that *Smith* does not "extend . . . beyond claims about discrimination over dress or appearance" and certainly "did not . . . create a new rule for transgender discrimination." *L.W.*, 83 F.4th at 486. And *Barnes* is a Title VII case that simply "follow[ed] the holding in *Smith*." 401 F.3d at 737. Plaintiffs' Opening Brief does not even acknowledge *L.W.*'s stereotyping analysis—let alone explain the nonsensical proposition that the sheer recognition of biological sex at birth is a sex stereotype.

Put succinctly, Plaintiffs raise a transgender-discrimination claim. That claim cannot be transformed into a sex-discrimination claim, so it faces rational-basis review.

30

### 2.    The Amendment Policy easily satisfies rational-basis review.

Under rational-basis review, the State's policy "is presumed to be valid and will be sustained if the classification drawn [in the policy] is rationally related to a legitimate state interest." *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 621-22 (6th Cir. 1997) (quotations omitted). This test does not require policy-makers to "actually articulate . . . the purpose or rationale supporting [the] classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quotations omitted). Instead, courts must uphold the policy "if there is any reasonably conceivable state of facts" or "plausible" justification that rationally connects the policy's classification to legitimate government ends. *FCC v. Beach Commc'ns*, 508 U.S. 307, 313-14 (1993) (quotations omitted). "[T]hose attacking the rationality of the . . . classification have the burden 'to negative every conceivable basis which might support it.'" *Id.* at 314-15 (quotations omitted).

Plaintiffs here come nowhere close to carrying that heavy burden. The Amendment Policy is a rational means of ensuring the accuracy of vital records, furthering health and research efforts, facilitating records-matching programs, and protecting women's rights—interests so weighty that they would satisfy even the intermediate-scrutiny standard. *See Nguyen*, 533 U.S. at 70.

*First*, the Policy "protect[s] the integrity and accuracy" of birth certificates by ensuring that they accurately reflect one's sex based on external genitalia at birth.

Tenn. Code Ann. § 68-3-203(a). "Protecting the integrity and accuracy of vital records is obviously a legitimate state interest." *Fowler v. Stitt*, 2023 WL 4010694, at *22 (N.D. Okla. June 8, 2023). And this state interest "is logically furthered by a law prohibiting subsequent alterations to the facts of birth." *Id.* (quotations omitted); *see MH v. First Jud. Dist. Ct.*, 465 P.3d 405, 412 (Wyo. 2020) (Kautz, J., specially concurring) ("[C]hanges to a birth certificate which seek to alter 'the facts of the birth' undermine the integrity and the accuracy of the birth certificate.").

*Second*, the Policy "aid[s] the public health of the state." Tenn. Code Ann. § 68-3-201. The biological-sex information contained in a birth certificate furthers public health and research capabilities, including statistical studies related to maternal health, public-health surveillance, and local health planning. *Id.* §§ 68-3-104(b)(3), 68-3-104(b)(6), 68-3-205(b), 68-3-607. Plaintiffs cannot dispute that promoting the public health and fostering research efforts are "legitimate state interests." *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005). Nor can Plaintiffs dispute that the preservation of accurate biological information is rationally related to those efforts.

*Third*, the Policy assists in the State's administrative and auditing functions. The sex designation on a birth certificate is routinely included as a data element in records-matching programs used by various state agencies, such as TennCare, the Department of Children's Services, the Department of Health, and the Department

of Human Services.  To link data across state government, these agencies need data elements that do not change and have a low rate of being miscoded.  By maintaining a constant sex designation, the State preserves one of its most stable identifiers and avoids the creation of incongruities in its records-matching programs.

*Fourth*, the Policy "protect[s] the interests of [biological] women." *Fowler*, 2023 WL 4010694 at *22.  Many States, including Tennessee, protect women's sports through statutory definitions and policies that call for sex-separated sports in certain circumstances.  *See* Tenn. Code Ann. § 49-6-310(a); TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION, 2023-24 TSSAA HANDBOOK (July 18, 2023), https://cms-files.tssaa.org/documents/tssaa/2023-24/handbook/2023-24TSSAABylaws.pdf.  States and localities also protect women (and men) through statutes related to sex-separated restrooms.  *See* Tenn. Code Ann. § 49-2-801 *et seq.*; *Adams*, 57 F.4th at 797.  "[B]irth certificates provide a ready, reliable, non-invasive means of verifying the biological sex of participants" for policies and "statutes that restrict participation by biological men." *Fowler*, 2023 WL 4010694 at *22-23.  By maintaining a clear record of one's biological sex, the Policy maintains the State's ability to "[r]ecogniz[e] and respect[] biological sex differences" between males and females.  *L.W.*, 83 F.4th at 486.

Rational-basis review "is a paradigm of judicial restraint," not a "license for courts to judge the wisdom, fairness, or logic of [policy] choices." *Beach*, 508 U.S.

33

at 313-14.  Courts "hardly ever strike[] down a policy as illegitimate under rational basis scrutiny," *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018), and this is not the case that calls for that extraordinary measure.  Plaintiffs may disagree with the policy choices underlying the State's approach to birth certificates, but the Policy is undoubtedly rational.

To summarize, even taking Plaintiffs' flawed disparate treatment theory on its own terms would not yield a viable claim because the Policy faces only rational-basis review and easily satisfies that standard.  The Court may affirm on this alternative ground.

## II.    The Complaint Fails to State a Due Process Claim.

To state a claim under the Fourteenth Amendment's Due Process Clause, Plaintiffs must (1) establish the existence of an applicable substantive due process right, (2) allege that the defendants forcibly disclosed their transgender status, *and* (3) show that the alleged disclosure violates the asserted right.  Plaintiffs cannot prevail on *any* of these issues—let alone all three of them.

### A.    Plaintiffs have no unenumerated constitutional right to amend the sex designation on their birth certificates.

The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  Even though this language speaks only to process, a controversial line of Supreme Court precedent has interpreted it to "provide[]

34

substantive, as well as procedural, protection[s] for 'liberty.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022). These substantive protections include most of the "rights guaranteed by the first eight Amendments" as well as "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Id.*

The Supreme Court has been "reluctant to expand" the list of unenumerated due process rights "because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). The substantive due process doctrine creates a real risk of courts "substitut[ing] their social and economic beliefs for the judgment of legislative bodies." *Dobbs*, 142 S. Ct. at 2283-84 (quotations omitted). Mindful of the policymaking "temptation" posed by the doctrine, *L.W.*, 83 F.3d at 472-73, the Supreme Court has imposed strictures on the recognition of unenumerated rights.

