No. 23-5669

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

KAYLA GORE; L.G.; K.N.; JAIME COMBS,

*Plaintiffs-Appellants,*

v.

WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; LISA PIERCEY, in her official capacity as Commission of the Tennessee Department of Health,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville
Case No. 3:19-cv-00328-EJR

### Brief of Alliance Defending Freedom as Amicus Curiae in Support of Appellees and for Affirmance

JOHN J. BURSCH
SUZANNE BEECHER
ALLIANCE DEFENDING FREEDOM
440 First Street NW
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@adflegal.org
sbeecher@adflegal.org

JONATHAN A. SCRUGGS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@adflegal.org

*Attorneys for Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5669                    Case Name: Gore v. Lee

Name of counsel: Jonathan A. Scruggs

Pursuant to 6th Cir. R. 26.1, Alliance Defending Freedom
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

    No

---

CERTIFICATE OF SERVICE

I certify that on _____December 22, 2023_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Jonathan A. Scruggs

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................ i

Table of Authorities ................................................................................ iv

Identity and Interest of Amicus Curiae ..................................................... 1

Introduction ............................................................................................ 2

Argument ................................................................................................ 4

I.     Tennessee's Amendment Policy triggers rational-basis review because it does not discriminate based on any protected classification. ................................................................................ 4

     A.    The Equal Protection Clause protects sex rooted in biology, not gender identity. ................................................ 4

     B.    Sex and gender identity differ conceptually and scientifically; the latter does not determine the former. ........ 8

     C.    The Amendment Policy treats similarly situated people the same regardless of their sex or gender identity. ........... 11

II.    This Court need not accept the complaint's legal conclusions or inconsistent factual allegations, and none of them state a plausible equal-protection claim. ................................................... 16

III.   The Amendment Policy serves rational and important government interests. ..................................................... 20

     A.    Medicine ......................................................................... 20

     B.    Sports .............................................................................. 22

     C.    Military ............................................................................ 25

     D.    Education ......................................................................... 26

Conclusion ............................................................................................ 28

Rule 32(g)(1) Certificate of Compliance ................................................. 30

Certificate of Service ...................................................................31

# TABLE OF AUTHORITIES

## Cases

*Adams ex rel. Kasper v. School Board of St. Johns County*,
57 F.4th 791 (11th Cir. 2022)....................................................6, 7, 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................17

*B.P.J. v. West Virginia State Board of Education*,
649 F. Supp. 3d 220 (S.D.W. Va. 2023) ....................................1, 24

*Ballard v. United States*,
329 U.S. 187 (1946) ...................................................................5, 7

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................16

*Boe v. Marshall*,
2023 WL 3454575 (M.D. Ala. May 15, 2023) ..................................1

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) .............................................................7, 15

*Cape v. Tennessee Secondary School Athletic Association*,
563 F.2d 793 (6th Cir. 1977) ...........................................................5

*Caskey Baking Company v. Commonwealth of Virginia*,
313 U.S. 117 (1941) .......................................................................12

*D.H. by A.H. v. Williamson County Board of Education*,
638 F. Supp. 3d 821 (M.D. Tenn. 2022)........................................28

*D.N. ex rel. Jessica N. v. DeSantis*,
2023 WL 7323078 (S.D. Fla. Nov. 6, 2023) ...................................24

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022) .......................................................................5

*Doe ex rel. Doe v. Boyertown Area School District*,
897 F.3d 518 (3d Cir. 2018).............................................................9

*Frontiero v. Richardson*,
   411 U.S. 677 (1973) ............................................................. 6, 7

*Grimm v. Gloucester County School Board*,
   972 F.3d 586 (4th Cir. 2020) ................................................. 9

*Heller v. Doe*,
   509 U.S. 312 (1993) ............................................................. 20

*In re Doe*,
   2017 WL 1375331 (Minn. Ct. App. Apr. 17, 2017) ...................... 19

*Kelley v. Board of Trustees*,
   35 F.3d 265 (7th Cir. 1994) ................................................. 23

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) .......................... 2, 4, 6, 7, 12, 13, 15

*Michael M. v. Superior Court of Sonoma County*,
   450 U.S. 464 (1981) ............................................................. 6

*O'Connor v. Board of Education of School District 23*,
   449 U.S. 1301 (1980) ........................................................... 6

*Roe ex rel. Roe v. Critchfield*,
   2023 WL 6690596 (D. Idaho Oct. 12, 2023) ........................... 7, 28

*Soule v. Connecticut Association of Schools, Inc.*,
   2023 WL 8656832 (2d Cir. Dec. 15, 2023) ............................... 23

*Tuan Anh Nguyen v. I.N.S.*,
   533 U.S. 53 (2001) ............................................................. 5, 6

*United States v. Virginia*,
   518 U.S. 515 (1996) ............................................................. 2

*Williams v. CitiMortgage, Inc.*,
   498 F. App'x 532 (6th Cir. 2012) ......................................... 18

*Yellow Springs Exempted Village School District Board of Education
   v. Ohio High School Athletic Association*,
   647 F.2d 651 (6th Cir. 1981) ............................................... 5

## Statutes

42 U.S.C. § 300gg-13 ................................................................13

42 U.S.C. § 300kk ....................................................................12

50 U.S.C. § 3802 .......................................................................25

50 U.S.C. § 3803 .......................................................................25

Ala. Code § 16-1-54 .................................................................28

Fla. Stat. § 1006.205(3)(d) ......................................................23

Tenn. Code Ann. § 1-3-105 ......................................................28

Tenn. Code Ann. § 49-2-802 ....................................................27

Tenn. Code Ann. § 49-7-180(b)................................................23

Tenn. Code Ann. § 68-3-203 ....................................................11

