

STATE OF TENNESSEE

# Office of the Attorney General

**JONATHAN SKRMETTI**
ATTORNEY GENERAL AND REPORTER

May 14, 2024

Kelly L. Stephens
U.S. Court of Appeals for the Sixth Circuit
540 Potter Stewart Courthouse
100 E. Fifth Street
Cincinnati, Ohio 45202-3988

Re:  No. 23-5669, *Kayla Gore v. William Lee*

Dear Clerk Stephens:

On May 3, 2024, this Court ordered the parties to file supplemental briefs "addressing the relevance to this dispute of § 1-3-105(c) of the Tennessee Code and of the State's decision to disallow changes based on gender identity for all state forms of identification (*e.g.*, driver's licenses and voter identification cards)."  In the State's view, neither § 1-3-105(c) nor the changed driver's-license policy affects the constitutionality of Tennessee's longstanding birth-certificate policies.  And, even if considered, the identified statutory and policy changes do not reflect animus towards transgender persons.

*1.    Background on § 1-3-105(c) and changes to driver's-license policy.*

a.    Section 1-3-105(c).    Enacted in 2023, § 1-3-105(c) clarified the meaning of "sex" in the Tennessee Code.  The statute defines "sex" to "mean[] a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth and evidence of a person's biological sex," "unless the context otherwise requires."  It also provides that "evidence of a person's biological sex includes, but is not limited to, a government-issued identification document that accurately reflects a person's sex listed on the person's original birth certificate."  *Id.* (quotations omitted).

1

Section 1-3-105(c) does not address any particular area of state law or target "all state forms of identification"—which reflect a differing mix of statutory, regulatory, and local requirements. The statute instead provides clarity across the Tennessee Code, which uses the term "sex" dozens of times in myriad contexts. Among other things, § 1-3-105(c) clarified the coverage of existing laws applicable to sex-separated facilities, living arrangements, schools, and the like, *e.g.*, *id.* §§ 4-21-602, 49-2-108, 49-2-805(a), as well as numerous laws prohibiting "sex" discrimination, *e.g.*, *id.* §§ 4-21-402(1), 4-21-601(a), 37-5-116, 49-6-3109(a), 50-2-202.[1] And it did so by adopting a definition of "sex" that conforms with an "overwhelming majority of dictionaries." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc).

b. <u>Changes to driver's-license policy</u>. In the wake of § 1-3-105(c)'s enactment, the Tennessee Department of Safety and Homeland Security reevaluated its relevant statutory authority and practices. A 1988 law known as The Uniform Classified and Commercial Driver License Act is among the many Tennessee statutes that reference "sex." That statute provides that "[e]very application [for a driver's license] shall state the full name, date and place of birth, sex, county of residence, [and] residence address . . . of [the] applicant," along with their "height, weight, hair and eye color, [and] social security number." Tenn. Code Ann. § 55-50-321(c)(1)(A). With this information, the Department issues driver's licenses that "bear thereon . . . a visible full face photograph" as well as certain information about the licensee. *Id.* § 55-50-331(b)(1). Implementing regulations specify that such licensee information "include[s] sex, height, and eye color." Tenn. Comp. R. & Regs. 1340-01-13-.18(2)(c); *see also* Tenn. Code Ann. § 55-50-407(a)(2) (similar for commercial driver's licenses). To align the Department's governing statute and implementing regulations with § 1-3-105(c), the Department now issues driver's licenses that list a person's sex as determined by anatomy at birth.

**2. *Neither § 1-3-105(c) nor changes to driver's-license policy affect the constitutionality of Tennessee's longstanding birth-certificate policies.***

For several reasons, the changes associated with § 1-3-105(c) do not bear on Tennessee's birth-certificate policies or the questions presented in this appeal.

---

[1] Tennessee is not the only State that has provided clarity as to the meaning of "sex." *See, e.g.*, Utah Code Ann. § 68-3-12.5(34); Kan. Stat. Ann. § 77-207(a)(1); House Bill 421, 2024 Idaho Laws c. 322 (effective July 1, 2024).

