No. 23-5669

# In the United States Court of Appeals for the Sixth Circuit

KAYLA GORE, JAIME COMBS, L.G., and K.N.,

*Plaintiffs-Appellants*,

v.

WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Middle District of Tennessee (Nashville Division)
No. 3:19-cv-00328
Honorable Eli Richardson

## PLAINTIFFS-APPELLANTS' SUPPLEMENTAL BRIEF

John T. Winemiller
MERCHANT & GOULD P.C.
800 S. Gay Street, Ste. 2150
Knoxville, TN 37929
(865) 380-5960
jwinemiller@merchantgould.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiffs-Appellants*
(Additional counsel listed on signature block.)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

ARGUMENT ........................................................................................ 1

I. Section 1-3-105(c) doubles down on the Policy's targeted exclusion of transgender people. ........................................................ 1

II. The State's interpretation of Section 1-3-105(c) bolsters Plaintiffs' equal protection claim, as it cannot plausibly be understood as anything other than an effort to disfavor transgender people. ........................................................ 3

III. To the extent the State argues that Section 1-3-105(c) bolsters its argument that birth certificates merely convey the State's message or viewpoint on sex, such argument cannot save the Policy from scrutiny. ........................................................ 7

CONCLUSION ........................................................................................ 8

Certificate of Compliance ........................................................................ 10

Certificate of Service ........................................................................ 11

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arroyo Gonzalez v. Rossello Nevares*, 305 F.Supp.3d 327 (D.P.R. 2018)................8

*Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) ....................................4

*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998) ..........................................................7

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)................................5

*Dekker v. Weida*, 679 F.Supp.3d 1271 (N.D. Fla. 2023)..........................................8

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023).................................................... 2, 3

*Hecox v. Little*, No. 20-35813, 2024 WL 1846141 (9th Cir. Apr. 29, 2024) ........2, 3

*In re Tam,* 808 F.3d 1321 (Fed. Cir. 2015).............................................................7

*Kadel v. Folwell*,
No. 22-1721, 2024 WL 1846802 (4th Cir. Apr. 29, 2024) (en banc)..................2

*Labrador v. Poe*, 144 S. Ct. 921 (2024) ...................................................................2

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1 (1st Cir. 2012)..4

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .....................................................................7

*Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999).......................................................7

*Rinaldi v. Yeager*, 384 U.S. 305 (1966)....................................................................6

*Romer v. Evans*, 517 U.S. 620 (1996) ............................................................ 1, 5, 6

*Schroer v. Billington*, 424 F.Supp.2d 203 (D.D.C. 2006) .........................................2

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ...............................................3

*Zzyym v. Pompeo*, 958 F.3d 1014 (10th Cir. 2020) ..................................................2

**Statutes**

2021 Tenn. Acts Ch. 281 ..........................................................................................6

2021 Tenn. Acts Ch. 453 ..........................................................................................6

2022 Tenn. Acts Ch. 1005 ........................................................................................6

2022 Tenn. Acts Ch. 818 ..........................................................................................6

2023 Tenn. Acts Ch. 1 ..............................................................................................6

2023 Tenn. Acts Ch. 486 ..........................................................................................1

2023 Tenn. Pub. Acts Ch. 285 .......... 6

2024 Tenn. Acts Ch. 832 .......... 6

Tenn. Code § 1-3-105(c) .......... passim

Tenn. Code § 68-3-203(d) .......... 3

**Rules**

Fed. R. App. P. 32(a)(5) .......... 10

Fed. R. App. P. 32(a)(6) .......... 10

Fed. R. App. P. 32(a)(7)(B) .......... 10

Fed. R. App. P. 32(f) .......... 10

**Court Documents**

Application for Extraordinary Relief, *Doe v. Tenn. Dep't of Safety and Homeland Security*, No. (No. 24-0503-III) (Davidson Cnty. Chancery Ct. filed Apr. 23, 2024) .......... 2

Compl., R.59 .......... 1, 2

Mot. Dismiss, R.66 .......... 2

Opening Br. .......... 4, 6

Reply Br. .......... 4, 6

**Legistlative Materials**

Civil Justice Subcomm. Feb. 21, 2023 Hrg., Tenn. House of Representatives, https://tnga.granicus.com/player/clip/27626?view_id=703&redirect=true .......... 3

Civil Justice Subcomm. Mar. 1, 2023 Hrg., Tenn. House of Representatives, https://tnga.granicus.com/player/clip/27626?view_id=703&redirect=true .......... 3

HB 425, R.62-12 ..........

