No. 23-5669

# In the United States Court of Appeals
# for the Sixth Circuit

KAYLA GORE, JAIME COMBS, L.G., and K.N.,

*Plaintiffs-Appellants*,

v.

WILLIAM BYRON LEE, in his official capacity as Governor of the State of
Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the
Tennessee Department of Health,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Middle District of Tennessee (Nashville Division)
No. 3:19-cv-00328
Honorable Eli Richardson

**PLAINTIFFS-APPELLANTS' PETITION FOR REHEARING *EN BANC*
AND/OR PANEL REHEARING**

John T. Winemiller
MERCHANT & GOULD P.C.
800 S. Gay Street, Ste. 2150
Knoxville, TN 37929
(865) 380-5960
jwinemiller@merchantgould.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
　EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiffs-Appellants*
(Additional counsel listed on signature block.)

## <u>TABLE OF CONTENTS</u>

Table of Authorities ..................................................................... iii

Issues Meriting *En Banc* Consideration.................................... 1

Argument............................................................................ 4

    I.    This case raises a question of exceptional importance because it creates a conflict on whether state policies categorically prohibiting transgender people from obtaining accurate birth certificates reflecting their identity pass constitutional muster............ 4

    II.   The scope and application of the Equal Protection Clause as it pertains to governmental sex classifications and policies that discriminate against transgender people raise questions of exceptional importance. ...................................................... 5

    III.  Panel rehearing or consideration by the full Court is warranted to correct the misapplication of this Court's informational privacy jurisprudence. .......................................................... 8

    IV.  At a minimum, panel rehearing is warranted to correct the majority's misapprehension of Plaintiffs' claims, requested relief, and the Policy............................................................ 13

Conclusion .......................................................................... 16

Certificate of Compliance ...................................................... 18

Certificate of Service ............................................................ 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<span>ASES</span>

*Arroyo González v. Rosselló Nevares*,
　305 F. Supp. 3d 327 (D.P.R. 2018) ................................................................4, 9

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ...............................................................................................10

*Barnes v. City of Cincinnati*,
　401 F.3d 729 (6th Cir. 2005) .................................................................................3

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ...............................................................................................14

*Bloch v. Ribar*,
　156 F.3d 673 (6th Cir. 1998) .............................................................................3, 8

*Bostock v. Clayton Cnty.*,
　590 U.S. 644 (2020) ............................................................................................1, 6

*Brandt by & through Brandt v. Rutledge*,
　47 F.4th 661 (8th Cir. 2022) ................................................................................2

*Califano v. Westcott*,
　443 U.S. 76 (1979) ..................................................................................................2

*City of Los Angeles, Dep't of Water & Power v. Manhart*,
　435 U.S. 702 (1978) ...............................................................................................6

*Craig v. Boren*,
　429 U.S. 190 (1976) ................................................................................................2

*Déjà Vu of Nashville v. Metro. Gov't of Nashville & Davidson Cnty, Tenn.*,
　274 F.3d 377 (6th Cir. 2001) ....................................................................3, 9, 10

*Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
　560 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty., Ga.*,
　590 U.S. 644 (2020) ................................................................................................2

*F.V. v. Barron*,
   286 F. Supp. 3d 1131 (D. Idaho 2018) .................................................4

*Foster v. Andersen*,
   2019 WL 329548 (D. Kan. Jan. 25, 2019) ..........................................9

*Fowler v. Stitt*,
   104 F.4th 770 (10th Cir. 2024) .....................................................2, 4, 7

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ..........................................................2, 7

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024) ......................................................2, 7

*In re Tam*,
   808 F.3d 1321 (Fed. Cir. 2015) ..........................................................8

*J.E.B. v. Alabama ex rel. T.B.*,
   511 U.S. 127 (1994)........................................................................2, 6

*Kadel v. Folwell*,
   100 F.4th 122 (4th Cir. 2024) (*en banc*)........................................2, 7

*Kallstrom v. City of Columbus*,
   136 F.3d 1055 (6th Cir. 1998) .........................................................3, 8

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ........................................................2, 7

*L.W. by & through Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ...............................................................1

*Lambert v. Hartman*,
   517 F.3d 433 (6th Cir. 2008) ...........................................................3, 9

*Marvaso v. Sanchez*,
   971 F.3d 599 (6th Cir. 2020) ...........................................................10

*Miller v. Johnson*,
   515 U.S. 900 (1995)............................................................................6

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982)...............................................................2

*Neitzke v. Williams*,
   490 U.S. 319 (1989).............................................................14

*Obergefell v. Hodges*,
   576 U.S. 644 (2015)...........................................................8, 9

*Pavan v. Smith*,
   582 U.S. 563 (2017) (per curiam)........................................8

*Powell v. Schriver*,
   175 F.3d 107 (2d Cir. 1999) .............................................3, 9

*Powers v. Ohio*,
   499 U.S. 400 (1991)..............................................................6

*Ray v. Himes*,
   2019 WL 11791719 (S.D. Ohio Sept. 12, 2019) ................4

*Reed v. Reed*,
   404 U.S. 71 (1971)................................................................2

*Sessions v. Morales-Santana*,
   582 U.S. 47 (2017)................................................................2

*Smith v. City of Salem*,
   378 F.3d 566 (6th Cir. 2004) ..............................................3

*Thompson v. Hebdon*,
   7 F.4th 811 (9th Cir. 2021) .................................................7

*United States v. Skrmetti*,
   144 S. Ct. 2679 (2024)..........................................................1

*United States v. Virginia*,
   518 U.S. 515 (1996)..............................................................2

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) .............................................2

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ............................................................1, 6, 9

## STATUTES

Tenn. Code Ann. § 1-3-105(c) .................................................................11

## RULES

Fed. R. App. P. 35(a) .............................................................................1

Fed. R. App. P. 35(a)(1)........................................................................13

Fed. R. App. P. 35(b)(1)(B)....................................................................5

Fed. R. App. P. 40(a)(2)........................................................................13

## ISSUES MERITING *EN BANC* CONSIDERATION

This case challenges the constitutionality of Tennessee's outlier policy categorically prohibiting transgender people—and only transgender people—from obtaining birth certificates that accurately reflect their sex, consistent with their gender identity. A divided panel affirmed the dismissal of Plaintiffs' equal protection and due process claims under the Fourteenth Amendment. A copy of the decision is enclosed (hereafter cited as "Op."). Consideration by the full Sixth Circuit is merited because this case raises questions of exceptional importance and the panel's decision conflicts with precedents of this Court, other Courts of Appeals, and the United States Supreme Court. *See* Fed. R. App. P. 35(a).

First, this case raises a question of exceptional importance in that the divided panel held that Tennessee's policy "does not discriminate based on sex, even if sex 'factors into' the law's application," because the policy "does not ascribe different benefits and burdens to the sexes." Op. at 8-9. The divided panel primarily relied on the same panel's decision in *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), which is currently under review by the United States Supreme Court. *See United States v. Skrmetti*, 144 S. Ct. 2679 (2024). In addition, the panel refused to apply the reasoning of *Bostock v. Clayton County*, 590 U.S. 644 (2020), because in the panel majority's view it "does not apply to equal protection claims." Op. at 9. The panel's equal protection holding and reasoning conflict with manifold

Supreme Court precedents establishing that "all gender-based classifications today warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996). This includes, *inter alia*, the following: *Sessions v. Morales-Santana*, 582 U.S. 47 (2017); *Virginia*, 518 U.S. 515; *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982); *Califano v. Westcott*, 443 U.S. 76 (1979); *Craig v. Boren*, 429 U.S. 190 (1976); and *Reed v. Reed*, 404 U.S. 71 (1971).

In addition, the panel's equal protection holding and reasoning not only directly conflict with the antecedent decision of the Tenth Circuit in *Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024), which held that a similar policy from Oklahoma violated the equal protection clause, but also myriad authoritative precedents from other Courts of Appeals recognizing that discrimination based on transgender status warrants heightened scrutiny independently or as a form of sex discrimination. *See*, *e.g.*, *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (*en banc*); *Hecox v. Little*, 104 F.4th 1061 (9th Cir. 2024), as amended (June 14, 2024); *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020); *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017). It also is in tension with several of this Court's sex discrimination precedents. *See*, *e.g.*, *Equal Emp. Opportunity Comm'n*

*v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock*, 590 U.S. 644; *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005); *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004).

Second, the panel majority's due process holding and reasoning conflict with and misapply this Court's authoritative informational privacy precedents. This includes *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), in which this Court recognized an informational privacy interest of constitutional dimension when the release of personal information could lead to bodily harm, and *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), in which this Court recognized an informational privacy interest of constitutional dimension when the released information relates to private, intimate matters of sexuality or one's personhood. *See also Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008); *Déjà Vu of Nashville v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377 (6th Cir. 2001). It also is tension with the authoritative precedents of other Courts of Appeals. *See*, *e.g.*, *Powell v. Schriver*, 175 F.3d 107, 111-12 (2d Cir. 1999) (finding that prison officials violated an incarcerated person's constitutional right to privacy by disclosing their "transsexualism").

In sum, consideration by the full Court is warranted because (1) this case involves questions of exceptional importance, including the proper application and scope of the equal protection clause to sex classifications and policies that

distinguish based on transgender status, and (2) the panel decision conflicts with

decisions of the Supreme Court and this Court such that consideration by the full

Court is necessary to secure and maintain uniformity of the Court's decisions.

## ARGUMENT

I.    **This case raises a question of exceptional importance because it creates a conflict on whether state policies categorically prohibiting transgender people from obtaining accurate birth certificates reflecting their sex pass constitutional muster.**

In the first instance, the panel majority's decision is an outlier in the federal

court system.  Indeed, the district court and the panel majority created a conflict

where there was otherwise unanimity among the federal courts.  The district court's

and the panel majority's decisions diverged by upholding Tennessee's outlier policy.

They are the only decisions currently in effect that have upheld a policy categorically

prohibiting transgender people from obtaining birth certificates that accurately

reflect their sex and consequently their identity.  As such, the panel majority's

decision directly conflicts with the Tenth Circuit's decision in *Fowler*, which was

decided prior to this case, as well as myriad other federal districts across multiple

circuits.  *See*, *e.g.*, *Ray v. Himes*, 2019 WL 11791719 (S.D. Ohio Sept. 12, 2019);

*Arroyo González v. Rosselló Nevares*, 305 F. Supp. 3d 327 (D.P.R. 2018); *F.V. v.*

*Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018).  Thus, this case presents a question

of exceptional importance in that it involves an issue on which the panel majority's

decision conflicts with the decision of another Court of Appeals that addressed the issue. *See* Fed. R. App. P. 35(b)(1)(B).

## II.   The scope and application of the Equal Protection Clause as it pertains to governmental sex classifications and policies that discriminate against transgender people raise questions of exceptional importance.

There is wide recognition that the scope and application of the Equal Protection Clause as it applies to governmental sex classifications raise questions of exceptional importance involving the constitutional rights of all people, including transgender people. Indeed, the Supreme Court has already granted *certiorari* review on a similar question arising from the decision in *Skrmetti*, upon which the panel majority primarily relied.

Here, as Judge White wrote in dissent, "The Policy plainly classifies individuals based on sex. By its literal terms, the State's willingness to issue an amended birth certificate calling a person 'male' or 'female' hinges on a person's genitalia at birth. And conditioning government action on anatomical features associated with males or females amounts to a sex-based classification, pure and simple." Op. at 33 (White, J., dissenting). Yet, the panel majority held that Tennessee's policy "does not discriminate based on sex, even if sex 'factors into' the law's application," because the policy "does not ascribe different benefits and burdens to the sexes." *Id.* at 8-9.

In concluding that laws that apply equally to men and women cannot classify based on sex, the panel majority dramatically departed from decades of equal protection sex discrimination jurisprudence (*see supra* at p. 2 (listing cases)), as well as the plain text of the Constitution.  That is because, until the panel majority's decision here (and in *Skrmetti*), it was beyond peradventure that the right to equal protection is guaranteed to individuals, not to classes.  *See* U.S. Const. amend. XIV, § 1 ("No State shall … deny to *any person* within its jurisdiction the equal protection of the laws.") (emphasis added); *see also Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens 'as individuals, not as simply components of a racial, religious, sexual or national class.'" (adapting quotation originating in *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 708 (1978), a Title VII case)); *J.E.B.*, 511 U.S. at 152 (Kennedy, J., concurring) (The "neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with the rights of individuals, not groups.").  It is thus "axiomatic" that facial classifications are not treated as neutral "on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).

This case also raises a question of exceptional importance warranting full consideration by the Court based on the panel majority's refusal to apply *Bostock*'s

reasoning to equal protection claims. Op. at 9. In *Bostock*, the Supreme Court explained that discrimination against transgender people is "necessarily" discrimination "because of sex." 590 U.S. at 665. And it is well-established that lower courts' decisions "must comport with the 'reasoning or theory,' not just the holding, of Supreme Court decisions." *Thompson v. Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021). By refusing to apply *Bostock*'s reasoning to equal protection claims, the panel majority conflicts with authoritative decisions of other Court of Appeals that have addressed the issue. *See Hecox*, 104 F.4th at 1080; *Kadel*, 100 F.4th at 153-54; *id.* at 177-81 (Richardson, J., dissenting); *Fowler*, 104 F.4th at 788-93.

Lastly, the question of whether classifications based on transgender status independently warrant heightened scrutiny is a question of exceptional importance and one on which the panel's decision conflicts with authoritative decisions of other Courts of Appeals. *See Grimm*, 972 F.3d at 611; *Karnoski*, 926 F.3d at 1200-01.

In sum, *en banc* consideration of the questions surrounding the scope and application of the Equal Protection Clause to sex classifications and policies that discriminate based on transgender status is warranted as these are questions of exceptional importance on which the panel majority's decision conflicts with precedents of the Supreme Court and other Courts of Appeals.[1]

---

[1]    In its equal protection analysis, the panel majority treated birth certificates as government speech. *E.g.*, Op. at 14. This, however, is in direct conflict with the

To the extent the Court is inclined to await the Supreme Court's decision in *Skrmetti* (which could address some—though not necessarily all—of these questions), Plaintiffs suggest that judicial efficiency, equity, and fairness counsel for holding this petition in abeyance, or staying issuance of the mandate, until such time in order to allow Plaintiffs to benefit from the Supreme Court's guidance regarding any of these questions.

### III.   Panel rehearing or consideration by the full Court is warranted to correct the misapplication of this Court's informational privacy jurisprudence.

*En banc* rehearing pursuant to Rule 35 or panel rehearing pursuant to Rule 40 is warranted to address the misapplication of this Court's foundational informational privacy precedents.  The panel majority rejected Plaintiffs' informational privacy claim, which was presented within the framework recognized by this Court in *Bloch* and *Kallstrom*.  In doing so, the panel majority's cramped interpretation of this Court's informational privacy jurisprudence created outright conflict within this Court's precedents, as well as those of other Courts of Appeals.

---

observations from other Courts of Appeals.  For example, in *In re Tam,* 808 F.3d 1321, 1348 (Fed. Cir. 2015), the Federal Circuit specifically cited birth certificates as a matter of private speech.  It is also, as Judge White points out in her dissent, in tension with the Supreme Court's recognition that a birth certificate "is also a benefit—one that the State can effectively deny a person through underinclusive, misleading, or demeaning contents."  Op. at 37-38 (citing to *Obergefell v. Hodges*, 576 U.S. 644 (2015), and *Pavan v. Smith*, 582 U.S. 563 (2017) (per curiam)).