*First*, courts analyze the asserted right at "the most specific level" of abstraction. *Michael H. v. Gerald D.*, 491 U.S. 110, 127 n.6 (1989) (plurality). "Level of generality is everything in constitutional law." *L.W.*, 83 F.4th at 475. By requiring a "careful description" of the asserted right, *Glucksberg*, 521 U.S. at 721, the court ensures that the Due Process Clause protects only those rights agreed to at the time of ratification. *Clark v. Jackson*, 2023 WL 2787325, at *5 (6th Cir. 2023); *see L.W.*, 83 F.4th at 475.

35

*Second*, courts require the specific right asserted to be "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Dobbs*, 142 S. Ct. at 2246-47. This is, "[t]o say the least, . . . a tough test." *Chambers v. Sanders*, 63 F.4th 1092, 1096 (6th Cir. 2023) (quotations omitted). Rightfully so. "Grounding new substantive due process rights in historically rooted customs is the only way to prevent life-tenured federal judges from seeing every heart-felt policy dispute as an emerging constitutional right." *L.W.*, 83 F.4th at 477.

A straightforward application of these principles dooms Plaintiffs' due process claim. Properly viewed, Plaintiffs ask this Court to recognize a right to compel the State to amend its birth certificates to reflect gender identity. That right does not exist. And Plaintiffs' attempt to shoehorn their claim into a supposed right to "informational privacy" fails as a matter of law.

### 1. The Due Process Clause provides no constitutional right to amend a birth certificate to reflect gender identity.

"At the most specific level of abstraction, Plaintiffs are asserting the right to amend the sex designation on their birth certificate to be consistent with their gender identity." *Fowler*, 2023 WL 4010694 at *16. Under the "specificity requirement," *Clark*, 2023 WL 2787325 at *5, *that right* must be so foundational that it calls for this Court to "remov[e the issue] . . . from the ebbs and flows of democracy by construing a largely unamendable Constitution to occupy the field." *L.W.*, 83 F.4th at 471. It is not, and the Court should not.

36

*First,* the "right" to amend one's birth certificate is not fundamental in our country's scheme of ordered liberty. Plaintiffs cannot plausibly contend that "neither liberty nor justice would exist if they" cannot compel the government to amend its records to reflect their desired characteristics. *Glucksberg*, 521 U.S. at 720-21. To state that argument is to refute it. Plaintiffs' asserted right differs in kind from the "short list" of liberty interests—like the right to interracial marriage and the right to forgo sterilization—that have been found to be "implicit in the concept of ordered liberty." *Lawrence v. Pelton*, 2021 WL 1511664, at *4 (6th Cir. 2021) (quoting *Glucksberg*, 521 U.S. at 720-21).

Moreover, the Constitution's reference to "liberty" generally "do[es] not encompass a right to compel a state to do something *for* someone not under some form of custody or restraint." *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1568 (10th Cir. 1993). Absent some "special relationship" or "special danger" created by the State (neither of which exists here), the Due Process Clause merely "places limitations on affirmative state action." *Kallstrom v. Columbus*, 136 F.3d 1055, 1065-66 (6th Cir. 1998). But Plaintiffs do not seek to *limit* the State's action; they seek "to *compel* the Government to accept a [sex-designation] change and reform its records accordingly." *Brown v. Cooke*, 362 Fed. App'x 897, 900 (10th Cir. 2010) (emphasis added). That type of affirmative compulsion falls outside the scope of the substantive due process doctrine.

37

*Second*, "[t]his country does not have a deeply rooted tradition" of requiring States to amend birth certificates to reflect a person's gender identity.  *L.W.*, 83 F.4th at 473 (quotations omitted).  Indeed, Plaintiffs offer no historical analysis whatsoever to support that asserted right—"no state constitutional provision or statute, no federal or state judicial precedent, not even a scholarly treatise."  *Dobbs*, 142 S. Ct. at 2259.  That is unsurprising.  For one thing, the concept of "gender identity" did not exist in 1868 when the Fourteenth Amendment was adopted.  Moreover, statewide birth certificates did not gain traction until the late 19th century and early 20th century.  Tennessee's statewide birth-certificate policy, for example, did not exist until 1881, 1881 Tenn. Pub. Acts 142, ch. 112, § 2, and the current system did not come about until 1909, *see* 1909 Tenn. Pub. Acts 1256, ch. 341, §§ 1-3.  Plaintiffs simply cannot "show that a constitutional right to [amend a birth certificate to reflect gender identity] was established when the Fourteenth Amendment was adopted."  *Dobbs*, 142 S. Ct. at 2254.

In fact, "it appears that until recently, there was little-to-no support in *any* American jurisdiction for a constitutional right to change the sex designation on a person's birth certificate."  *Fowler*, 2023 WL 4010694 at *17.  To the State's knowledge, "no state constitutional provision presently recognizes such a right."  *Id.* And no state laws or regulations allowed amendment of the sex designation, outside of factual errors, until the mid-20th century.  Even then, most States only allowed

changes for sex-change *surgeries*, not a person's "internal sense of their own gender." Compl., R.59, at 381; *see, e.g.*, Ala. Code § 22-9A-19; Ark. Code Ann. § 20-18-307(d); Ky. Rev. Stat. Ann. § 213.121(5); La. Stat. Ann. § 40:62; Mo. Ann. Stat. § 193.215(9); Wis. Stat. Ann. § 69.15(4)(b). To this day, there is no widespread statutory right to amend a birth certificate to reflect gender identity; only a handful of States have adopted such a policy. *See* Haw. Rev. Stat. Ann. § 338-17.7; 410 Ill. Comp. Stat. Ann. 535/17; N.J. Stat. Ann. § 26:8-40.12; Vt. Stat. Ann. tit. 18, § 5112; Wash. Admin. Code 246-490-075.

This spotty, recently developing trend is a far cry from the historical support necessary to recognize a substantive due process right. The Supreme Court, in *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019), incorporated the right to be free of excessive fines only after "trac[ing] the right back to Magna Carta, Blackstone's Commentaries, and 35 of the 37 state constitutions in effect at the ratification of the Fourteenth Amendment." *Dobbs*, 142 S. Ct. at 2246-47. Similarly, the lead opinion in *McDonald v. Chicago*, 561 U.S. 742 (2010), found the right to bear arms only after "survey[ing] the origins of the Second Amendment, the debates in Congress about the adoption of the Fourteenth Amendment, the state constitutions in effect when that Amendment was ratified (at least 22 of the 37 States protected the right to keep and bear arms), federal laws enacted during the same period, and other relevant historical evidence." *Dobbs*, 142 S. Ct. at 2247. No comparable history exists here.