## Other Authorities

Aditi Bhargava et al., *Considering Sex as a Biological Variable in Basic & Clinical Studies: An Endocrine Society Scientific Statement*, Endocrine Rev. (Mar. 11, 2021) ...............................8, 10

Alexander A. Boni-Saenz, *Legal Age*, 63 B.C. L. Rev. 521 (2022) ..........19

*Bans on Transgender Youth Participation in Sports*, Movement Advancement Project (Nov. 29, 2023) ............................................23

Chandra Pajapati et al., *Sex Differences in Heart: From Basics to Clinics*, Eur. J. Med. Rsch. (Nov. 9, 2022).......................................21

Claire Burgess et al., *Evolving Sex and Gender in Electronic Health Records*, Fed. Practitioner (June 2019) ...................................21, 22

*Gender & Health*, World Health Org.........................................................9

*How Sex & Gender Influence Health & Disease*, Nat'l Inst. Health ........9

Irving Zucker & Brian J. Prendergast, *Sex Differences in Pharmacokinetics Predict Adverse Drug Reactions in Women*, BioMed Central (June 5, 2020) ........................................................ 21

Janine Austin Clayton & Cara Tannenbaum, *Reporting Sex, Gender, or Both in Clinical Research?*, JAMA Network (Nov. 8, 2016) ...... 21

John Armstrong et al., *Performance of Non-binary Athletes in Mass-Participation Running Events*, 9 BMJ Open Sport & Exercise Med. (2023) ................................................................................ 25

Katie Barnes, *Amid protests, Penn swimmer Lia Thomas becomes first known transgender athlete to win Division I national championship*, ESPN (Mar. 17, 2022) .......................................... 22

Martine van Zoest et al., *Sex Assignment & Diagnostics in Infants with Ambiguous Genitalia − A Single-Center Retrospective Study*, Sex Dev. (Oct 2019) ........................................................ 11

*Nondiscrimination/LGBTQ Youth: Bans on Transgender People's Use of Bathrooms & Facilities*, Movement Advancement Project (Nov. 6, 2023) ...................................................................... 28

Peter C. Baldwin, *Public Privacy: Restrooms in American Cities, 1869–1932*, 48 J. of Soc. Hist. 264 (2014) ...................................... 27

*Promoting Healthy Development of Sexuality & Gender Identity*, Bright Futures (July 2022) ............................................................. 8

*Request for Status Information Letter*, Selective Serv. Sys. ................... 26

Sandra Hunter et al., *The Biological Basis of Sex Differences in Athletic Performance: Consensus Statement for the American College of Sports Medicine*, Translational J. Am. Coll. Sports Med. (Fall 2023) ................................................................................ 24

Sara Dahlen, *De-sexing the Medical Record? An Examination of Sex Versus Gender Identity in the General Medical Council's Trans Healthcare Ethical Advice*, The New Bioethics (Feb. 3, 2020) ...... 22

*Sex & Gender Influences in Health & Disease*, Nat'l Inst. Health ......... 21

Sharziya Allarakha, *What are the 72 Other Genders?*, Med. Net (Feb. 2, 2022) ............................................................................... 10

*Understanding Transgender People, Gender Identity & Gender Expression*, Am. Psych. Ass'n (June 6, 2023) ................................... 9

W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227 (2018) ....................................................................... 26, 27

*Who Needs to Register*, Selective Serv. Sys. ........................................ 25

*Women's Preventive Services Guidelines*, Health Res. & Servs. Admin. (Dec. 2022) ...................................................................................... 13

## **Regulations**

29 C.F.R. § 825.120 ................................................................................... 13

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

Alliance Defending Freedom is dedicated to protecting religious freedom, free speech, the sanctity of life, parental rights, and marriage and family. Because the law should respect that men and women are equal but different, ADF advocates for laws that recognize relevant physiological and biological differences between the sexes.

ADF routinely defends state laws that acknowledge these relevant differences between men and women—whether to protect fairness in women's sports, *B.P.J. v. W. Va. State Bd. of Educ.*, 649 F. Supp. 3d 220 (S.D.W. Va. 2023) (counsel for female athlete intervenor); to ensure privacy in private spaces, *Roe v. Critchfield*, No. 23-2807 (9th Cir. docketed Oct. 16, 2023) (co-counsel for Idaho); or to protect children from potentially dangerous body-altering procedures, *Boe v. Marshall*, No. 2:22-CV-184-LCB, 2023 WL 3454575 (M.D. Ala. May 15, 2023) (counsel for Alabama). ADF submits this brief to support Tennessee's policy of recording sex on birth certificates—a policy that helps promote public health, protect people's privacy, and provide equal athletic opportunities to women and girls.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief. All counsel were timely notified of this brief and consented to its filing.

## INTRODUCTION

As late Justice Ruth Bader Ginsburg famously said, the "[p]hysical differences between men and women … are enduring" and "remain cause for celebration." *United States v. Virginia*, 518 U.S. 515, 533 (1996). These differences have led officials for countless years in countless contexts to document people's sex—to advance medicine, protect privacy, and ensure equal opportunity. To be sure, cultural debates about what it means to be male or female embroil our country today. But this appeal asks a legal question: does the Equal Protection Clause—as its terms were understood at the time of its ratification in 1868—*require* state birth certificates to reflect someone's perceived gender identity rather than their sex?

To ask the question is to answer it. Neither the Constitution's text nor our pre-1868 legal history reference gender identity; indeed, gender identity as a concept would not be developed for another 100 years. Thus, this Court has rightly held in an analogous context that an "across-the-board regulation" that merely references sex or gender identity and applies to everyone regardless of these traits "does not trigger any traditional equal-protection concerns." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023) (upholding state laws on medical procedures that alter the bodies of children experiencing gender dysphoria).