2

a. <u>Section 1-3-105(c) did not change Tennessee's birth-certificate policies</u>. Long before § 1-3-105(c)'s enactment, the Office of Vital Records understood the term "sex" in the Vital Records Act, Tenn. Code Ann. § 68-3-101 *et seq.*, to refer to a person's sex based on external genitalia at birth. Plaintiffs' own allegations—made years before § 1-3-105(c)'s enactment—recognize that the sex designation on Tennessee birth certificates "conveys the state's message that sex is determined solely by the appearance of external genitals at the time of birth." Compl., R.59, at 414 (¶216); *see id.* at 394 (¶98), 398 (¶119), 402 (¶145), 405 (¶168).[2] Tennessee's amendment policy likewise allows amendments to the sex designation only if the initial male or female designation was inaccurately recorded at the time of birth. *See* Resp. Br. 13-14. So nothing about § 1-3-105(c) altered the preexisting policies Plaintiffs challenge.

b. <u>Section 1-3-105(c) does not show Tennessee's longstanding birth-certificate policies stem from animus</u>. Section 1-3-105(c)'s enactment in 2023 says nothing about whether discriminatory intent underlies birth-certificate policies in place since *at least* 1977.

For purposes of analyzing discriminatory intent, "all that matters is the intent of the legislature responsible for the enactment at issue." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1141 (9th Cir. 2023) (Ikuta, J.). When analyzing "discriminatory purpose," the Supreme Court focuses on the intent of "the decisionmaker, in this case a state legislature, [that] selected or reaffirmed a particular course of action." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). And when analyzing whether a rational basis exists, courts look to whether "*the challenged government action* was motivated by animus or ill-will." *Johnson v. Bredesen*, 624 F.3d 742, 747 (6th Cir. 2010) (quotations omitted) (emphasis added); *accord Am. Express Travel Related Servs. v. Kentucky,* 641 F.3d 685, 692 (6th Cir. 2011). Even if other governmental actions reflect animus, "[t]he ultimate question remains whether a discriminatory intent has been proved in a given case." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (quotations omitted). The motivations of one legislature cannot somehow be imputed to actions taken "during different legislative sessions by a [completely] different composition of legislators." *Brnovich v. DNC*, 141 S. Ct. 2321, 2349 n.22 (2021) (quotations omitted).

And the longstanding birth-certificate policies challenged here do not themselves derive from discriminatory animus. Plaintiffs nowhere allege facts indicating that animus underlies Tennessee's birth-certificate policies. *See* Resp. Br.

---

[2] All record pincites refer to the "Page ID" numbers in the ECF file stamps.

18-20; Op., R.110 at 2621. Nor could they. Tennessee has long included a "sex" designation on its birth certificates. 1909 Tenn. Pub. Acts 1256, ch. 341, § 3. And, for nearly half a century, it has limited amendments to this designation. In 1977, the Tennessee legislature made clear that "[t]he sex of an individual will not be changed on the original certificate of birth as a result of sex change surgery." 1977 Tenn. Pub. Acts 280, ch. 128, § 21. This choice did not stem from animus but from the legislature's desire to ensure "that those natural events which occur at birth should not be allowed to be changed." Tr. of Legis. Proceedings (Apr. 4, 1977), R.62-14 at 710. Then, as now, that choice furthered legitimate policy objectives. *See* Resp. Br. 31-34.

    c.    <u>Section 1-3-105(c) does not support this Court's creating a new quasi-suspect class</u>. No discriminatory intent underlies § 1-3-105(c). *Infra* 5-7. But even were animus suspected, that would not affect the quasi-suspect-class determination here. Over the past fifty years, the Supreme Court has disentangled animus determinations from the creation of new quasi-suspect classes—repeatedly declining to subject new classifications to heightened review even when recognizing animus against groups.