Judiciary Comm. Feb. 28, 2023 Hrg., Tenn. Senate, https://tnga.granicus.com/player/clip/27729?view_id=703&redirect=true .......... 4

SB 162, R.62-18 .......... 3

SB 162, R.62-20 .......... 3

SB 162, R.62-13 .......... 3

Tenn. Dep't of Safety & Homeland Sec., DPL – 302 Proof of Identity, revised July 3, 2023 .......... 6

Tenn. House Floor Session, 27th Legislative Day (Apr. 21, 2023), https://tnga.granicus.com/player/clip/28402?view_id=703&redirect=true ...........4

Tenn. Senate Floor Session, 16th Legislative Day (Mar. 13, 2023), https://tnga.granicus.com/player/clip/27934?view_id=703&redirect=true ...........4

Tr. of HB 425 Floor Proceedings, R.62-14...............................................................3

Tennessee Code Section 1-3-105(c) is relevant to this case in the following ways:

First, to the extent the State interprets Section 1-3-105(c) to prohibit amending the sex designation on birth certificates furnished for purposes of identification, Section 1-3-105(c) is subsumed within Plaintiffs' challenge to Tennessee's policy or practice of categorically prohibiting transgender persons born in Tennessee from correcting the sex on their birth certificates to be consistent with their gender identity ("the Policy"). Compl., R.59, PageID#389.

Second, Section 1-3-105(c) is relevant in that it further demonstrates that the Policy is a classification "drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 633 (1996).

Third, to the extent the State argues Section 1-3-105(c) supports its argument that birth certificates constitute government speech, such argument does not save the Policy from scrutiny.

In sum, the State's adoption of Section 1-3-105(c) bolsters Plaintiffs' claims.

## ARGUMENT

### I. Section 1-3-105(c) doubles down on the Policy's targeted exclusion of transgender people.

Section 1-3-105(c) became effective on July 1, 2023, *after* the district court's decision. *See* 2023 Tenn. Acts Ch. 486. It defines "sex" within the Tennessee Code to mean "a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth and evidence of a person's biological sex," "unless the context otherwise requires." Tenn. Code § 1-3-105(c). And it considers as evidence of a person's "biological sex" "a government-issued identification document that accurately reflects a person's sex listed on the person's *original* birth certificate." *Id.* (emphasis added).

While nothing in Section 1-3-105(c) explicitly disallows changes based on gender identity for all state forms of identification, the State represented during oral

argument that the State interprets Section 1-3-105(c) to do so.[1] Not only does this interpretation render this section a part of the very Policy Plaintiffs challenge,[2] but it undermines the State's argument below that Plaintiffs' ability "to obtain other identity documents, such as driver's licenses, listing their preferred sex identifier," belies Plaintiffs' claims. Mot. Dismiss, R.66, PageID#821. Indeed, taking the State's interpretation of Section 1-3-105-(c) and Policy together, Plaintiffs are unable to obtain *any* state identification that correctly reflects their identity. The Policy, including the State's interpretation of Section 1-3-105(c), prohibits amending their birth certificate and Section 1-3-105(c) conditions the sex designation on other identification documents on their birth certificate.

Moreover, Section 1-3-105(c)'s definition of sex is nonsensical. As the Complaint alleges, which must be taken as true, there are "multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity" and "[t]hese characteristics may not always be in alignment." Compl., R.59, PageID#381. Indeed, a person's anatomy and genetics may not always align. *See Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020). Sex "is not a cut-and-dried matter of chromosomes" or external genitalia. *Schroer v. Billington*, 424 F.Supp.2d 203, 211 (D.D.C. 2006). The statute's use of this reductive definition of sex "has been carefully drawn" to target and exclude transgender people, for whom these sex-related characteristics do not align, "even if it does not use the word 'transgender' in the definition."[3]

---

[1] Plaintiffs' description of the State's interpretation should not be viewed as a concession that it is correct or lawful. *See*, *e.g.*, Application for Extraordinary Relief, *Doe v. Tenn. Dep't of Safety and Homeland Security*, No. 24-0503-III (Davidson Cnty. Chancery Ct. filed Apr. 23, 2024).