In the first instance (*Bloch*), the panel majority held that "[t]he disclosure of one's biological sex, a medical fact of birth collected by the State about everyone, does not remotely compare to the government's gratuitous disclosure of the details of a rape at a press conference." Op. at 22. But a person's transgender status and information about their genitalia are inherently private and intimate matters relating to one's sexuality and personhood. The Second Circuit has explicitly held as much. *See Powell*, 175 F.3d at 111; *see also Foster v. Andersen*, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019); *Arroyo Gonzalez*, 305 F. Supp. 3d at 333. While the panel majority stated that "[n]ot every revelation of sexual or personal information warrants heightened constitutional scrutiny," Op. at 21, this Court had previously described the "clear principle emerging from *Bloch*" as the "right to be free from governmental intrusion into matters touching on sexuality and family life, and that to permit such an intrusion would be to strip away the very essence of [their] personhood." *Lambert*, 517 F.3d at 441. And to be sure, as the Supreme Court has recognized, the liberty protected by the Fourteenth Amendment "includes certain specific rights that allow persons, within a lawful realm, to *define and express their identity*." *Obergefell*, 576 U.S. at 651-52 (emphasis added).

In the second instance (*Kallstrom*), the panel majority held that "plaintiffs have not alleged a substantial risk of bodily harm from Tennessee's amendment policy." Op. at 21. In doing so, the panel majority appears to insist on a "narrow"

interpretation of *Kallstrom* such that Plaintiffs must allege with specificity the persons who would pose a threat when Plaintiffs' sensitive information—i.e., their transgender status—is disclosed.  But such interpretation is in direct tension with this Court's precedent in *Déjà Vu of Nashville v. Metropolitan Government of Nashville & Davidson County*, which applied *Kallstrom*'s reasoning to find that, due to risks of harassment and physical violence, sexually oriented business license and permit applicants' names and residential addresses constitute protected private information exempted from Tennessee's Open Records Act.  274 F.3d at 394-95.

What is more, it is important to keep in mind the stage of this proceeding.  This is an appeal from the granting of a motion to dismiss.  As such, the panel majority was required to "accept [the] factual allegations [in Plaintiffs' Amended Complaint] as true, draw all reasonable inferences in the plaintiff's favor, and only then determine whether those facts and inferences plausibly give rise to an entitlement to relief." *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020).  "The plausibility standard is not akin to a 'probability requirement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Here, the panel majority not only appears to have applied a probability standard, but also ignored several allegations made by Plaintiffs about the "very real threat" to their "personal security and bodily integrity, and possibly their lives" that disclosure of the transgender status would pose. *Déjà Vu*, 274 F.3d at 394-95.  For example, each Plaintiff specifically alleged that she is "personally

aware of the high incidence of violence and harassment directed at transgender persons" and that she "reasonably fears that possessing a birth certificate that fails to reflect her female gender identity increases the likelihood that she will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence."  Complaint, R.59, PageID#393, 394, 397, 398, 401, 402, 404, 405.[2]  As Judge White noted in dissent, "[t]he majority takes a myopic view of Appellants['] allegations."  Op. at 47.

Finally, the panel majority incorrectly held that the government does not disclose a person's transgender status by forcing the person to carry a birth certificate inconsistent with their gender identity.  It is beyond debate that a birth certificate is a foundational identity document, required to obtain other identification.  The panel majority observed that there may be alternative forms of identification to prove identity for purposes of public benefits or employment.  *See* Op. at 19.  But this is not always the case and certainly not in Tennessee, where the State noted its interpretation of Section 1-3-105(c) of the Tennessee Code as prohibiting any amendment to the gender marker on any state identification.  *See* Plaintiffs' Suppl. Br.  For example, social security information is insufficient to prove identity for

---

[2]    Again, the posture of this proceeding is important.  Had the panel majority drawn the appropriate inferences in Plaintiffs' favor, its conclusions would not be contrary to the already existing record below.  *See* Gore Depo., R.93-4, PageID#1585-90.

employment and a report of birth abroad is obviously unavailable to someone born in Tennessee. A passport is not a sufficient solution either, as it requires the significant and routine expenditures of financial resources that a person seeking employment, school enrollment, or access to public benefits may not have.[3] It thus defies logic to conclude that the State does not force the disclosure of Plaintiffs' transgender status when it conditions governmental benefits and services, employment, and much more on proof of identity of which a birth certificate may be the only form of allowable identification available to a person. *See* Op. at 48-50 (White, J., dissenting).

Accordingly, the panel majority's holding and reasoning with regards to Plaintiffs' informational privacy are both in tension with these Court's precedents and those of other Courts of Appeals, and also fail to appropriately credit Plaintiffs' allegations as true and draw inferences in Plaintiffs' favor. Consequently, rehearing, either by the panel or the full Court, is appropriate here. Indeed, rehearing is necessary not only to address the panel majority's misapprehensions but also to secure and maintain uniformity of the Court's decisions. *See* Fed. R. App. P. 35(a)(1).

---

[3]    For example, Ms. Gore, who has experienced homelessness and relied on public benefits in the past, does not have a U.S. Passport. Compl., R.59, PageID#393 (listing identifications Ms. Gore has).

**IV.    At a minimum, panel rehearing is warranted to correct the majority's misapprehension of Plaintiffs' claims, requested relief, and the Policy.**

Panel rehearing is also warranted in this case under Rule 40 because the panel majority's decision is based on multiple fundamental misapprehensions of Plaintiffs' claims and the birth certificate policy that infected the entirety of the opinion.  *See* Fed. R. App. P. 40(a)(2).

From the start, the panel majority operates from the premise that birth certificates identify "the biological sex of the newborn."  Op. at 2.  The panel majority then proceeds to state that, "[a]s relief, [Plaintiffs] ask the Court to require Tennessee to adopt an amendment procedure that permits changes whenever individuals self-report that their gender identity conflicts with the biological sex listed on their birth certificate."  Op. at 7.

The panel majority therefore *implicitly assumed* that observation of a person's genitalia at birth *defines and determines* their "biological sex."  But the panel majority does not define biological sex; nor does the Vital Statistics Act or any of its implementing regulations.  Rather, each of these refer to "sex" not "biological sex."  Furthermore, the panel majority purposely ignored the allegations in Plaintiffs' Complaint, which it was required to accept as true.  Plaintiffs' Complaint repeatedly asserts that a person's sex is more than their external genitalia at birth and that a person's gender identity is one of multiple sex-related characteristics and a primary factor determining a person's sex.  Take the following, for example:

13

21. A person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. These characteristics may not always be in alignment. . . .

23. Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex. . . .

28. External reproductive organs are not determinative of a person's sex.

29. Gender identity is the critical determinant of a person's sex, including for transgender people whose sex-related characteristics are not in typical alignment. . . .

53. The gender marker originally placed on a transgender person's birth certificate is inaccurate because it is based on visual assumptions about the person's sex made at the time of their birth, without taking into consideration relevant factors that determine a person's sex, including most importantly, gender identity

Complaint, R.59, PageID#381-82, 386. Simply put, the panel majority created a false dichotomy between sex and gender identity that ignores the allegations in Plaintiffs' Complaint. This false dichotomy stained the entirety of the Court's analysis and, on its own, is a sufficient basis to warrant panel rehearing.

Again, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level, *on the assumption that all the allegations in the complaint are true (even if doubtful in fact).*") (emphasis added) (citations omitted).

14

What is more, the panel majority appears to misapprehend the Policy at issue by claiming that the State's allowance of corrections to the gender marker on birth certificates by people born with ambiguous genitalia is not evidence of discrimination because that is done, in the panel majority's view (without any support or citation), based on a biological determination.  But how those determinations occur involves a factual determination and, in fact, the record developed below does not support the panel majority's contention.  Rather, the record evidence demonstrated that the State permits other individuals, such as those born with ambiguous genitalia, to correct the sex designation of "unknown" on their birth certificates *after the time of recordation*, based on sex-related characteristics *other than external genitalia*.  *See* Lefler Depo., R.93-16, PageID#2390-92, 2400.[4]

In addition, the panel majority appears to have entirely misconstrued the relief sought by Plaintiffs.  The panel majority understood Plaintiffs to be asking "the Court to require Tennessee to adopt an amendment procedure that permits changes whenever individuals self-report that their gender identity conflicts with the biological sex listed on their birth certificate."  Op. at 7.  This is not true.  Plaintiffs

---

[4]    *See also* Migeon, C. J., et al. (2002). Ambiguous genitalia with perineoscrotal hypospadias in 46,XY individuals: long-term medical, surgical, and psychosexual outcome. *Pediatrics*, *110*(3), e31, at 1 ("For this group of patients, there is a lack of agreement about optimal sex assignment (in terms of the child developing a gender identity that is congruent with his or her rearing) and types of genital surgery associated with the best cosmetic and functional outcome.").

did not ask the Court to order the State to adopt any specific policy.  To the contrary,

Plaintiffs made clear that

> it is this wholesale inability to obtain a birth certificate that reflects their
> identity—distinct from a person's original birth record and vital
> statistics record—that Plaintiffs challenge, rather than advancing any
> particular standard for permitting amendments.  Compl., R.59,
> PageID#415.  Whether validation of a person's identity in form of a
> mental health or medical provider can be required is matter of policy
> that Plaintiffs' requested relief does not address.

Plaintiffs' Suppl. Br. at 2, n.2; *see also* Compl., R.59, PageID#415.

These misapprehensions of Plaintiffs' claims, requested relief, and the Policy

itself, along with the failure to credit as true Plaintiffs' allegations, permeated the

panel majority's opinion such that panel rehearing is warranted.

## <u>CONCLUSION</u>

For the foregoing reasons, the full Court should rehear this appeal *en banc*

under Federal Rule of Civil Procedure 35 or the panel should rehear this appeal under

Federal Rule of Civil Procedure 40.  To the extent the Court is inclined to await the

Supreme Court's decision in *United States v. Skrmetti*, Plaintiffs suggest that judicial

efficiency, equity, and fairness counsel for holding this petition in abeyance, or

staying issuance of the mandate, until such decision is rendered.

Dated September 9, 2024.                         Respectfully submitted,

 /s/ Omar Gonzalez-Pagan

John T. Winemiller                    Omar Gonzalez-Pagan
MERCHANT & GOULD P.C.                 LAMBDA LEGAL DEFENSE AND
800 S. Gay Street, Ste. 2150          EDUCATION FUND, INC.
Knoxville, TN 37929                   120 Wall Street, 19th Floor
(865) 380-5960                        New York, NY 10005
jwinemiller@merchantgould.com         (212) 809-8585
                                      ogonzalez-pagan@lambdalegal.org

River Lord                            Sasha Buchert
MERCHANT & GOULD P.C.                 LAMBDA LEGAL DEFENSE AND
150 South Fifth Street, Ste. 2200     EDUCATION FUND, INC.
Minneapolis, MN 55402                 111 K Street NE, 7th Floor
(612) 332-5300                        Washington, DC 20002
rlord@MerchantGould.com               (202) 804-6245
                                      sbuchert@lambdalegal.org

Gavin R. Villareal
Maddy R. Dwertman                     Joshua Lee
BAKER BOTTS L.L.P.                    BAKER BOTTS L.L.P.
401 S. 1st Street, Ste. 1300          700 K Street, NW
Austin, TX 78704                      Washington, DC 20001
(512) 322-2500                        (202) 639-7700
gavin.villareal@bakerbotts.com        joshua.lee@bakerbotts.com
maddy.dwertman@bakerbotts.com

Brandt Thomas Roessler
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2500
brandt.roessler@bakerbotts.com

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limit of Fed. R. App. P. 35(b)(2), (3) and Fed. R. App. P. 40(b) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 3,899 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

## **CERTIFICATE OF SERVICE**

On September 9, 2024, a true and correct copy of the foregoing was filed with

the electronic case filing (ECF) system of the U.S. Court of Appeals for the Sixth

Circuit, which currently provides electronic service on all counsel of record.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

# ADDENDUM

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0151p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————

KAYLA GORE; L.G.; K.N.; JAIME COMBS,

*Plaintiffs-Appellants,*

*v.*

No. 23-5669

WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:19-cv-00328—Eli J. Richardson, District Judge.

Argued: May 2, 2024

Decided and Filed: July 12, 2024

Before: SUTTON, Chief Judge; WHITE and THAPAR, Circuit Judges.

———————

### COUNSEL

**ARGUED:** Omar Gonzalez-Pagan, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., New York, New York, for Appellants. J. Matthew Rice, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. **ON BRIEF:** Omar Gonzalez-Pagan, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., New York, New York, Sasha Buchert, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Washington, D.C., Joshua Lee, BAKER BOTTS L.L.P., Washington, D.C., John T. Winemiller, MERCHANT & GOULD P.C., Knoxville, Tennessee, Gavin R. Villareal, Maddy R. Dwertman, BAKER BOTTS L.L.P., Austin, Texas, Brandt Thomas Roessler, BAKER BOTTS L.L.P., New York, New York, for Appellants. J. Matthew Rice, Steven J. Griffin, Trenton M. Meriwether, Sara E. Sedgwick, Dianna Baker Shew, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. Chad M. Eggspuehler, TUCKER ELLIS LLP, Cleveland, Ohio, Patience Crozier, GLBTQ LEGAL ADVOCATES & DEFENDERS, Boston, Massachusetts, Jonathan A. Scruggs, ALLIANCE DEFENDING FREEDOM, Scottsdale,

Arizona, John J. Bursch, Suzanne Beecher, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Anthony Powell, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amici Curiae.

SUTTON, C.J., delivered the opinion of the court in which THAPAR, J., joined. WHITE, J. (pp. 25–51), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

SUTTON, Chief Judge.  After a child is born, Tennessee creates a birth certificate that identifies the biological sex of the newborn.  While the State permits individuals to change some aspects of their birth certificates (such as a new name or the identity of adoptive parents), it treats the sex listed on a birth certificate as a historical fact unchangeable by an individual's transition to a different gender identity.  At issue is whether that policy violates the United States Constitution.

### I.

### A.

Millions of children are born in the United States every year.  Their births not only create a new generation of Americans but also offer vital information for public officials.  Recording the circumstances of these births provides insights about population changes, demographics, fertility rates, infant mortality, and other medical issues.  To capture this data, the States record the facts of each individual's birth and compile them in a birth certificate.  The federal government takes an interest in this information as well.  It asks the States to record information about every birth and compiles the nationwide data in an annual report.  *See* 42 U.S.C. § 242k(g), (h).  The information "support[s] statistical and epidemiological activities" that "improv[e] the effectiveness, efficiency, and quality of health services" throughout the country.  *Id.* § 242k(a).  Among the pieces of information requested by the National Center for Health Statistics and provided by all 50 States is the biological sex of each newborn.  *See* U.S. Standard Certificate of Live Birth (2003); Michelle J.K. Osterman et al., *Births: Final Data for 2022*, 73 Nat'l Vital Stat. Reps. 1, 2 (2024).

This practice traces its origins to our early history.  In 1639, the Massachusetts Bay Colony required civil registration of births, marriages, and deaths.  Susan J. Pearson, *The Birth Certificate: An American History* 32 (2021).  Two centuries later, Massachusetts again set the pace when it required town clerks in 1842 to collect information about newborns, including their sex, and forward it to the State.  *Id.* at 42.  The other States adopted similar laws in the nineteenth and twentieth centuries.  *Id.* at 44, 57.  By the mid-twentieth century, every State created birth certificates and used them to compile a range of data about newborns, including their biological sex.  *See id.* at 189, 239.

With the advent of sex-reassignment surgery in the 1960s, some individuals sought to change the sex listed on their birth certificates.  In response, a few States permitted individuals to change the sex on their birth certificates if they provided proof that they underwent sex-reassignment surgery.  *See* Douglas K. Smith, Comment, *Transsexualism, Sex Reassignment Surgery, and the Law*, 56 Cornell L. Rev. 962, 988 (1971).  Other States at the time gave public officials discretion to "correct any error" or "alter[]" birth certificates upon satisfactory proof, sometimes authorizing new identifications of sex based on proof of surgery, other times not. John P. Holloway, *Transsexuals – Their Legal Sex*, 40 U. Colo. L. Rev. 282, 288–89 (1968).  In the first lawsuits over the issue, the state courts disagreed whether biological sex, sex-reassignment surgery, or current identity should control the designation.  *Compare K. v. Health Div., Dep't of Hum. Res.*, 560 P.2d 1070, 1070–72 (Or. 1977) (explaining that birth certificates should reflect sex at birth), *and Anonymous v. Weiner*, 270 N.Y.S.2d 319, 321–24 (N.Y. Sup. Ct. 1966) (affirming an agency's decision to rely on biological sex), *with M.T. v. J.T.*, 355 A.2d 204, 210–11 (N.J. Super. Ct. App. Div. 1976) (holding that reassignment surgery determines sex), *and In re Anonymous*, 293 N.Y.S.2d 834, 837–38 (N.Y. Civ. Ct. 1968) (criticizing a definition of sex that ignored psychology and requiring the state to issue a new birth certificate).