The upshot:  Our Nation's understanding of ordered liberty does not include a right to compel the State to amend its official records to include a person's gender identity, rather than biological sex.  And history refutes the existence of any such right.

### 2.    Plaintiffs' informational-privacy argument fails as a matter of law.

Given the lack of historical support for the specific right requested, Plaintiffs do exactly what this Court has cautioned against: They "climb[] up the ladder of generality to a perch . . . that the case law and our traditions simply do not support." *L.W.*, 83 F.4th at 475.  Plaintiffs package their claim in terms of a supposed right to informational privacy.[5]  But Plaintiffs cannot support the judicial creation of a bespoke informational-privacy right to fit this context, nor can they shoehorn their claim into any existing protections.  And, even if they could, their claim would fail because the Policy does not force disclosure of a person's transgender status, let alone infringe any privacy right.

---

[5] Plaintiffs' Opening Brief does not raise—and thus abandons—Plaintiffs' supposed rights to "autonomy," to "define and express one's gender identity," and "to live in accordance with one's gender identity."  Compl., R.59, at 412-13; *see United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006).

### a. The Court should not create a new informational-privacy right.

This Court should not use the so-called "right to informational privacy" to create a new substantive due process right.

For starters, the "right to informational privacy" rests on a shaky foundation. The Supreme Court has "assume[d]" that such a right exists, but never held as much. *NASA v. Nelson*, 562 U.S. 134, 147 (2011); *Leiser v. Moore*, 903 F.3d 1137, 1143-44 (10th Cir. 2018). And jurists have cogently explained that, while "informational privacy seems like a good idea," "[a] federal constitutional right to 'informational privacy' does not exist." *NASA*, 562 U.S. at 159-60 (Scalia, J., concurring in judgment); *see Am. Fed'n of Gov't Emps. v. HUD*, 118 F.3d 786, 791 (D.C. Cir. 1997) (expressing "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information").

Given this backdrop, this Court has proceeded with caution. "Whereas some other circuits have recognized the existence of a constitutional right of privacy in various types of confidential information, the Sixth Circuit has held that the Constitution does not encompass a general right to nondisclosure of private information." *Wilson v. Collins*, 517 F.3d 421, 429 (6th Cir. 2008) (citation and quotations omitted). Instead, the Court has "continued to restrict the right of privacy to those rights that can be deemed fundamental or implicit in the concept of ordered liberty." *Id.*

The "right" Plaintiffs seek to vindicate cannot be squared with this "restrictive view of informational privacy." *Lambert v. Hartman*, 517 F.3d 433, 441 (6th Cir. 2008). As discussed, Plaintiffs marshal no historical evidence that the asserted right is implicit to the concept of ordered liberty or deeply rooted in our historical tradition. *Supra* 37-40. Indeed, Plaintiffs do not "even begin to meet the hurdle required for the recognition of a *new* fundamental right." *Lambert*, 517 F.3d at 444.

>    **b.    Plaintiffs' challenge falls outside of recognized informational-privacy rights.**

Nor can Plaintiffs fit their claim within existing precedent. The Sixth Circuit has recognized an informational-privacy right only in two limited circumstances: (1) when the disclosure of sensitive information to particularly dangerous persons creates a substantial risk of bodily harm, *Kallstrom*, 136 F.3d at 1064, and (2) when the disclosure of humiliating, sexual details invades the right to privacy in sexual matters, *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998). The allegations here fall within neither.

***Kallstrom* does not apply**. Plaintiffs cannot fit their substantive due process claim within the limited right to informational privacy recognized in *Kallstrom*. 136 F.3d at 1062-64. There, the City of Columbus released the home addresses of undercover police officers and their family members "into the hands of" a violent street gang after the officers testified against the gang. *Id.* at 1059, 1063. This Court held that the officers had a privacy right of "constitutional dimension[]" in this

information given that its disclosure created a "substantial risk of serious bodily harm, possibly even death, from a perceived likely threat." *Id.* at 1063-64. In doing so, though, the Court specifically limited its holding to "these circumstances," noting that not "every governmental act which intrudes upon or threatens to intrude upon an individual's body invokes the Fourteenth Amendment." *Id.* at 1064.

Subsequent Sixth Circuit precedent has reiterated that "not . . . all risks of physical harm created by disclosure . . . trigger the right to privacy." *Lambert*, 517 F.3d at 443-44. Rather, "*Kallstrom* created a narrowly tailored right" that only applies when (1) the government discloses sensitive information to persons who are "particularly dangerous *vis-à-vis the plaintiffs*" and (2) that disclosure creates a specific, "substantial risk of serious bodily harm." *Barber v. Overton*, 496 F.3d 449, 455-56 (6th Cir. 2007) (quotations omitted). Plaintiffs satisfy neither requirement.

*First*, the Complaint does not allege that the State is releasing Plaintiffs' transgender status to individuals who are "particularly dangerous *vis-à-vis the plaintiffs*." *Id*. In fact, the Complaint does not allege disclosure to any specific individuals at all; it merely recites vague and general concerns related to "discrimination, harassment, and violence" from unknown persons. Compl., R.59, at 414. That failure, alone, forecloses Plaintiffs' claim.

Undeterred, Plaintiffs contend that *Barber* does not actually require disclosure to individuals who are "particularly dangerous *vis- à-vis the plaintiffs*." Pltfs. Br.

46-47.  The decision says otherwise.  *Barber* included a "belabor[ed] . . . discussion of *Kallstrom*" and specifically relied on its dangerous-recipient requirement.  496 F.3d at 456-57.[6]  When rejecting the asserted claim, the court focused on the "release of the information to . . . prisoners" and held that the relationship between the prisoners and guards does not fall within the "exceeding[ly] narrow" right *Kallstrom* recognized.  *Id.* at 457.  While Plaintiffs may not like *Barber*'s supposedly "cramped reading of *Kallstrom*," Pltfs. Br. 47, it sets the binding rule in this Circuit.  *Doe v. City of Mansfield*, 2023 WL 1822208, at *7 (6th Cir. 2023) (recognizing that *Barber* "interpret[ed] *Kallstrom* narrowly").

*Second*, even if Plaintiffs could get past the dangerous-recipient requirement, their reliance on generalized threats of violence cannot establish a substantial risk of bodily harm.  As this Court has repeatedly recognized, "not . . . all risks of physical harm created by disclosure . . . trigger the right to privacy."  *Lambert*, 517 F.3d at 443-44.  It is not a generalized fear from the release of information, but a specific risk of violence, that gives rise to a constitutional claim.  *Barber*, 496 F.3d at 456.  Plaintiffs simply "do[] not allege the kind of case-specific, concrete risk of bodily harm that *Kallstrom* [and subsequent Sixth Circuit precedent] . . . require."  Op., R.110, at 2643.