Appellants try to avoid this result and impose a different defini-tion of sex on Tennessee by alleging in their complaint that sex is "determined by … gender identity." Compl., R.59, PageID#384. On their logic, (1) Appellants like Kayla Gore—though born male—belong to the female sex by self-identification, (2) this allegation must be accepted as true at the pleading stage, and (3) Tennessee therefore treats Gore worse than women with female on their birth certificates. Such word games defy common sense. Just because plaintiffs allege something about themselves does not mean a court is forced to accept those allegations as true.

No matter how *Appellants* define sex, Tennessee's birth certificate law (hereinafter the Amendment Policy) defines sex in biological terms based on external genitalia at birth. And equal-protection jurisprudence defines sex in biological terms too. Those legal definitions govern, not Appellants' conclusory allegations. Accordingly, Tennessee's biology-focused policy must be evaluated under the Equal Protection Clause, not Appellants' standards. Appellants' contrary complaint allegations are either mere legal conclusions or inconsistent factual allegations. Neither state plausible claims.

Under the proper standard—rational-basis review—the Amendment Policy easily survives. The policy treats everyone the same no matter their sex or gender identity. And Tennessee has very good reasons to record someone's sex, not gender identity: those in fields like

3

education, sports, and medicine often need to know a person's sex to enforce sex-specific privacy spaces in schools, to designate sex-specific sports teams, and to provide appropriate medical treatment. As a matter of the Equal Protection Clause's text, history, and tradition, Tennessee may maintain accurate sex designations on birth certificates.

## ARGUMENT

### I.   Tennessee's Amendment Policy triggers rational-basis review because it does not discriminate based on any protected classification.

For equal-protection analysis, courts evaluate a law under rational-basis review unless the law discriminates based on protected classifications like race or sex. *Skrmetti*, 83 F.4th at 479. While sex is a protected classification, gender identity is not. *Id*. Of course, this conclusion presupposes that sex and gender identity are different. And they are—constitutionally, scientifically, and conceptually. Once this distinction is understood, it is clear that Tennessee's Amendment Policy references biological anatomy and discriminates against no one.

### A.   The Equal Protection Clause protects sex rooted in biology, not gender identity.

Although the Equal Protection Clause does not mention any protected classification, the Supreme Court has repeatedly recognized that sex is a constitutionally protected trait defined in terms of biology.

4

"[T]he two sexes are not fungible." *Ballard v. United States*, 329 U.S. 187, 193 (1946). Refusal to recognize "our most basic biological differences … risks making the guarantee of equal protection superficial, and so disserving it." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001) ("the difference between men and women in relation to the birth process is a real one").

This Court agrees. When discussing female athletics, it noted: "to measure equal opportunity, present relevant differences cannot be ignored. When males and females are not in fact similarly situated and when the law is blind to those differences, there may be as much a denial of equality as when a difference is created which does not exist." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). *Accord, e.g., Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (rejecting equal-protection challenge to different rules for women's basketball because "[w]hen the classification, as here, relates to athletic activity, it must be apparent that its basis is the distinct differences in physical characteristics and capabilities between the sexes").

Unsurprisingly, the Supreme Court has upheld laws against equal-protection challenges when the laws reflect real biological differences between men and women. So laws may ban abortions even though only women can give birth and get abortions. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Laws can penalize only

males for having sex with underage females because of pregnancy risks. *Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 471–73 (1981) (plurality opinion). Laws can impose "a different set of rules" to prove biological parenthood "with respect to fathers and mothers" because of "the unique relationship of the mother to the event of birth." *Nguyen*, 533 U.S. at 63–64. And laws can separate sports teams by sex; otherwise, "boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events." *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers).

All this shows that "biological sex … is the driving force behind the Supreme Court's sex-discrimination jurisprudence." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.6 (11th Cir. 2022) (en banc). And "[r]ecognizing and respecting biological sex differences does not amount to [improper] stereotyping" under the Equal Protection Clause. *Skrmetti*, 83 F.4th at 486.

This Court recognized the biological focus of "sex" in *Skrmetti. Id.* As that decision made clear, sex and gender identity differ—the former defined by biology, the latter by subjective perception. Unlike sex, which is determined "by the accident of birth," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973), "transgender identity is not definitively ascertainable at the moment of birth," *Skrmetti*, 83 F.4th at 487 (cleaned up). Unlike sex, which is "an immutable characteristic,"

*Frontiero*, 411 U.S. at 686, gender identity "is not necessarily immutable…" *Skrmetti*, 83 F.4th at 487. Unlike sex, which is binary, *Ballard*, 329 U.S. at 193, gender identity involves "a huge variety," *Skrmetti*, 83 F.4th at 487. To put it plainly, "transgender status [is a] distinct concept[ ] from sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1746–47 (2020). None of this logic would make sense if sex were equivalent to or determined by gender identity. This Court's precedents reject Appellants' attempts to collapse these distinct concepts.

Other courts agree and likewise understand sex to be rooted in biology. The Eleventh Circuit has refused to "equat[e] gender identity … to biological sex" because it "would refute the Supreme Court's long-standing recognition" tying sex in the Fourteenth Amendment to biology. *Adams*, 57 F.4th at 807. A contrary factual finding would "constitute clear error." *Id.* at 808. *Accord, e.g., Roe ex rel. Roe v. Critchfield*, No. 1:23-CV-00315-DCN, 2023 WL 6690596, at *6 (D. Idaho Oct. 12, 2023) ("The Supreme Court has never defined sex to include gender identity.").