    A leading example is *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985). There, the Court held a policy unconstitutional on animus grounds, while simultaneously declining to create a new quasi-suspect class. *Id.* at 442-50. It explained that "there have been and there will continue to be instances of discrimination against the [intellectually disabled] that are in fact invidious, and that are properly subject to judicial correction under constitutional norms"—"[b]ut the appropriate method of reaching such instances is not to create a new quasi-suspect classification and subject all governmental action based on that classification to more searching evaluation." *Id.* at 446. The Supreme Court has adopted this same approach in declining to recognize homosexual persons as a quasi-suspect class. *See Romer v. Evans*, 517 U.S. 620, 632 (1996); *United States v. Windsor*, 570 U.S. 744, 770 (2013); *see also Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015).

    Put simply, the Court has moved away from recognizing new quasi-suspect classes towards making case-specific animus-based determinations. And in doing so, it has untethered the question of whether animus animated a particular law from the question of whether the judiciary should displace legislative judgment on a class-wide basis through heightened review. Accordingly, any determination that animus underlies § 1-3-105(c) would not support treatment of transgender persons as a quasi-suspect class. *See* Resp. Br. 21-24.

4

### *3. Neither § 1-3-105(c) nor changes to driver's-license policy reflect animus.*

In any event, Tennessee did not enact § 1-3-105(c) or change its driver's-license policy out of animus towards transgender persons.

Courts generally "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "Inquiries into congressional motives or purposes are a hazardous matter," *id.*, and "the search for the 'actual' or 'primary' purpose of a statute is likely to be elusive," *Michael M. v. Superior Ct.*, 450 U.S. 464, 469-70 (1981) (plurality) (quotations omitted). And judicial attempts to ascertain these "motivation[s]" necessarily "represent a substantial intrusion into the workings of other branches of government." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977). That intrusion only grows when a federal court attempts to divine the motives underlying a state policy, leaving courts all the more "reluctan[t] to attribute unconstitutional motives to the states." *Mueller v. Allen*, 463 U.S. 388, 394 (1983).

This Court thus generally declines to "peer past" statutory text to draw inferences from statements of individual legislators. *Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013) (cleaned up). "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 254 (2022) (quotations omitted). And "the speculations and accusations of [a] law's few opponents simply do not support an inference of . . . animus." *Butts v. New York*, 779 F.2d 141, 147 (2d Cir. 1985).

"Instead of asking judges to read the hearts and minds of legislators, the inquiry asks whether the law at issue is 'inexplicable by anything but animus.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir. 2023) (quoting *Trump v. Hawaii*, 585 U.S. 667, 706 (2018)). This approach "eschew[s]" the "guesswork" associated with determining a statute's purpose. *O'Brien*, 391 U.S. at 384. And it respects the foundational "presum[ption] that a legislature acts . . . in good faith." *United States v. Des Moines Nav. & Ry. Co.*, 142 U.S. 510, 544 (1892); *see Abbott*, 585 U.S. at 603-04 (presumption applies even if prior discrimination established).

Applying this standard refutes any notion that discriminatory animus underlies § 1-3-105(c). Nothing on the face of the statute reflects animus; it merely recognizes the "[p]hysical differences between men and women." *United States v. Virginia*, 518 U.S. 515, 533 (1996). And, even looking beyond the text (an

5

"adventure" that "the law forecloses," *Bailey*, 715 F.3d at 960), nothing about the context of § 1-3-105(c)'s enactment indicates animus. The Tennessee Code uses the term "sex" dozens of times, including in non-discrimination statutes. *Supra* 2. In recent years, some federal courts and the federal government have found "sex" to be ambiguous in federal non-discrimination statutes.[3] By adopting § 1-3-105(c), lawmakers simply clarified that when Tennessee statutes use the term "sex," they do so consistent with its longstanding meaning. Defining "sex" consistent with the common usage recognized in an "overwhelming majority of dictionaries" is not discrimination. *Adams*, 57 F.4th at 812.