[2] To be clear, it is this wholesale inability to obtain a birth certificate that reflects their identity—distinct from a person's original birth record and vital statistics record—that Plaintiffs challenge, rather than advancing any particular standard for permitting amendments. Compl., R.59, PageID#415. Whether validation of a person's identity in form of a mental health or medical provider can be required is matter of policy that Plaintiffs' requested relief does not address.

[3] *Hecox v. Little*, 79 F.4th 1009, 1025 (9th Cir. 2023), *opinion withdrawn*, No. 20-35813, 2024 WL 1846141 (9th Cir. Apr. 29, 2024); *see also Kadel v. Folwell*, No. 22-1721, 2024 WL 1846802, at *12, *14 n.23 (4th Cir. Apr. 29, 2024) (en banc). Plaintiffs acknowledge the *Hecox* opinion was recently withdrawn; the withdrawal

In this way, Section 1-3-105(c) mirrors and reinforces the existing provisions underlying the Policy. Tennessee Code Section 68-3-203(d) – the Policy's backbone – was similarly enacted to target transgender people. The original bills for the Vital Records Act of 1977 expressly authorized the amendment of the sex designation on Tennessee-issued birth certificates following "sex change surgery." *See*, *e.g.*, HB 425, R.62-12, PageID#661. However, the bills were amended to expressly prohibit such amendments in response to "controversy" at the time. Tr. of HB 425 Floor Proceedings, R.62-14, PageID#709-710; SB 162, R.62-13, PageID#697. That controversy pertained to Renee Richards's participation in the U.S. Open. *See* R.62-18, PageID#773; R.62-19, PageID#775; R.62-20, PageID#777. The Policy targets transgender people for exclusion, barring them from having birth certificates that accurately reflect their identities.

## II. The State's interpretation of Section 1-3-105(c) bolsters Plaintiffs' equal protection claim, as it cannot plausibly be understood as anything other than an effort to disfavor transgender people.

The State's sweeping interpretation of Section 1-3-105(c) to prohibit any amendment to the gender marker in any state form of identification demonstrates that Tennessee's Birth Certificate Policy cannot be explained by anything other than "a bare … desire to harm a politically unpopular group," which "cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

Here, the "text, structure, purpose, and effect" of the Policy and Section 1-3-105(c), as interpreted by the State, "all demonstrate" that its purpose is to single out transgender people for discriminatory treatment. *Hecox*, 79 F.4th at 1022. So does Section 1-3-105(c)'s legislative history. During the legislative proceedings leading to Section 1-3-105(c)'s enactment, for example, Representative Grills, one of the bill's sponsors, referred to the idea of non-cisgender people as "a road that seems to be attacking the very character of God."[4] Another bill sponsor, Representative

---

pertained to the scope of relief "in light of the Supreme Court's decision in *Labrador v. Poe*, 144 S. Ct. 921 (2024)." *See Hecox*, 2024 WL 1846141, at *1.

[4] Civil Justice Subcomm. Feb. 21, 2023 Hrg., Tenn. House of Representatives, https://tnga.granicus.com/player/clip/27626?view_id=703&redirect=true (at 1:02:10). *See also* Civil Justice Subcomm. Mar. 1, 2023 Hrg., Tenn. House of Representatives,

Bulso, stated that the bill was meant "to set down a marker" because there is, according to him, debate about "what a transgender person is" and "the reason is that we have only two kinds of people in the world. We've got men and we've got women. We have males and we have females."[5] He further stated that telling someone "that it's normal to want to be the other sex" is "not normal" but rather "the opposite of normal."[6] The legislative record is replete with similar statements.[7]

The State's Policy and Section 1-3-105(c) are not rationally related – let alone, substantially related or narrowly tailored – to any of the State's proffered justifications. *See* Opening Br. at 41-45, Reply Br. at 23-27. The State's interests "ma[k]e no sense in light of how" Tennessee deals with the birth certificates of people born with ambiguous genitalia (i.e., permitting corrections not based on genitalia) and how it relies on the *original* birth certificate – not a *corrected* or *amended* one – to determine access to sex-designated sports or facilities (Response Br. at 33).[8] *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001).

As the First Circuit explained in holding the Defense of Marriage Act unconstitutional, "the Supreme Court has now several times struck down state or local enactments without invoking any suspect classification." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 10 (1st Cir. 2012). "In each, the protesting group was historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible." *Id.*

---

https://tnga.granicus.com/player/clip/27626?view_id=703&redirect=true (Rep. Grills at 1:12:30).