In 1977, the Model State Vital Statistics Act recommended that the States permit amendments to birth certificates based on proof of sex-reassignment surgery, and many States followed that approach.  *See* John Ostrowsky, *Birth Certificate Gender Corrections: The Recurring Animus of Compulsory Sterilization Targeting Transgender Individuals*, 27 UCLA Women's L.J. 273, 275 (2020).  In the early 2000s, some States began accepting proof of

hormone treatment or therapy, as opposed to proof of surgery, to obtain a change to the sex designation on a birth certificate, a shift that the State Department embraced in 2010 with respect to passports. Lisa Mottet, *Modernizing State Vital Statistics Statutes*, 19 Mich. J. Gender & L. 373, 383, 402–04 (2013).

In 2012, Argentina became the first country to permit individuals to amend their birth certificates based on self-designation alone. In that year, it permitted amendments to the sex designation on a birth certificate without any medical documentation. *Id.* at 385–86.

In 2017, California, Oregon, and Washington became the first States in this country to allow changes to an individual's birth-certificate sex based on self-designation alone, without proof of medical treatment or surgery. Two of the States enacted statutes that allowed self-reporting the gender on the birth certificate, including a third nonbinary option. 2017 Cal. Legis. Serv. Ch. 853; 2017 Or. Laws Ch. 100. Washington did the same through a rulemaking process that year. 18-02 Wash. Reg. 27, 27–28 (Dec. 27, 2017).

Today, the States' practices are all over the map. At least six States do not permit amendments that conflict with the individual's biological sex. *See* Idaho Code § 39-245A; Kan. Stat. Ann. § 77-207(a), (c); Mont. Admin. R. 37.8.311(5); Okla. Stat. tit. 63, § 1-321; S.C. Code Ann. Regs. 61-19.1101(A); Tenn. Code Ann. § 68-3-203(d); *see also* DH660 Instructions for Amending a Certificate of Live Birth (2002) (Florida); N.D. Cent. Code § 23-02.1-25.1. Twelve States allow amendments to change one's listed sex but only after surgery. *See* Ala. Code § 22-9A-19(d); Ariz. Rev. Stat. § 36-337(A)(3); Ark. Code Ann. § 20-18-307(d); Ga. Code Ann. § 31-10-23(e); Ky. Rev. Stat. Ann. § 213.121(5); La. Stat. Ann. § 40:62.A; 10-146 Me. Code R. § 11(A); 15-5 Miss. Code R. § 3.21.2 (requiring "reassignment"); Mo. Rev. Stat. § 193.215.9; Neb. Rev. Stat. § 71-604-01; N.C. Gen. Stat. § 130A-118(b)(4); Wis. Stat. § 69.15(4); *see also* N.H. Rev. Stat. Ann. § 5-C:87(V) (requiring a "sex change"). Fifteen States allow amendments without surgery but require evidence to support the change, often a declaration by a medical professional that the individual has received appropriate treatment. *See* Conn. Gen. Stat. § 19a-42(i); Del. Admin. Code § 4205-10.7; Haw. Rev. Stat. § 338-17.7(a)(4); Iowa Code § 144.23; Md. Code Ann., Health-Gen § 4-211(b); Mass. Gen. Laws ch. 46, § 13(e); Minn. Stat. § 144.2181(a); *Supporting Documents for Amendments*, Minn. Dep't of Health,

https://www.health.state.mn.us/people/vitalrecords/reqdocs.html    (last visited July 10, 2024);
Nev. Admin. Code § 440.030; *Changing or Correcting a Birth Record*, Ohio Dep't of Health
(May 7, 2024), https://odh.ohio.gov/know-our-programs/vital-statistics/Changing-Correcting-
Birth-Record; Request to Modify an Adult's Birth Record 3 (Pennsylvania); Correcting a Birth
Certificate 2 (2022) (Texas); Utah Code Ann. § 26B-8-111(2); Va. Code Ann. § 32.1-261(A)(5);
Procedure for Changing the Sex Listed on Your Birth Certificate 1 (West Virginia); 48-10 Wyo.
Code R. § 4(e).  Eleven States allow changes to birth certificates based solely on applicants'
declaration of their current gender identity.  *See* Cal. Health & Safety Code § 103426(a); Colo.
Rev. Stat. § 25-2-113.8(3); 410 Ill. Comp. Stat. 535/17(1)(e); *Correct a Birth Record – FAQ's*,
Mich. Dep't of Health & Hum. Servs. (Apr. 25, 2024), https://www.michigan.gov/mdhhs/doing-
business/vitalrecords/correct-a-birth-record/correct-a-birth-record-faqs; N.J. Stat. Ann. § 26:8-
40.12(a); N.M. Stat. Ann. § 24-14-25(D); N.Y. Pub. Health Law § 4138(1)(f); Or. Admin. R.
333-011-0272; R.I. Code R. § 10-10-1.37(E)(5); 12-5 Vt. Code R. § 59:10.2; Wash. Admin.
Code § 246-490-075(4); *see also* Smith, *Transsexualism*, *supra*, at 992–94 (summarizing
contemporary disagreement in European nations' treatment of transsexual birth record changes).
It remains unclear how three States—Alaska, Indiana, and South Dakota—handle the issue.  *See*
Alaska Stat. § 18.50.290; *In re K.G.*, 200 N.E.3d 475, 478–79 (Ind. Ct. App. 2022); H.B. 1076,
2021 Leg., 96th Sess. (S.D. 2021).

### B.

Tennessee creates a birth certificate for each newborn child.  *See* Tenn. Code Ann. § 68-
3-202(a); *id.* § 68-3-301(a).  The certificate must record the names of the parents, the name of the
child, the date and time of birth, the city of birth, and the child's biological sex.  *Id.* §§ 68-3-
302(a), 311(b)(2).  When the mother delivers the baby in a medical institution like a hospital,
Tennessee law requires the physician to provide the "medical information" for the certificate.  *Id.*
§ 68-3-302(b).  When physicians record the sex of the child, they rely "solely on observations
about the external genitalia of newborns" to determine whether the baby is male or female.  R.59
at 14, ¶ 65.  Once complete, the certificate is filed with the Office of Vital Records.  Tenn. Code
Ann. § 68-3-301(a).  While individuals routinely seek copies of their birth certificates for use as

identification documents, the certificates "remain the property of the office of vital records." *Id.* § 68-3-104(a)(6).

To "protect the integrity and accuracy of vital records," Tennessee tightly regulates amendments to its birth certificates. *Id.* § 68-3-203(a). It usually requires proof of an error. If applicants show that "an original entry on a certificate was factually inaccurate at the time of recordation," they may amend their birth certificate without any "record of the amendment [appearing] upon the face of the certificate." *Id.* § 68-3-203(f). The applicant must provide an affidavit and "documentary evidence" that identifies the error and provides the correct information. Tenn. Comp. R. & Regs. 1200-07-01-.10(2)(a). A "sex change surgery" does not count as a factual error that permits a change to the sex listed on a birth certificate. Tenn. Code Ann. § 68-3-203(d).

The law has a few exceptions. When individuals adopt a child, they may request a new birth certificate to show the names of the adoptive parents. After the amendment, the State keeps the old certificate but preserves it under seal. Tenn. Comp. R. & Regs. 1200-07-01-.04(10). If individuals obtain a court order to change their name, they may amend their birth certificate to reflect the name change, say because they have a new married name or because they changed their name for some other reason. *See* Tenn. Code Ann. § 68-3-203(c); Tenn. Comp. R. & Regs. 1200-07-01-.10(2)(a)(7).

Plaintiffs are transgender individuals, and the sex listed on their birth certificates conflicts with their gender identity. The birth certificates of plaintiffs Kayla Gore, Jaime Combs, L.G., and K.N. list them as male, and each of them identifies as female. Consistent with that identity, each of them has changed their gender on other official documents, including their passports and social security records.

The four plaintiffs all were born in Tennessee, though two of them now live in other States. The plaintiffs filed this lawsuit against Tennessee's Governor and its Commissioner of the Department of Health. In addition to being "stigmatized" by this policy, R.59 at 20, ¶ 95, the plaintiffs allege that the certificates divulge their transgender status when they present their birth certificates for employment or when they apply for a passport. One of the plaintiffs, Kayla Gore,

gave up on a job opportunity based on a fear of disclosure.  All of the plaintiffs fear that "possessing a birth certificate that fails to reflect [their] female gender identity" increases the risk that they will suffer "discrimination, distress, harassment, or violence."  R.59 at 19, ¶ 92.  In filing this complaint, they argue that Tennessee's policy violates their rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  As relief, they ask the Court to require Tennessee to adopt an amendment procedure that permits changes whenever individuals self-report that their gender identity conflicts with the biological sex listed on their birth certificate.  The district court rejected the claims as a matter of law.

## II.

Does the United States Constitution require Tennessee to change the biological sex listed on the birth certificates of transgender individuals to match their gender identities?  In claiming that it does, the plaintiffs raise four theories: (1) the law discriminates based on sex; (2) the law discriminates based on transgender status; (3) the law discriminates based on irrational classifications; and (4) the law infringes a substantive due process right to informational privacy.

## A.

*Equal protection—sex.*  The Fourteenth Amendment prevents a State from denying its citizens "equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The provision does not by itself create substantive rights, and it does not forbid States from drawing distinctions in their laws.  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  But it does prohibit States from allocating benefits and burdens based on suspect and irrational classifications.  Laws that discriminate based on suspect classifications, such as race or sex, receive heightened review.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985).  Otherwise, laws are "presumed to be valid" and will be upheld if they bear a rational relationship to a legitimate state interest.  *Id.* at 440; *see Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015).  Through it all, and above all, the Equal Protection Clause requires States to "treat like cases alike."  *Vacco v. Quill*, 521 U.S. 793, 799 (1997).

Tennessee's birth-certificate policy treats like alike.  It makes one relevant distinction.  It distinguishes between those applicants who produce evidence that the doctor erred in

identifying their biological sex at birth and those who do not.  Given Tennessee's aim of accurately recording the biological sex of newborns—was the child a boy or a girl?—that distinction is rational.  The distinction also treats the sexes identically.  Under Tennessee law, anyone may amend their certificate if they provide "documentary evidence" showing the certificate contains "incorrect data."  Tenn. Comp. R. & Regs. 1200-07-01-.10(2)(a).  That policy does not impose any special restraints on, and does not provide any special benefits to, applicants due to their sex.  It does not impose "one rule for" males and "another for" females.  *See Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017).  Nor does it prefer one sex over another when individuals try to amend their birth certificates.  *See Reed v. Reed*, 404 U.S. 71, 73, 76 (1971).  The amendment application does not ask for the sex of the individual, and eligibility for it does not turn on the sex of the individual.  The policy treats the sexes equally.  *See Geduldig v. Aiello*, 417 U.S. 484, 494–95 (1974).

The plaintiffs push back on this conclusion.  Because Tennessee classifies newborns as male or female on their birth certificates, they claim that the law amounts to a "sex-based classification on its face."  Appellants' Br. 32.  That is true in one sense.  Under Tennessee law, doctors must answer the same question on each original birth certificate:  Was the baby a "male" or "female" based on their biological sex?  But the *amendment policy* does no such thing.  It does not attach any significance to the biological sex of the applicant.  And that is the only practice challenged today.

Plaintiffs, to be clear, do not challenge the initial designation of sex on each birth certificate.  As they admit in their complaint, they challenge only Tennessee's policy of barring residents from "correcting" their sex based on their gender identity, and that is the only "Birth Certificate Policy challenged herein."  R.59 at 15, ¶ 70.  The plaintiffs never claim that the Constitution forbids Tennessee from recording the sex of a newborn—something the States uniformly do today and have consistently done since Massachusetts began the practice in 1842.  The plaintiffs thus do not challenge the steadfast practice of simply recording an "enduring" difference in the biological makeup of the species at birth.  *United States v. Virginia*, 518 U.S. 515, 533 (1996); *see L.W. v. Skrmetti*, 83 F.4th 460, 480–82 (6th Cir. 2023), *cert. granted*, No. 23-477, 2024 WL 3089532 (June 24, 2024).  Nor could they.  When a law does not

ascribe different benefits and burdens to the sexes, that law does not discriminate based on sex, even if sex "factors into" the law's application. *Skrmetti*, 83 F.4th at 484.

Even so, the plaintiffs point out, had they "been assigned female at birth, they would be able to have certificates matching their identity," and they allege that necessarily amounts to a form of sex discrimination. Appellants' Br. 34; *see Bostock v. Clayton County*, 590 U.S. 644, 656–57 (2020). But this contention, premised on Title VII cases, does not apply to equal protection claims, as we and others have explained. *Skrmetti*, 83 F.4th at 484–85 (discussing the "[d]ifferences between the language of the statute and the Constitution" along with the distinct principles at play in the Equal Protection Clause and Title VII); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 290, 308 (2023) (Gorsuch, J., concurring) (distinguishing the Equal Protection Clause from Title VI, and concluding Title VI has "essentially identical" language to Title VII); *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc)*; Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023); *Brandt ex rel. Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing en banc); *cf. Texas v. Loe*, __ S.W.3d __, No. 23-0697, 2024 WL 3219030, at *14 (Tex. June 28, 2024).

One other point on *Bostock*. Under the plaintiffs' theory of equal protection, *Bostock* was constitutionally compelled as applied to all government employers. As the plaintiffs see it, a government may not allocate benefits and burdens based on "sex" if the term does not cover gender identity as opposed to solely biological sex. If true, that means the Supreme Court had no discretion in resolving *Bostock* with respect to the public employee in that case. 590 U.S. at 653. Any other interpretation of "sex" in Title VII would have violated the Equal Protection Clause. That would come as a surprise, we suspect, to the *Bostock* lawyers, judges, and justices alike.

A Title VII approach to this lawsuit does not advance the plaintiffs' cause anyway. No matter the biological sex of an individual, the Tennessee amendment policy would remain the same. No person, male or female, may amend a birth certificate simply because it conflicts with their gender identity. Tennessee does not guarantee anyone a birth certificate matching gender identity, only a certificate that accurately records a historical fact: the sex of each newborn.

The plaintiffs maintain that the district court pulled the trigger too quickly—that it could not resolve this case without resolving disputes of fact about the intersection of "sex," "biological sex," and "gender." Appellants' Br. 22–26. But this case does not turn on shifting and disputed facts. It turns on an undisputed fact, an undisputed application of state law, and a disputed application of federal law. The parties do not dispute the accuracy of the plaintiffs' sex designation at birth. And the parties do not dispute the application of Tennessee law or the meaning of "sex" under it. What separates them is the meaning of the Equal Protection Clause. The district court correctly resolved this case as a matter of law.

The plaintiffs worry that the amendment policy turns on sex-based stereotypes. But the policy does not enforce any notion about how Tennesseans should dress or speak, what pronouns they should use, or whether they should present themselves as male or female (or neither). Applicants who dress one way or the other, use "he," "she," or "they" to refer to themselves, or who use more masculine or feminine names all may seek to amend their birth certificates on the same terms.

Plaintiffs' position "ultimately boil[s] down to" a demand that the Federal Constitution requires Tennessee to use "sex" to refer to gender identity on all state documents. *Rust v. Sullivan*, 500 U.S. 173, 194 (1991). The Constitution does not contain any such requirement. Tennessee may decide how to use the word "sex" in government documents, and it may decide what facts to record in a government-owned record—"to say what it wishes" in its records. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). The State does not have to add new items, or delete existing ones, whenever a citizen demands a change to official records. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207–08 (2015). How, it's worth asking, could a government keep uniform records of any sort if the disparate views of its citizens about shifting norms in society controlled the government's choices of language and of what information to collect? Governments "naturally choose[] what to say and what not to say. That must be true for government to work." *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022); *see Pleasant Grove City v. Summum*, 555 U.S. 460, 467–69 (2009).