---

[6] Plaintiffs claim that "*Barber* was fractured," Pltfs. Br. at 47 n.18, but Judge Cook joined the majority opinion "in its entirety," 496 F.3d at 458.

Plaintiffs cannot cure this problem by sensationalizing the district court's opinion as "declar[ing] that . . . *more* hate crimes must be visited upon transgender people to give them a privacy interest in their transgender status." Pltfs. Br. 49-50. The lower court held no such thing. The reality is, Plaintiffs allege only limited circumstances in which a birth certificate must be produced—when seeking employment, voting, obtaining medical care, or interacting with the government. Compl., R.59, at 386, 401. And they identify no risk of violence from disclosure in those specific circumstances. The Complaint contains a passing reference to hate crimes and assaults reported in a 2015 survey by the National Center for Transgender Equality. Compl., R.59, at 386-87. But it draws no connection between the survey and the alleged forced disclosures. Nor could it, without implausibly suggesting that voting officials, employers, government officials, and medical professionals are committing violent hate crimes when they receive a transgender person's birth certificate. If Plaintiffs' allegations suffice, then this Court's narrow approach to informational-privacy claims will be a thing of the past.

***Bloch* does not apply.** Plaintiffs similarly cannot fit their substantive due process claim within the narrow informational-privacy right recognized in *Bloch*. 156 F.3d at 685-86. There, a sheriff held a press conference to broadcast "highly personal and extremely humiliating details" of a woman's rape "in retaliation" for the woman "criticizing the sheriff's lack of diligence in investigating the crime." *Id.*

45

at 676.  The release of these details "was unnecessary, illegal . . . , and did absolutely nothing to advance the sheriff's defense."  *Id.*  Concerned with the protection of "personal sexual matters" from disclosure, this Court recognized a narrow substantive due process right to "prevent[] government officials from gratuitously and unnecessarily releasing the intimate details of [a] rape where no pen[o]logical purpose is being served."  *Id.* at 685-86.

That narrow right is not implicated here.  For one, a person's transgender status reveals nothing about their sexual life or preferences.  *Bloch*'s holding "was premised on the notion that the disclosure of private sexual information implicated . . . the fundamental right of privacy in one's sexual life."  *Lambert*, 517 F.3d at 441.  Yet, the Complaint "at no point speaks in terms of being transgender as being a matter of sexuality, and indeed it defines being transgender in a manner that is utterly unrelated to sexual preferences, orientation, attitudes, and activities."  Op., R.110, at 2645.  One's transgender status is simply untethered from the fundamental right—privacy in one's sex life—that *Bloch* rested on.

Plaintiffs contend that *Bloch* extends "beyond sexual preferences or activities" because it cited "sister-circuit decisions that emphasized the . . . intimate nature of sexual matters."  Pltfs. Br. 51 (quotations omitted).  But each of the referenced "sexual matters" involved issues tied to sexual intercourse—pregnancy, miscarriage, abortion, contraception, etc.  *Bloch*, 156 F.3d at 685.  And, again, one's transgender

46

status is not even one step removed from sexual intercourse; it bears no relation to sexual intercourse or preferences at all. That other circuits—which this Court has recognized take a broader approach to informational privacy—have divined a right to privacy in one's transgender status cannot expand the limited rights recognized in this Circuit. Pltfs. Br. 53-54. Plaintiffs' allegations fall outside the fundamental right protected in *Bloch*.[7]

What is more, *Bloch* does not apply here because a person's transgender status is not "information . . . of a . . . *humiliating* nature." *Lambert*, 517 F.3d at 440. Plaintiffs admit that "there is no basis . . . to find anything humiliating about being transgender." Pltfs. Br. 56 (quoting Op., R.110, at 2645). And they openly stated that they "are not ashamed of their transgender status." *Id*. at 55. Thus, the disclosure alleged here does not implicate the narrow right recognized in *Bloch*. *See Lambert*, 517 F.3d at 440.

Plaintiffs downplay the requirement that the information disclosed be humiliating in nature, claiming that "this Court has never rejected an informational privacy claim because the information was not humiliating enough." Pltfs Br. 55. That

---

[7] Nor can Plaintiffs argue for a new fundamental right for the first time in their reply. *Johnson*, 440 F.3d at 845-46. Regardless, such an effort would be futile. The fact that some recognized rights "sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected." *Glucksberg*, 521 U.S. at 727-28 (citation omitted). The Supreme Court and this Court have considered—and rejected—that very proposition. *See id.*; *L.W.*, 83 F.4th at 474; *Dobbs*, 142 S. Ct. at 2258.

ignores a mountain of precedent emphasizing the "humiliating" nature of the infor-

mation disclosed in *Bloch*.  *See, e.g.*, *Lambert*, 517 F.3d at 440; *Wurzelbacher v.*

*Jones-Kelley*, 675 F.3d 580, 586 (6th Cir. 2012); *City of Mansfield*, 2023 WL

1822208 at \*3; *Summe v. Kenton Cnty. Clerk's Off.*, 604 F.3d 257, 270 (6th Cir.

2010); *Lee v. City of Columbus*, 636 F.3d 245, 260 (6th Cir. 2011).  And it ignores

cases rejecting claims that did not "involve[] information of a . . . humiliating na-

ture."  *Kenny v. Bartman*, 2017 WL 3613601, at \*6 (6th Cir. 2017); *Wiles v. Ascom*

*Transp. Sys.*, 478 Fed. App'x 283, 295 (6th Cir. 2012) (dismissing claims involving

disclosure of information in motor vehicle records); *cf. Mattox v. City of Forest Park*,

183 F.3d 515, 523 (6th Cir. 1999) (dismissing retaliation claim when information

was "embarrass[ing]" but "d[id] not rise to the level of [the revelations] in *Bloch*").

Plaintiffs also contend that even if the fact of their transgender status is not

humiliating, "it *is* humiliating to have their status forcibly disclosed by the State."

Pltfs Br. 55.  But this Court has focused on whether the "*information*" disclosed is

"humiliating [in] nature," not whether the State's disclosure of non-humiliating in-

formation somehow causes humiliation.  *Lambert*, 517 F.3d at 440 (emphasis

added).  Contrary to Plaintiffs' contentions, *Bloch* did not hold that the "disclosure"

*by the government* of "the fact that one was raped" was humiliating.  Pltfs. Br. 56.