In fact, after recently surveying the field, one district court could not "locate a single case where a court at any level defined the term 'sex' to include 'gender identity' or 'transgender status.'" *Roe*, 2023 WL 6690596, at *6 n.8. This consensus flows naturally from commonsense and Supreme Court precedent. For equal-protection purposes, sex and

gender identity are different. Sex is defined and determined by biology, not identity.

### B.   Sex and gender identity differ conceptually and scientifically; the latter does not determine the former.

Because precedent defines sex based on biology for equal-protection purposes, that closes the matter. But scientific literature and common sense amply support that same conclusion.

Many prominent medical and health organizations—including many that support rights based on gender identity—define sex with reference to objective biological traits:

- The Endocrine Society: "Sex is a biological concept.… all mammals have 2 distinct sexes.… Sex is dichotomous, with sex determination in the fertilized zygote stemming from unequal expression of sex chromosomal genes."[2]

- American Academy of Pediatrics: "An assignment made at birth, usually male or female, typically on the basis of external genital anatomy but sometimes on the basis of internal gonads, chromosomes, or hormone levels."[3]

- American Psychological Association: "Sex is assigned at birth, refers to one's biological status as either male or female, and is associated primarily with physical attributes

---

[2] Aditi Bhargava et al., *Considering Sex as a Biological Variable in Basic & Clinical Studies: An Endocrine Society Scientific Statement*, Endocrine Rev. (Mar. 11, 2021), https://bit.ly/48krsz0.
[3] *Promoting Healthy Development of Sexuality & Gender Identity*, Bright Futures (July 2022), http://tinyurl.com/4rrje76x.

such as chromosomes, hormone prevalence, and external and internal anatomy."[4]

- The National Institute of Health: "Sex is a biological classification, encoded in our DNA. Males have XY chromosomes, and females have XX chromosomes. Sex makes us male or female. Every cell in your body has a sex—making up tissues and organs, like your skin, brain, heart, and stomach. Each cell is either male or female depending on whether you are a man or a woman."[5]

In contrast, gender identity is a concept rooted in someone's subjective perception. According to the World Health Organization, "[g]ender refers to the characteristics of women, men, girls and boys that are socially constructed."[6] And "[g]ender identity refers to a person's deeply felt, internal and individual experience of gender, which may or may not correspond to the person's physiology or designated sex at birth."[7]

Courts agree with these basic definitions. *E.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020) (defining "gender identity" as someone's "deeply felt, inherent sense of their gender"); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018) (contrasting sex as "anatomical and physiological

---

[4] *Understanding Transgender People, Gender Identity & Gender Expression*, Am. Psych. Ass'n (June 6, 2023), https://bit.ly/3RyS5cC.
[5] *How Sex & Gender Influence Health & Disease*, Nat'l Inst. Health, http://tinyurl.com/msk6vs2m (last visited Dec. 20, 2023).
[6] *Gender & Health*, World Health Org., https://bit.ly/3Ru7mf4 (last visited Dec. 19, 2023).
[7] *Id.*

processes that lead to or denote male or female" versus "gender identity" as someone's "subjective, deep-core sense of self as being a particular gender").

Given these definitions, it follows that gender identity (rooted in subjective perception) does not determine sex (rooted in objective biology). Again, the Endocrine Society: "Sex is an essential part of vertebrate biology, but gender is a human phenomenon. Sex often influences gender, *but gender cannot influence sex.*" (emphasis added).[8] Just because someone identifies as something does not make it so. That holds for sex like everything else.

Further demonstrating the gap between gender identity and sex, some people do not identify as *any* particular sex. A recent summary catalogues at least 72 gender identities, including many non-binary ones.[9] Transgender advocacy groups like the Human Rights Campaign admit that someone can identify as a "fluid or unfixed gender identity."[10] If someone's sex—physiological and biological traits—were equivalent to or "determined by their gender identity," as Appellants claim (Appellants Br. 22), these distinct concepts would collapse on

---

[8] Bhargava, *supra*, at n.2.
[9] Sharziya Allarakha, *What are the 72 Other Genders?*, Med. Net (Feb. 2, 2022), https://bit.ly/3RLBrrH.
[10] *Glossary of Terms*, Hum. Rts. Campaign (May 31, 2023), https://bit.ly/3GO8WmW.

themselves. This Court should reject Appellants' attempt to rewrite the law via (re)definitional fiat.

### C.   The Amendment Policy treats similarly situated people the same regardless of their sex or gender identity.

With those foundational concepts in place, the proper legal analysis becomes clear: Tennessee's Amendment Policy satisfies equal protection because it treats everyone equally no matter their sex or gender identity.

The Amendment Policy requires birth certificates to document someone's sex based on the "appearance of external genitalia at the time of birth" (Compl., R.59, PageID#381, 388) and only allows subsequent changes for "factually inaccurate [entries] at the time of recordation" (Tenn. Code Ann. § 68-3-203(f)), which excludes changes because of "sex change surgery" (Tenn. Code Ann. § 68-3-203(d)) or social transitions (Compl., R.59, PageID#389).[11]

---

[11] While external genitalia at birth does not track every biological indicator (e.g. chromosomes), doing so is neither practical nor necessary. External genitalia at birth aligns with other sex characteristics 99.98% of the time. Martine van Zoest et al., *Sex Assignment & Diagnostics in Infants with Ambiguous Genitalia − A Single-Center Retrospective Study*, Sex Dev. (Oct 2019), https://bit.ly/3RTgZp6. And none of Appellants claims to be part of the 0.02% with ambiguous genitalia or a sexual development disorder. Appellants thus do not object to—nor are they injured by—Tennessee choosing one biological marker (physical genitalia) over another (chromosomes, hormone levels). Instead, Appellants object to Tennessee's designating *any* biological sex marker

The Amendment Policy thus treats everyone the same regardless of sex or gender identity. Everyone gets a birth certificate that designates their sex as defined by external genitalia—whether a person is male or female and no matter how they identify, either at the time of birth or later. Just like the law in *Skrmetti*, the Amendment Policy "lacks any of the hallmarks of sex discrimination. It does not prefer one sex over the other …. It does not include one sex and exclude the other …. It does not bestow benefits or burdens based on sex.… And it does not apply one rule for males and another for females." 83 F.4th at 480 (cleaned-up).