Nor does Tennessee's driver's-license policy reflect animus, given the many rational reasons that support it. For one, officials may rely on a person's driver's license to make decisions about detention and other policies—particularly for low-level offenders who face only temporary custody with no strip search. *See* Tenn. Code Ann. § 40-7-119(b). The risks of housing men and women together in the same custodial facilities are well recognized, as are the risks associated with housing transgender individuals. *See, e.g.*, Tenn. Code Ann. § 41-4-110 (requiring separate housing for men and women); *Greene v. Bowles*, 361 F.3d 290 (6th Cir. 2004) (addressing asserted risks to transgender persons); *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 533 (S.D. Ill. 2019) (noting testimony that female inmates filed "many . . . legitimate" complaints under the Prison Rape Elimination Act when housed with a "sexually active" male-to-female transgender inmate). The policy of maintaining a person's sex at birth on driver's licenses furthers the State's interest in ensuring the safety of all persons—including transgender persons—in jail facilities.

Tennessee's driver's-license policy also assists law enforcement and first responders in medical emergencies. Even for a person who has undergone sex-change surgery, their sex based on external genitalia at birth remains relevant for medical care: Drug dosages, medical conditions, and testing values can all vary based on one's sex at birth. *See* ADF Br. 20-22. So in a roadside medical emergency, a driver's license that accurately reflects a person's sex at birth helps facilitate proper medical care.

To be sure, States are free to view these policy considerations differently. But Tennessee's lawmakers could reasonably conclude that the value to law enforcement

---

[3] *See, e.g.*, *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 721-22 (4th Cir. 2016), *vacated and remanded*, 580 U.S. 1168 (2017); Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390, 41,537 (proposed July 12, 2022).

and emergency personnel of knowing a person's sex at birth outweighs any marginal identification benefit of licenses' reporting gender identity, given the photograph on the license. *Supra* 2, 6. Nor was it unreasonable for lawmakers to heed the administrative and logistical complications of reporting gender identity given the large variance in gender identities—some of which are non-binary or de-linked from sex entirely.

Finally, Tennessee's policies do not stand alone. Tennessee is not the only State that retains sex at birth on birth certificates.[4] It is not the only State that retains sex at birth on driver's licenses.[5] And it is not the only State that does both.[6] But, even if Tennessee did stand alone, "novelty itself is not a vice," *Chandler v. Miller*, 520 U.S. 305, 324 (1997) (Rehnquist, C.J., dissenting); it is a virtue of our federal system. Foundational federalism principles allow Tennessee to adopt rational policies without giving rise to an animus inference.

The Supreme Court "has long disfavored arguments based on alleged legislative motives." *Dobbs*, 597 U.S. at 253. Nothing here comes close to overcoming the strong presumption that State legislatures act in good faith. So even assuming § 1-3-105(c) and the driver's-license policy are relevant, they provide no support to Plaintiffs' constitutional claims.

Respectfully,

/s/J. Matthew Rice
J. MATTHEW RICE
*Solicitor General*

*Counsel for Defendant-Appellees*

---

[4] *See* Equality Ohio Amicus Br. 2, n.1.
[5] *See, e.g.*, Fla. Dep't of Highway Safety and Motor Vehicles, *Driver License Operation Manual-Issuance Requirements-IR08-Gender Requirements* (Jan. 26, 2024), https://perma.cc/AQY5-Y395.
[6] *See* Kan. Stat. Ann. § 77-207(a)(1), (c); *Foster v. Stanek*, No. 18-2552-DDC-KGG, 2023 WL 5625433, at *1 (D. Kan. Aug. 31, 2023); *Kansas ex rel. Kobach v. Harper*, No. SN-2023-CV-422 (Shawnee Cnty. Dist. Ct. Mar. 11, 2024), https://perma.cc/SD84-24WZ.

# CERTIFICATE OF COMPLIANCE

  This letter brief complies with the Court's May 3, 2024, Order because it contains 2,599 words.

  This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Times New Roman 14-point font in Microsoft Word.

        <u>/s/J. Matthew Rice</u>
        J. MATTHEW RICE
        *Solicitor General*

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 6 Cir. R. 25(f), I certify that a true and exact copy of this letter brief has been filed via the Court's electronic filing system on May 14, 2024. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

<u>/s/J. Matthew Rice</u>
J. MATTHEW RICE
*Solicitor General*