[5] Civil Justice Subcomm. Mar. 1, 2023 Hrg., https://tnga.granicus.com/player/clip/27745?view_id=703&redirect=true (Reb. Bulso at 1:15:35).

[6] *Id.*

[7] *See generally* Tenn. House Floor Session, 27th Legislative Day (Apr. 21, 2023), https://tnga.granicus.com/player/clip/28402?view_id=703&redirect=true; Judiciary Comm. Feb. 28, 2023 Hrg., Tenn. Senate, https://tnga.granicus.com/player/clip/27729?view_id=703&redirect=true; Tenn. Senate Floor Session, 16th Legislative Day (Mar. 13, 2023), https://tnga.granicus.com/player/clip/27934?view_id=703&redirect=true.

[8] Section 1-3-105(c) further illustrates the State's ability to rely on *original* birth certificates, as opposed to a *corrected* or *amended* ones, when it needs to ascertain a person's designation based on genitalia alone.

For example, in *Moreno*, the Supreme Court invalidated Congress's decision to exclude from the food stamp program households containing unrelated individuals, because the rule disqualified many otherwise-eligible and particularly needy households and evinced a "bare congressional desire to harm a politically unpopular group." 413 U.S. at 534, 537–38. That "bare … desire to harm" is more than present here as evinced by Section 1-3-105(c)'s legislative history, the precision with which the Policy targets *only* transgender people for disfavor, and the lack of relation between the State's proffered interests and the Policy.

Similarly, in *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985), the Supreme Court overturned a local ordinance as applied to the denial of a permit for a group home for people with mental disabilities. Among the reasons the Court found the proffered interests in that case unconvincing was that nursing or convalescent homes *were* allowed without a permit. As such, what remained were "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding." *Id.* at 448. Such is the case here, where the State's Policy permits people born with ambiguous genitalia to amend the sex designation on their birth certificates based on other sex characteristics, but prohibits amendments for transgender people. Like in *Cleburne*, the Policy and Section 1-3-105(c) thus appear to rest on "mere negative attitudes" or "fears" about transgender people, which is not enough to justify the Policy.

Finally, in *Romer v. Evans*, 517 U.S. 620 (1996), the Supreme Court struck down Colorado's Amendment 2, which prohibited state or local regulations from protecting gay people from discrimination. The Court called "unprecedented" the "disqualification of a class of persons from the right to seek specific protection from the law" and deemed the amendment a "status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." *Id.* at 632–33, 635. So, too, is the case here, where the Policy coupled with the State's interpretation of Section 1-3-105(c) create an *unprecedented* prohibition that prevents transgender people from obtaining *any* state form of identification that accurately reflects their identity. ***No state has gone as far as Tennessee has to target transgender people for erasure and constrain their ability to fully and actively participate in our society.***

Some additional context may be helpful. Against the backdrop of the Policy and during this case's pendency, aside from Section 1-3-105(c), the State adopted the following measures affecting transgender people's ability to participate fully in public life, among others:

- Requiring the forced outing of transgender students, 2024 Tenn. Acts Ch. 832;
- Prohibiting medically necessary healthcare for transgender adolescents, 2023 Tenn. Acts Ch. 1;
- Prohibiting "gender marker changes that are inconsistent" with one's birth-assigned sex on driver's licenses, Tenn. Dep't of Safety & Homeland Security, DPL – 302 Proof of Identity, revised July 3, 2023;
- Prohibiting transgender students from participating in school sports, 2023 Tenn. Pub. Acts Ch. 285 and 2022 Tenn. Acts Ch. 1005;
- Restricting instruction on sexual orientation or gender identity, 2021 Tenn. Acts Ch. 281 and 2022 Tenn. Acts Ch. 818; and
- Requiring signage by businesses if they respect a transgender person's identity; 2021 Tenn. Acts Ch. 453.

These are but a sampling of the measures the State adopted in the last four years targeting transgender people for discrimination. Neither the Constitution nor our laws requires courts to turn a blind eye to this reality, which demonstrates beyond doubt that the State is engaged in a targeted campaign to limit or prohibit transgender people's ability to live freely and authentically in Tennessee.

Plaintiffs stand by their arguments that the Policy, including its incorporation of Section 1-3-105(c), must be subjected to either intermediate or strict scrutiny under the Fourteenth Amendment. Opening Br. at 32-41, 45-57; Reply Br. at 8-22. But even rational basis review "imposes a requirement of some rationality *in the nature of the class singled out*." *Rinaldi v. Yeager*, 384 U.S. 305, 308-09 (1966) (emphasis added). And here, the Policy and Section 1-3-105(c) are specifically "drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633.