The same holds true for amendments to state birth certificate records.  If Tennessee may elect to record biological sex on a birth certificate, as the plaintiffs concede, it may decide to maintain that record as is, even in the face of requests to change "sex" to mean "gender identity." True, the State must implement its amendment policy fairly, treating like citizens alike.  *See Walker*, 576 U.S. at 208; *Summum,* 555 U.S. at 469–70.  And it may not deny benefits stemming from a basic right protected by equal protection or substantive due process.  *Cf. Pavan v. Smith*, 582 U.S. 563, 56–67 (2017).  But absent an existing fundamental right, the Constitution does not require the States to embrace the plaintiffs' view of what information a birth certificate must record.  That's why Tennessee's choice to record sex—not gender identity—does not withhold a constitutionally prescribed benefit.  Its amendment policy treats both sexes equally, and as elaborated below there is no fundamental right to a birth certificate recording gender identity instead of biological sex.

Tennessee's decision to abide by its long-standing approach to the issue hardly amounts to unequal protection of the laws, even under the most soaring generality of those terms.  Recall that the first States to embrace the plaintiffs' proposed policy through their democratic representatives were California, Oregon, and Washington, and they did so a mere seven years ago in 2017.  At this point, it deserves emphasis, just eleven States have adopted the plaintiffs' approach—permitting individuals to amend their birth certificates whenever they self-report a difference between their gender identity and their sex on a birth certificate.  In interpreting an essentially unamendable constitution, the federal courts must be careful about freezing in time just one new approach to a difficult policy issue, particularly one that is steadily evolving and one that turns on each State's plenary power to decide how to speak for itself about the matter. Any other approach—one going beyond the original bedrock promise of treating like individuals alike—would usher in a new form of equal protection, what might be called a substantive equal protection claim.

B.

*Equal protection—suspect class.*  The plaintiffs separately claim that Tennessee's birth certificate law discriminates based on transgender status, and maintain that strict, skeptical, or some other form of heightened review should apply to it.  We have considered and rejected this

theory before.  *See Skrmetti*, 83 F.4th at 486.  The plaintiffs face the same problem now as the plaintiffs did in *Skrmetti*.  "[N]either the Supreme Court nor this Court has recognized transgender status as a suspect class."  *Id.*  Rational basis review applies.  *Id.*

As *Skrmetti* explained, the plaintiffs cannot show that they qualify as a suspect class.  *Id.* at 486–87.  Unlike existing suspect classes, transgender individuals "do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group."  *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (quotation omitted).  Transgender identity refers to "a huge variety of gender identities and expressions."  *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S15 (2022).  Gender identity is not "definitively ascertainable at the moment of birth," *Ondo*, 795 F.3d at 609, and it can change over time, *Skrmetti*, 83 F.4th at 487.  The Supreme Court "has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth."  *Ondo*, 795 F.3d at 609.  Gender identity does not meet that criterion.  *Skrmetti*, 83 F.4th at 486–88.

The plaintiffs also have failed to show that the amendment policy stems from animus against transgender individuals.  *Id.* at 487–88.  Nor could they show that it was created with that goal in mind.  The policy long predates medical diagnoses of gender dysphoria.

The plaintiffs also have not established a cognizable claim of political powerlessness.  *See Cleburne*, 473 U.S. at 445.  Even if we shift the focus from the issues in *Skrmetti* (limitations on treatments for gender dysphoria at age 17 and younger) to the issue presented here (requests to change government identification documents to reflect an individual's gender identity), the political record shows a country vigorously engaged in a new policy issue, one in which transgender individuals have won in some areas and lost in others.  That is a stubborn reality of all political debates, not evidence that the people of a State should not be allowed to vote on the issue.

Transgender individuals have had considerable success politically in convincing governments to permit identification documents to match their gender identity.  The U.S. State Department, for example, allows transgender individuals to obtain passports and consular

reports of birth abroad that match their gender identity.  *See* Press Statement, U.S. Dep't of State, Proposing Changes to the Department's Policies on Gender on U.S. Passports and Consular Reports of Birth Abroad (June 30, 2021), https://www.state.gov/proposing-changes-to-the-departments-policies-on-gender-on-u-s-passports-and-consular-reports-of-birth-abroad/. The same holds true for social security records.  *See* Press Release, Soc. Sec. Admin., Social Security Implements Self-Attestation of Sex Marker in Social Security Number Records (Oct. 19, 2022), https://www.ssa.gov/news/press/releases/2022/#10-2022-3.  Likewise for most immigration documents.  *See* Alert, U.S. Citizenship and Immigr. Servs., USCIS Updates Policy Guidance on Self-Selecting a Gender Marker on Forms and Documents (Mar. 31, 2023), https://www.uscis.gov/newsroom/alerts/uscis-updates-policy-guidance-on-self-selecting-a-gender-marker-on-forms-and-documents.  American service members also may change their listed gender to match their gender identity in the Department of Defense's Enrollment Eligibility Reporting System.  Department of Defense Instruction 1300.28, In-Service Transitions for Transgender Service Members, § 3.4 (Apr. 30, 2021).

The political power of transgender individuals does not stop at the National Government. They have obtained comparable relief in the States in all manner of ways.  A significant majority of the States allow transgender individuals to change their gender on a driver's license, often on the applicant's declaration alone.  *See* Elaina Rahrig, *Transgender and Nonbinary Persons' Rights and Issues*, 24 Geo. J. Gender & L. 855, 900–02 (2023).  And a significant majority of States, as shown earlier, permit individuals to alter the sex identified on their birth certificates to match their gender identity, some with medical documentation, some with none.  Eleven States permit precisely what plaintiffs seek under the Federal Constitution—amendments to birth certificates based solely on the individual's self-designation—all through the democratic process in just the last seven years.

In cataloguing this track record, we do not mean to minimize the discrimination that transgender individuals have faced before.  But past is not always prologue.  These and other legislative measures in favor of transgender rights make it difficult to maintain that their cause is one destined for political failure.

All of this shows that transgender individuals do not occupy "a position of political powerlessness" that requires "extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). Tennessee's policy is simply a nondiscriminatory form of government speech embraced by some States about an undeniable historical fact.

In resisting this conclusion, the plaintiffs point to statutory language prohibiting individuals from changing their listed sex "as a result of sex change surgery" as evidence that they are being singled out for animus-driven treatment. Tenn. Code Ann. § 68-3-203(d). But this provision confirms only that "sex," as used in Tennessee's birth certificates, does not refer to gender identity, even when accompanied by surgical procedures. The law simply clarifies Tennessee's use of "sex" as speech about a biological and historical fact of birth and ensures a uniform practice across Tennessee birth certificates. On the plaintiffs' theory, birth certificates would refer to biological sex for some Tennesseans but to gender identity for others. Tennessee chose to record births based solely on biological sex. That choice of government policy, indeed that choice of government speech, *see Summum*, 555 U.S. at 467–69, does not violate the Fourteenth Amendment.

In a variation on this theme, the plaintiffs invoke Tennessee's treatment of those born with ambiguous genitalia as proof of animus. As to those children, they explain, the State permits updates to a birth certificate without showing an error in the original record. But it is not evidence of animus or for that matter evidence of discrimination for a State to permit the correction of a biological sex designation if the sex of the child was ambiguous at birth and time shows the child to be biologically male rather than female or vice versa. That likewise would explain why some doctors identify the sex of the child as "unknown" on the birth certificate and why the State would permit the individual to amend the certificate later to show that they are male or female. *See* R.93-16 at 54–58; R.93-10 at 46–48. None of this amounts to evidence of unconstitutional discrimination; it is evidence of standing by the policy in a consistent and historically and biologically accurate way.

The plaintiffs point to a discussion during the legislative deliberations to suggest the amendment policy reflects animus. But that is not what the discussion shows. The sponsor of

the amendment policy explained on the floor of the Tennessee Senate that "the intent" of the policy was to ensure "that those natural events which occur at birth should not be allowed to be changed" on the State's records. R.62-14 at 7. That is not animus.

The plaintiffs argue that recent legislation shows animus against transgender individuals. In 2023, Tennessee's legislature defined "sex" as "immutable biological sex . . . at the time of birth" throughout the Tennessee Code. Tenn. Code Ann. § 1-3-105(c). As a result of this statute, Tennessee ended its practice of allowing transgender individuals to update their driver's licenses and voter identification cards to reflect their gender identity. We acknowledge the plaintiffs' frustration with this change. But the reality is that the plaintiffs did not challenge that statute or any accompanying regulations in this case. The new law also does not speak to the validity of the Volunteer State's birth certificate amendment policy. That policy has been around for decades, and it's the rare new law that retroactively establishes animus for a past law. *See* 1977 Tenn. Pub. Acts 280–81 (establishing the statutory amendment policy); *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 688 n.22 (2021) (finding that bills passed "during different legislative sessions by a substantially different composition of legislators" have sparse "probative value" in showing animus) (quotation omitted).

All of which takes us back to the key point: The States have considerable discretion in defining the terms used in their own laws and in deciding what records to keep. *See Shurtleff*, 596 U.S. at 251. Tennessee did not exceed that discretion in distinguishing biological sex from gender identity in its birth certificate records.

C.

*Equal protection—rational basis.* In the absence of any explanation for heightened review of Tennessee's birth-certificate amendment policy, we must uphold the policy if a rational basis supports it. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). In making that call, we do not question the "wisdom, fairness, or logic" of Tennessee's chosen path, only whether it supports a legitimate government purpose. *Id.* at 313–14; *see Vance v. Bradley*, 440 U.S. 93, 97 (1979).

Ample legitimate explanations support Tennessee's amendment policy. Tracking the biological sex of infants at birth "aid[s] the public health of the state." Tenn. Code Ann. § 68-3-201. Tennessee collects this information to assist in "preparing and publishing reports of vital statistics," and those reports help state and federal officials to track important medical and sociological trends. *Id.* § 68-3-104(a)(3). Tennessee likewise has an interest in maintaining a consistent, historical, and biologically based definition of sex. Allowing changes to reflect gender identity would mean that some birth certificates would show biological sex, others gender identity. Maintaining a consistent definition, based on physical identification at birth, "protect[s] the integrity and accuracy of [Tennessee's] vital records." *Id.* § 68-3-203(a). That is a legitimate State interest. *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001) (respecting this "most basic biological difference[]" avoids the risk of "making the guarantee of equal protection superficial"); *Pavan*, 582 U.S. at 568 (Gorsuch, J., dissenting) (noting that "rational reasons exist for a biology based birth registration scheme . . . like ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders"); *Kasper*, 57 F.4th 791, 803 n.6 (noting that "biological sex . . . is the driving force behind the Supreme Court's sex-discrimination jurisprudence").

The plaintiffs respond that Tennessee allows other changes to birth certificates, proving it does not believe its own theory. The State, it is true, allows changes with respect to other parts of a birth certificate—say to reflect the names of adoptive parents—even though a doctor did not err in listing the biological parents at the certificate's creation. *See* Tenn. Comp. R. & Regs. 1200-07-01-.04; *id.* 1200-07-01-.10(2)(a)(7). But the Constitution does not require Tennessee to allow all changes or none. *See Vance*, 440 U.S. at 108. Insisting that some metrics—like biological sex, time and date of birth, location of birth—remain unchanged absent evidence of error rationally correlates with Tennessee's stated interests, indeed its own speech and viewpoint about the best way to keep records of births in the State.

Invoking a recent Tenth Circuit case, the plaintiffs insist that Tennessee can maintain this original information but still must issue an amended birth certificate for a citizen's "own use." *Fowler v. Stitt*, 104 F.4th 770, 795–96 (10th Cir. 2024) (holding that a similar amendment policy did not rationally relate to the State's interest in accurate records). With respect, this approach

misunderstands rational basis review. That deferential standard does not require States to show that a classification is the only way, the best way, or even the most defensible way to achieve their interests. *See Beach Commc'ns*, 508 U.S. at 313–14; *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 316 (1976). It requires only that "some 'plausible' reason" supports the classification, no matter how imprudent or ineffective. *Tiwari v. Friedlander*, 26 F.4th 355, 361–62 (6th Cir. 2022). A State "does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Murgia*, 427 U.S. at 316 (quotation omitted). Tennessee, like all States, records a fact of birth: the biological sex of the child. A policy requiring an error before changing that record rationally correlates with the State's interest in consistency and historical accuracy.

### D.

*Due process—substantive.* The plaintiffs claim that Tennessee's amendment policy violates their substantive due process right to informational privacy. The Fourteenth Amendment guarantees all citizens "due process of law." U.S. Const. amend. XIV, § 1. The provision on its face sets forth *procedural* safeguards before a government limits an individual's liberty and property rights. Over time, the Supreme Court has added discrete *substantive* protections for "fundamental rights and liberties" unmentioned in the Constitution. *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). Appreciating the risks of assuming authority to identify rights without any textual anchor, of doing so in the context of a written constitution that enumerates many other rights, and of doing so in the context of a nearly unamendable charter, the Supreme Court has embraced a skeptical-review standard of its own about expanding this narrow sphere. In the Court's words, it has been "reluctant to expand" substantive due process rights "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). To that end, any purported substantive due process right must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720–21 (quotations omitted).

The right to a birth certificate conforming to one's gender identity is not "deeply rooted" in our history and "implicit in the concept of ordered liberty." By the time the States ratified the

Fourteenth Amendment, modern birth-registration systems were just getting underway in the States. Pearson, *The Birth Certificate*, *supra*, at 43–46. Tennessee did not pass its own statewide laws until 1881. 1881 Tenn. Pub. Acts 142–45. The concept of "gender identity" did not enter the English lexicon until the 1960s. David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles, 1945–2001*, 33 Archives Sexual Behav. 87, 93 (2004). Only in 1977 did the Model State Vital Statistics Act recommend that the States allow individuals to amend their sex on a birth certificate, and even then it did so only after proof of sex-reassignment surgery. § 21(e) (U.S. Dep't of Health, Educ., & Welfare 1978). The first court cases challenging sex designations on birth certificates, all in the state courts, are likewise of late twentieth century vintage. *See, e.g.*, *Anonymous v. Weiner*, 270 N.Y.S.2d 319, 321–24 (N.Y. Sup. Ct. 1966); *M.T. v. J.T.*, 355 A.2d 204, 210–11 (N.J. 1976); *In re Anonymous*, 293 N.Y.S.2d 834, 837–38 (N.Y. Civ. Ct. 1968). On this historical record, the claimed right to change an individual's sex on a birth certificate to reflect the person's gender identity is not deeply rooted in our history.

Matters do not improve if we think of the plaintiffs' claim as rooted in a substantive due process right to "informational privacy." That label does not alter the history just described. And that history shows that, however important individuals may perceive the designation of their sex on a birth certificate, it is only recently that the States have modified their laws to permit sex designations to conform to gender identity. Even now, less than a dozen States do what plaintiffs ask in the name of substantive due process: permit a sex change based exclusively on the individual's self-designation. That is not to disparage the plaintiffs' claim. It's just to say that the claim does not turn on the kind of deeply rooted value that substantive due process protects.

The plaintiffs resist this conclusion in several ways. They point to language in several Supreme Court cases to start. In one, the Court said that some constitutional guarantees, without spelling out which ones, may protect "zones of privacy." *Paul v. Davis*, 424 U.S. 693, 712–13 (1976) (quotation omitted). In another, the Supreme Court said without elaboration that there exists a due process "interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977). Despite requests to do so, "the Court has said little else on the subject" ever since. *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 146 (2011); *see id.* at

162 (Scalia, J., concurring in judgment) (noting that "there is no constitutional right to 'informational privacy'"). But such language here and there, never a holding with respect to a banned type of disclosure, does not help the plaintiffs with respect to the specifics of this law. *See J.P. v. DeSanti*, 653 F.2d 1080, 1087–90 (6th Cir. 1981). No Supreme Court case remotely holds that the States may not stand by their birth certificate policies and may not preserve the historical fact of the biological sex of each birth in the State. The reality is that the Constitution does not create a general right of privacy, "leaving most privacy-rights protection 'to the states or the legislative process.'" *Bailey v. City of Port Huron*, 507 F.3d 364, 367 (6th Cir. 2007) (quoting *DeSanti*, 653 F.2d at 1091).

The plaintiffs point to two cases from our circuit that recognize narrow substantive due process rights to prevent the disclosure of certain private information. In one, the claimant charged the government with improperly disclosing personal information to gang members about an undercover police officer. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998). In the other, a government official disclosed private information about a rape of an individual. *Bloch v. Ribar*, 156 F.3d 673, 676 (6th Cir. 1998).

A threshold problem thwarts the plaintiffs' invocation of these two cases. Tennessee's amendment policy does not disclose their transgender status. It simply maintains a uniform meaning of "sex" on state-owned and stated-created records of birth. Tennessee law in truth generally prohibits the State and its officials from disclosing information contained in a birth certificate. Tenn. Code Ann. § 68-3-205(a). While Tennessee allows the individuals themselves to disclose the information in birth certificates, that does not show that the State does so. Nor is the disclosure of information in a birth certificate by the individual the only way one can obtain public benefits or employment. *See id.* § 4-58-103(c) (public benefits); *id.* § 50-1-703(a)(1)(A)(iii), (a)(1)(B)(i) (employment verification). Other documents serve the same purpose, including those identity documents that individuals may change to match their gender identity. *See, e.g.*, *id.* § 4-58-103(c)(1) (allowing use of passport, U.S. government issued birth certificate, report of birth abroad, or social security information for securing public benefits). The only cited instance in which Tennessee requires disclosure of one's birth certificate is to obtain a license as a counselor. Tenn. Comp. R. & Regs. 0450-01-.05(1)(f). But this does not

disclose a person's listed sex to the public at large or individual citizens; it discloses the certificate to a state-created and governor-appointed board of counselors and therapists. *See* Tenn. Code Ann. § 63-22-101; Tenn Comp. R. & Regs. 0450-01-.05(1)(f).

The plaintiffs' theory of disclosure also fails to work on its own terms. As alleged in the complaint, the plaintiffs claim that transgender identity amounts to a mismatch between an individual's gender identity and biological sex. R.59 at 7, ¶ 26. But Tennessee does not force or allow disclosure of that mismatch. Nor do the plaintiffs allege any facts showing that Tennessee has disclosed or forced them to disclose their gender identity. It's difficult to see how Tennessee's amendment policy could do so when an individual's gender identity is, as the plaintiffs say, a "core internal sense" of one's gender. R.59 at 7, ¶ 23. Tennessee's insistence on maintaining a record of a person's biological sex does not disclose any mismatch with their gender identity.

The plaintiffs also do not show the violation of a right to informational privacy on the terms of our own cases. Start with the right not to have information disclosed because it creates a substantial risk of harm. In *Kallstrom*, three undercover officers investigated a violent gang, then testified against the gang's members in their criminal case. 136 F.3d at 1059. As part of the trial, the City of Columbus revealed the officers' names and addresses along with the names and addresses of the officers' relatives. *Id.* Given the gang's "propensity for violence" and the "like[lihood]" that they would "seek revenge," coupled with the minimal value to the public in disclosing this information, we held that the City violated the Constitution by disclosing this information. *Id.* at 1063–65.

That right, unlike this one, stems from a common law right "to be free from . . . unjustified intrusions on personal security." *Ingraham v. Wright*, 430 U.S. 651, 673 (1977). Any such right at most prohibits the government from releasing specific information to dangerous persons who are "likely to seek revenge" when such disclosure creates a "substantial risk of serious bodily harm, possibly even death." *Lambert v. Hartman*, 517 F.3d 433, 441, 444 (6th Cir. 2008) (quotation omitted). Not all risks of harm, we have explained, rise to the level of a constitutional violation. *See id.*; *DeSanti*, 653 F.2d at 1091. They can't. "Virtually every governmental action interferes with personal privacy to some degree." *Katz v. United States*,

389 U.S. 347, 350 n.5 (1967). We therefore have insisted on construing this right "narrowly" to those cases where the information is "particularly sensitive and the persons to whom it was disclosed were particularly dangerous *vis-à-vis the plaintiffs*." *Barber v. Overton*, 496 F.3d 449, 456 (6th Cir. 2007).

The plaintiffs have not alleged a substantial risk of bodily harm from Tennessee's amendment policy. Their complaint invokes a 2015 survey, which found "nearly one third of respondents who had shown an identification document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted." R.59 at 13, ¶ 58. On top of that, the plaintiffs refer to an "aware[ness] of the high incidence of violence" against transgender individuals. *Id.* at 20, ¶ 94; *see id.* at 23, ¶ 115; 28, ¶ 141; 31, ¶ 164. These generalized risks fall well short of the substantial, direct, and individualized risk of bodily harm or death when the government discloses to gang members the names of undercover officers who investigated and discovered their crimes. Even when the government discloses sensitive information to the public more generally, plaintiffs must still show that it poses "a very real threat" to their "personal security and bodily integrity, and possibly their lives." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 394-95 (6th Cir. 2001) (quotation omitted) (rejecting First Amendment challenge to law that required the disclosure of names and personal information of adult entertainers on the ground that *Kallstrom* would prohibit disclosure of the information because "in the past" they had been "stalked, harassed, and injured by customers").

Turn to the second case. In *Bloch v. Ribar*, a sheriff at a press conference disclosed "highly personal and extremely humiliating details" of a rape. 156 F.3d at 676. Because the disclosure lacked any investigatory or other value, we held that "a rape victim has a fundamental right of privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of the rape." *Id.* at 686.

We have not found such a violation since. Here, too, caution is warranted, as our subsequent case law confirms. *See Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 586 (6th Cir. 2012). Not every revelation of sexual or personal information warrants heightened constitutional scrutiny. *See Doe v. Wigginton*, 21 F.3d 733, 739–40 (6th Cir. 1994) (disclosing HIV infection

did not violate constitutional right to privacy); *cf. Flaskamp v. Dearborn Pub. Schs.*, 385 F.3d 935, 946–47 (6th Cir. 2004) (inquiring about teacher's relationship with student did not implicate right to informational privacy); *Hughes v. City of North Olmsted*, 93 F.3d 238, 242 (6th Cir. 1996) (inquiring about marital status did not implicate right to privacy).

The disclosure of one's biological sex, a medical fact of birth collected by the State about everyone, does not remotely compare to the government's gratuitous disclosure of the details of a rape at a press conference. Any disclosure of this birth-certificate information is not made by the government, it is limited, and it is highly regulated. *See* Tenn. Code Ann. § 68-3-205(a) (limiting disclosure of information on birth certificates); *Flaskamp*, 385 F.3d at 946 (treating "extent of dissemination as an important factor" for informational privacy claims).

The plaintiffs' invocation of an out-of-circuit case does not change things. In *Powell v. Schriver*, the Second Circuit found that prison officials violated an inmate's constitutional right to privacy by disclosing the inmate's "transsexualism." 175 F.3d 107, 111–12 (2d Cir. 1999). But difference, not similarity, captures the comparison. The key allegation was that a prison official disclosed to inmates that another inmate had a sex-change surgery and was HIV positive. *Id.* at 109. By contrast, Tennessee merely prevents an individual from amending a birth certificate to accord with one's gender identity. That policy does not remotely violate any of our precedents or for that matter this Second Circuit precedent.

At bottom, the plaintiffs' claim fits poorly with the Due Process Clause. That Clause acts "as a limitation on the State's power to act," not as a generator of "affirmative right[s]" or benefits. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989). There is no deeply rooted right to a birth certificate matching one's gender identity. And the Due Process Clause does not require Tennessee to create one. Having decided to generate birth certificates in the first instance, the State has considerable discretion in what they should say: what they should record, what language they should use, and when if at all they should be amended. The platform is the State's and absent some form of invidious discrimination in the recording of this information and allocation of benefits under it, the State retains considerable discretion over it. No due process violation occurred.

* * *

At least since the early 1800s and since the birth of most States, American governments have been collecting, compiling, and preserving records about the biological sex of each child born in their jurisdiction.  No one in this case protests the origins of that policy, the public-policy benefits of keeping and tracking this information, or the unbroken continuation of the policy today.  What separates the parties is a debate over when individuals may compel States to *amend* their birth certificates based on the individual's self-designation of a gender different from their biological sex.  In response to this debate, some States have modified their approaches and others have left them as they are.  For the fleeting present, eleven States provide individuals with this option, and all of them embraced these innovations through the democratic process in just the last seven years.

The Equal Protection and Due Process Clauses of the United States Constitution do not suddenly require the remaining thirty-nine States, including Tennessee, to do the same.  Whether as a matter of text, history, or precedent, the Clauses do not shut down this ongoing debate.  And they do not override the democratic processes that have long guided this medical recordkeeping and the government speech underlying it.

Any other approach would short-circuit the healthy, if sometimes difficult, legislative debates over these policies, debates that offer as much possibility for alteration as for continuity.  And any other approach would impede legislative compromise over the many settings in which these issues appear: sports, bathrooms, pronouns, medical treatments for juveniles, and birth certificates.  Why build a consensus among the competing constituencies if the Fourteenth Amendment, as interpreted by life-tenured judges, waits in the offing to provide total victory?  In reality, constitutionalizing the question is apt to undermine a democratic consensus, whether under the demands of substantial or narrow tailoring.  A compromise in one area becomes a too-much or too-little weapon in another given the requirements of skeptical scrutiny.

In the last analysis, policymaking in this area through democracy rather than through federal judges is far more likely to lead to stable settlements than efforts to update the meaning of the Fourteenth Amendment.  It is the rare public official who, after a successful election,

declares a commitment to represent *some* constituents.  Over time, that reality usually works for the best when it comes to handling even the most vexing issues.

Either way, we as judges cannot ignore the legal reality that the United States Constitution does not speak directly to this evolving issue in our society.  What it does require—rational grounds for drawing policy choices—is too modest an obligation to make a difference in the debate at the center of today's case.

We affirm.

———————————

## DISSENT

———————————

HELENE N. WHITE, Circuit Judge, dissenting.   At issue is the constitutionality of a Tennessee policy that prohibits transgender individuals from updating their birth certificates to reflect their sex consistent with their gender identity.   The policy classifies individuals based on the State's generalizations of what it means to be truly male and female, and it forcibly outs them in the myriad circumstances when birth certificates are necessary to participate fully in contemporary society.   That amounts to sex-based discrimination in violation of the Equal Protection Clause and the disclosure of private information in violation of the Due Process Clause.   The majority sees no constitutional infirmity and affirms the district court's dismissal of claims seeking to bar enforcement of the policy.   I see things differently, and respectfully dissent.

## I.

### A.

Tennessee issues birth certificates for all individuals born within its jurisdiction under its Vital Records Act of 1977, Tenn. Code Ann. §§ 68-3-202(a), -301(a).   These birth certificates, like those from other states, are "fundamental to modern citizenship," Susan J. Pearson, *The Birth Certificate: An American History* 3 (2021); *see also* International Covenant on Civil and Political Rights art. 24 ¶ 2, *adopted* Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 171 (recognizing human right to registration at birth); Convention on the Rights of the Child art. 7 ¶ 1, *adopted* Nov. 20, 1989, 1577 U.N.T.S. 3 (similar).   They are used to obtain passports, *see* 22 C.F.R. § 51.42(a), Social Security cards, *see* 20 C.F.R. § 422.107(a)–(d), and driver licenses and other state photo identification, *see* Tenn. Code Ann. §§ 55-50-321(a)(1), -336(a); Tenn. Comp. R. & Regs. 1340-01-13-.11.   Schools use them to enroll students.   *See* Tenn. Code Ann. § 49-6-5106.   Employers use them in hiring workers.   *See id.* § 50-1-703(a)(1)(A)(iii), (B)(i). Professionals use them to obtain licenses to practice.   *See, e.g.*, Tenn. Comp. R. & Regs. 0880- 02-.03(6) (physician); *id.* 1730-01-.05(1)(i), (2)(h) (veterinarian); *id.* 0480-01-.05(6) (optician); *id.* 1180-02-.03(5) (psychologist); *id.* 0460-02-.01(1)(e) (dentist); *id.* 1370-02-.05(1)(h) (hearing

instrument specialist); *id.* 1370-01-.05(2) (speech language pathologist and audiologist).   And recreationists use them to apply for some hunting, fishing, and trapping licenses.   *See id.* 1660-01-28-.11(2).

Tennessee recognizes that it sometimes needs to update information or correct errors on birth certificates.   Thus, individuals can amend their birth certificates after name changes, *see* Tenn. Code Ann. § 68-3-203(c); Tenn. Comp. R. & Regs. 1200-07-01-.10(2)(a)(7), and adoptive parents can substitute their information for that of the birth parents on their children's birth certificates, *see* Tenn. Code Ann. § 68-3-310(1); Tenn. Comp. R. & Regs. 1200-07-01-.04.   The State fixes "incorrect data" on birth certificates upon receipt of an affidavit and supporting evidence.   Tenn. Comp. R. & Regs. 1200-07-01-.10(2).   And it changes original information on a birth certificate that was "factually inaccurate at the time of recordation."   Tenn. Code Ann. § 68-3-203(f).

As alleged in the operative complaint, the information on each Tennessee birth certificate includes, among other things, the person's given name, surname, parents' names, date of birth, and—pertinent here—sex.   Many features factor into sex.   The term generally means "the sum of the structural, functional, and sometimes behavioral characteristics of organisms that distinguish males and females," *Sex*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sex (last visited July 10, 2024).   These include, for example, hormones, external and internal morphological features, external and internal reproductive organs, and chromosomes.   Also included, Appellants allege, is gender identity—the core internal sense of one's own gender, a sense that is innate, has biological underpinnings, and is fixed at an early age.[1]   Indeed, gender identity is the critical and primary determinant of sex.

Tennessee's typical practice is to ascertain sex for a birth certificate based on third-party observations of the newborn's external genitalia at the time of birth.   For cisgender individuals—who make up most of the population—this method generally matters little.   A cisgender person's

---

[1] *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3874 (2017) ("Results of studies from a variety of biomedical disciplines—genetic, endocrine, and neuroanatomic—support the concept that gender identity and/or gender expression likely reflect a complex interplay of biological, environmental, and cultural factors."   (endnote omitted)).

sex assigned at birth is consistent with the person's later perceived gender identity. Thus, cisgender individuals' birth certificates accurately reflect their gender identity. Not so for transgender individuals. A transgender person's gender identity does not align with other sex-related characteristics, so ascertaining sex for a birth certificate based on external genitalia yields a birth certificate that conflicts with the person's later perceived gender identity and, therefore, sex.

Tennessee does not allow transgender individuals to change the sex marker on their birth certificate to align with gender identity. The Vital Records Act provides that "[t]he sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." Tenn. Code Ann. § 68-3-203(d).[2] And based on this provision, Appellants allege, Tennessee has a policy, custom, or practice that categorically prohibits a transgender individual born in Tennessee from changing the sex marker listed on a birth certificate from sex assigned at birth to align with gender identity, regardless of the steps the individual takes to live in a manner consistent with the individual's gender identity (the Policy).[3] This stands in contrast to

---

[2]This provision dates to 1977, when Tennessee enacted its Vital Records Act, ch. 128, § 21(d), 1977 Tenn. Pub. Acts 259, 280. That same year, the federal government had published a revised version of the Model State Vital Statistics Act (MSVSA) (Nat'l Ctr. for Health Stat., U.S. Dep't of Health, Educ., & Welfare, 1978), https://www.cdc.gov/nchs/data/misc/mvsact77acc.pdf, "a document designed to be used by State Registrars of Vital Statistics and State Legislators when considering revision of the Vital Statistics laws," *id.* at 1. The MSVSA provided for amending the sex marker on a birth certificate if an individual undergoes gender-affirming surgery and receives a corresponding court order. *See id.* § 21(e), at 17. The provision likely reflected experts' recognition "at the time that allowing for gender reclassification was the appropriate way to meet the multiple goals of this type of recordkeeping, including accuracy, availability of vitally needed certificates of birth for access to institutions important in everyday life, and administrative ease." Dean Spade, *Documenting Gender*, 59 Hastings L.J. 731, 767 (2008). Most states adopted policies permitting such amendments. *See id.* A proposed version of Tennessee's Vital Records Act of 1977 included a provision that would have allowed these amendments, too, but the idea generated controversy. *See* David Spear, *Governor's Vital Records Bill Is Hot Potato for Legislators*, Nashville Banner, Mar. 17, 1977, at 14; *What Other Editors Say*, Johnson City Press, Mar. 24, 1977, at 4; Mark McNeely, *Child Car Restraint Bill Wins House Approval*, Knoxville News Sentinel, Apr. 8, 1977, at 5. The majority leader of the Tennessee House of Representatives struggled to find a sponsor for the bill, which some dubbed "The Governor's Transsexual Bill." Spear, *supra*, at 14. Instead of permitting amendments, the enacted version of the State's Vital Records Act expressly forbade them. *See* § 21(d), 1977 Tenn. Pub. Acts at 280.

[3]Last year, Tennessee codified a definition of "sex" applicable across its statutes. *See* Act of May 17, 2023, ch. 486, § 1, 2023 Tenn. Pub. Acts (codified at Tenn. Code Ann. § 1-3-105(c)) (defining "sex" as "a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth"). Appellants cite this statutory change, which appears to alter Tennessee's practice of allowing amendments to the sex marker on driver licenses, as evidence of animus against transgender individuals. The majority rejects this argument, observing that "it's the rare new law that retroactively establishes animus for a past law." Maj. Op. 15. However, this animus was evident long before the passage of the new statutory definition, as shown *supra* note 2.

Tennessee's treatment of individuals born with ambiguous genitalia and whose certificates state "unknown" or "undetermined"; the State permits these individuals to amend the sex marker on their certificates after the time of birth based on characteristics other than genitalia.

The inconsistency between transgender individuals' gender identity and sex as indicated on their birth certificates undermines the identification function of birth certificates. Transgender individuals who have taken steps to bring their bodies and lived experiences into alignment with their gender identities will often be correctly perceived by others as having their respective gender identities. But forcing a transgender individual to use a birth certificate indicating sex assigned at birth causes others to question whether the individual is indeed the person stated on the birth certificate.

This inconsistency also invites harm and discrimination. Transgender individuals' gender presentation often and unsurprisingly reflects their gender identity, so disclosing sex assigned at birth effectively discloses their transgender status. And that disclosure contributes to transgender individuals experiencing high rates of discrimination, harassment, and violence. Some surveys show that nearly one third of transgender individuals who have used identification documents inconsistent with gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted. *See* Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 89 (2016).

Tennessee's Policy stands as an outlier in our Nation. At least forty-three jurisdictions allow changes to the sex marker on birth certificates under varying circumstances. *See* Ala. Code § 22-9A-19(d); Alaska Stat. § 18.50.290;[4] Ariz. Rev. Stat. § 36-337(A)(3); Ark. Code Ann. § 20-18-307(d); Cal. Health & Safety Code § 103426; Colo. Rev. Stat. § 25-2-113.8; Conn. Gen. Stat. § 19a-42(i); 16 Del. Admin. Code § 4205-10.7; D.C. Code § 7-231.22; Ga. Code Ann. § 31-10-23(e); 10 Guam Code Ann. § 3222(e); Haw. Rev. Stat. § 338-17.7(a)(4); 410 Ill. Comp. Stat. 535/17(1)(e); Iowa Code § 144.23(3); Ky. Rev. Stat. Ann. § 213.121(5); La. Rev. Stat. Ann. § 40:62; Me. Stat. tit. 22, § 2705(5); Md. Code Ann., Health—General § 4-211(b), (f); Mass

---

[4]Although Alaska law does not expressly permit amendments to the sex marker on birth certificates, it appears that the state allows them as a matter of practice. *See Alaska Identity Documents*, Advocs. for Trans Equal., https://transequality.org/documents/alaska-identity-documents (last visited July 10, 2023).

Gen. Laws ch. 46, § 13(e); Mich. Comp. Laws § 333.2831(c); Minn. Stat. Ann. § 144.218; *Change a Birth Record*, Minn. Dep't of Health, https://www.health.state. mn.us/people/vitalrecords/change.html (July 1, 2024); 15-3 Miss. Code R. § 3.21.2; Mo. Rev. Stat. § 193.215(9); Neb. Rev. Stat. § 71-604.01; Nev. Admin. Code § 440.030; N.H. Rev. Stat. Ann. § 5-C:87(V); N.J. Stat. § 26:8-40.12; N.M. Stat. Ann. § 24-14-25(D); N.Y. Pub. Health Law § 4138(1)(f); N.C. Gen. Stat. § 130A-118(b)(4); N.D. Cent. Code § 23-02.1-25.1; N.D. Admin. Code 33-04-12-02; 1 N. Mar. I. § 26018(d); Or. Rev. Stat. § 432.235(3)(b); Pa. Dep't of Health, HD002292, *Request to Modify an Adult's Birth Record* 2 (2021); 216 R.I. Code R. § 10-10-1.37(E)(5); Tex. Health & Safety Code § 191.028; Tex. Dep't of State Health Servs., VS-170, *Correcting a Birth Certificate* 2 (2022); Utah Code Ann. § 26B-8-111(2)–(5); Vt. Stat. Ann. tit. 18, § 5112; Va. Code Ann. § 32.1-261(A)(5); Wash. Admin. Code § 246-490-075; W. Va. Health Stat. Ctr., W. Va. Dep't of Health & Hum. Res., *Procedure for Changing the Sex Listed on Your Birth Certificate* 1; Wis. Stat. § 69.15(1); 59-10 Wyo. Code R. § 4.

Courts have ruled that three other jurisdictions must allow such changes. *See F.V. v. Jeppesen*, 477 F. Supp. 3d 1144, 1149–51 (D. Idaho 2020); Bureau of Vital Recs. & Health Stat., Idaho Dep't of Health & Welfare, *Instructions to Change the Indicator of Sex on an Idaho Birth Certificate to Reflect Gender Identity* 1 (2023); *Ray v. McCloud*, 507 F. Supp. 3d 925, 928–29 (S.D. Ohio 2020); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 334–35 (D.P.R. 2018). And another circuit court has upheld the plausibility of claims challenging enforcement of one other jurisdiction's policy prohibiting sex-marker amendments. *See Fowler v. Stitt*, 104 F.4th 770, 774–75 (10th Cir. 2024) (Oklahoma).

## B.

Appellants Kayla Gore, Jaime Combs, L.G., and K.N. are transgender women. All were born in Tennessee and were issued Tennessee birth certificates indicating that their sex was male. And all have alleged they suffer from Tennessee's prohibiting them from changing the sex marker on their birth certificates to align with their gender identity.

Gore is a community advocate and was born and lives in Memphis. Although she was assigned the sex of male at birth, she knew that she was a girl since she was a child. She began

to wear feminine clothes and makeup but was discouraged from expressing her feminine identity, so she stopped. In her twenties, Gore felt freer to restart expressing her feminine identity. She was living openly as a woman by 2012 and was perceived by the public and her community as such. She has undergone gender-affirming medical care to bring her body and appearance into alignment with her identity, and she has changed her name and gender marker on her Tennessee identification card, voter registration card, and Social Security record. But she has been outed as transgender and subjected to awkward, personal, and invasive questions regarding her transition and transgender status on several occasions when having to present her birth certificate to secure employment. She has felt dissuaded from pursuing some employment opportunities because of those experiences.

Combs is a retired cosmetologist, was born in Elizabethtown, and now resides in Nashville. She knew that she was a girl as young as five years old and began living openly as female when she was an adult. Around 1996, Combs legally changed her given name from the traditionally male name she received at birth to the traditionally female name she currently uses. In 1999, after consulting with medical and mental-health professionals, she underwent gender-affirming treatment, including surgery, to align her body and appearance with her gender identity. She also changed the gender marker on her driver license, passport, and Social Security record. When applying for a passport in 2013, however, she was forced to submit documentation from a gynecologist showing the results of a physical examination because of the discrepancy between the sex markers on her birth certificate and driver license. Further, she signed uncontested papers allowing her husband to retain control of their joint assets when divorcing because she was told that Tennessee would not recognize her marriage, given that the State did not recognize same-sex unions at the time, and was threatened with being outed as transgender.

L.G. was born in Tennessee and now lives in Kentucky. She, too, identified as female from a young age. She first tried to live openly as female in high school but faced blowback from her community and attempted suicide. However, by age twenty-four, she knew she had to be true to herself and began openly identifying as female again. She began to transition socially to female and underwent gender-affirming care. She also legally changed her name. On one occasion, she had to present her birth certificate as identification at a doctor's office and was

subjected to harassment by a staff member for the disparity between her sex assigned at birth and her gender identity and expression. On another occasion, after a driver rear-ended her vehicle, the police officer responding to the scene examined her driver license and said that there was "an issue with [her] ID—the gender is wrong." R. 59, PID 401. And when later updating the marker on her license, Tennessee Department of Safety staff made demeaning and embarrassing comments about her transgender status and disregarded Department policies allowing such amendments. It took multiple attempts over years to update the marker.

K.N. was born in Tennessee and now lives in California. From an early age, she struggled with others perceiving her as a boy. She identified as more feminine and presented that way. Eventually, she came out as transgender to her family and friends—but not publicly—and began to transition socially and undergo gender-affirming care. As a result, the public and her community also perceive her as a woman. She updated several identification documents to reflect her gender identity, such as her passport and Social Security records. Still, K.N. had to present her birth certificate and passport when updating the marker on her driver license, leading to invasive and unnecessary questions about the inconsistency between the sex listed on the two.

## C.

On April 23, 2019, Appellants Gore, L.G., and K.N. brought claims under 42 U.S.C. § 1983 against the Governor of Tennessee and the Commissioner of the Tennessee Department of Health in their official capacities (Tennessee). Appellants later filed an amended complaint adding Combs. They alleged that the Policy constitutes discrimination based on sex and transgender status in violation of the Equal Protection Clause and amounts to disclosure of private information in violation of the Due Process Clause, seeking injunctive and declaratory relief against its enforcement.[5] Appellants moved for summary judgment under Federal Rule of Civil Procedure 56 on their claims against Tennessee, and Tennessee moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

---

[5]Appellants also asserted violations of their substantive-due-process rights to autonomy and to define and express their gender identity, as well as their First Amendment right against compelled speech. They further requested relief regarding Tennessee's laws, regulations, and policies requiring strikethroughs showing amendments to birth certificates. Appellants do not raise these issues in the instant appeal.

The district court granted Tennessee's motion.  It first determined that Appellants' equal-protection claims rested on the notion "that the birth certificate's sex designation for a transgender person is 'incorrect.'"  R. 110, PID 2614.  But it concluded that "sex" refers only to "a medical determination about the baby's external genitalia at the time of birth."  *Id.* at PID 2617.  Thus, Appellants did not show that their birth certificates were, in fact, incorrect, and they did not plausibly allege equal-protection violations.  The court next ruled that Appellants did not adequately allege informational-privacy claims, rejecting their assertion that transgender status was constitutionally protected from disclosure due to a substantial risk of bodily harm or such status being sexual, personal, and humiliating in nature.  It further reasoned that the State was not responsible for any purported disclosure because transgender status depends on a person's sex assigned at birth and gender identity and a birth certificate does not disclose gender identity, an internal sense of one's identity.

The district court entered final judgment the same day it granted Tennessee's motion.  Appellants timely appealed.

## II.

This court reviews de novo a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *See Lipman v. Budish*, 974 F.3d 726, 740 (6th Cir. 2020).  "[W]e construe the complaint in the light most favorable to the plaintiff, accept [the] allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  "Against that backdrop, we ask whether the complaint 'contain[s] sufficient factual matter . . . to "state a claim to relief that is plausible on its face."'"  *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "The defendant has the burden of showing that the plaintiff has failed to state a claim for relief."  *Treesh*, 487 F.3d at 476.

## III.

"There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination."  *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973) (plurality opinion).  "Today's skeptical scrutiny of official action denying rights or opportunities based on sex

responds to [that] history," *United State v. Virginia* (*VMI*), 518 U.S. 515, 531 (1996), when our law was "rife with overbroad generalizations about the way men and women are," *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017). To survive judicial review under what is now known as "intermediate scrutiny," *Clark v. Jeter*, 486 U.S. 456, 461 (1988), the government "carr[ies] the burden of showing an 'exceedingly persuasive justification' for [any] classification" based on sex. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461 (1981)). "The burden is met only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Id.* (quoting *Wengler v. Druggists Mutual Ins. Co.*, 446 U.S. 142, 150 (1980)).

Contrary to the majority, I conclude that the Policy violates the Equal Protection Clause. The Policy accords disparate treatment based on sex, thus triggering heightened scrutiny, and Tennessee does not proffer an exceedingly persuasive justification for that treatment.[6]

## A.

If a State "provides that different treatment be accorded to [individuals] on the basis of their sex," it necessarily "establishes a classification subject to scrutiny under the Equal Protection Clause." *Reed v. Reed*, 404 U.S. 71, 75 (1971). Disparate treatment exists if reference to a person's sex is needed to determine whether some activity is permitted or prohibited. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982) (noting that a law is not "facially unrelated to race" because it "dealt in explicitly racial terms").

The Policy plainly classifies individuals based on sex. By its literal terms, the State's willingness to issue an amended birth certificate calling a person "male" or "female" hinges on a person's genitalia at birth. And conditioning government action on anatomical features associated with males or females amounts to a sex-based classification, pure and simple. *See VMI*, 518 U.S. at 533 (noting "[p]hysical differences between men and women" in explaining the "heightened review" applicable to sex-based classifications); *Adams ex rel. Kasper v. Sch. Bd.*,

---

[6]Appellants further argue that the Policy discriminates based on transgender status in violation of the Equal Protection Clause. Because the Policy violates equal-protection principles as a sex-based classification, I do not reach that issue.

57 F.4th 791, 801 (11th Cir. 2022) (en banc) ("The School Board's bathroom policy requires 'biological boys' and 'biological girls'—in reference to their sex determined at birth—to use either bathrooms that correspond to their biological sex or sex-neutral bathrooms. This is a sex-based classification."); *A.C. ex rel. M.C. v. Metro. Sch. Dist.*, 75 F.4th 760, 772 (7th Cir. 2023) (similar).

What is more, the Policy rests on stereotypical notions about what it means to be truly "male" and "female." Heightened scrutiny applies to such government action predicated on "typically male or typically female 'tendencies,'" *VMI*, 518 U.S. at 541 (citation omitted), and "generalizations about the way men and women are," *Morales-Santana*, 582 U.S. at 57. The Policy is predicated on just that: If a person does not conform to the State's assumptions on the anatomical features that women do or should have at birth, the Policy dictates that the State deny an amended certificate with a "female" marker. The same applies for men and the State's assumptions on maleness. This court must, therefore, "take a 'hard look' at" the Policy, *VMI*, 518 U.S. at 541.

## B.

The majority looks past the fact that the Policy classifies people as male and female in deciding whether individuals may receive amended birth certificates indicating one sex or another and concludes that the Policy need not undergo intermediate scrutiny.

The majority begins by asserting that "[t]he policy treats the sexes equally." Maj. Op. 8. It "does not impose any special restraints on, and does not provide any special benefits to, applicants due to their sex. It does not impose 'one rule for' males and 'another for' females. Nor does it prefer one sex over another when individuals try to amend their birth certificates." *Id.* (citation omitted). "When a law does not ascribe different benefits and burdens to the sexes," the majority reasons, "that law does not discriminate based on sex, even if sex 'factors into' the law's application." *Id.* at 8–9 (quoting *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023), *cert. granted*, No. 23-477, 2024 WL 3089532 (June 24, 2024)). And the Policy, the majority continues, "does not attach any significance to the biological sex of the applicant," even

though the State's practices concerning original birth certificates, not at issue in this case, might. *Id.* at 8.

The majority's reference to "biological sex" is unclear,[7] as Appellants allege that gender identity has biological underpinnings. Regardless, Tennessee attaches controlling significance to determinations of sex based on external genitalia at birth under the Policy and accordingly prescribes different rules for, and affords different benefits to, males and females. Individuals born with female-appearing genitalia can ask the State to amend their birth certificate to indicate "female" but not "male," and vice versa for individuals born with male-appearing genitalia. Tennessee's proffered justifications for the Policy, like defending the interests of "biological women" in sex-separated athletics and restrooms, illustrate how the content of birth certificates' sex markers carries downstream effects and thus further belie the majority's contention that the Policy results in no differential benefits or burdens based on sex. And the State attaches other consequences to sex indicated on a birth certificate—for instance, protections under the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-102(20) ("'Sex' means and refers only to the designation of an individual person as male or female as indicated on the individual's birth certificate."), and "the designation of a person's sex . . . on police booking sheets, warrants, and other court records," *Changing Sex Designation on Certain Government Records*, Tenn. Op. Att'y Gen. No. 14-70, 2014 WL 3700672, at *1 (2014).

Nor is the majority's reasoning—that the distribution of benefits and burdens is determinative—on solid legal footing. "In *Brown v. Board of Education*, 347 U.S. 483 (1954) (*Brown I*), [the Supreme Court] held that segregation deprived black children of equal educational opportunities regardless of whether school facilities and other tangible factors were equal, because government classification and separation on grounds of race themselves denoted inferiority." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 746 (2007). "It was not the inequality of the facilities but the fact of legally separating children on the basis of race on which the Court relied to find a constitutional violation in 1954." *Id.*

---

[7]*See* Hembree et al., *supra* note 1, at 3875 tbl. 1 ("As [the physical aspects of maleness and femaleness] may not be in line with each other (*e.g.*, a person with XY chromosomes may have female-appearing genitalia), the terms biological sex and biological male or female are imprecise and should be avoided.").

The same principle holds true for discrimination based on sex or gender: Our "long and unfortunate history of sex discrimination" requires applying "heightened scrutiny" to "*all* gender-based classifications today." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994) (emphasis added) (quoting *Frontiero*, 411 U.S. at 684). Thus, for example, "[s]triking individual jurors on the assumption that they hold particular views simply because of their gender is 'practically a brand upon them, affixed by the law, an assertion of their inferiority.'" *Id.* at 142 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1880)). "It denigrates the dignity of the excluded juror . . . ." *Id.* And "[t]he message it sends to all those in the courtroom, and all those who may later learn of the discriminatory act, is that certain individuals, for no reason other than gender, are presumed unqualified by state actors to decide important questions upon which reasonable persons could disagree." *Id.*; *see United States v. Windsor*, 570 U.S. 744, 772 (2013) ("[The Defense of Marriage Act] tells [same-sex] couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition. . . . The differentiation demeans the couple . . . . And it humiliates tens of thousands of children now being raised by same-sex couples."); *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (noting that criminalizing same-sex physical intimacy imposes "stigma" and "demeans the lives of homosexual persons").

Here, Tennessee assumes that individuals are male and female based solely on genitalia at birth. The State manifests its judgments about maleness and femaleness indelibly in documents so critical to modern society that they constitute a form of "legal personhood," Pearson, *supra*, at 3. In so doing, the State denigrates those who do not conform to societal assumptions about what it means to be male or female, like transgender individuals, conveying that they are somehow less male or female because of the accidents of their birth—that no matter what, in the eyes of the State, their genitalia at birth alone determine their identities forevermore.

Further, to the extent the majority reasons that the Policy applies to all people, males and females, such reasoning is misplaced. That governmental action discriminates against all people based on sex does not change the fact that governmental action discriminates based on sex. As I have previously noted, this "equal application" principle was once in constitutional vogue but has since been excised from our law through cases like *Loving v. Virginia*, 388 U.S. 1, 8 (1967) (anti-miscegenation statute), *Powers v. Ohio*, 499 U.S. 400, 410 (1991) (race-based peremptory

strikes), *J.E.B.*, 511 U.S. at 146 (sex-based peremptory strikes), and *Johnson v. California*, 543 U.S. 499, 506 (2005) (temporary race-based prison segregation). *See L.W.*, 83 F.4th at 500–01 (White, J., dissenting); *see also Fowler*, 104 F.4th at 792 ("[W]e are unpersuaded by the argument that the Policy is not sex-based discrimination if it applies equally to all sexes."); *Kadell v. Folwell*, 100 F.4th 122, 147–48 (4th Cir. 2024) (similar).

The majority then construes Appellants' argument to be that the "Constitution requires Tennessee to use 'sex' to refer to gender identity on all state documents." Maj. Op. 10. But, the majority reasons, Tennessee "may decide how to use the word 'sex' in government documents, and it may decide what facts to record in a government-owned record—'to say what it wishes' in its records." *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)). "Governments 'naturally choose[] what to say and what not to say. That must be true for government to work.'" *Id.* (alteration in original) (quoting *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022)). "The same holds true for amendments to state birth certificate records," the majority concludes. *Id.* at 11. Tennessee "may decide to maintain that record as is, even in the face of requests to change 'sex' to mean 'gender identity,'" and "the Constitution does not require the States to embrace [Appellants'] view of what information a birth certificate must record." *Id.*

This reasoning rests on the government-speech doctrine, which holds that "[t]he Free Speech Clause restricts government regulation of private speech" but "does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). In short, when the government is the speaker, "[i]t is entitled to say what it wishes and to select the views that it wants to express." *Id.* at 467–68 (cleaned up).

Yet a birth certificate is not simply government speech. It is also a benefit—one that the State can effectively deny a person through underinclusive, misleading, or demeaning contents. When holding that same-sex couples were entitled to marry under the Equal Protection and Due Process Clauses, *Obergefell v. Hodges*, 576 U.S. 644 (2015), noted "birth and death certificates" in the "list of governmental rights, benefits, and responsibilities" that States had withheld from them. *Id.* at 670. And *Pavan v. Smith*, 582 U.S. 563 (2017) (per curiam), held that Arkansas's refusal to "issue birth certificates including the female spouses of women who give birth"

constituted "differential treatment infring[ing] *Obergefell*'s commitment to provide same-sex couples 'the constellation of benefits that the States have linked to marriage.'" *Id.* at 564 (quoting 576 U.S. at 670). State law provided that "when a married woman . . . conceives a child by means of artificial insemination, the State will—indeed, *must*—list the name of her male spouse on the child's birth certificate," but "in those very same circumstances," the State "omit[ted] a married woman's female spouse from her child's birth certificate." *Id.* at 566. "As a result, same-sex parents . . . lack[ed] the same right as opposite-sex parents to be listed on a child's birth certificate, a document often used for important transactions like making medical decisions for a child or enrolling a child in school." *Id.* Thus, the State "chose[] to make its birth certificates more than a mere marker of biological relationships: The State use[d] those certificates to give married parents a form of legal recognition that [was] not available to unmarried parents." *Id.* at 567.

Tennessee's birth certificates are no different. Its birth certificates serve a critical identification function, and its laws tie birth certificates to any number of rights and opportunities, *see, e.g.*, Tenn. Code Ann. §§ 49-6-5106, 50-1-703(a)(1)(A)(iii), (B)(i), 55-50-321(a)(1), -336(a); Tenn. Comp. R. & Regs. 0480-01-.05(6), 0880-02-.03(6), 1180-02-.03(5), 1340-01-13-.11, 1370-01-.05(2), 1660-01-28-.11(2), 1730-01-.05(1)(i), (2)(h). Just as Arkansas denied same-sex parents legal recognition and the benefits tied to birth certificates through the content listed on their children's birth certificates, so, too, does Tennessee deny legal recognition and all the concomitant benefits under State law through its birth certificates' content.

We should also pause to consider the consequences of injecting the government-speech doctrine into equal-protection jurisprudence. The majority identifies no Supreme Court case holding that the doctrine limits the Equal Protection Clause. Several courts and jurists have suggested it might not. *See Summum*, 555 U.S. at 468 (noting that the doctrine "does not mean that there are no restraints on government speech"); *id.* at 482 (Stevens, J., concurring) ("[G]overnment speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses."); *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 331 n.9 (1st Cir. 2009) (noting that the Equal Protection Clause may limit government speech); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir.

2005) (similar).  For good reason:  The doctrine "is susceptible to dangerous misuse," and "we must exercise great caution before extending . . . government-speech precedents."  *Matal v. Tam*, 582 U.S. 218, 235 (2017).  And our country's history illustrates how the contents of birth certificates can create and perpetuate injustices.  *See Sunseri v. Cassagne*, 196 So. 7, 9 (La. 1940) (upholding annulment of marriage under anti-miscegenation statute based, in part, on a birth certificate indicating that one spouse was "colored" despite contrary evidence); Pearson, *supra*, at 189–221 (discussing historical role of birth certificates in "administering the racial state" during the Jim Crow era); *cf. id.* at 289 (noting that States' "bathroom bills . . . share a history with the efforts of [registrars of vital records during the Jim Crow era] who believed that birth certificates could be used to fix and accurately represent the biological truth of race").

## C.

Because the Policy accords disparate treatment based on sex, it is constitutional only if it survives intermediate scrutiny.  Under that standard, the government must come forward with an "exceedingly persuasive" justification.  *VMI*, 518 U.S. at 533.  It satisfies its burden "only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'"  *Hogan*, 458 U.S. at 724 (quoting *Wengler*, 446 U.S. at 150).  "If the State's objective is legitimate and important," the government must then show "the requisite direct, substantial relationship between objective and means."  *Id.* at 725.  "The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women."  *Id.* at 725–26.

Here, Tennessee proffers several justifications for the Policy:  (1) the accuracy and integrity of birth certificates; (2) public health; (3) administrative and auditing functions; and (4) the interests of "biological women."  Appellees Br. 31–34.  None withstands scrutiny.

To start, the Policy is insufficiently tailored to the purported interest in the accuracy and integrity of vital records.  Tennessee allows other amendments to birth certificates based on events occurring after birth.  It allows a person to update a birth certificate upon a name change.

*See* Tenn. Comp. R. & Regs. 1200-07-01-.10(2)(a)(7).  It allows adoptive parents to substitute their names for those of birth parents.  *See id.* 1200-07-01-.04.  And it allows a person to change the sex marker if the person was born with ambiguous external genitalia.  All such changes alter birth-certificate entries that were historically accurate when made based on subsequent events.  Such substantial underinclusivity shows that the Policy lacks the adequate means-ends fit.  *See Fowler*, 104 F.4th at 795–96 (noting that "Oklahoma allows amendments to other seemingly immutable facts—like birth parents"—in concluding that the State's prohibition on amending the sex marker on birth certificates was not rationally related to an asserted interest in the accuracy of vital records).

The Policy also embodies a "gratuitous" sex-based classification, *Weinberger v. Wiesenfeld*, 420 U.S. 636, 653 (1975); *see Morales-Santana*, 582 U.S. at 63 n.13 ("[O]ur decisions reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn.").  When "the State's [proffered] purposes are as well served by a gender-neutral classification as one that gender classifies . . . , the State cannot be permitted to classify on the basis of sex."  *Orr. v. Orr*, 440 U.S. 268, 283 (1979).  The State keeps its own records of sex assigned at birth.  Why it must also force transgender individuals to hold and use birth certificates reflecting their sex assigned at birth rather than their gender identity—the critical determinant of sex, Appellants allege—is far from clear.  *See Fowler*, 104 F.4th at 795 ("[Oklahoma's interest in the accuracy of its vital records] is not rationally related to the Policy because even if transgender people amend the sex listed on their birth certificates, Oklahoma retains and has access to original birth certificates.").

Tennessee's asserted interest in aiding the public health of the State fares no better.  The State claims that information on sex assigned at birth furthers public health and research capabilities, like statistical studies related to maternal health, public-health surveillance, and local health planning.  Again, the State retains its own records of original birth certificates and subsequent alterations.  Its unwillingness to alter the sex marker on birth certificates in the possession of transgender individuals does not further that interest and entails a gratuitous classification based on sex.

Nor does any interest in administrative and auditing functions justify the Policy. Tennessee asserts that the sex designation on a birth certificate is routinely used in matching records across various State agencies, and it further asserts that the stability and low miscoding rate of the sex marker assists in that matching.  But the State cites nothing in the record to substantiate this justification.  The argument also fails on its own terms because the marker is not as stable as Tennessee makes it seem.  The State permits individuals to amend the sex marker on their birth certificate if the marker does not accurately reflect their external genitalia at birth.  It also permits individuals born with ambiguous genitalia to amend their birth certificate's sex marker.  And regardless, "administrative convenience" is an "inadequate justification[] for gender-based classifications."  *Califano v. Goldfarb*, 430 U.S. 199, 211 n.9 (1977) (plurality opinion).

Finally, Tennessee cannot justify the Policy on the grounds that it facilitates a reliable and non-invasive way to verify a person's sex, thus protecting "women's interests" in sex-separated athletics and restrooms.  The State did not raise this argument below.  *See Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 528 (6th Cir. 2014).  It does not point to anything suggesting that this concern actually motivated the Policy, and justifications "invented *post hoc* in response to litigation" do not suffice, *VMI*, 518 U.S. at 533.  Further, permanently classifying every person born in the State to enable sex separation in the subset of environments where it is required is substantially overbroad, *see Morales-Santana*, 582 U.S. at 63 n.13.  Even if information concerning sex assigned at birth were required to fulfill this asserted purpose, the State could ascertain such information by reviewing its own original records, *see Fowler*, 104 F.4th at 796.

## IV.

"The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint.  The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) (citations omitted).  Although the Court has been "reluctant" to recognize new rights, *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992), it has acknowledged a limited privacy right involving "at least two different kinds of

interests," *Whalen v. Roe*, 429 U.S. 589, 598–600 (1977). The first concerns "independence in making certain kinds of important decisions." *Id.* at 599–600. The second—at issue here— concerns "disclosure of personal matters." *Id.* at 599; *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977). This interest, we have held, "does not encompass a general right to nondisclosure of private information." *J.P. v. DeSanti*, 653 F.2d 1080, 1090 (6th Cir. 1981). Rather, the disclosure must be "of [a] constitutional dimension"—that is, the disclosure must implicate a fundamental right. *Id.* at 1090–91. The State bears the burden of showing that interference with a protected privacy right survives strict scrutiny, which demands narrow tailoring toward a compelling governmental interest. *See Reno v. Flores*, 507 U.S. 292, 302 (1993).

Unlike the majority, I conclude that the Policy effectively discloses transgender status and thus implicates fundamental interests in bodily integrity and private sexual matters. And since Tennessee fails to show that the Policy withstands intermediate scrutiny, the Policy by force does not survive strict scrutiny.

## A.

"The Due Process Clause . . . was intended to give Americans at least the protection against governmental power that they had enjoyed as Englishmen against the power of the Crown." *Ingraham v. Wright*, 430 U.S. 651, 672–73 (1977). Its protection of liberty "include[s] the right 'generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.'" *Id.* at 673 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). "Among the historic liberties so protected was a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security." *Id.* "This common law right is first among equals," *Guertin v. Michigan*, 912 F.3d 907, 918 (6th Cir. 2019), and "bears an impressive constitutional pedigree," *Doe v. Claiborne County ex rel. Claiborne Cnty. Bd. of Ed.*, 103 F.3d 495, 506 (6th Cir. 1996). "No right is held more sacred, or is more carefully guarded by the common law," the Supreme Court remarked in the nineteenth century, "than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

Drawing from this deep pedigree, this court held in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), that an individual has a right against the State's disclosure of private information that jeopardizes personal security and bodily integrity. *See id.* at 1062. There, undercover officers sought to stop the City of Columbus, Ohio, from revealing their identities to attorneys for gang members during whose criminal case the officers had testified. *See id.* at 1062–63. Given the gang's "propensity for violence and intimidation, the district court found that the City's release of the [officers'] addresses, phone numbers, and driver's licenses to defense counsel in the [criminal] case, as well as their family members' [information], created a serious risk to" the officers' and their relatives' safety. *Id.* at 1063. We agreed:

> We see no reason to doubt that where disclosure of this personal information may fall into the hands of persons likely to seek revenge upon the officers for their involvement in the [criminal] case, the City created a very real threat to the officers' and their family members' personal security and bodily integrity, and possibly their lives.

*Id.*

Not "every governmental act which intrudes upon or threatens to intrude upon an individual's body invokes the Fourteenth Amendment," we noted. *Id.* at 1064. But the circumstances of that case "reache[d] a level of significance sufficient to invoke strict scrutiny as an invasion of personhood." *Id.* (quoting Laurence H. Tribe, *American Constitutional Law* 1333 (2d ed. 1988)).

The privacy right recognized in *Kallstrom* is not limited to its facts. In *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County*, 274 F.3d 377 (6th Cir. 2001), we considered a free-speech challenge to a municipal ordinance imposing a licensing scheme for adult-entertainment businesses, including provisions requiring that applicants disclose to the municipality their names, heights, weights, eye colors, dates of birth, and current and past residential addresses. *See id.* at 393. The challengers argued that these disclosure provisions "pose[d] more than an incidental burden on First Amendment activities" "because under the Tennessee Open Records Act, members of the public with illicit motives [could] easily obtain the [challengers'] personal information," thereby creating "the threat of public exposure and possible violence." *Id.* at 394. We noted that one plaintiff had testified that "entertainers in

the past have been stalked, harassed, and injured by customers," adult dancers often used fake names and had unpublished addresses and telephone numbers to minimize the risk of harassment, and local organizations had taken strong stances against the kind of erotic speech that she engaged in. *Id.* at 394–95. We thus rejected the challengers' argument by concluding that *Kallstrom* shielded the challengers' information from disclosure by the municipality. *See id.*

Applying *Kallstrom* and *Deja Vu* here, Appellants adequately alleged risks to their personal security and bodily integrity. They alleged specific incidents when they suffered harm from presenting identification documents indicating their sex assigned at birth. They further alleged that transgender individuals suffer widespread discrimination, harassment, and violence when presenting such documents and cite a survey indicating as much. *See* James et al., *supra*, at 89. Nor is there any "denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034, 1051 (7th Cir. 2017). They "frequently experience harassment in places such as schools," "medical settings," and "retail stores," "experience physical assault in" schools and places of public accommodation, and "are more likely to be the victim of violent crimes." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 612 (4th Cir. 2020). And "[i]t is similarly obvious that an individual who reveals that she is a trans[gender] 'potentially exposes herself . . . to discrimination and intolerance.'" *Powell v. Schriver*, 175 F.3d 107, 111–12 (2nd Cir. 1999) (third alteration in original) (quoting *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994)); *cf. Williams v. Kincaid*, 45 F.4th 759, 778–79 (4th Cir. 2022) (concluding that an inmate's transgender status "increase[d] the risk that she will suffer violence" in gross-negligence claim against a sheriff for housing policy based solely on genitalia).

## B.

Due process further protects "certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell*, 576 U.S. at 663. These include "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Paul v. Davis*, 424 U.S. 693, 713 (1976). Also included are certain "sexual choices." *Windsor*, 570 U.S. at 772. "[L]iberty gives substantial

protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex," the Court noted in striking down a statute criminalizing same-sex physical intimacy. *Lawrence*, 539 U.S. at 572. The Equal Protection Clause relatedly requires scrutiny of disparate treatment based on nonconformity with gender generalizations. *See J.E.B.*, 511 U.S. at 138 (invalidating peremptory strikes based on presumption that jurors' views corresponded to their sex because they embody "the very stereotype the law condemns" (quoting *Powers*, 499 U.S. at 410)). In discussing the Fourth Amendment concerns of cell-phone searches, moreover, the Court has noted that some information, including on one's "romantic life" and "sexual associations," is "qualitatively different." *Riley v. California*, 573 U.S. 373, 395–96 (2014) (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)). And courts have recognized a privacy right in particular "information about one's body." *Hancock v. County of Rensselaer*, 882 F.3d 58, 65 (2d Cir. 2018) (collecting cases).

In this vein, we held in *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), that an individual has a right against disclosure of certain information concerning personal sexual matters. *See id.* at 685–86. At issue was a sheriff "holding a press conference to release the confidential and highly personal details of [a person's] rape by an unknown assailant." *Id.* at 676. Noting the "historic social stigma" against survivors of sexual violence and the "tradition of 'blaming the victim,'" we stated that "[r]eleasing the intimate details of rape . . . not only dissect[s] a particularly painful sexual experience, but often . . . subject[s] a victim to criticism and scrutiny concerning her sexuality and personal choices regarding sex." *Id.* at 685. "Our sexuality and choices about sex," we continued, "are interests of an intimate nature which define significant portions of our personhood." *Id.* And revealing this information "exposes an aspect of our lives that we regard as highly personal and private." *Id.* "[A] number of our sister circuits" had held "that information regarding private sexual matters warrants constitutional protection against public dissemination," *id.*, on topics ranging from "one's body and state of health" as indicated in "medical records," *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980), to past pregnancies and abortions, *see Thorne v. City of El Segundo*, 726 F.2d 459, 468–70 (9th Cir. 1983). We thus held that the sheriff's disclosure violated the plaintiff's privacy right. *See* 156 F.3d at 685–86.

Transgender status falls neatly within the ambit of *Bloch*. The incongruence between sex assigned at birth and gender identity constitutes a matter of "sexuality," *id.* at 685—as that term is conventionally defined, *see Sexuality*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sexuality (last visited July 10, 2024) ("the quality or state of being sexual"; "the condition of having sex"), and as we have used the term in related contexts, *see, e.g.*, *Barnes v. City of Cincinnati*, 401 F.3d 729, 737–38 (6th Cir. 2005); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 580 (6th Cir. 2018), *aff'd sub. nom. Bostock v. Clayton County*, 590 U.S. 644 (2020). Transgender status also is a "personal" and "private sexual matter[]," "an aspect of [one's life] that we regard as highly personal and private," that "define[s] [a] significant portion[] of [one's] personhood," 156 F.3d at 685. Indeed, as the Second Circuit has observed in recognizing a right against disclosure, transgender status "is the unusual condition that is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." *Powell*, 175 F.3d at 111. "The excrutiatingly [sic] private and intimate nature of trans[gender] [status], for persons who wish to preserve privacy in the matter, is really beyond debate." *Id.* (collecting cases).

## C.

The majority sees the rights recognized in *Kallstrom* and *Bloch* differently, concluding that Appellants fail to state claims under either theory of informational privacy.[8]

Starting with *Kallstrom*, the majority concludes that Appellants "have not alleged a substantial risk of bodily harm from Tennessee's amendment policy." Maj. Op. 21. The survey involving transgender individuals' identification documents that Appellants referenced in the complaint, coupled with their awareness of prevalent anti-transgender violence, the majority says, are "generalized risks" that "fall well short of the substantial, direct, and individualized risk of bodily harm or death" required under *Kallstrom*. *Id.*

---

[8]The majority also concludes that "[t]he right to a birth certificate conforming to one's gender identity is not 'deeply rooted' in our history and 'implicit in the concept of ordered liberty.'" Maj. Op. 17. Courts look to these features to determine whether they should newly recognize a fundamental right. *See Glucksberg*, 521 U.S. at 720–21. But Appellants do not urge us to recognize a heretofore unrecognized right. They argue only that their claims fall within the scope of the privacy interests we have already recognized in *Kallstrom* and *Bloch*.

The majority takes a myopic view of Appellants allegations.  Appellants also alleged specific incidents involving identification documents when they personally experienced harassment and discrimination because of their transgender status.  Although these incidents did not involve violence or explicit threats thereof, they foreshadowed greater risks to their bodily integrity.  Especially because we must view the allegations in the light most favorable to Appellants, we should consider the allegations in the context of the unmistakable and heightened risks of discrimination, harassment, and violence that transgender individuals face in our society, *see Whitaker*, 858 F.3d at 1051; *Grimm*, 972 F.3d at 612.  And again, as the Second Circuit has concluded, disclosing transgender status "obvious[ly]" exposes the person "to discrimination and intolerance."  *Powell*, 175 F.3d at 111–12 (quoting *Doe v. City of New York*, 15 F.3d at 267).

The majority further frames *Kallstrom* to require more than it does.  Our holding was premised on "a *perceived* likely threat" from the disclosure of the officers' personal information.  136 F.3d at 1064 (emphasis added).  The information at issue there was not even disclosed directly to the violent gang members, only their attorneys.  *See id.* at 1059, 1063–64.  And we cited no evidence that the gang members actually inflicted or even threatened violence against the officers or their relatives.  The only observations we noted to substantiate the risks were "generalized," Maj. Op. 21—the gang's "propensity for violence and intimidation" and "likely [desire] to seek revenge," 136 F.3d at 1063.  Our subsequent decision in *Deja Vu* "largely t[ook] the hint" about what *Kallstrom* requires, too, *L.W.*, 83 F.4th at 486.  In discussing the evidence supporting the right against disclosure of information on applications for adult-entertainment business licenses, we noted only general fears and general risks.  *See* 274 F.3d at 394–95.  There was no clear indication that the plaintiffs had themselves experienced any violence, harassment, or threats.

We also must not forget the procedural posture of this case.  The district court dismissed Appellants' claims on a Rule 12(b)(6) motion to dismiss.  *Kallstrom*, in contrast, was an appeal from the denial of a motion for preliminary and permanent injunctions and judgment dismissing the claims.  *See* 136 F.3d at 1059–60.  *Deja Vu* likewise was an appeal from several motions for preliminary injunctions.  *See* 274 F.3d at 385–87.  The standard in the procedural posture of those cases is much more demanding than the standard applicable here.  *Compare Peatross v.*

*City of Memphis*, 818 F.3d 233, 245 n.7 (6th Cir. 2016) ("The standard for surviving a motion to dismiss is less stringent that the standard for surviving summary judgment."), *with Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) ("[T]he proof required . . . to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion . . . ."). It is only to be expected that our decisions in appeals from injunctions could and would discuss the risks of disclosure to plaintiffs in more granular terms than in an appeal from the grant of a motion to dismiss.

Turning to *Bloch*, the majority concludes that the disclosure at issue here "does not remotely compare to the government's gratuitous disclosure of the details of a rape at a press conference." Maj. Op. 22. "Any disclosure," it continues, "is limited, and it is highly regulated." *Id.* Even accepting that these are valid distinctions, they bear on whether the government's disclosure survives scrutiny and say nothing about whether disclosure is of a constitutional dimension.

As to both the *Kallstrom* and *Bloch* theories, the majority concludes that Tennessee does not itself disclose anything—"[w]hile Tennessee allows the individuals themselves to disclose the information in birth certificates, that does not show that the State does so," *id* at 19. It further concludes that, even if some disclosure occurs, it is not of transgender status. That status depends on sex assigned at birth and gender identity—the "'core internal sense' of one's gender"—and a birth certificate at most reveals the former but not the latter. *Id.* at 20 (quoting R. 59, PID 381).

The majority's reasoning runs afoul of the unconstitutional-conditions doctrine. This doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). Put differently, "[e]ven though government is under no obligation to provide a person, or the public, a particular benefit, it does not follow that conferral of the benefit may be conditioned on the surrender of a constitutional right." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996). So the government cannot condition even a discretionary benefit "to produce a result which it could not command directly." *Oil States Energy Servs., LLC v.*

*Greene's Energy Grp., LLC*, 584 U.S. 325, 342 n.4 (2018) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

The first conclusion—that Tennessee cannot be responsible for any disclosure when individuals present their birth certificates—ignores that the State imposes a condition on reaping the benefits of birth certificates. The State allows individuals to use birth certificates for a number of purposes—to verify identity, citizenship, eligibility for employment, and so on. Tennessee could not directly effectuate the disclosure of private information it deems necessary on birth certificates—by mandating, for example, that transgender individuals shout their sex assigned at birth from the rooftops—and it cannot effectuate the same disclosure indirectly by conditioning its birth certificates' benefits on the surrender of privacy rights, *see Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 67 F.4th 816, 823–24 (6th Cir. 2023).[9]

The second conclusion—that Tennessee does not disclose transgender status—is unpersuasive for similar reasons. Although the majority notes that gender identity is innate and internal, it ignores gender expression, which is simply the external manifestations of gender identity and, therefore, definitionally apparent to society, *see Gender Expression*, Merriam-Webster, https://www.merriam-webster.com/dictionary/gender%20expression (last visited July 10, 2024). Expressing gender identity inconsistent with "stereotypes"—assumptions "that men and women's appearance and behavior [are] determined by their sex" assigned at birth—is protected under the Equal Protection Clause, *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011), *see also VMI*, 518 U.S. at 533 ("overbroad generalizations about the different talents, capacities, or preferences of males and females"); *Hogan*, 458 U.S. at 725 ("archaic and stereotypic notions"). Yet Tennessee's Policy essentially forces transgender individuals to pick between this equal-protection right and the privacy interest in transgender status. Given that Tennessee discloses sex assigned at birth through birth certificates, transgender individuals must

---

[9]The majority also suggests that transgender individuals may use other documents to achieve the same benefits. *See* Maj. Op. 19. This argument fails for the same reason—it assumes (wrongly) that the State may withhold the benefits of birth certificates for some individuals simply because they may use other documents to achieve similar ends. Indeed, that argument assumes that the State may make it harder for some individuals to secure rights and benefits afforded by law or else face the threat of being outed. This cannot be the case. *Cf. Kirchberg*, 450 U.S. at 461 (concluding in sex-based discrimination case that "the 'absence of an insurmountable barrier' will not redeem an otherwise unconstitutionally discriminatory law" (quoting *Trimble v. Gordon*, 430 U.S. 762, 774 (1977))).

choose between: (1) not expressing their true gender identity, thereby effectively shielding from disclosure their transgender status yet sacrificing their right to express their identity inconsistent with stereotypes, or (2) expressing their identity, thereby exercising their equal-protection right, but surrendering their privacy right in their status. The Constitution does not contemplate such a Catch-22.

**V.**

Lastly, the majority seems to frame this action as an attempt to "short-circuit" Tennessee's and other States's experimentation within a novel, ongoing policy debate. Maj. Op. 23. But this case does not concern an innovative technology or medical procedure or some unprecedented development. Being transgender is not new, nor are attempts to induce gender conformity through law or otherwise. Individuals whom we today might call transgender, and gender-nonconforming individuals more generally, have existed across the globe for time immemorial. *See* Genny Beemyn, *US History*, *in Trans Bodies, Trans Selves* 501, 501 (Laura Erickson-Schroth ed., 2014). They have also existed in America from the beginning of our history—as have attempts to prevent them from and punish them for identifying and living in manners inconsistent with their sex assigned at birth. *See id.* at 501–04.

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.

*Obergefell*, 576 U.S. at 664.

Addressing the injustice of received strictures concerning gender conformity is what we must do in this case. Tennessee's Policy classifies people permanently as male or female based on external genitalia at birth—and it does so without the exceedingly persuasive justification that the Equal Protection Clause requires. The Policy also effectively results in the disclosure of transgender status, thereby creating a substantial risk of physical harm and exposing a private

Case 23-5669   Document 65-2   Filed 09/09/2024   Page 77

No. 23-5669                    *Gore, et al. v. Lee, et al.*                    Page 51

sexual matter in violation of the Due Process Clause.  For these reasons, the Policy does not pass constitutional muster, and I would reverse.