It repeatedly stressed that the Sheriff released the "humiliating details" of the rape—

i.e., the humiliating information.  *Bloch*, 156 F.3d at 676, 682; *see also id.* at 681

48

(referring to "humiliating information" and "humiliating, and confidential information").

To put it briefly, the right invoked by Plaintiffs is not among the narrow informational-privacy rights previously recognized by this Court.

**B.     Plaintiffs allege no forced disclosure of their transgender status.**

Setting aside the lack of a constitutionally protected right, Defendants have not forced transgender persons to disclose their transgender status. For one, the presentation of a birth certificate does not reveal one's transgender status. And even if it did, Plaintiffs cannot tie any disclosure to Defendants in this suit or, for that matter, to the challenged Policy.

***No Disclosure of Transgender Status.*** Plaintiffs' informational-privacy claim rests on the premise that the "Policy forces transgender persons to disclose their transgender status." Op., R.110, at 2648; *see* Compl., R.59, at 411. Yet, according to Plaintiffs' own allegations, a Tennessee birth certificate *does not* reveal a person's transgender status.

To determine a person's transgender status, a party must know two things: (1) the person's "gender identity," and (2) the person's "sex . . . assigned at birth." Compl., R.59, at 381 (defining transgender). "Gender identity" refers to one's "internal sense of their own gender," *id.*, and "sex assigned at birth" refers to "the sex recorded on a person's birth certificate at the time of birth . . . based on the

appearance of external genitalia at the time of birth," *id.* at 381, 388. Without both, a party has no way of comparing any "diverg[ence]" between the two and, thus, no way of knowing whether a person is transgender. Op., R.110, at 2649.

The presentation of a Tennessee birth certificate to a third party conveys only sex assigned at birth—i.e., sex based on external genitalia at birth. *Id.* "[A] person's gender identity can be revealed only by the person himself or herself disclosing his or her internal feelings," *id.* at 2652, and the State in no way "forc[es] transgender persons (by threats, intimidation, etc.) to disclose . . . internal thoughts about themselves," *id.* at 2649. Plaintiffs, therefore, do not plausibly allege that Tennessee birth certificates (or the challenged policy) forcibly disclose a person's transgender status.

Ironically, Plaintiffs' forced-disclosure argument seems to rest on the very sex stereotyping they purportedly denounce. Their argument assumes that a person's gender identity "somehow is conveyed based on external appearance created by activities, dress, or physical features." *Id.* at 2651-52. But "persons generally are allowed to appear, dress, behave, and be denominated however they want—irrespective of (and untethered to) . . . their gender identity." *Id.* at 2650. Indeed, by Plaintiffs' own admission, gender identity refers only to a person's "*internal* sense of their own gender." Compl., R.59, at 381 (emphasis added).

The district court laid out this no-forced-disclosure argument *at length* in its opinion. Op., R.110, at 2648-53. Yet not one paragraph in Plaintiffs' 58-page brief

confronts this fatal flaw in the informational-privacy theory. That silence forecloses Plaintiffs' claim as a procedural matter, because "an appellant abandons all issues not raised and argued in its initial brief on appeal." *Johnson*, 440 F.3d at 845-46. And it highlights that Plaintiffs have no good-faith basis for arguing that Tennessee birth certificates reveal one's *internal* feelings and, thus, transgender status.

***No Disclosure by Defendants***. The Complaint also fails to challenge any *State*-required disclosure of the information in their birth certificate. To be sure, some State statutes and regulations allow use of a birth certificate, among other possible documents, to confirm citizenship. *See, e.g.*, Tenn. Code Ann. § 4-58-103(c). But Plaintiffs neither challenge any such law nor allege an inability to use some other document to confirm their citizenship. Plaintiffs' voluntary production of their birth certificate to third parties cannot constitute a forced disclosure *by the State*.

On top of that, Plaintiffs do not tie any disclosure to the defendants in this case. Governor Lee and Commissioner Alvarado have not produced Plaintiffs' birth certificate to any third party. Nor have they compelled Plaintiffs to present their birth certificate to any party. Plaintiffs' inability to trace any forced-disclosure to *Defendants* deprives them of standing to maintain a forced disclosure claim, *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021), removes this case from the *Ex Parte Young* exception to sovereign immunity, *EMW Women's Surgical Ctr. v. Beshear*, 920 F.3d

421, 445 (6th Cir. 2019), and forecloses a § 1983 action against the named defendants, *Pineda v. Hamilton Cnty.*, 977 F.3d 482, 490 (6th Cir. 2020).

At bottom, Plaintiffs cannot explain how the State requires disclosure of internal feelings and, therefore, cannot plausibly claim that the State forces transgender persons to disclose their transgender status. Moreover, Plaintiffs have not challenged any State-mandated disclosure of their birth certificates—let alone a disclosure tied to the defendants named here. For either reason, Plaintiffs' forced-disclosure theory falls short.

### C.  The Amendment Policy does not violate any informational-privacy right.

Finally, even taking Plaintiffs' forced-disclosure argument on its own terms, the Complaint fails to allege a violation of any informational-privacy right. Courts do not apply an "exacting . . . standard" when analyzing the possible infringement of informational-privacy rights. *NASA*, 562 U.S. at 153.[8] They take into account a number of considerations, including the "Government's interests," the "reasonableness" of governmental action, and the threat to the asserted privacy interest. *Id.* at 138, 154. Each of those considerations favors the State.

---

[8] *Kallstrom* analyzed infringement under strict scrutiny, 136 F.3d at 1064, but *NASA* specifically declined to apply "[s]o exacting a standard" for informational privacy claims, 562 U.S. at 153. That subsequent Supreme Court decision governs.

*First*, this Court has explained that governmental interests can overcome privacy concerns. *Mansfield*, 2023 WL 1822208 at *5; *see Bloch*, 156 F.3d at 686 ("If the details were released in connection with a [criminal] trial, for example, the compelling state interest in prosecuting a criminal would almost certainly outweigh the Blochs' privacy interest.").  And, here, maintaining an accurate record of a person's sex based on genitalia at birth implicates a number of important governmental interests—like ensuring the accuracy of vital records, enabling health and research efforts, facilitating records-matching programs, and protecting women's rights. *Supra* 31-33.  These legitimate interests "justif[y]" any intrusion into the asserted informational-privacy right. *Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 946-47 (6th Cir. 2004).

*Second*, the Amendment Policy is a "reasonable, and indeed a [logical], approach" to furthering the State's interests. *NASA*, 562 U.S. at 153; *see supra* 31-34.

*Third*, "any intrusion into [Plaintiffs'] informational privacy . . . [i]s relatively minor" because the alleged disclosure is limited to very specific contexts, *Flaskamp*, 385 F.3d at 946—like "when seeking employment[,] when voting," or when obtaining medical care, Compl., R.59, at 386, 401.  This Court has "treated the extent of dissemination as an important factor in assessing an informational-privacy claim," and the limited circumstances (if any) requiring forced disclosure of a birth certificate are a far cry from the "widespread dissemination" found to constitute

53

infringement in other cases. *Flaskamp*, 385 F.3d at 946 (quoting *In re Zuniga*, 714 F.2d 632, 642 (6th Cir. 1983)); *see Bloch*, 156 F.3d at 676 (information announced at press conference). And not only are the alleged disclosures to a limited number of people, many of the identified recipients have independent confidentiality obligations. *See* Tenn. Code Ann. § 2-2-141(e) (election officials); *id.* § 68-11-1503 (healthcare providers).

In sum, even assuming the Complaint implicates a protected right and further assuming a forced disclosure, the important governmental interests furthered by the Policy cannot be overcome by the minor privacy intrusion associated with the limited disclosure of one's birth certificate.

## III.    The Court Should Reject Plaintiffs' Remand Request.

Puzzlingly, Plaintiffs' lead argument contends that "this Court need not delve into the merits of Plaintiffs' claims" at all because the district court "failed to apply the appropriate standard." Pltfs. Br. 19-28. This case has been pending for over four years; the district court wrote a 74-page opinion; and the questions presented are pure issues of law that this Court reviews *de novo*. Yet, Plaintiffs want the Court to pick out a few stray statements from a lengthy opinion, without analyzing how they affect the outcome, and tell the district court to try again. Pltfs. Br. 19. That makes no sense.

54

Appellate courts "review[] judgments, not statements in opinions." *California v. Rooney*, 483 U.S. 307, 311 (1987) (quotations omitted). This Court has specifically noted that, when reviewing motions to dismiss, it "need not ask specifically whether the district court followed the correct standard" because it determines whether a plaintiff has "plausibly stated a claim for relief" with "fresh eyes." *Doe v. Mich. State Univ.*, 989 F.3d 418, 430 n.3 (6th Cir. 2021). "[I]t would be a waste of everyone's time to remand to the district court what [should] be decided now as a matter of law." *Beaty v. United States*, 937 F.2d 288, 291 (6th Cir. 1991). "If the decision below is correct, if must be affirmed," even if "the lower court relied upon a wrong ground or gave a wrong reason." *Piatt v. Gray*, 321 F.2d 79, 80 (6th Cir. 1963).

Regardless, Plaintiffs' limited challenges to the lower court's opinion lack merit. The district court did not "fail[] to construe the pleadings in the light most favorable to Plaintiffs," Pltfs. Br. 19, by adhering to the Complaint's allegation that "it is the practice of the State of Tennessee, for purposes of determining the sex designation on birth certificates, to rely solely on observations about the external genitalia of newborns." Compl., R.59, at 388; *supra* 14-16. Nor did the district court depart from the Complaint's allegations by referencing cisgender persons obtaining sex-change surgery or mentioning hate crime statistics—neither of which was necessary for the district court's holding. *See supra* 19 n.4, 42-45. Plaintiffs'

aversion to this Court reaching the merits only highlights the weakness of their claims.

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated: December 20, 2023                    Respectfully submitted,

                                            /s/J. Matthew Rice
Jonathan Skrmetti                           J. Matthew Rice
 *Attorney General & Reporter*               *Associate Solicitor General*
 *of the State of Tennessee*                 *Counsel of Record*

Andrée Sophia Blumstein                     Steven J. Griffin
 *Solicitor General*                         *Senior Counsel for Strategic Litiga-*
                                             *tion and Assistant Solicitor General*

Dianna Baker Shew                           Trenton M. Meriwether
 *Senior Executive Counsel*                  *Assistant Attorney General*
 *for Trial Advocacy*

Sara E. Sedgwick                            Office of Tennessee Attorney General
 *Senior Assistant Attorney General*        P.O. Box 20207
                                            Nashville, Tennessee
                                            (615) 532-6026
                                            matt.rice@ag.tn.gov

                                            *Counsel for Defendant-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations of Fed. R. App. P. 32(a)(7)(b) because it contains 12,949 words, excluding portions exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Times New Roman 14-point font in Microsoft Word.

/s/J. Matthew Rice
J. MATTHEW RICE
*Associate Solicitor General*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 6 Cir. R. 25(f), I certify that a true and exact copy of this brief has been filed via the Court's electronic filing system on December 20, 2023. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

/s/J. Matthew Rice
J. MATTHEW RICE
*Associate Solicitor General*

**DESIGNATION OF RELEVANT DOCUMENTS**

The following record documents are relevant to this appeal:

| Document | R. | Pages |
|---|---|---|
| First Amended Complaint | 59 | 375-417 |
| Defendants' Motion to Dismiss Amended Complaint | 65 | 800-803 |
| Memorandum in Support of Defendants' Motion to Dismiss | 66 | 804-825 |
| Plaintiffs' Opposition to Defendants' Motion to Dismiss Amended Complaint | 71 | 905-933 |
| Defendants' Reply in Support of Their Motion to Dismiss | 74 | 937-943 |
| Memorandum Opinion of the District Court | 110 | 2593-2666 |
| Order Granting Defendants' Motion to Dismiss | 111 | 2667 |
| Entry of Judgment | 112 | 2668 |
| Notice of Appeal | 113 | 2669-2671 |
| USCA Case Number | 114 | 2672-2674 |
| Appellants' Certification That No Transcript Will Be Ordered | 115 | 2675-2676 |
| Corrected Certificate of Service | 116 | 2677-2678 |

## ADDENDUM

For the Court's convenience, this addendum includes:

- 1881 Tenn. Pub. Acts 142, ch. 112, § 2

- 1909 Tenn. Pub. Acts 1256, ch. 341, §§ 1-3.

# ACTS

OF THE

# STATE OF TENNESSEE,

PASSED BY THE

## FORTY-SECOND GENERAL ASSEMBLY.

## 1881.

PUBLISHED BY AUTHORITY.

NASHVILLE, TENN.:
TAVEL & HOWELL, PRINTERS TO THE STATE.
1881.

[ 142 ]

## CHAPTER CXII.

AN ACT to provide for the Registration of Births, Marriages, and Deaths in Tennessee.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That every justice of the peace, minister of the gospel, and all other legally authorized persons solemnizing marriage in this State, shall make a

*Record of marriages.* record of each marriage so solemnized by him, together with all the facts relating to the same, as required by the fifth section of this act; and such justice, ministers of the gospel, or other persons, shall, at the time such marriage is solemnized, deliver on demand to either of the parties so joined in marriage as aforesaid, a certificate of such marriage, containing all the facts in relation thereto required by said fifth section of this act; and shall, within (30) thirty days thereafter, deliver to the Clerk of the County Court in which such marriage took place, a certified copy of such record.

SEC. 2. That every physician, surgeon, and midwife, who may be in professional attendance at any birth or death in this State, or in the absence of any or all of the aforesaid parties, the head or senior member of said house-

*Births.* hold wherein said birth or death occurred, shall, within thirty (30) days thereafter, file a written statement, duly certified to, of the fact, together with such other facts pertaining thereto as are required in section five of this act, with the senior (by age) justice of the peace of the civil district in which said birth or death occurred.

SEC. 3. It shall be the duty of the aforesaid justice of the peace in each civil district in the State, on receiving the returns of such births or deaths, to record the same

*Justices to keep record.* in a book, properly ruled, in the order in which they are received by said justice, and once within each and every thirty days make and deliver to the County Court Clerk of the county in which such civil district is located, a certified copy of such record.

SEC. 4. It shall be the duty of every coroner in this

*Coroner—in-quests.* State to keep in a well bound book a record of every inquest held in his district, and within thirty days after the holding of such inquest he shall deliver to the County

Court Clerk of the county wherein said coroner has jurisdiction, a certified copy of such record, giving all the facts as required in section five of the act for other deaths.

SEC. 5. It shall be the duty of the County Court Clerks of the several counties in this State, on receiving the returns of such births, marriages, and deaths, to record the same at length in separate books (well bound), to be provided for that purpose by the county, with proper indexes thereto. The births, marriages, and deaths shall be numbered and recorded in the order in which they are received by the said clerk, and the record of marriages shall be indexed, using both the name of the bridegroom and bride. The record of births shall state in separate columns the date of the birth, the name of the child (if it has any), the sex and color of the child, the place of birth, the christian and surname of both parents, the residence and nativity, and kinship, if any, of the parents, the occupation of the father, and the date when the record was made; *Provided*, that in case the child had no christian name, such name shall be obtained and reported by the head of the household wherein each birth occurred, within thirty days after his or her attention has been called to the fact by the senior (by age) justice of the peace, who shall do so at once upon discovering the omission, and such christian name shall be distinctly designated in such report as the christian name belonging to a child previously reported, and shall be properly entered by said justice in the blank left for such christian name in his book of record. The record of marriages shall state in separate columns the date and place of marriage, the christian and surname of the bridegroom and bride, and the maiden name of the bride, if a widow, the color, age and place of birth of each, the residence of each at the time of marriage, the occupation of the bridegroom, and the name and official station of the person by or before whom they were married, the name and residence of at least two witnesses present at such marriage, and the date when such record was made. The record of death shall state, in separate columns, the date of the death, the christian and surname of the deceased, the sex and color, whether married or single, the age in years, months, and days, the place of death, the disease or apparent cause of death, the nativity of the deceased, and the occupation, if any, and the names and residence of the parents, and their relationship, if any, if known, and the date when such re-

Duties of County Court Clerks.

[ 144 ]

Clerks to report to Secretary of State.
cord was made. The Clerk of the County Court of the several counties shall annually, on or before the first day of April, make and transmit to the Secretary of State a certified copy of the records in his office of all the births, marriages, and deaths reported in their respective counties for the year ending December thirty-first last preceding, and each County Court Clerk shall receive for the record of each birth, marriage, and death in his office three cents, and three cents for each birth, marriage and death returned by him to the Secretary of State, to be paid by the county upon the presentation of a certificate from the Secretary of State that the duties herein imposed upon said County Court Clerk have been performed, and shall be compensation in full for all the services required by this act to be performed by him.

Secretary of State.
SEC. 6. It shall be the duty of the Secretary of State to receive the returns made in pursuance of the fifth section of this act, and he shall cause the same for each year to be bound together in one or more volumes, at the expense of the State, and make indexes thereto, and with the assistance of the Secretary of the State Board of Health, who is hereby constituted *ex officio* "the Superintendent of Vital Statistics," shall prepare such tabular statements, results, and deductions therefrom as will render them of practical utility, and make reports thereof annually to the Governor of the State, which report may be ordered published and distributed in such manner as the Legislature may from time to time direct.

Municipal authorities.
SEC. 7. Nothing contained in this act shall be so construed as interfering with the manner adopted by any municipality in this State for collecting such vital statistics; and it is hereby made the duty of such municipal authorities to cause to be made once in every thirty days a transcript of such municipal record, which, after being duly certified to, they shall cause the same to be delivered to the Clerk of the County Court in which county said municipality is located.

Penalties.
SEC. 8. In case of the refusal or neglect by any of the officers or individuals mentioned in this act to perform any of the duties hereinbefore required of them, or either of them, to be done and performed by any of the provisions herein contained, and upon conviction shall be fined not less than five dollars nor more than fifty dollars, and the prosecuting attorney in each county or judicial district is hereby required to prosecute in the name of the people of the State of Tennessee all persons in his county

or judicial district who shall be guilty of a violation of this act.

SEC. 9. *Be it further enacted,* That all acts or parts of acts coming in conflict with this act, are hereby repealed, and that this act shall take effect from and after its passage, the public welfare requiring it.

Passed March 30, 1881.

FRANK MATTHEWS,
*Speaker of the Senate pro tem.*

H. B. RAMSEY,
*Speaker of the House of Representatives.*

Approved April 5, 1881.

ALVIN HAWKINS,
*Governor.*

## CHAPTER CXIII.

AN ACT to amend an act to establish and maintain a uniform system of public schools.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That section 7, subsection 12, and section 9, subsection 6, of an act passed March 6, 1873, and approved March 20, 1873, entitled An Act to estab- Scholastic year lish and maintain a uniform system of public schools, be and the same is hereby so amended that the scholastic year shall hereafter close on the 30th day of June instead of the 31st day of August, as therein provided.

SEC. 2. *Be it further enacted,* That all the rights and privileges reserved and given to cities and incorporated Rights of cities towns by section 51 of said act, be and the same are and towns. hereby extended to all schools and school systems that have been established by cities or incorporated towns since the passage of said act, or that may hereafter be established by them.

SEC. 3. *Be it further enacted,* That cities and incorpor- Graded schools ated towns which have been established, or may hereafter establish such higher graded schools, be and they are

10

# ACTS

OF THE

# STATE OF TENNESSEE

PASSED BY THE

### FIFTY-SIXTH GENERAL ASSEMBLY

## 1909

PUBLISHED BY AUTHORITY

NASHVILLE, TENN
McQUIDDY PRINTING COMPANY
1909

TENNESSEE STATE LIBRARY

## CHAPTER 341.

### House Bill No. 140.

#### (By Mr. Murphy.)

AN ACT to provide for the animal [annual] collection and regis-
tration of births and deaths in the State of Tennessee; to fix
the compensation for such collection and registration; and to
provide fine and penalty for the violation of this Act.

**State Board of Health to supervise.** SECTION 1. *Be it enacted by the General Assembly
of the State of Tennessee,* That the State Board of
Health shall have general supervision of the system
hereinafter provided for the collection and registra-
tion of births and deaths in the several counties of
this State, and shall establish and maintain at its
office in the Capitol Building at Nashville a bureau
for the collection, registration, and tabulation of
births and deaths throughout the State, and shall
make and cause to be published and distributed re-
ports of such vital statistics from time to time as
in the judgment of said Board may best serve the
public; and said Board shall prescribe such methods
and prepare and distribute such blank forms as may
be necessary to establish and maintain a uniform
system for the collection and registration of births
and deaths in the several counties of this State.

**Scholastic census takers to report to County Board of Health.** SEC. 2. *Be it further enacted,* That during the
month of July of each year, or at the time desig-
nated by law for taking the scholastic population of
the State, the Clerk of the Board of School Directors
in each separate school district of the several coun-
ties of this State, and likewise such other person or
persons elected or otherwise designated by Municipal
Boards of Education to take the scholastic popula-
tion in the several municipalities of this State shall
be required, and are hereby empowered and directed,
to collect and report to the Secretary of the County
Board of Health (the County Court Clerk) each
birth and death occurring within their respective
district during the scholastic year last preceding in
such form and manner as hereinafter designated,
and all such reports or returns of births and deaths

Case: 23-5669   Document: 34   Filed: 12/20/2023   Page: 80

thus collected shall be delivered to the Secretary of the County Board of Health (the County Court Clerk) not later than the first day of August of each year.

SEC. 3. *Be it further enacted*, That in order to facilitate the accurate and intelligent collection and registration of births and deaths as provided in Section 2 of this Act, the State Board of Health shall be required, and is hereby authorized and directed, to furnish the Secretary of the County Board of Health (the County Court Clerk) in the several counties of this State a sufficient number of blank forms, designating in separate columns: *State Board to furnish blanks.*

First: In the registration of births, the date of birth, the name of the child, the sex and the color of the child, the place of birth, the Christian name and surname of both parents, the nativity of both parents, the occupation of the father, the name of the attending physician or midwife, and the date when the record was made.

Second: In the registration of deaths, the date of the death, the Christian and surname of the deceased, the sex and color, whether married or single, the age, the place of death, the disease or apparent cause of death, the nativity and occupation of deceased, the name of the attending physician, and the date when such record was made.

The Secretary of the County Board of Health (the County Court Clerk) in the several counties of this State shall in due time, or prior to the month of July of each year, furnish to each and every Clerk in the several school districts of the respective county, and likewise to such other person or persons designated for municipal school districts, as specified in Section 2 of this Act, the necessary blank forms provided by said State Board of Health. The said Secretary of the County Board of Health (the County Court Clerk) shall receive and carefully preserve all returns or reports of births and deaths from Clerks and other person or persons designated in Section 2 of this Act, and shall cause all such returns or reports to be promptly transcribed in well-bound books (to be furnished by the county for that purpose) according to form and manner provided and hereinbefore designated in this section of this Act; and immediately, or not later than ten days after the *Duties of Secretary of County Boards.* *To record reports.*

Case: 23-5669   Document: 34   Filed: 12/20/2023   Page: 81

said Secretary of the County Board of Health (the County Court Clerk) has caused all such returns or reports of births and deaths to be thus transcribed, he shall be required, and is hereby directed, to forward to the State Board of Health each and every such original return or report of births and deaths, and at the same time shall furnish to the said State Board of Health the name and address of any Clerk or Clerks, person or persons designated in Section 2 of this Act who shall fail or refuse to comply with the requirements of this Act.

**Compensation of census taker.** SEC. 4. *Be it further enacted,* That the Clerk of the District School Directors and other person or persons designated in Section 2 of this Act shall receive as compensation ten cents per capita for collecting and reporting to the Secretary of the County Board of Health (the County Court Clerk) each birth and each death in accordance with the form **Compensation of Clerk.** and manner hereinbefore designated; and the Secretary of the County Board of Health (the County Court Clerk) in the several counties of this State shall receive as compensation ten cents per capita for each and every such transcript of birth and death by him made in accordance with the form and manner hereinbefore designated; and all such compensation above specified shall be made a county charge and the County Court Clerk shall order the payment of the same out of the funds of the county.

SEC. 5. *Be it further enacted,* That the Secretary of the County Board of Health (the County Court Clerk) in the several counties of this State shall be required to furnish when desired a certified copy of any birth or death record or file in his office, and for each and every such certified copy of birth or death record thus furnished he shall be allowed to charge the individual, firm, or corporation requiring same a fee of one dollar.

SEC. 6. *Be it further enacted,* That nothing contained in this Act shall be so construed as interfering with the manner adopted by any municipality of five thousand or over inhabitants (according to the last United States census or any subsequent United States census) for the collection and registration of births and deaths.

**Penalty.** SEC. 7. *Be it further enacted,* That in case of the refusal or neglect of any of the officials or individ-

Case: 23-5669    Document 34    Filed: 12/20/2023    Page: 82

uals mentioned in this Act to perform any of the duties hereinbefore required of them, or either of them, to be done and performed by any of the provisions herein contained, and, upon conviction, shall be fined not less than five dollars nor more than fifty dollars, and the prosecuting attorney in each county or judicial district is hereby required to prosecute all persons in his county or judicial districts who shall be guilty of a violation of this Act.

SEC. 8. *Be it further enacted,* That all Acts or parts of Acts coming in conflict with this Act are hereby repealed, and that this Act shall take effect from and after its passage, the public welfare requiring it.

Passed April 27, 1909.

M. HILLSMAN TAYLOR,
*Speaker of the House of Representatives.*

WILLIAM KINNEY,
*Speaker of the Senate.*

Approved April 28, 1909.

MALCOLM R. PATTERSON,
*Governor.*