To be sure, the Amendment Policy mentions sex and sex-change surgeries. But "[c]lassification is not discrimination" without more. *Caskey Baking Co. v. Commonwealth of Virginia*, 313 U.S. 117, 121 (1941). Countless policies "mention the word 'sex,'" but do not trigger heightened review. *Skrmetti*, 83 F.4th at 482 (citing examples of laws regulating abortion, female genital mutilation, prostate cancer, and breastfeeding); 42 U.S.C. § 300kk(a)(1)(A) (requiring officials to collect and report "data on race, ethnicity, sex," and more "for applicants, recipients, or participants" of public health programs).

---

instead of a gender-identity marker. Courts lack the power to issue relief that goes beyond a plaintiff's alleged injuries. *Skrmetti*, 83 F.4th at 490–91.

Indeed, many laws and government programs mention sex by providing benefits for pregnancy and breastfeeding only to women. *E.g.*, 29 C.F.R. § 825.120(a)(4) (providing certain prenatal-care benefits just for "mother[s]"); 42 U.S.C. § 300gg-13 (requiring insurance coverage "with respect to women" for certain preventative care); *Women's Preventive Services Guidelines*, Health Res. & Servs. Admin. (Dec. 2022), https://bit.ly/471zcFf (identifying preventative care to cover "breastfeeding equipment"). And many government hospitals and government health insurance programs record someone's sex and treat men and women differently (but equally) based on that information. *See infra* § III.

Appellants would require that all these acts and policies satisfy higher constitutional scrutiny. Yet they only trigger rational-basis review because they "treat both sexes equally" and do not "disadvantage" anyone based on their sex. *Skrmetti,* 83 F.4th at 483.

This conclusion applies equally to gender identity. Although the Amendment Policy forbids changes after so-called "sex-change" surgeries (Compl., R.59, PageID#389), the Amendment Policy forbids changes to the sex designation on a birth certificate for countless other reasons too. Adding clarity does not change or expand the reasons why people cannot change the sex designation on their birth certificate. In the context of a policy that references sex, it makes sense to define terms and clarify details.

At most, Appellants can complain about disparate impact, not disparate treatment, by arguing that most people who seek sex-change surgeries identify as transgender. But that is not always the case. *E.g.*, Op., R.110, PageID#2620 (citing examples like criminals undergoing surgeries to avoid capture). Detransitioners seek these procedures initially but eventually regret them. Someone else could ask to change their sex designation to show solidarity with the LGBT community. Tennessee's Amendment Policy doesn't care why someone might want these procedures, reverse them, or try to change the sex designation on birth certificates to be inaccurate. The Amendment Policy bans all attempts to change a person's sex designation on his or her birth certificate when doing so produces inaccuracies.

The challengers in *Skrmetti* levied the same disparate-impact objection against the law there: almost all who seek body-altering procedures to alleviate gender dysphoria identify as transgender. But if the law banning these procedures in *Skrmetti* did not constitute proxy discrimination triggering heightened review, the mere reference in Tennessee's Amendment Policy to sex-change surgeries does not either. *Contra* Appellants Br. 37 (citing out-of-circuit district court opinions rather than *Skrmetti* to argue for proxy discrimination).

In the end, Appellants' arguments all come back to demanding sex blindness—insisting that heightened scrutiny kicks in whenever policies reference or notice sex or gender identity. That is why they

attempt to read their sex-blind interpretation of Title VII discrimination into equal protection. Appellants Br. 33–34 (invoking *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020)). But not even *Bostock* requires universal sex-blindness under Title VII; it only addressed gender-identity discrimination when firing employees, not things like sex-designated bathrooms. 140 S. Ct. at 1753.[12]

*Skrmetti* squarely forecloses Appellants' argument. It refused to read *Bostock*'s analysis into the Fourteenth Amendment. 83 F.4th at 484–85 (noting different text and context). It is no answer to say *Skrmetti* declined to import a Title VII standard into the Equal Protection Clause and did not address what qualifies as discrimination. Appellants Br. 33–34. *Bostock* interpreted what qualifies as discrimination under Title VII. By refusing to incorporate that understanding, *Skrmetti* rejected a sex-blind definition of discrimination for equal-protection analysis.

---

[12] Indeed, the Justice Department recently told the Supreme Court that a sex-designated bathroom "is not going to give rise to the kinds of stigmatic or dignitary harms [under Title VII] that we usually associate with unequal treatment on the basis of sex." Tr. Oral Arg. at 62, *Muldrow v. City of St. Louis,* No. 22-193 (S. Ct. argued Dec. 6, 2023).

## II.   This Court need not accept the complaint's legal conclusions or inconsistent factual allegations, and none of them state a plausible equal-protection claim.

Recognizing their unsurmountable legal problems under this Circuit's precedent, Appellants try to hide behind their complaint allegations. Invoking allegations like "[g]ender identity is the critical determinant of a person's sex" and male litigants "are women" (Compl., R.59, PageID#382), Appellants argue that Tennessee treats them differently than biological women by giving Appellants inaccurate birth certificates. Appellants Br. 8. But artful pleading doesn't fix inadequate legal theories. Appellants' tactics fail for two reasons.

First, Appellants' allegations about sex and gender identity are not factual assertions but legal conclusions. And courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Here, the relevant question is not how Appellants perceive or define themselves or how they define sex, but how the Equal Protection Clause and Tennessee's Amendment Policy do. The Amendment Policy considers Appellants to be males, and so does the Equal Protection Clause. *Supra* § I.A.

Applying the Constitution's understanding of sex, Appellants have failed to state a constitutional claim. For example, Appellant Gore identifies as "transgender" and "was assigned the sex of male at birth." Compl., R.59, PageID#392. The complaint never alleges that Gore has

16

any naturally occurring biological markers of a female (like chromosomes, hormone level, or anatomy).[13] So Appellants like Gore have either failed to allege they are female for equal-protection purposes or have alleged that they are in fact male for equal-protection purposes. Either way, Appellants cannot show disparate treatment when compared to females.

Indeed, Appellants' allegations must be legal conclusions because accepting them would necessarily make gender identity a protected class, superseding *Skrmetti*, which determined that sex and gender identity differ for equal-protection purposes. That is exactly Appellants' goal: to achieve by pleading what cannot be done by argument. This Court should reject that attempt.

Second, Appellants cannot state a plausible claim even accepting their allegations as factual. To evaluate whether a claim is plausible, courts draw on their "judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). And common sense shows that Appellants born with male anatomy like Gore are not similarly situated to women born with female anatomy.

---

[13] To be sure, Appellants allege that "[b]y 2012," Gore had "socially and medically" transitioned and "brought" Gore's "body characteristics and outside appearance into alignment with [a] female gender identity." Compl., R.59, PageID#392–93. But that just underscores that Gore's body characteristics at birth were male.

Appellants' complaint bears this out. It repeatedly demands that Tennessee recognize Appellants' "true sex, as determined by their gender identity." Compl., R.59, PageID#379, 391, 406–08. And it defines "accurate identification documents" as those "that are consistent with a person's gender identity—a person's core internal sense of their own gender[.]" Compl., R.59, PageID#376. Based on this gerrymandered definition of "true sex" and "accurate" documents, Appellants allege that "the sex designation on their original birth certificate is inaccurate because they were assigned the incorrect [true] sex at birth." Compl., R.59, Page ID#376.

These allegations underscore that the complaint uses a definition of sex inconsistent with the Amendment Policy and different than one needed to prove sex discrimination under the Equal Protection Clause. For Appellants, sex is defined by and equivalent to gender identity, i.e., their "internal sense of their own gender." Compl., R.59, PageID#376. But Appellants cannot state a plausible equal-protection claim based solely on their internal perception of sex. Appellants cannot alter legal concepts by artful pleading. And this Court need not "accept as truth conflicting pleadings … that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (cleaned up).

18

Accepting Appellants' gambit would lead to a flood of lawsuits based on perceptions, semantic redefinitions, and artful pleadings. For example, one person already tried to alter the date on his birth certificate "on the ground that he experiences a psychological disconnect between his biological age and the age at which he now identifies." *In re Doe*, No. A16-1392, 2017 WL 1375331, at *1 (Minn. Ct. App. Apr. 17, 2017). Though unsuccessful in his legal efforts, that litigant marshalled a doctor, psychologist, and professor who affirmed that he "feels most comfortable" with younger peers, that the document change would allow him to "develop a more cohesive sense of self," and that "age stereotypes and age role expectations" pervade society. *Id.*

Under Appellants' theory, such a person could easily state a viable age-discrimination claim by alleging their "true age" is an age based on their identity rather than their biology. *See* Alexander A. Boni-Saenz, *Legal Age*, 63 B.C. L. Rev. 521, 524 (2022) (arguing that the "stronger embrace of elective, fluid, and hybrid identities … opens up the prospect that age, too, should be a product of individual self-determination and expression rather than state-imposed definition"). And once the door opens on sex and age, everything on government documents will be up for grabs: height, eye-color, weight, birthdate, birthplace, to name a few.

This Court should keep the lid on that Pandora's Box. Rather than accept inconsistent complaint allegations dependent on semantic rede-

finitions, this Court should dismiss Appellant's complaint as an attempt to plead around unfavorable precedent.

## III.  The Amendment Policy serves rational and important government interests.

Because the Amendment Policy does not discriminate based on any protected classification, it need satisfy only rational-basis review. *Supra* § I. Under this low standard, courts apply "a strong presumption of validity" to laws and uphold them if "there is any reasonably conceivable state of facts that could provide a rational basis for the [challenged] classification." *Heller v. Doe*, 509 U.S. 312, 319–20 (1993) (cleaned up).

The Amendment Policy easily clears that low bar. As Appellants concede, birth certificates "are critical and foundational identity documents." Appellants Br. 3. Indeed, in multiple contexts, governments and private actors need to know someone's birth sex. So Tennessee has rational reasons to place that information on state birth certificates and not alter it based on self-professed gender identity.

### A.  Medicine

In the medical field, sex is critical—whether for mental health, substance-use disorders, autoimmune diseases, pain processing,

musculoskeletal health, or cancer treatment.[14] Sex also matters enormously to drug dosage because females often metabolize drugs more slowly than men, even when holding bodyweight constant, thus exposing women to worse side effects.[15] In the cardiovascular realm, men and women have different heart sizes and present heart-disease symptoms differently.[16] And in the clinical realm, reporting sex ensures accurate conclusions, facilitates meta-analysis, and avoids wasteful and even unethical research.[17]

Problems can easily occur if health-care professionals lack "accurate information about patient birth sex," particularly when determining appropriate screenings, prescribing the proper drug dosage, and pairing lab results with assumed hormonal history.[18] As more people identity as transgender, these problems may increase. When some in the Veterans Health Administration replaced sex in documents with gender identity, that threatened to "misalign natal

---

[14] *Sex & Gender Influences in Health & Disease*, Nat'l Inst. Health, http://tinyurl.com/32x4v45m (last visited Dec. 20, 2023).

[15] *Id.;* Irving Zucker & Brian J. Prendergast, *Sex Differences in Pharmacokinetics Predict Adverse Drug Reactions in Women*, BioMed Central (June 5, 2020), http://tinyurl.com/25b47t8s.

[16] Chandra Pajapati et al., *Sex Differences in Heart: From Basics to Clinics*, Eur. J. Med. Rsch. (Nov. 9, 2022), https://tinyurl.com/2zbysr6a.

[17] Janine Austin Clayton & Cara Tannenbaum, *Reporting Sex, Gender, or Both in Clinical Research?*, JAMA Network (Nov. 8, 2016), http://tinyurl.com/4crhmjv8.

[18] Claire Burgess et al., *Evolving Sex and Gender in Electronic Health Records*, Fed. Practitioner (June 2019), https://bit.ly/476WbhZ.

sex–based clinical reminders, medication dosages, and laboratory test values, which created potential patient safety risks."[19] Medical ethicists worry about conflating sex and gender identity in medical records.[20]

To avoid confusion, doctors and researchers sometimes need an easy, non-invasive way to verify someone's sex—for example, to ensure someone's eligibility in a study about their health conditions. Tennessee's birth certificates could provide that official document. Tennessee thus has a rational need for a stable and clear record that could be relied on by different state officials and non-state actors to verify someone's sex.

### B.    Sports

Across the country, women and girls have lost equal opportunities and the chance to be champions because men who identify as women have begun to compete in women's sports. In Georgia, Lia Thomas won the women's 500-yard freestyle at the NCAA Swimming and Diving Championships, bumping 15 women down the scoreboard that day, including two Olympians.[21] In Connecticut, two male track athletes won

---

[19] *Id.*

[20] Sara Dahlen, *De-sexing the Medical Record? An Examination of Sex Versus Gender Identity in the General Medical Council's Trans Healthcare Ethical Advice*, The New Bioethics (Feb. 3, 2020), https://tinyurl.com/ypsnhu85.

[21] Katie Barnes, *Amid protests, Penn swimmer Lia Thomas becomes first known transgender athlete to win Division I national championship*, ESPN (Mar. 17, 2022), https://es.pn/3Ty1HY6.

a combined 15 state championships in women's track and set 17 individual records, repeatedly displacing female athletes like Chelsea Mitchell and Selina Soule and excluding them from the winner's podium.[22] And in West Virginia, a male athlete beat over 100 different middle-school girls in shot put and discus, denying two girls the chance to compete in conference championships.[23]

In response to incidents like these, 24 states (including Tennessee) have passed "Save Women's Sports" laws that designate women's sports teams for females to ensure fairness in women's sports.[24] Many of these laws use birth certificates to identify a person's sex and determine eligibility to participate in women's sports. *See, e.g.*, Tenn. Code Ann. § 49-7-180(b); Fla. Stat. § 1006.205(3)(d). Accurate birth certificates facilitate equal opportunity and fairness for women in sports.

States unquestionably have a rational interest in ensuring equal opportunity for women in sports. Courts have repeatedly upheld Title IX on this ground. *E.g.*, *Kelley v. Bd. of Trustees*, 35 F.3d 265, 272 (7th Cir. 1994) (complying with Title IX serves important interests under Equal Protection Clause by ensuring equal athletic opportunity to

---

[22] *Soule v. Conn. Ass'n of Schs., Inc.*, No. 21-1365, 2023 WL 8656832, at *3 (2d Cir. Dec. 15, 2023).
[23] Def. W. Va.'s Mot. to Suspend Inj. Pending Appeal at 6, *B.P.J. v. W. Va. State Bd. of Educ.*, No. 23-5669 (6th Cir. Oct. 19, 2023), https://tinyurl.com/mr3snzka.
[24] *Bans on Transgender Youth Participation in Sports*, Movement Advancement Project (Nov. 29, 2023), http://tinyurl.com/yc6rh4ae.

women). After all, "[w]hile some females may be able to outperform some males, it is generally accepted that, on average, males outperform females athletically because of inherent physical differences between the sexes. This is not an overbroad generalization, but rather a general principle that realistically reflects the average physical differences between the sexes." *B.P.J.*, 649 F. Supp. 3d at 231 (upholding women's sports law against equal protection and Title IX challenge); *D.N. ex rel. Jessica N. v. DeSantis*, No. 21-CV-61344, 2023 WL 7323078, at \*7 (S.D. Fla. Nov. 6, 2023) (same).

Science supports these claims. The American Committee on Sports Medicine, for example, recently released an extensive expert statement surveying the scientific literature on athletic performance. In it, the Committee noted that "[b]iological sex is a primary determinant of performance in many athletic events and physical tasks."[25] "Males outperform females in sports and athletic endeavors that require aerobic endurance, muscle strength, power, and speed. The biological differences between males and females result in ~10%–30% sex difference in athletic performance."[26]

---

[25] Sandra Hunter et al., *The Biological Basis of Sex Differences in Athletic Performance: Consensus Statement for the American College of Sports Medicine*, Translational J. Am. Coll. Sports Med. (Fall 2023), https://tinyurl.com/4y2z4c3x.
[26] *Id.*

Or as one recent study about athletes who identified as non-binary found, "[t]he differential between natal male and natal female performances is better explained by differences in sex than differences in gender identity, as this differential persists for our non-binary cohort."[27] So in sports, "it is vital to control for sex as it is likely to play a significant role in any analysis."[28]

In light of these fundamental physiological differences, Tennessee has good reason to limit women's sports to women. And Tennessee's efforts to accurately record sex on birth certificates advances that goal.

### C.    Military

Sex is also relevant for military service. Under the Military Selective Service Act, "every male citizen" must be registered in case they need to be conscripted into the armed forces. 50 U.S.C. §§ 3802-03.

The Selective Service Department interprets this Act "as applying to gender at birth"—"e.g. the sex listed on an original birth certificate"—meaning that males who identify as female—including Appellants like Gore—must register for the draft.[29] To encourage draft registration, some federal and state benefit programs exclude unregi-

---

[27] John Armstrong et al., *Performance of Non-binary Athletes in Mass-Participation Running Events*, 9 BMJ Open Sport & Exercise Med. (2023), https://perma.cc/SD89-M7CL.

[28] *Id.*

[29] *Who Needs to Register*, Selective Serv. Sys., https://tinyurl.com/4w2ytscy (last visited Dec. 19, 2023).

stered men until they provide a Status Information Letter from the Selective Service Department showing they have a permissible exemption. To obtain that letter, a female who identifies as male can submit "a copy of your female birth certificate" or medical documentation about transition efforts.[30]

The Selective Service Department depends on birth certificate accuracy to administer the draft and facilitate program eligibility determinations. If the federal government can use state birth certificates in this way, Tennessee certainly can ensure the accuracy of its birth certificates—to help the federal government facilitate the draft, help the federal government protect national security, and determine eligibility in its own state programs where sex is relevant.

### D.    Education

Designating intimate spaces by sex goes back "as far as written history will take us." W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227, 287–88 (2018). At the time of the Fourteenth Amendment, sex-assigned bathrooms were the norm in places like schools, department stores, railway stations, and hotels. Peter C. Baldwin, *Public Privacy: Restrooms in American Cities, 1869–1932*, 48 J. of Soc.

---

[30] *Request for Status Information Letter*, Selective Serv. Sys., https://tinyurl.com/3mpbrrr2 (last visited Dec. 19, 2023).

Hist. 264, 270–72 (2014); Carter, *supra*, at 277–78 (citing state regulations).

Recent events confirm the need to protect privacy and safety by creating sex-specific private spaces. In 2021, a male student wearing a skirt sexually assaulted a female student in the girls' bathroom of a Loudon County, Virginia school.[31] Earlier this year, an 18-year-old male student who identifies as female allegedly exposed his male genitals to 14-year-old female student in the girls' shower room of a Wisconsin school.[32] And a school in Colorado tried to force an 11-year-old girl to share a bed with a male student who identified as female on an overnight trip.[33]

In light of these and similar events, some local school districts and some states—including Tennessee—have clarified that private spaces like bathrooms, locker rooms, showers, and overnight accommodations in K-12 public schools should be designated by sex, not gender identity. *See, e.g.*, Tenn. Code Ann. § 49-2-802(2); *Nondiscrimination/LGBTQ Youth: Bans on Transgender People's Use of Bathrooms & Facilities*,

---

[31] Salvador Rizzo, *Victim of School Bathroom Sexual Assault Sues Virginia School District*, Wash. Post (Oct. 5, 2023), https://bit.ly/4181FrB.

[32] Corrine Hess, *U.S. Department of Education is Opening an Investigation into Sun Prairie Locker Room Incident*, Wis. Pub. Radio (Nov. 30, 2023), https://bit.ly/3t5ao0W.

[33] Melissa Koenig, *Parents Claim Daughter, 11, Was Forced to Sleep in Bed with Transgender Student on School Trip*, N.Y. Post (Dec. 6, 2023), https://bit.ly/46LskLZ.

Movement Advancement Project (Nov. 6, 2023), http://tinyurl.com/2p8sby93 (eight other states). And these laws often rely on, as they do in Tennessee, the "sex listed" on the person's "original birth certificate" as the basis for that eligibility determination. Tenn. Code Ann. § 1-3-105. *Accord, e.g.*, Ala. Code § 16-1-54.

Courts have frequently upheld these sex designations and stated that they serve substantial government interests in protecting privacy. *E.g.*, *Adams*, 57 F.4th 791; *Roe*, 2023 WL 6690596, at *8; *D.H. by A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 834 (M.D. Tenn. 2022). Tennessee should not be prohibited from advancing these important privacy interests by ensuring accuracy of sex designations in its state birth certificates. Proper administration of Tennessee's law depends on this accuracy.

## CONCLUSION

The Equal Protection Clause recognizes sex as an immutable trait, rooted in biology, and different from gender identity. So Tennessee law may as well. While Appellants are free to define their sex as they wish in their personal lives, they have no right to impose their views on the state. Tennessee may thus ensure the accuracy of its birth certificates to help promote public health, protect people's privacy, and provide equal athletic opportunities to women and girls. This Court should affirm.

Dated: December 22, 2023

Respectfully submitted,

/s/ *Jonathan A. Scruggs*

JONATHAN A. SCRUGGS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@adflegal.org

JOHN J. BURSCH
SUZANNE BEECHER
ALLIANCE DEFENDING FREEDOM
440 First Street NW
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@adflegal.org
sbeecher@adflegal.org

## RULE 32(G)(1) CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because this brief contains 6,096 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: December 22, 2023

*/s/Jonathan A. Scruggs*
Jonathan A. Scruggs

*Attorney for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jonathan A. Scruggs*
Jonathan A. Scruggs

*Attorney for Amicus Curiae*