**III. To the extent the State argues that Section 1-3-105(c) bolsters its argument that birth certificates merely convey the State's message or viewpoint on sex, such argument cannot save the Policy from scrutiny.**

At oral argument, the State asserted that Section 1-3-105(c) supported its argument that birth certificates merely convey the State's message or viewpoint on sex. This does not save the Policy from scrutiny, however.

In *Matal v. Tam*, 137 S. Ct. 1744 (2017), the Supreme Court instructed lower courts to "exercise great caution before extending … government-speech precedents" because the doctrine "is susceptible to dangerous misuse." *Id.* at 1760. And in that case, the Federal Circuit cited birth certificates as a matter of private speech. *See In re Tam,* 808 F.3d 1321, 1348 (Fed. Cir. 2015).

That makes eminent sense. Birth certificates have always been used as forms of identification and not merely as recordation of historical facts for the State's purposes. And no one disputes that birth certificates communicate who a person is, including their sex—matters determined in relation to the person themself, not in relation to the State.

Ultimately, the State routinely permits amendments to birth certificates that diverge from so-called historical facts assessed at birth. This includes name changes, parentage changes post-adoption, and corrections to the sex designation for people born with ambiguous genitalia. The State does not control what name a person will have or whom their parents are, and the State certainly does not control the sex by which any person identifies, whether transgender, cisgender, or born with ambiguous genitalia.

But even if the Court were to accept that Section 1-3-105(c) bolsters the State's argument that birth certificates are government speech, that does not save the State's Policy from scrutiny. The State simply cannot have it both ways. To the extent the State's position is that the sex designation on a birth certificate conveys the government's speech on the meaning of sex, that ties right back into how adopting such definition erases transgender people's identities, targeting them for disfavor, and amplifies the equal protection problems outlined above. And if birth certificates are government speech, then that would bolster Plaintiffs' due process claims, cementing Plaintiffs' informational privacy claim as it is undoubtedly the government that is disclosing Plaintiffs' transgender status – "excruciatingly private and intimate information," *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) –

such that it is protected from disclosure under *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998).

## CONCLUSION

"Gender identity is real." *Dekker v. Weida*, 679 F.Supp.3d 1271, 1299 (N.D. Fla. 2023). Transgender people are who they say they are. "[W] we must heed their voices: 'the woman that I am,' 'the man that I am.'" *Arroyo Gonzalez v. Rossello Nevares*, 305 F.Supp.3d 327, 334 (D.P.R. 2018).

Through its Policy and Section 1-3-105(c), the State seeks to erase transgender peoples' identities and to prevent them from participating fully in public life. Our Constitution does not countenance such unprecedented action, which infringes on transgender people's rights to equality and informational privacy.

Plaintiffs respectfully request that the Court reverse the dismissal of Plaintiffs' equal protection and informational privacy claims, and to remand the case.

Dated May 14, 2024.

Respectfully submitted,

/s/ Omar Gonzalez-Pagan
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Sasha Buchert
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
111 K Street NE, 7th Floor
Washington, DC 20002
(202) 804-6245
sbuchert@lambdalegal.org

Gavin R. Villareal
Maddy R. Dwertman
BAKER BOTTS L.L.P.

John T. Winemiller
MERCHANT & GOULD P.C.
800 S. Gay Street, Ste. 2150
Knoxville, TN 37929
(865) 380-5960
jwinemiller@merchantgould.com

River Lord
MERCHANT & GOULD P.C.
150 South Fifth Street, Ste. 2200
Minneapolis, MN 55402
(612) 332-5300
rlord@MerchantGould.com

Brandt Thomas Roessler
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2500

brandt.roessler@bakerbotts.com

Joshua Lee
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
(202) 639-7700
joshua.lee@bakerbotts.com

401 S. 1st Street, Ste. 1300
Austin, TX 78704
(512) 322-2500
gavin.villareal@bakerbotts.com
maddy.dwertman@bakerbotts.com

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limit of set forth in the Court's May 3, 2024 letter order because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), the brief contains 2,597 words and does not exceed 10 pages.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

**CERTIFICATE OF SERVICE**

On May 14, 2024, a true and correct copy of the foregoing was filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the Sixth Circuit, which currently provides electronic service on all counsel of record.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan